## 18-1051(L)

**Consolidated Cases: 18-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065, 18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105**

# United States Court of Appeals for the District of Columbia Circuit

MOZILLA CORPORATION, et al.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

## PROOF BRIEF FOR GOVERNMENT PETITIONERS

JAMES R. WILLIAMS
  *County Counsel*
  *County of Santa Clara*
Office of the County Counsel
70 West Hedding Street
San José, CA 95110
(408) 299-5906

BARBARA D. UNDERWOOD
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-6279

CALIFORNIA PUBLIC UTILITIES COMMISSION
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822

Dated: August 20, 2018

*(Complete counsel listing appears on signature pages.)*

# CERTIFICATE AS TO
# PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), petitioners the States of New York, California, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, the District of Columbia, the County of Santa Clara, Santa Clara County Central Fire Protection District, and the California Public Utilities Commission (Government Petitioners) certify as follows:

## A.    Parties and Amici

The Government Petitioners are the State of New York et al. (No. 18-1055), the County of Santa Clara and the Santa Clara County Central Fire Protection District (No. 18-1088), and the California Public Utilities Commission (No. 18-1089). In addition to the Government Petitioners, the following are petitioners in the consolidated petitions for review: Mozilla Corporation (No. 18-1051), Vimeo, Inc. (No. 18-1052), Public Knowledge (18-1053), Open Technology Institute at New America (No. 18-1054), National Hispanic Media Coalition (No. 18-1056), NTCH, Inc. (No. 18-1061), Benton Foundation (No. 18-1062), Free Press (18-1064),

Coalition for Internet Openness (No. 18-1065), Etsy, Inc. (No. 18-1066), Ad Hoc Telecom Users Committee (No. 18-1067), Center for Democracy and Technology (No. 18-1068), and INCOMPAS (No. 18-1105).

Respondents in these consolidated cases are the Federal Communications Commission and the United States of America.

More than twenty million companies, organizations, and individuals participated in the underlying rulemaking proceeding (WC Docket 17-108, FCC No. 17-166). The Commission did not include in its *Order* a listing of the parties that participated in the underlying proceeding. Below is a representative, but not comprehensive, list of companies and organizations that filed comments or reply comments during the rulemaking according to the Commission's Electronic Comment Filing System:

> 18MillionRising.org (Voices Coalition)
> AARP
> Access Now
> Ad Hoc Telecommunications Users Committee
> ADT Corporation
> ADTRAN, Inc.
> Advanced Communications Law & Policy Institute at New York Law School
> Akamai Technologies, Inc.
> Alamo Broadband
> Alarm Industry Communications Committee
> Alaska Communications
> ALEC
> Amazon

American Association of Community Colleges
American Association of Law Libraries et al.
American Association of State Colleges and Universities et al.
American Cable Association
American Civil Liberties Union
American Consumer Institute
American Library Association
American Sustainable Business Council
Americans for Tax Reform and Digital Liberty
Apple Inc.
AppNexus
Asian Americans Advancing Justice | AAJC
Association of Research Libraries
AT&T Services, Inc.
Benton Foundation
Black Women's Roundtable
California Public Utilities Commission
CALinnovates
Cause of Action
CCIA
Center for Democracy & Technology
Center for Individual Freedom
Center for Media Justice et al. (Voices Coalition)
CenturyLink
Charter Communications, Inc.
Cisco Systems, Inc.
Citizens Against Government Waste
City of Boston, Massachusetts
City of Portland, Oregon
City of San Francisco, California
Coalition for Internet Openness
Cogent Communications Group, Inc.
Color of Change (Voices Coalition)
Comcast Corporation
Common Cause
Communications Workers of America
Commonwealth of Massachusetts
Competitive Enterprise Institute

CompTIA
Community Technology Advisory Board
Consumers Union
County of Santa Clara, California
Cox Communications, Inc.
CREDO Mobile
CTIA – The Wireless Association
Daily Kos
Data Foundry
Digital Policy Institute
Directors Guild of America
District of Columbia
Electronic Frontier Foundation
Electronic Gaming Foundation
Engine
Entertainment Software Association
Electronic Privacy Information Center
Ericsson
Etsy, Inc.
European Digital Rights
Farsight Security
Fiber Broadband Association
FreedomWorks
Free Press
Free State Foundation
Friends of Community Media
Frontier Communications
FTC Staff
Future of Music Coalition
Golden Frog
Greenlining Institute
Hispanic Technology and Telecommunications Partnership
Home Telephone Company
INCOMPAS
Independent Film & Television Alliance
Information Technology Industry Council
Inmarsat
Institute for Local Self-Reliance

Interisle Consulting Group LLC
Internet Association
Internet Freedom Coalition
Internet Innovation Alliance (IIA)
ITIF
ITTA – The Voice of Midsize Communications Companies
Level 3 Communications, LLC
Judicial Watch
Massillon Cable Comments
Media Alliance (Voices Coalition)
MediaFreedom.org
Meetup, Inc.
Microsoft Corporation
M-Lab
Mobile Future
Mobilitie, LLC
Motion Picture Association of America
Mozilla
NAACP
National Association of Realtors
National Association of Regulatory Utility Commissioners
National Association of State Utility Consumer Advocates
National Cable & Telecommunications Association
National Exchange Carrier Association
National Grange
National Hispanic Media Coalition
National Newspaper Publishers Association
National Venture Capital Association
Netflix, Inc.
New America Foundation (Open Technology Institute)
New Media Rights
Nokia
Nominum
NTCA – The Rural Broadband Association
Oracle Corp
Presente.Org (Voices Coalition)
Public Knowledge
QUALCOMM Incorporated

R Street
Sandvine Incorporated
Software and Information Industry Alliance
Sprint Corporation
State of California
State of Connecticut
State of Hawaiʻi
State of Illinois
State of Iowa
State of Maine
State of Maryland
State of Mississippi
State of New York
State of Oregon
State of Rhode Island
State of Vermont
State of Washington
Techdirt
Tech Knowledge
Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI),
    et al.
Telecommunications Industry Association
T-Mobile USA, Inc.
TracFone Wireless
Twilio
Twitter
United Church of Christ (Voices Coalition)
United States Telecom Association
Verizon
Vimeo, Inc.
Voices for Internet Freedom Coalition
Volo
Wikimedia Foundation
Wireless Internet Service Providers Association
Writers Guild of America, West, Inc.
WTA – Advocates for Rural Broadband
Y Combinator

The following entities have intervened in support of Petitioners: City and County of San Francisco, National Association of Regulatory Utility Commissioners, Internet Association, Computer and Communications Industry Association, National Association of State Utility Consumer Advocates, Writers Guild of America, West, Inc., and Entertainment Software Association. The following entities have moved to intervene in support of Respondents: NCTA - The Internet & Television Association, CTIA - The Wireless Association, USTelecom – The Broadband Association, American Cable Association, Leonid Goldstein, and Wireless Internet Service Providers Association. The following entity has intervened in support of neither side: Digital Justice Foundation.

As of the time of this filing, there are no *amici curiae*.

## B.  Ruling Under Review

The ruling under review is the Commission's *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 (2018) (the "*Order*").

## C.  Related Cases

The *Order* has not previously been the subject of a petition for review by this Court or any other court.  All petitions for review of the *Order* have been consolidated in this Court.

The following cases previously before this Court involved review of earlier, related Commission decisions that raised issues substantially similar to those raised in this case: *United States Telecom Association v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *reh'g denied* 855 F.3d 381 (D.C. Cir. 2017), and *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014). The following petitions for certiorari seeking review of the *United States Telecom Association* decision are currently pending before the Supreme Court of the United States: *Daniel Berninger v. FCC*, S.Ct. No. 17-498; *AT&T Inc. v. FCC*, S.Ct. No. 17-499; *American Cable Association v. FCC*, S.Ct. No. 17-500; *CTIA-The Wireless Association v. FCC*, S.Ct. No. 17-501; *NCTA-The Internet & TV Association v. FCC*, S.Ct. No. 17-502; *TechFreedom v. FCC*, S.Ct. No. 17-503; *U.S. Telecom Association v. FCC*, S.Ct. No. 17-504.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

GLOSSARY OF TERMS AND ABBREVIATIONS ...................................x

PRELIMINARY STATEMENT.................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

ISSUES PRESENTED ..............................................................................3

STATUTES AND REGULATIONS ..........................................................3

STATEMENT OF THE CASE ..................................................................4

    A.    The Role of State and Local Governments in Regulating
           Communications and Protecting Public Safety........................4

    B.    Order on Review........................................................................5

    C.    The Government Petitioners .....................................................8

           1.    The State Petitioners.......................................................8

           2.    The County of Santa Clara and the Santa Clara
                County Central Fire Protection District ...........................9

           3.    California Public Utilities Commission .........................10

STANDARD OF REVIEW........................................................................11

SUMMARY OF ARGUMENT .................................................................11

STANDING ..............................................................................................14

ARGUMENT .............................................................................................15

i

POINT I

THE *ORDER* IS ARBITRARY AND CAPRICIOUS .......................................... 15

    A.   The Commission Disregarded the Serious Risk That Providers Will Engage in Abusive Practices That Undermine the Open Internet.................................................. 16

    B.   The Commission Violated Its Statutory Mandate to Consider Public Safety................................................................ 22

    C.   The *Order* Failed to Consider Significant and Long-Standing Reliance Interests. .................................................. 29

    D.   The Commission Failed to Properly Consider the Effect of Reclassification on Universal Service and Pole Attachment Rights. ................................................................ 32

POINT II

THE COMMISSION'S PREEMPTION ORDER IS INVALID ............................ 39

    A.   The Commission May Not Preempt Absent Statutory Authority. ................................................................................. 39

    B.   The Commission's Reference to Conflict Preemption Is Premature and Erroneous in Any Event. ............................... 48

        1.   Conflict preemption must be raised on a case-by-case basis, not suggested in an order opining in advance that all state laws are preempted. .................... 48

        2.   The *Order* fails to identify a valid basis for conflict preemption. ...................................................................... 50

CONCLUSION ................................................................................... 56

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Alascom, Inc. v. FCC,*
    727 F.2d 1212 (D.C. Cir. 1984) .................................................. 48, 49

*Alaska v. U.S. Dep't of Transp.,*
    868 F.2d 441 (D.C. Cir. 1989) ............................................................ 14

*American Library Ass'n v. FCC,*
    406 F.3d 689 (D.C. Cir. 2005) ............................................................ 41

*American Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) ............................................................ 32

*AT&T Corp. v. FCC,*
    86 F.3d 242 (D.C. Cir. 1996) ............................................................. 15

*Building & Constr. Trades Council of Metro Dist. v.*
    *Associated Builders & Contractors of Mass./R.I., Inc.,*
    507 U.S. 218 (1993) ............................................................................ 53

*California v. FCC,*
    39 F.3d 919 (9th Cir. 1994) ............................................................... 42

*California v. FCC,*
    905 F.2d 1217 (9th Cir. 1990) ........................................................... 41

*City of New York v. FCC,*
    486 U.S. 57 (1988) ....................................................................... 44, 45

*Comcast Corp. v. FCC,*
    600 F.3d 642 (D.C. Cir. 2010) ............................... 13, 41, 42, 43, 44, 48

*Computer & Communications Industry Association v. FCC,*
    693 F.2d 198 (D.C. Cir. 1982) ............................................................ 44

*Direct Commc'ns Cedar Valley, LLC v. FCC,*
    753 F.3d 1015 (10th Cir. 2014) .......................................................... 34

| Cases | Page(s) |
|---|---|

*EchoStar Satellite L.L.C. v. FCC,*
  704 F.3d 992 (D.C. Cir. 2013) ............................................... 47

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ........................................ 16, 29, 30

*Global Tel\*Link v. FCC,*
  866 F.3d 397 (D.C. Cir. 2017) ............................................ 51

*Graham v. R.J. Reynolds Tobacco Co.,*
  857 F.3d 1169 (11th Cir. 2017) ......................................... 54

*Hillsborough County, Fla. v. Automated Med. Labs., Inc.,*
  471 U.S. 707 (1985) ......................................................... 50

*Louisiana Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986) .................................................. 4, 47

*Medtronic v. Lohr,*
  518 U.S. 470 (1996) ......................................................... 50

*Metropolitan Life Ins. Co. v. Massachusetts,*
  471 U.S. 724 (1985) .......................................................... 4

*Minnesota Pub. Util. Comm'n v. FCC,*
  483 F.3d 570 (8th Cir. 2007) ........................................... 42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual
  Auto Ins. Co.,*
  463 U.S. 29 (1983) ........................................................... 15

*National Ass'n of Regulatory Utility Comm'rs v. FCC,*
  533 F.2d 601 (D.C. Cir. 1976) ........................................... 40

*National Ass'n of Regulatory Utility Comm'rs v. FCC,*
  880 F.2d 422 (D.C. Cir. 1989) ........................................... 46

*New York State Dep't. of Soc. Servs. v. Dublino,*
  413 U.S. 405 (1973) ......................................................... 51

**Cases** **Page(s)**

*Nuvio Corp. v. FCC,*
  473 F.3d 302 (D.C. Cir. 2006) ............................................................ 22

*People v. Charter Commc'ns, Inc.,*
  162 A.D.3d 553 (N.Y. App. Div. 2018) ................................................ 22

*Public Citizen v. Federal Motor Carrier Safety Admin.,*
  374 F.3d 1209 (D.C. Cir. 2004) .................................................... 15, 22

*Public Serv. Comm'n of Maryland v. FCC,*
  909 F.2d 1510 (D.C. Cir. 1990) .................................................... 40, 45

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum
Corp.,*
  485 U.S. 495 (1988) ............................................................................. 55

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ............................................................................... 48

*Telocator Network of Am. v. FCC,*
  691 F.2d 525 (D.C. Cir. 1982) ............................................................ 16

*Texas Office of Pub. Util. Counsel v. FCC,*
  183 F.3d 393 (5th Cir. 1999) .............................................................. 46

*United States Telecom Ass'n v. FCC,*
  825 F.3d 674 (D.C. Cir. 2016) ........................................................ 2, 30

*United States Telecom Ass'n v. FCC,*
  855 F.3d 381 (D.C. Cir. 2017) ............................................................ 20

*Verizon v. FCC,*
  740 F.3d 623 (D.C. Cir. 2014) ............................................................ 53

*Wyeth v. Levine,*
  555 U.S. 555 (2009) ..................................................................... 11, 49

**Constitutions**

Cal. Const. art. XII .................................................................................. 10

| Statutes | Page(s) |
|---|---|

## *Federal*

Pub. L. No. 104-104, 110 Stat. 56 (1996) ................................. 52

5 U.S.C. § 706 ............................................................... 11

28 U.S.C. § 2342 ......................................................... 3, 49

42 U.S.C. § 5195c .......................................................... 24

47 U.S.C.
    § 151 ...................................................................... 22
    § 152 note ............................................................... 52
    § 153 ...................................................................... 43
    § 154 ...................................................................... 40
    § 160 ...................................................................... 46
    § 214 ...................................................................... 33
    § 224 ................................................................. 36, 37
    § 230 ...................................................................... 43
    § 253 ............................................... 33, 35, 51, 52, 54
    § 254 ......................................................... 33, 34, 35
    § 332 ................................................................. 51, 54
    § 402 ................................................................... 3, 49
    § 414 ...................................................................... 51
    § 1302 .................................................................... 56
    § 1304 .................................................................... 56

## *State*

Cal. Pub. Util. Code § 871 ............................................ 33

Conn. Gen. Stat.
    § 16-247e ............................................................... 33
    § 21a-217 ............................................................... 52

6 Del. Code ch. 24A ....................................................... 52

220 Ill. Comp. Stat. § 5/13-301 ................................... 33

**Statutes** **Page(s)**

Mass Gen. L. c. 25 § 21.................................................................25

Md. Code Ann.
    Com. Law § 14-3301 et seq. ...........................................52
    Pub. Util. § 8-201 ............................................................33

Minn. Stat.
    § 237.70 (2017) ...............................................................33
    § 325F.693 (2017)...........................................................52

N.J. Stat. Ann. § 49:3-53...........................................................52

Ch. 88, 2018 Or. Laws (Apr. 9, 2018).........................................9

Or. Rev. Stat. § 646A.800 ...........................................................53

No. 169, 2018 Vt. Acts (May 22, 2018)........................................9

Wash. Rev. Code ch. 19.385 .......................................................9

**Administrative Materials**

***Federal***

25 FCC Rcd. 5541 (May 19, 2010).............................................37

*In re City of Wilson,*
    30 FCC Rcd. 2408 (Mar. 12, 2015) ...................................52

*In re Lifeline & Link Up Reform and Modernization,*
    31 FCC Rcd. 3962 (2016) .................................................33

*In re Protecting and Promoting the Open Internet,*
    30 FCC Rcd. 5601 (2015) .................................................16

***State***

*Regulations*

940 Mass. Code Regs. § 19.01 et seq.........................................52

**Administrative Materials** Page(s)

37 Pa. Code § 301.1 et seq. ..................................................... 53

*Decisions*

Decision No. 98-10-058, 82 CPUC2d 510, 1998 Cal. PUC LEXIS 879 ...... 37

*In re Rockland Electric Co.*,
    Case No. ER16060524 (N.J. Bd. of Pub. Util., Aug. 23,
    2017) ......................................................................................... 25

*Executive Orders*

Exec. Order No. 2-18 (Feb. 17, 2018), 326 Vt. Govt. Reg. 2
    (Mar. 2018) .................................................................................. 9

Exec. Order No. 9 (Feb. 5, 2018), 50 N.J. Reg. 931 (Mar. 5,
    2018) ............................................................................................ 9

Exec. Order No. 175 (Jan. 24, 2018), 9 N.Y.C.R.R. § 8.175 ..................... 9

Haw. Exec. Order No. 18-02 (Feb. 5, 2018),
    https://governor.hawaii.gov/wp-
    content/uploads/2018/02/Executive-Order-No.-18-02-Net-
    Neutrality-Signed.pdf ................................................................. 9

Mont. Exec. Order No. 3-2018 (Jan. 22, 2018),
    http://governor.mt.gov/Portals/16/docs/2018EOs/EO-03-
    2018_Net%20Freedom.pdf?ver=2018-01-22-122048-023 .................... 9

R.I. Exec. Order No. 18-02 (Apr. 24, 2018),
    http://www.governor.ri.gov/documents/orders/ExecOrder1
    8-02.pdf ....................................................................................... 9

**Miscellaneous Authorities**

National Conference of State Legislatures, *Net Neutrality
    Legislation in States* (as of July 18, 2018),
    http://www.ncsl.org/research/telecommunications-and-
    information-technology/net-neutrality-legislation-in-
    states.aspx .................................................................................. 9

**Miscellaneous Authorities** **Page(s)**

Philip Weiser, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U. L. Rev. 1692 (2001) .................................................................. 51

S. Conf. Rep. No. 104-458 (1996) ............................................................ 47

Wash. S. Bill Rep. on SHB 2282 (Feb. 27, 2018), at http://lawfilesext.leg.wa.gov/Biennium/2017-18/Htm/Bill%20Reports/Senate/2282-S%20SBR%20APS%2018.htm............................................................ 53

# GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| *2015 Order* | *In re Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015), *aff'd sub nom. United States Telecom Association v. FCC*, 825 F.3d 674 |
| BIAS | Broadband Internet Access Service |
| Cable Act of 1984 | Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2279 |
| *California I* | *California v. FCC*, 905 F.2d 1217 (9th Cir. 1990) |
| *California III* | *California v. FCC*, 39 F.3d 919 (9th Cir. 1994) |
| CCIA | Computer and Communications Industry Association |
| Commission or FCC | Federal Communications Commission |
| CPUC | California Public Utilities Commission |
| Communications Act | Communications Act of 1934, as amended, 47 U.S.C. § 151 et seq. |
| County | County of Santa Clara |
| County Fire | Santa Clara County Central Fire Protection District |
| Edge provider | Entity providing content, applications, and services over the Internet to end users |
| Government Petitioners | States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, the District of Columbia, the County of Santa Clara, Santa Clara County Central Fire Protection District, and the California Public Utilities Commission |
| Kabai Decl. | Declaration of Imre Kabai [Addendum 13-15] |

| | |
|---|---|
| Lifeline | Federal and state programs that provide a monthly discount for low-income subscribers of certain communication services |
| *Maryland PSC* | *Public Serv. Comm'n of Maryland v. FCC*, 909 F.2d 1510 (D.C. Cir. 1990) |
| McSweeny | Commissioner Terrell McSweeny, Federal Trade Commission |
| *Minnesota PUC* | *Minnesota Pub. Util. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007) |
| *NARUC II* | *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) |
| Non-Government Petitioners | Mozilla Corporation, Vimeo, Inc., Public Knowledge, Open Technology Institute, National Hispanic Media Coalition, NTCH, Inc., Benton Foundation, Free Press, Coalition for Internet Openness, Etsy, Inc., Ad Hoc Telecom Users Committee, Center for Democracy and Technology, and INCOMPAS |
| NGP Br. | Brief for Non-Government Petitioners |
| NYAG | New York Attorney General's Office |
| Open Internet | The principle that broadband providers must treat all Internet traffic the same regardless of source |
| OTI | New America's Open Technology Institute |
| *Order* | Restoring Internet Freedom, *Declaratory Ruling, Report and Order, and Order*, 33 FCC Rcd. 311 (2018) [JA __-__] |
| Sandoval | Professor Catherine Sandoval, Santa Clara University School of Law |
| State Petitioners | States of New York, California, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia |
| Transparency Rule | Disclosures mandated by the *Order* ¶¶ 215-231 |

# PRELIMINARY STATEMENT

The Government Petitioners are the States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, the District of Columbia (the State Petitioners); the County of Santa Clara (the County), the Santa Clara County Central Fire Protection District (County Fire), and the California Public Utilities Commission (CPUC).[1] The Government Petitioners share a strong interest in preserving the open Internet as a vital resource for the health and welfare of our residents.

For more than fifteen years, the Federal Communications Commission has agreed that an open Internet free from blocking, throttling, or other interference by service providers is critical to ensure that all Americans have access to the advanced telecommunications

---

[1] Intervenor City and County of San Francisco also joins this brief.

services that have become essential for daily life.[2] The recent *Order* represents a dramatic and unjustified departure from this long-standing commitment. The *Order* is invalid and must be vacated for the many reasons raised by the Non-Government Petitioners. In addition, as this brief explains, the *Order* is arbitrary and capricious because it failed to reconcile the Commission's abdication of regulatory authority with the inevitable harms that the *Order* will cause to consumers, public safety, and existing regulatory schemes. Indeed, the *Order* entirely ignored many of these issues, including public safety, in violation of the agency's statutory mandate.

The *Order* compounded its devastating impact on millions of Americans by purporting to preempt state and local laws that would protect consumers and small businesses from abuses by service providers. The Commission identified no valid authority for such preemption. The *Order*'s attempt to preempt state and local laws thus must be invalidated.

---

[2] The "open Internet" refers to "the principle that broadband providers must treat all internet traffic the same regardless of source." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 689 (D.C. Cir. 2016).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). The *Order* was released on January 4, 2018, and a summary of the *Order* was published on February 22, 2018. *See* 83 Fed. Reg. 7,852 (Feb. 22, 2018). The petitions were timely filed.

## ISSUES PRESENTED

1. Whether the *Order* is arbitrary and capricious.

2. Whether the Commission's purported preemption of state and local regulation of broadband service is invalid.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the Addendum.

**A. The Role of State and Local Governments in Regulating Communications and Protecting Public Safety**

State and local governments "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of their residents." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). The Federal Communications Act of 1934 (Communications Act), as amended by the Telecommunications Act of 1996 (1996 Act), recognizes that communications are central to this authority and thus establishes "a system of dual state and federal regulation." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 359 (1986).

---

[3] This Statement of the Case supplements the Statement contained in the Brief for the Non-Government Petitioners (NGP Br.), which the Government Petitioners hereby join. As stated *infra* at 11, the Government Petitioners also join the legal arguments made by the Non-Government Petitioners.

## B.    Order on Review

In the *Order*, the Commission reversed its prior regulatory treatment of broadband Internet access service (BIAS) in several pertinent respects.[4] *See Restoring Internet Freedom, Declaratory Ruling, Report and Order, and Order,* WC Docket No. 17-108, FCC 17-166, 33 FCC Rcd. 311 (2018) (*Order*) [JA __-__]. The *Order* (1) reclassified BIAS from a telecommunications service (regulated under Title II's common-carrier provisions) to an information service (governed by Title I); (2) eliminated "bright-line" rules prohibiting BIAS providers from blocking, throttling, and imposing paid prioritization; (3) eliminated the "general conduct" rule, which had prohibited "unreasonable interference or disadvantage" to end users' access to, or edge providers' offering of, online services;[5] (4) disavowed regulation of broadband privacy and data

---

[4] For a complete background of the Commission's regulatory approach to broadband, including its long history of promoting the open Internet through policy, enforcement, and regulations, *see* NGP Br. at Statement(A).

[5] An edge provider is an entity that provides online content to end users, such as Netflix, Google, Etsy, or Kickstarter.

security practices; and (5) eliminated numerous transparency requirements, while preserving a narrow and discrete set of mandatory federal disclosures (the Transparency Rule). *See Order* ¶¶ 21-64, 86-161, 181-184, 209-238, 239-296 [JA __-__, __-__, __-__, __-__, __-__].

The Commission justified the elimination of its existing bright-line and general conduct rules by concluding that it had no statutory authority to impose those rules. The Commission reasoned that its reclassification decision eliminated Title II authority to regulate broadband; that § 706 of the 1996 Act and § 230 of the Communications Act were "hortatory" or "policy" statements that did not grant the Commission any "regulatory authority"; and that various provisions in Titles II, III, and VI of the Communications Act also did not confer regulatory authority. *Id.* ¶¶ 268-292 [JA __-__].

In evaluating the impact of these changes, the Commission did not perform any analysis of the public safety risks that several parties (including Government Petitioners) had identified in the record, despite its statutory mandate to consider such safety concerns. The Commission also summarily dismissed record evidence of serious reliance interests

on the Commission's long-standing protection of an open Internet, mistakenly asserting that no such interests exist. *Id.* ¶ 159 [JA __].

Despite disavowing any statutory authority to affirmatively impose the bright-line and general conduct rules, the Commission declared that it was nonetheless preempting "any state or local measures that would effectively impose rules or requirements that [the Commission] ha[s] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service" addressed in the *Order*, including disclosure requirements.[6] *Id.* ¶¶ 194-196 [JA __-__]. The *Order* predominantly relied on "the impossibility exception to state jurisdiction" as authorizing preemption. *Id.* ¶ 198 [JA __]. The *Order* further relied on the Commission's "independent authority to displace state and local regulation in accordance with the longstanding federal policy of nonregulation for information services." *Id.* ¶ 202 [JA __]. The Commission purported to derive such authority from (1) § 230's policy

---

[6] The Commission provided a nonexclusive list of preempted laws and regulations, including "'economic regulation' and 'public utility-type regulation.'" *Id.* ¶ 195 n.730 [JA __].

statement regarding a "vibrant and competitive free market" for Internet services, notwithstanding the *Order*'s earlier disavowal of the statute as a source of regulatory power; (2) § 153(51)'s definition of a "telecommunications carrier"; and (3) the 1996 Act's forbearance provision, which allows the Commission to forbear from imposing certain Title II regulations on common carriers. *Id.* ¶¶ 202-204 [JA__-__] (citing 47 U.S.C. §§ 230(b)(2), 153(51), 160).

## C.    The Government Petitioners

### 1.    The State Petitioners

The State Petitioners collectively represent over 165 million people—approximately fifty percent of the United States population—who rely on broadband Internet for personal, business, and other services on a daily basis. The States promulgate and enforce numerous laws and regulations applicable to BIAS providers, including laws protecting consumers from deceptive and unfair business practices.

Following the *Order*, multiple State Petitioners took legislative or executive action to protect consumers and edge providers from harmful

practices by BIAS providers.[7] Many other States have introduced legislation to address such practices.[8]

### 2. The County of Santa Clara and the Santa Clara County Central Fire Protection District

The County provides its 1.9 million residents with essential services such as law enforcement, health care, and social services. The County also oversees most regional public health and safety functions, including emergency planning and services, disease control and prevention, and criminal justice administration. County Fire provides fire services both within and outside Santa Clara County.

---

[7] *See* Haw. Exec. Order No. 18-02 (Feb. 5, 2018); Exec. Order No. 9 (Feb. 5, 2018), 50 N.J. Reg. 931(a) (Mar. 5, 2018); Exec. Order No. 175 (Jan. 24, 2018), 9 N.Y.C.R.R. § 8.175; Ch. 88, 2018 Or. Laws (Apr. 9, 2018); R.I. Exec. Order No. 18-02 (Apr. 24, 2018); No.169, 2018 Vt. Acts (May 22, 2018); Exec. Order No. 2-18 (Feb. 17, 2018), 326 Vt. Govt. Reg. 2 (Mar. 2018); Wash. Rev. Code ch. 19.385. *See also* Mont. Exec. Order No. 3-2018 (Jan. 22, 2018). The State of Montana is not a party to this action.

[8] *See* National Conference of State Legislatures, *Net Neutrality Legislation in States* (as of July 18, 2018), http://www.ncsl.org/research/telecommunications-and-information-technology/net-neutrality-legislation-in-states.aspx.

Over the past several years, the County has made significant investments to modernize its systems. Many of the services developed through these investments are web-based and rely on high-bandwidth, latency-sensitive exchanges of information with the public. County Fire likewise relies on Internet-based systems to provide crucial public safety services.

### 3. California Public Utilities Commission

The CPUC is a constitutionally created agency empowered to regulate industries deemed critical to the public welfare, including gas, electricity, telecommunications, and water. Cal. Const., art. XII. The agency is charged with ensuring that public utilities furnish safe and reliable service to promote the safety, health, and comfort of the public, at just and reasonable rates. The CPUC oversees and regulates numerous programs that are affected by the *Order*, including California's energy grid, public utility infrastructure, and universal service programs.

## STANDARD OF REVIEW

The *Order* should be set aside if this Court determines that the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

An "agency's conclusion that state law is preempted" is entitled to deference only if Congress has expressly "authorized" the agency "to preempt state law directly." *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). Absent such express authorization, the weight accorded an "agency's explanation of a state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." *Id.* at 577.

## SUMMARY OF ARGUMENT

The Government Petitioners join the legal arguments made by the Non-Government Petitioners. This brief provides several additional reasons that the *Order* is invalid and must be vacated.

I. The Commission acted arbitrarily and capriciously in crediting industry promises to refrain from harmful practices, notwithstanding substantial record evidence showing that BIAS providers have abused

and will abuse their gatekeeper roles in ways that harm consumers and threaten public safety. The Commission's failure to address the impact of the *Order* on public safety is particularly egregious given the agency's statutory mandate to consider this issue. The *Order* also failed to reconcile its abrupt abandonment of the Commission's long-standing protection of the open Internet with the substantial reliance interests of parties (including the Government Petitioners) that have invested in Internet-based services that depend on nondiscriminatory access by consumers to be effective. Finally, the Commission wrongly declined to address the effect of reclassification on universal service programs and other state regulatory structures.

II. Even if the *Order* were otherwise lawful, the Commission exceeded its authority by purporting to preempt state and local governments from taking action to protect consumers and edge providers from abuses by BIAS providers. Having disavowed Title II authority over broadband, the Commission's preemption order can be rooted only in Title I ancillary authority, which in turn must be based on some separate statutorily mandated responsibility. The *Order* identified no such mandate, and instead relied on a purported federal policy of deregulation

unmoored from any specific statutory command. But as this Court held in *Comcast Corp. v. FCC*, policy alone cannot provide the basis for the Commission's exercise of ancillary authority, and hence cannot support the *Order*'s attempt to preempt here. 600 F.3d 642, 658 (D.C. Cir. 2010).

Nor can the Commission rely on conflict preemption to support the *Order*. The Commission did not specifically identify conflict preemption as a basis for its *Order*, and any assertion of conflict preemption as a facial matter—divorced from consideration of a specific law or regulation—would be premature and invalid. In any event, there is no conflict between state regulation of broadband service and the Communications Act, which expressly contemplates and relies on active state supervision in this area.

## STANDING

The *Order* injures the Government Petitioners in several ways.[9] First, the *Order* authorizes BIAS providers to interfere with the Government Petitioners' ability to provide crucial Internet-based services to their residents on a nondiscriminatory basis.[10] Second, by abdicating federal regulatory authority, the *Order* imposes substantial costs on the Government Petitioners by shifting the burden of policing BIAS providers to state and local law enforcement. Third, the *Order* purports to preempt state laws, thus causing injury to the States' "sovereign power to enforce state law." *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989). Fourth, the *Order* interferes with state public utility regulators' ability to comply with federal statutory mandates to promote universal service and protect public safety. The Government Petitioners participated in the proceedings below.[11]

---

[9] For the legal standard for standing, *see* NGP Br. at Standing.

[10] In an excess of caution, the County offers two supporting declarations in addition to the record evidence demonstrating this injury. See Addendum at 1-15.

[11] While Minnesota, New Jersey, and New Mexico did not submit comments or join the December 2017 letter submitted by nineteen

# ARGUMENT

## POINT I

### THE *ORDER* IS ARBITRARY AND CAPRICIOUS

An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "A statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency." *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

To survive review under the arbitrary-and-capricious standard, an agency's decision must be based on "substantial evidence," and "take into account whatever in the record fairly detracts from its weight." *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996). While an agency may depart from a prior policy, "'a reasoned explanation is needed for

---

Attorneys General (JA __-__), these States suffer the same injuries as the other State Petitioners.

15

disregarding facts and circumstances that underlay or were engendered by the prior policy,'" including reliance interests. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

The Government Petitioners join the Non-Government Petitioners' arguments with respect to the arbitrary and capricious nature of the *Order*. See *supra* at 11. The *Order* is also arbitrary and capricious for the following reasons.

## A.   The Commission Disregarded the Serious Risk That Providers Will Engage in Abusive Practices That Undermine the Open Internet.

"One of the fundamental premises of a regulatory scheme such as that established by the Communications Act is that the free market cannot always be trusted to" advance the public good. *Telocator Network of Am. v. FCC*, 691 F.2d 525, 549 (D.C. Cir. 1982). Just a few years ago, the Commission reiterated its long-standing recognition of the need to protect consumers through affirmative rules ensuring access to an open Internet. *See, e.g.*, *In re Protecting and Promoting the Open Internet* (*2015 Order*), 30 FCC Rcd. 5601 (2015). Numerous commenters, including the Government Petitioners, urged the Commission to

preserve these prophylactic rules to prevent abusive practices by BIAS providers that will harm consumers and undermine public safety. *See, e.g.*, NYAG Comments at 13-14 [JA __-__]; Attorneys General Comments at 18-22 [JA __-__]; Public Knowledge Comments at 101-27 [JA __-__].

The *Order* unreasonably disregarded these concerns and disavowed the Commission's prior analysis of the likelihood that BIAS providers will engage in abusive practices. First, the Commission concluded that the record evidence of harm was "sparse" and "speculative." *Order* ¶¶ 109-116 [JA __-__]. Next, the Commission determined that its prior rules were unnecessary because BIAS providers "have strong incentives to preserve Internet openness" and have voluntarily "committed to refrain from blocking or throttling." *Id.* ¶¶ 117-129 [JA __-__]. Finally, the Commission decided that "the transparency rule . . . coupled with existing consumer protection and antitrust laws" would minimize the risk of future harm. *Id.* ¶ 116, 140-154 [JA __, __-__].

The Commission's analysis is deeply flawed. *See* Br. for Non-Government Petitioners (NGP Br.) at V(A)-(B). The Commission's assertion (*Order* ¶¶ 109-110, 117 [JA __, __-__]) that BIAS providers will

voluntarily refrain from blocking, throttling, and similar practices incorrectly assumes that providers historically displayed such self-restraint. But it was the Commission's long-standing enforcement of open Internet policies that *compelled* BIAS providers to refrain from harmful practices that injure consumers and undermine public safety. The relatively minimal evidence of such harms in the United States is the result of the protective rules that the Commission has abandoned, rather than evidence that those rules are unnecessary.

The Commission also unreasonably disregarded (*Order* ¶¶ 165, 168 [JA __, __-__]) evidence showing that BIAS providers intentionally engaged in harmful conduct when protective regulations were not in place. *See, e.g.*, NYAG Comments at 3-10 [JA __-__]; OTI Reply Comments at 47-50 [JA __-__]; INCOMPAS Comments at 60-61 [JA __-__] (describing interconnection disputes affecting millions of consumers). The Commission likewise improperly dismissed as irrelevant (*Order* ¶ 115 & n.426 [JA __]) record evidence of harms in foreign countries—where there were no open Internet protections—including specific examples of blocking and throttling by Canadian and European BIAS providers. *See* Engine Comments at 20-21 [JA __-__].

The Commission provided no reason that the same incentives that led providers to engage in such practices in the Canadian and European markets would not apply to the United States market if the Commission were to abandon its regulatory responsibilities.

Equally flawed is the Commission's misguided assumption (*Order* ¶¶ 116, 141-142 [JA __, __-__]) that providers' voluntary commitments coupled with existing consumer protection laws provide sufficient protection.[12] The Commission offered no meaningful defense of its decision to uncritically accept industry promises that are untethered to any enforcement mechanism. Nothing in the *Order* would stop a BIAS provider from abandoning its voluntary commitments, revising its Transparency Rule disclosures, and beginning to block, throttle, or engage in paid prioritization, subject only to the Transparency Rule's limited disclosure requirements—leading to the very harms to consumer interests and public safety that the Commission's long-standing commitment to protecting the open Internet was intended to prevent.

---

[12] The *Order* also relied on antitrust laws as a potential remedy for future consumer harm. *See Order* ¶¶ 143-154 [JA __-__]. Antitrust law is insufficient to address the harms at issue. *See* NGP Br. at V(A)(2).

The *Order* also failed to identify how consumers or state law enforcement could police BIAS provider's compliance with their voluntary commitments. The Commission merely stated that "the transparency rule allows us to reject the argument that antitrust and consumer protection enforcers cannot detect problematic conduct." *Order* ¶ 142 & n.515 [JA __]. But nothing in the Transparency Rule's generalized disclosures allows a consumer or a state law enforcement agency to evaluate the causes underlying real-time performance and service quality, let alone to attribute any observed service degradation to an undisclosed decision by the provider, without additional investigation. *See* CCIA Reply Comments at 19-21 [JA __-__]; McSweeny Comments at 6 [JA __]; OTI Reply Comments at 28 [JA __]. *See also United States Telecom Ass'n v. FCC*, 855 F.3d 381, 389 (D.C. Cir. 2017) (Srinivasan, J.) (concurring in denial of rehearing en banc). Without such information, it will be difficult for consumers or the States to meaningfully police whether BIAS providers have reneged on their promises.

Even if such information were available, consumer protection laws would provide only an imperfect, ex post remedy. As the Commission

explained in the *2015 Order*, prophylactic rules are especially necessary for BIAS because consumers have limited provider options, face high switching costs, and are at a substantial informational disadvantage. *2015 Order* ¶¶ 80-82, 97-99. Allowing only after-the-fact remedies removes a critical consumer protection and imposes substantial investigative and litigation costs on consumers and state law enforcement alike. Moreover, consumer protection laws may not be able to remedy the harms caused by interfering with individuals' access to public safety systems.

Finally, the Commission failed to address the conflict between its embrace of state laws (as a justification for withdrawing federal regulation) and its subsequent declaration that such laws are purportedly preempted. See *infra* Point II. While the Commission touted "state laws proscribing deceptive trade practices" as a way to minimize consumer harm (*Order* ¶ 142 & n.517 [JA __-__]), the agency simultaneously attempted to preempt state regulation of "any aspect of broadband service" addressed in the *Order* (*id.* ¶ 195 [JA __]). Unsurprisingly, BIAS providers have already cited to this preemption language to shield themselves from traditional state enforcement and

regulatory actions. *See, e.g., People v. Charter Commc'ns, Inc.*, 162 A.D.3d 553 (N.Y. App. Div. 2018); Mot. for Summary Judgment, *MetroPCS Cal., LLC v. Picker*, No. 17-cv-5959, Dkt. No. 63 (N.D. Cal. Apr. 6, 2018).

## B. The Commission Violated Its Statutory Mandate to Consider Public Safety.

Congress created the Commission to "promot[e] safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151. "The Commission is required to consider public safety by . . . its enabling act." *Nuvio Corp. v. FCC*, 473 F.3d 302, 307-08 (D.C. Cir. 2006). Notwithstanding this express mandate to consider public safety and record evidence showing substantial public safety concerns associated with abusive BIAS provider practices that violate open Internet principles but are permitted by the *Order*, the Commission did not consider public safety at all. "[T]he complete absen[c]e of any discussion of a statutorily mandated factor" renders the *Order* arbitrary and capricious. *Public Citizen*, 374 F.3d at 1216.

As with many private-sector services, large portions of critical infrastructure used by governments and utilities have moved to the

Internet. This modernization enables more robust, responsive, and efficient service delivery. Consumers' access to the open Internet is essential to the effective provision of these online services. There is no evidence that it is possible to isolate and preferentially prioritize communications important to public health and safety, given the diversity of platforms and endpoints. Santa Clara Comments at 3-4 [JA __-__]. *See also* Sandoval Reply Comments at 31-32 [JA __-__].

In addition, BIAS providers have shown every indication that they will prioritize their economic interests, even in situations that implicate public safety. See *supra* at 17-19. For example, a BIAS provider recently throttled the connection of a County Fire emergency response vehicle involved in the response to the largest wildfire in California history and did not cease throttling even when informed that this practice threatened public safety.[13] Declaration of Anthony Bowden ¶¶ 9-11

_____

[13] Government Petitioners do not contend that this throttling would have violated the *2015 Order*. However, BIAS providers have not prioritized public safety over economic interests and should not be expected to; nor does the Order require them to.

[Addendum 3-4]. In light of these points, the *Order*'s total silence on the issue of public safety is arbitrary and capricious.

***The energy grid.*** As part of the effort to modernize the nation's electrical grid, electric utilities in California and other States have invested ratepayer funds in integrated systems of smart meters, communications networks, and data management systems that enable two-way communication between utilities and customers. Sandoval Reply Comments at 51 [JA __]. Instant communication between customers, suppliers, energy generators, contractors, regulators, and safety personnel is essential to maintaining a safe and reliable grid, and must thus remain free from blocking or delay due to throttling or deprioritization.[14]

California has relied on demand response services offered by utilities and third parties to directly balance load, manage congestion, and satisfy state and federal reliability standards. Sandoval Supp. Reply Comments, Ex. C at 34-35 [JA __-__]. The grid operator also dispatches demand response to achieve immediate load reduction when high temperatures, wildfire, or other emergencies make conservation urgent.

---

[14] 42 U.S.C. § 5195c; Sandoval Reply Comments at 47 [JA __].

Since demand response relies on instantaneous communication with the customer, the absence of open Internet rules jeopardizes the ability to reduce load in times of extreme energy grid stress. Consequently, the *Order* threatens the reliability of the electric grid, and the safety and welfare of California's residents.[15]

***Public health and safety systems.*** Similarly, state and local governments have modernized their public health and safety systems by moving such systems online. These systems depend on the public's access to BIAS on nondiscriminatory terms. *See e.g.*, Santa Clara Comments at 2-14 [JA __-__]; Sandoval Reply Comments at 25-27, 30-32 [JA __-__, __-__]; Ohio Counties Comments at 3-4, 8 [JA __-__, __]; West Virginia Counties Comments at 3-4 [JA __-__].

The County of Santa Clara's emergency and public health services are particularly likely to be affected by the repeal of the open Internet rules. *See* Santa Clara Comments at 2-14 [JA __-__]. The County has

---

[15] Other States have adopted similar programs and would be equally affected. *See, e.g.*, Mass. Gen. L. c. 25, § 21(b) (mandating energy efficiency plans that include demand response programs); *In re Rockland Electric Co.*, Case No. ER16060524 (N.J. Bd. of Pub. Util., Aug. 23, 2017).

established a web-based emergency operations center to facilitate coordination internally with other agencies and with first responders in case of emergency. *Id.* at 6-7 [JA __-__]. This tool relies on instant communication among emergency responders without regard to the users' BIAS provider. *Id.* Particularly in such emergencies, where networks are already stressed, delays, deprioritization, or blocking could render an emergency responder or victim using her own device unable to communicate, resulting in the loss of important situational information.

Instant communication is also essential to the proper functioning of the County's public health systems. For example, the County uses web-based public alert systems to distribute time-sensitive safety information to the public, including evacuation orders, shelter-in-place orders, and disease outbreak information. *Id.* at 8-9 [JA __-__]. This online information is widely used and of critical importance to the public—during the 2009 H1N1 emergency, for example, a County system was so heavily used that it became overloaded. Significant delays from blocking, throttling, or deprioritization could impede effective notification and jeopardize safety in public-health emergencies. *Id.* During an emergency, meaningful (that is, timely) access to public-

health information should not be limited to those who have paid for priority or access.

The County's hospital also relies upon, and has plans to expand, web-based systems that are latency-sensitive and bandwidth-intensive. The County is in the planning stages of an expansion of its telemedicine capabilities, which will include a high-definition video solution that will allow clinicians to treat patients using a broadband connection. Using the system, doctors will be able to perform triage and improve outcomes in time-sensitive situations (such as strokes or vehicular accidents) where immediate diagnosis can mean the difference between life and death. The system will also allow providers to avoid high-risk situations such as in-person treatment of jail inmates. The hospital also uses systems like Citrix, which allows doctors to access important clinical applications and its records system, which transfers more than two million patient records annually among thousands of clinics, hospitals, and emergency departments. *Id.* at 10-11 [JA __-__]. Access to an open Internet is essential for these tools to be reliable and beneficial.

Because of the unique functions of entities that provide public health and safety services, the providers that serve them are often small,

niche businesses. Declaration of Imre Kabai (Kabai Decl.) ¶¶ 8-9 [Addendum 14-15]; Santa Clara Comments at 3-4 [JA __-__]. Open Internet rules promoted the trend toward more effective public health and safety systems by allowing these niche providers to develop systems to serve the public sector. Santa Clara Comments at 3, 6 [JA __, __]. Because governments are obligated to be cost conscious, neither governments nor the businesses that serve them are likely to pay to prioritize their traffic.[16] *Id.* Accordingly, the *Order* could stifle the growth of niche providers and limit the effectiveness of government entities that rely on their services. The Commission's unexplained failure to address this concern is an additional reason the *Order* is arbitrary and capricious.

---

[16] The County has also heavily invested in Internet-based solutions to promote civic engagement, including, for example, live broadcast of public meetings and web publication of its law. The *Order* likewise threatens to make such innovative systems for connecting citizens to their governments available only to those who can pay, or to those whose governments pay for access. Santa Clara Comments at 4-6 [JA __-__].

**C.    The *Order* Failed to Consider Significant and Long-Standing Reliance Interests.**

"In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino*, 136 S. Ct. at 2126 (quotation marks omitted). Commenters, including the Government Petitioners, submitted substantial evidence of reliance on open Internet principles, including millions of dollars of investment. Sandoval Reply Comments at 51-52 [JA __-__]; Santa Clara Comments at 3, 14 n.17 [JA __, __]; Kabai Decl. ¶¶ 5-8 [Addendum 14]. The *Order's* analysis of this evidence consists of a three-sentence paragraph that does not come close to satisfying the Commission's obligation. *See Order* ¶ 159 [JA __].

The Commission brushed aside evidence of reliance interests by erroneously asserting that it need not analyze "[a]ssertions in the record regarding absolute levels of edge investment" because commenters "do not meaningfully attempt to attribute particular portions of that investment to any reliance on the *Title II Order*." *Id*. Investments, however, are made in reliance on many factors, and courts have never required a precise allocation of portions of an investment to preexisting

conditions.[17] *See, e.g.*, *Encino*, 136 S. Ct. 2126 (finding serious reliance interest on "background understanding" of a policy without demanding allocation of the value of that reliance).

The Commission also incorrectly assumed that commenters must show reliance specifically on the *2015 Order*. But the open Internet did not begin in 2015. Rather, the Commission has enforced these principles since 2005, engendering reasonable reliance that whole time. *See U.S. Telecom*, 825 F.3d at 693; NGP Br. at Statement(A). The *Order* vitiated these principles, doing far more than revert to the status quo in 2014. Many commenters, including the Government Petitioners, explicitly and reasonably relied not only on the *2015 Order*, but also on the rules and enforcement actions taken by the Commission for over a decade.[18] Santa

---

[17] In contrast, the Commission found that BIAS providers had halted or limited infrastructure investment due solely to the *2015 Order* despite overwhelming evidence to the contrary. *See Order* ¶¶ 89-98 [JA __-__].

[18] The Commission is wrong to state that reliance would not have been reasonable because of "the lengthy prior history of information service classification of broadband Internet access service." *Order* ¶ 159 [JA __]. Reasonable reliance was based on the Commission's regulatory protection of the open Internet, which it had maintained for over a decade irrespective of how BIAS was classified.

Clara Comments at 3, 14 n.17 [JA __, __]; Kabai Decl. ¶¶ 5-8 [Addendum 14]. The Commission cannot avoid its obligation to analyze and weigh record evidence by artificially limiting the analysis to reliance on its most recent rules, when the *Order* overturned a much longer history of open Internet protections maintained by the Commission under both Title I and II.

The County, in particular, submitted evidence of its reliance on the Commission's protection of the open Internet in making decisions to invest in systems for protecting public safety, public health, and patient health and safety; publication of its law; compliance with its public notice and access requirements; and facilitating civic participation. Santa Clara Comments at 3, 10, 14 n.17 [JA __, __, __]; Kabai Decl. ¶¶ 5-8 [Addendum 14]. For example, in reliance on the open Internet, the County invested more than a million dollars in its medical records system and is investing hundreds of thousands of dollars in its telemedicine systems. Santa Clara Comments at 10-11 [JA __-__].

Similarly, the modern energy grid was developed in reliance on the open Internet. See *supra* at 24-25.

Having decided that it need not analyze record evidence of reliance, the Commission stated that it was "not persuaded that there were reasonable reliance interests" on the *2015 Order*. *Order* ¶ 159 [JA __]. Such a "conclusory . . . statement cannot substitute for a reasoned explanation." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008). The Commission's inaccurate summary of the record and its failure to address the ample evidence of industry, governmental, and public safety reliance on an open Internet renders the *Order* arbitrary and capricious.

## D. The Commission Failed to Properly Consider the Effect of Reclassification on Universal Service and Pole Attachment Rights.

The Commission's decision to reclassify BIAS cannot be reconciled with the States' statutory obligations to advance universal service and provide nondiscriminatory utility pole access. The Commission also disregarded the effect of reclassification on the States' ability to enforce important safety regulations for pole attachments. The *Order* must be reversed because the Commission

failed to properly consider the implications of its reclassification decision on important regulatory schemes.

*Lifeline Programs.* The 1996 Act obligates the Commission and the States to ensure the affordability and widespread availability of safe, reliable, high-quality telecommunications services. 47 U.S.C. §§ 253(b), 254(c), (e)-(f). The federal Lifeline program promotes universal service by enabling discounts on telecommunications services for low-income Americans. In 2015, the Commission modernized the federal Lifeline program to include broadband.[19] Many States have also enacted state universal service programs to enable low-income citizens' access to high-quality telecommunications.[20]

Under 47 U.S.C. § 214(e)(1), federal universal service support is available only for common carriers designated by a State or the Commission as an "eligible telecommunications carrier." Title II common carriage thus forms the legal underpinning to provide Lifeline

---

[19] *See generally In re Lifeline & Link Up Reform and Modernization*, 31 FCC Rcd. 3962 (2016).

[20] *See, e.g.*, Cal. Pub. Util. Code § 871; Conn. Gen. Stat. § 16-247e; 220 Ill. Comp. Stat. § 5/13-301; Md. Code Ann., Pub. Util. § 8-201; Minn. Stat. § 237.70 (2017).

subsidies for standalone broadband service—i.e., Internet connection unbundled from other services such as phone. *See Direct Commc'ns Cedar Valley, LLC v. FCC*, 753 F.3d 1015, 1049 (10th Cir. 2014). Similarly, only telecommunications providers are required to contribute to the Universal Service Fund. *See* 47 U.S.C. § 254(d).

Several commenters noted that reclassification of BIAS would eliminate the statutory basis for including standalone broadband in universal service programs. *See* CPUC Comments at 13 [JA __]; Public Knowledge Comments at 95-97 [JA __-__]; Free Press Comments at 71-72 [JA __-__]; Voices Coalition Comments at 53-62 [JA __-__]; National Consumer Law Center Comments at 5-8 [JA __-__]. As these commenters noted, universal service programs cannot fulfill their purpose unless they include broadband Internet access. While the Commission asserted in the *Order* that it need not address its legal authority to continue supporting BIAS in the Lifeline program until later proceedings (*Order* ¶¶ 192-193 [JA __-__]), this regulatory punt missed the point because classification determines eligibility for universal service support under § 214(e). The Commission thus could—

and should—have addressed the impact of reclassification on the federal Lifeline program.

The *Order* also failed to consider the effect of reclassification on the States' ability to include standalone broadband in state universal service programs. The 1996 Act preserves state authority to implement "requirements necessary to preserve and advance universal service [and] ensure the continued quality of *telecommunications services*." 47 U.S.C. § 253(b) (emphasis added); *see id.* § 254(f). If BIAS is not classified as a telecommunications service, the States could arguably be precluded from requiring standalone BIAS in their respective Lifeline programs.[21] Although the Commission recognized that reclassification would affect the Lifeline program, the Commission ultimately failed to address, much less resolve, how it or the States could mandate standalone broadband in Lifeline programs given these statutory limitations.

---

[21] The Commission's assertion that § 706 of the 1996 Act is "hortatory" impermissibly eliminates an alternate source of regulatory authority to include standalone BIAS in universal service programs. *Accord* NGP Br. at IV.

***Pole Attachments.*** In the *2015 Order*, the Commission recognized the critical importance of pole attachments to deploying communications networks, and acknowledged that Title II ensures BIAS providers' access to, among other things, utilities' poles at just, reasonable, and nondiscriminatory rates. *2015 Order* ¶¶ 56, 413, 478 [JA __, __, __]. In the current *Order*, the Commission reversed course but failed to recognize—much less reconcile—the *Order*'s effect on the States' ability to ensure nondiscriminatory pole access and to adopt and enforce pole attachment safety regulations.

The Commission concluded that Title II classification was not necessary to promote broadband deployment. *Order* ¶185 [JA __]. However, the Commission failed to acknowledge the federal requirement that utilities extend nondiscriminatory access to poles and rights-of-way *only* to "cable television systems or *telecommunications carriers*." 47 U.S.C. § 224(f)(1) (emphasis added). Once BIAS providers are classified as information services providers, they lose the statutory right to access utility infrastructure.

The Commission further failed to explain how the States could enforce safety regulations for pole attachments by standalone BIAS

providers in the absence of Title II classification. Pursuant to § 224, States can elect to regulate the rates, terms, and conditions for pole attachments under state law, and certify to the Commission that they will do so. More than twenty States, including California, have so certified, and thus have reverse-preempted the Commission from exercising jurisdiction over pole attachments in those States.[22] This reverse-preemption, however, applies to nondiscriminatory access by telecommunications carriers. *See* 47 U.S.C. § 224(c), (f). The Commission did not explain how States can enforce terms and conditions on BIAS providers under this statute—including regulations relating to "safety, reliability and generally applicable engineering purposes," *id.* § 224(f)(2), if those providers are not deemed to provide telecommunications services.

---

[22] *See* Decision No. 98-10-058, 82 CPUC2d 510, 1998 Cal. PUC LEXIS 879 (adopting pole attachment and rights-of-way rules); *see also* 25 FCC Rcd. 5541 (May 19, 2010) (complete list of States that have reverse-preempted).

This omission has real-world implications for public safety.[23] Unauthorized, and sometimes hazardous, attachments to the millions of poles in any given State are regular occurrences. The ability to enforce safety regulations for pole attachments is paramount in States like California, which has recently suffered unprecedented wildfires and windstorms that have wreaked havoc on utility infrastructure. *Cf.* CPUC Comments at 9 [JA __]. A standalone BIAS provider might pledge compliance with a State's safety regulations to obtain access to utility infrastructure, yet subsequently commit a major safety violation with impunity. The *Order* does not explicitly preclude such a provider from arguing that, as a provider of information services, it is exempt from a State's authority to investigate the incident or impose fines, sanctions, or other remedies. Although the Commission acknowledged (rightly) that its *preemption* determination does not interfere with States' authority to address safety issues in rights-of-way (*see Order* ¶ 196 n.735

---

[23] The Commission's failure to consider public safety concerns violated its express mandate to consider public safety. See *supra* at 22.

[JA __]), it failed to address the effect of *reclassification* on the States'

ability to regulate utility pole attachments by BIAS providers.

## POINT II

### THE COMMISSION'S PREEMPTION ORDER IS INVALID

**A.  The Commission May Not Preempt Absent Statutory Authority.**

In the *Order's* preemption provisions, the Commission purported

to rely on a "federal policy of nonregulation" and asserted that "an

affirmative policy of deregulation is entitled to the same preemptive

effect as a federal policy of regulation."[24] *Order* ¶¶ 194, 202 [JA __, __].

This justification fundamentally misstates the law.

An agency that deems itself to lack statutory authority to regulate

a particular practice altogether cannot rely on the same absence of

authority to preempt state regulation. This Court has long held that "the

allowance of wide latitude in the exercise of *delegated* powers is not the

equivalent of untrammeled freedom to regulate activities over which the

---

[24] The Notice of Proposed Rulemaking (JA __-__) did not seek comments on the Commission's intention to preempt state law or provide notice of what statutory authority the Commission intended to rely on in order to preempt state law.

statute fails to confer, or explicitly denies, Commission authority."

*National Ass'n of Regulatory Utility Comm'rs v. FCC* (*NARUC II*), 533 F.2d 601, 617 (D.C. Cir. 1976) (emphasis added). There is a "vital difference between a refusal to use granted power, and an attempt to prevent regulation by others in an area where no" agency authority exists. *Id.* at 620 n.113. Here, the Commission interpreted the Communications Act to prevent the agency from exercising affirmative authority to regulate broadband. That position necessarily eliminated the agency's authority to preempt as well.

Under controlling case law, the Commission has no power to preempt state action unless its action is either directly authorized by statute or ancillary to the effective performance of its statutorily mandated responsibilities. As this Court has made clear, the Commission "cannot regulate (let alone preempt state regulation of) any service that does not fall within its Title II jurisdiction over common carrier services [the pertinent statutory authority] or its Title I jurisdiction over matters 'incidental' [or ancillary] to communication by wire." *Public Serv. Comm'n of Maryland v. FCC* (*Maryland PSC*), 909 F.2d 1510, 1515 n.6 (D.C. Cir. 1990); *see also* 47 U.S.C. § 154(i). The

Commission emphatically disavowed Title II authority. See *supra* at 5-6. And none of the three grounds asserted in the *Order* provide the Commission with "independent authority to displace state and local regulations." *Order* ¶ 202 [JA __].

First, the Commission appeared to rely on its ancillary authority under Title I to preempt state and local laws pursuant to a purported "federal policy of nonregulation for information services." *Id.* But "Title I is not an independent source of regulatory authority; rather, it confers on the FCC only such power as is ancillary to the Commission's specific statutory responsibilities." *California v. FCC (California I)*, 905 F.2d 1217, 1240 (9th Cir. 1990). Regulations pursuant to ancillary authority are thus permissible only when they "are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." *American Library Ass'n v. FCC*, 406 F.3d 689, 703 (D.C. Cir. 2005).

"Policy statements alone cannot provide the basis for the Commission's exercise of ancillary authority" because policy is not a delegation of regulatory authority. *Comcast*, 600 F.3d at 654. Instead, only a statutorily mandated responsibility derived from "express delegated

authority" can justify the exercise of ancillary jurisdiction. *Id.* at 658.[25]

Thus, "it is Title II, III, or VI to which the [Commission's exercise of] authority must ultimately be ancillary." *Id.* Here, the Commission purported to identify a "federal policy of nonregulation for information services" in a policy statement and a definitional provision. But neither source is sufficient to assert ancillary authority under *Comcast* and *NARUC II.*

_____

[25] There is no merit to the Commission's assertion that the Eighth and Ninth Circuits have authorized agency preemption based on a generic federal policy of deregulation alone. *See Order* ¶¶ 194, 198 & nn.726, 738 [JA __-__, __] (citing *Minnesota Pub. Util. Comm'n v. FCC* (*Minnesota PUC*), 483 F.3d 570 (8th Cir. 2007), and *California v. FCC* (*California III*), 39 F.3d 919 (9th Cir. 1994)). These courts did not have to resolve the question presented here—whether the Commission failed to properly assert ancillary authority. In *Minnesota PUC*, the parties did not contest the Commission's assertion of ancillary authority. And in *California III*, the Ninth Circuit had previously held that the FCC had ancillary authority to establish a regulatory regime for enhanced services. *See California III,* 39 F.3d at 932 (citing *California I*, 905 F.2d at 1240 n.35). In any event, to the extent that *Minnesota PUC* and *California III* may be read to stand for the proposition that the Commission may link its ancillary authority to preempt solely based on a "federal policy of nonregulation," such a holding would be flatly inconsistent with this Court's precedent. *See Comcast*, 600 F.3d at 651-58.

The Commission initially relied on § 230(b)(2) (*Order* ¶ 203 [JA __]), which provides, in relevant part, that "[i]t is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). That provision, standing alone, cannot be construed to furnish the Commission with the necessary authority to preempt state laws because this Court has already held that the policy statements contained in § 230 do not support ancillary authority. *See Comcast*, 600 F.3d at 652-55. Indeed, the Commission itself acknowledged that § 230(b) is "hortatory." *Order* ¶ 284 [JA __-__].

The Commission also cited to § 153(51), the statutory definition of "telecommunications carrier," which provides that the Commission may impose common carrier regulations on such an entity "only to the extent that [a carrier] is engaged in providing telecommunications services." *See id.* ¶ 203 [JA __] (citing 47 U.S.C. § 153(51)). No court has held that the Commission can derive ancillary authority from a definitional statute that, by its plain terms, limits only the agency's authority to act and says nothing about state authority.

The Commission further mistakenly asserted (*see id.* ¶ 202 nn.748-749 [JA __-__]) that legal precedent permits the exercise of ancillary authority even without specific delegated powers. In *Computer & Communications Industry Association v. FCC*, this Court permitted preemption only after holding that the Commission had properly exercised its Title I ancillary authority over enhanced services offered by common carriers. 693 F.2d 198, 214 (D.C. Cir. 1982). As this Court later explained in *Comcast*, the order at issue in *CCIA* had properly "linked [the Commission's] exercise of ancillary authority to its Title II responsibility over common carrier rates—just the kind of connection to statutory authority missing here." 600 F.3d at 656.

The Commission was equally incorrect to rely on *City of New York v. FCC*, 486 U.S. 57 (1988). At issue in that case was the Commission's preemption of local technical standards for cable television signals following the Cable Act of 1984. The Supreme Court upheld the Commission's decision, holding that the text and legislative history of the Cable Act showed that Congress enacted the statute as a "straightforward endorsement" of the Commission's prior regulatory approach, which had included preemption of technical standards

44

regulation. *Id.* at 67-70. In doing so, the Court identified a specific statutory provision in the Cable Act to which the Commission's preemption order was ancillary. *Id.* at 66-67 (citing 47 U.S.C. § 544(a)-(e)). Here, the Commission failed to identify any comparable statutory provision to which its purported preemption is ancillary.

Second, and for similar reasons, the Commission cannot assert stand-alone authority to preempt state law under the "impossibility exception to state jurisdiction." *Order* ¶¶ 198-201 [JA __-__]. The so-called "impossibility exception" allows the Commission to exercise jurisdiction over intrastate practices that the agency otherwise would be prohibited from regulating under § 152(b). The Commission has authority to regulate such intrastate practices if and only if "(1) the matter to be regulated has both interstate and intrastate aspects; (2) FCC preemption is necessary to protect a valid federal regulatory objective; and (3) state regulation would negate the exercise by the FCC of its own *lawful authority*." *Maryland PSC*, 909 F.2d at 1515 (emphasis added) (citations and alteration marks omitted). Under the last prerequisite, the impossibility exception likewise requires the Commission to identify an independent source of statutory authority to support any given

45

preemption decision. *See Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 422-423 (5th Cir. 1999)*; National Ass'n of Regulatory Utility Comm'rs v. FCC*, 880 F.2d 422, 429 (D.C. Cir. 1989).

Third, and last, the Commission contended that its preemption authority "finds further support in the Act's forbearance provision." *See Order* ¶ 204 [JA __] (citing 47 U.S.C. § 160(e)). Section 160 allows the Commission to "forbear from applying any regulation or any provision of [Title II] to a telecommunications carrier or telecommunications service" if the Commission determines that such regulation is not necessary or that forbearance is consistent with public interest. 47 U.S.C. § 160(a). In turn, state public utility commissions "may not continue to apply or enforce any provision [of Title II] that the Commission has determined to forbear from applying." *Id.* § 160(e).

As the Commission appeared to acknowledge, the forbearance provision is not directly applicable here because it applies only to telecommunication services regulated by Title II, and not to information services as the Commission has reclassified BIAS to be. Instead, the Commission asserted that "[i]t would be incongruous if state and local regulation were preempted" pursuant to a Title II forbearance decision,

but not when the Commission has determined that Title II is inapplicable. *Order* ¶ 204 [JA __]. But the starting premise of the Commission's reasoning is mistaken. Section 160(e) does not by its own terms "limit or preempt State enforcement of State statutes or regulations"; instead, it forbids the States only from "continu[ing] to apply or enforce any provision of the *Communications Act* that the Commission has determined to forbear from applying." S. Conf. Rep. No. 104-458, at 185 (1996) (emphasis added). Because Title II's forbearance provision does not authorize preemption, it creates no incongruity that would justify the *Order*'s further attempt to preempt state and local laws.

The Commission thus failed to identify any statutory mandate to which its preemption of state laws is ancillary. Absent that authority, the Commission cannot "confer power upon itself" to "take action which it thinks will best effectuate a federal policy." *Louisiana Pub. Serv.*, 476 U.S. at 374; *see also EchoStar Satellite L.L.C. v. FCC*, 704 F.3d 992, 999 (D.C. Cir. 2013).

**B. The Commission's Reference to Conflict Preemption Is Premature and Erroneous in Any Event.**

**1. Conflict preemption must be raised on a case-by-case basis, not suggested in an order opining in advance that all state laws are preempted.**

Because the Commission did not cite conflict preemption as a legal basis for its preemption order, *see Order* ¶¶ 197-204 [JA __-__], the *Order* cannot be upheld on that basis.[26] To the extent that the *Order* nevertheless suggested (*see id.* ¶¶ 194-196) that state laws are preempted because they conflict with the Commission's deregulatory agenda, the Commission's effort to find conflict preemption as a facial matter, over a broad swath of unidentified state and local laws, is premature and without legal effect, and this Court should hold as much.

"[W]hether a state regulation unavoidably conflicts with national interests is an issue incapable of resolution in the abstract." *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1220 (D.C. Cir. 1984). Conflict preemption analysis is fact-driven and requires review of the specific state statute or regulation under review, its interplay with the federal regime, and

---

[26] *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Comcast*, 600 F.3d at 660 ("[T]he Commission must defend its action on the same grounds advanced in the *Order*.").

the nature of the regulated service or practice. *See id.* Moreover, agency assertions of conflict preemption are not entitled to deference as a blanket matter; rather, the weight given to such a declaration depends on the persuasiveness of the agency's analysis of the specific state and federal laws at issue. *See Wyeth*, 555 U.S. at 576-77. Accordingly, conflict preemption must be raised in individual cases challenging specific state laws—not in a broad pronouncement suggesting that state laws are preempted as a class regardless of their individual features.

The Commission's premature suggestion of conflict preemption could have substantial consequences for the Government Petitioners if this Court does not vacate the *Order*. Without such relief, BIAS providers could argue that the Hobbs Act's jurisdictional limitations, *see* 28 U.S.C. § 2342(1); *see also* 47 U.S.C. § 402(a), preclude state and local governments from contesting conflict preemption in challenges to individual laws and enforcement actions, and thus hamper state efforts to enforce duly enacted laws.[27]

---

[27] *See, e.g.*, Br. for Appellant at 25-26, *People v. Charter Commc'ns, Inc.*, No. 450318/17 (N.Y. App. Div. 2018) (BIAS provider arguing that

## 2. The *Order* fails to identify a valid basis for conflict preemption.

In any event, there is no merit to the Commission's suggestion (*Order* ¶¶ 194-196 [JA __-__]) that broad swaths of state laws and disclosure requirements impermissibly conflict with federal law. "[B]ecause the States are independent sovereigns in our federal system," preemption analysis must begin "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic v. Lohr*, 518 U.S. 470, 486 (1996). The presumption against preemption applies with equal force where the purported conflict derives from an agency regulation. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715-16 (1985). Moreover, where, as here, "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal

New York's state-law consumer protection action should be dismissed on the ground that it implicitly challenges the *Order*'s legal validity).

50

pre-emption becomes a less persuasive one."[28] *New York State Dep't. of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973).

Federal law endorses state regulation of communications services. *See generally* Philip Weiser, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U. L. Rev. 1692, 1694 (2001). The Communications Act preserves all state remedies available "at common law or by statute," 47 U.S.C. § 414, and embraces state authority in areas of traditional state concern—including state-law "requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." 47 U.S.C. § 253(b); *see also id.* § 332(c)(3), (7).

Congress underscored its intent to preserve a substantial role for state and local regulation of communications by carefully cabining federal preemption in this area. Thus, although the 1996 Act authorized

---

[28] The Commission's assertion that the presumption against preemption does not apply here is baseless. *Order* ¶ 202 n.749 [JA __]. The presumption against preemption is built into the Communications Act, which preserves and welcomes state regulation. *Global Tel\*Link v. FCC*, 866 F.3d 397, 403 (D.C. Cir. 2017).

preemption of some state laws, *see e.g., id.* § 253(a); Pub. L. No. 104-104, § 602(a), 110 Stat. 56, 144 (1996), Congress required all such provisions to be construed narrowly. To that end, § 601(c) of the 1996 Act provides that "[t]his Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 47 U.S.C. § 152 note. As then-Commissioner Ajit Pai noted in 2015, "section 601(c) counsels against any broad construction of the 1996 Act that would create an implicit conflict with state law." *In re City of Wilson*, 30 FCC Rcd. 2408, 2512 (Mar. 12, 2015) (dissenting statement) (alteration marks omitted), *pet. for review granted Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016).

Sovereign States are not required to take an *ex post* approach to consumer protection law and may prohibit specific industry practices *ex ante* in order to protect consumers and the general public.[29] Such laws

---

[29] *See, e.g.*, Conn. Gen. Stat. § 21a-217 (health club contracts); 6 Del. Code ch. 24A (debt management services); N.J. Stat. Ann. § 49:3-53 (investment advisers); Md. Code Ann., Com. Law § 14-3301 et. seq. (immigration consultants); 940 Mass. Code Regs. § 19.01 et seq. (retail marketing and sale of electricity); Minn. Stat. § 325F.693 (2017)

fall well within the ambit of traditional State police powers. Accordingly, States are entitled to take legislative and regulatory action to protect consumers and small businesses and address unfair business practices in the BIAS industry.[30]

The Commission nevertheless asserted that state laws addressing specific BIAS practices could be contrary to the agency's decision to reclassify BIAS as an information service and would therefore interfere with the "pro-competitive, deregulatory goals of the 1996 Act." *Order* ¶ 194 [JA __-__]. To be sure, this Court has interpreted the 1996 Act to bar the *Commission* from imposing regulations under Title I on information services that would prohibit blocking, throttling, and paid prioritization. *See Verizon v. FCC*, 740 F.3d 623, 656 (D.C. Cir. 2014). But Congress's choice to bar the Commission from promulgating certain

---

(prohibiting telephone companies from slamming); Or. Rev. Stat. § 646A.800 (regulating late fees for cable service); 37 Pa. Code § 301.1 et seq. (automotive industry trade practices).

[30] *See, e.g.*, Wash. S. Bill Rep. on SHB 2282 (Feb. 27, 2018) (making a violation of Washington's law enforceable under the Consumer Protection Act). State laws and executive orders involving the States' purchasing authority are likewise not subject to preemption. *See Building & Constr. Trades Council of Metro Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 226-230 (1993).

types of regulations under Title I does not, standing alone, prohibit the States from acting. "Although federal agencies have only the authority granted to them by Congress, states are sovereign." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1190 (11th Cir. 2017). A "clear and manifest purpose" to preempt the States' sovereign powers cannot be inferred from a congressional decision to strip a federal agency of jurisdiction. *Id.* at 1190-91.

No other provision of the 1996 Act clearly expresses Congress's intent to preempt state regulation of information services. For example, while the 1996 Act expressly authorizes preemption with respect to certain types of state regulation of *telecommunications* services, *see, e.g.*, 47 U.S.C. §§ 253(a), 332(c)(3), the Act includes no similar provision regarding information services. To the contrary, Congress expressly preserved state regulation of *all* communications services through consumer protection, tort, or other state law remedies, and warned against implied preemption. See *supra* at 51-52. Indeed, the Commission admitted (*Order* ¶ 196 n.732 [JA _]), that the classification of BIAS as an information service cannot altogether preclude state regulation.

Nor is there merit to the Commission's argument that the 1996 Act implicitly "embraced" the Commission's policy of preemption by adopting the Commission's deregulatory approach to enhanced services (the predecessor to information services). *Order* ¶ 202 & n.749 [JA __-__]. A national policy of deregulation cannot be enacted silently. "Without a text that can . . . plausibly be interpreted as *prescribing* federal preemption, it is impossible to find that a free market was mandated by federal law." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988).

Finally, there is no basis for the Commission's effort to preempt state-law disclosure requirements exceeding the narrowed Transparency Rule. *Order* ¶ 195 n.729 [JA __-__]. In the absence of clear congressional intent to displace state law, the States have the authority (and in many cases, the obligation) to exercise their own judgment concerning the types of disclosures that are necessary to regulate the businesses operating in their States. Here, Congress has actively encouraged state efforts to collect data about BIAS service and providers, indicating that Congress intended to support, rather than displace, the States' ability to compel regulatory disclosures from

providers. *See, e.g.*, 47 U.S.C. § 1304 (setting aside federal funds for state studies regarding broadband deployment); *see also id.* § 1302(a). In addition, mandating public disclosures to protect consumers from being cheated based on their ignorance of material facts is a classic form of consumer protection well within the States' historic police powers.

## CONCLUSION

The *Order* should be vacated and reversed.

Dated:     New York, New York
           August 20, 2018

Respectfully submitted,

AROCLES AGUILAR
General Counsel
HELEN M. MICKIEWICZ
Assistant General Counsel
LISA-MARIE G. CLARK
Staff Counsel

By: */s/ Kimberly J. Lippi*
KIMBERLY J. LIPPI
Staff Counsel
California Public Utilities
Commission
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822
Kimberly.Lippi@cpuc.ca.gov

*Attorneys for Petitioner California Public Utilities Commission*

*(Counsel listing continues on next page.)*

BARBARA D. UNDERWOOD
Attorney General of the
  State of New York
STEVEN C. WU
Deputy Solicitor General

By: */s/ Ester Murdukhayeva*
ESTER MURDUKHAYEVA
Assistant Solicitor General
Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6279
Ester.Murdukhayeva@ag.ny.gov

*Attorneys for Petitioner State of New York*

JAMES R. WILLIAMS
County Counsel
GRETA S. HANSEN
LAURA TRICE

By: */s/ Danielle L. Goldstein*
DANIELLE L. GOLDSTEIN
Office of the County Counsel
70 W. Hedding Street
San José, CA 95110
(408) 299-5906
Danielle.Goldstein@cco.sccgov.org

JEFFREY T. PEARLMAN
Intellectual Property &
Technology Law Clinic
USC Gould School of Law
699 Exposition Boulevard
Los Angeles, CA 90089-0071
(213) 740-7613
jef@law.usc.edu

PHILLIP R. MALONE
Juelsgaard Intellectual Property
and Innovation Clinic
Mills Legal Clinic at
Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305
(650) 725-6369
jipic@law.stanford.edu

*Attorneys for Petitioners County of
Santa Clara and Santa Clara
County Central Fire Protection
District*

XAVIER BECERRA
Attorney General of the
   State of California

By:   */s/ Nicklas A. Akers*
NICKLAS A. AKERS
Senior Assistant Attorney General
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 703-5562
Nicklas.Akers@doj.ca.gov

*Attorneys for Petitioner State of
California*

GEORGE JEPSEN
Attorney General of the
   State of Connecticut

By:   */s/ Jonathan J. Blake*
JONATHAN J. BLAKE
Assistant Attorney General
Office of the Attorney General
110 Sherman Street
Hartford, CT 06105
(860) 808-5400
Jonathan.Blake@ct.gov

*Attorneys for Petitioner State of
Connecticut*

58

RUSSELL A. SUZUKI
Attorney General of the
  State of Hawai'i

By:  /s/ Clyde J. Wadsworth
CLYDE J. WADSWORTH
Solicitor General
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1180
Clyde.J.Wadsworth@hawaii.gov

*Attorneys for Petitioner State of
Hawai'i*

LISA MADIGAN
Attorney General of the
  State of Illinois

By:  /s/ David Franklin
DAVID FRANKLIN
Solicitor General
Office of the Attorney General
100 West Randolph Street
12th Floor
Chicago, IL 60601
(312) 814-5028
DFranklin@atg.state.il.us

*Attorneys for Petitioner State of
Illinois*

MATTHEW P. DENN
Attorney General of the
  State of Delaware

By:  /s/ Christian D. Wright
CHRISTIAN D. WRIGHT
Director, Consumer Protection
Office of the Attorney General
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Christian.Wright@state.de.us

*Attorneys for Petitioner State of
Delaware*

THOMAS J. MILLER
Attorney General of the
  State of Iowa

By:  /s/ Benjamin E. Bellus
BENJAMIN E. BELLUS
Assistant Attorney General
Office of the Attorney General
1305 East Walnut Street, 2nd Floor
Des Moines, IA 50319
(515) 281-5926
Benjamin.Bellus@ag.iowa.gov

*Attorneys for Petitioner State of
Iowa*

JANET T. MILLS
Attorney General of the
   State of Maine


By: _/s/ Brendan O'Neil_
BRENDAN O'NEIL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8842
Brendan.ONeil@maine.gov

*Attorneys for Petitioner State of
Maine*

BRIAN E. FROSH
Attorney General of the
   State of Maryland


By: _/s/ Richard L. Trumka, Jr._
RICHARD L. TRUMKA, JR.
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6957
RTrumka@oag.state.md.us


*Attorneys for Petitioner State of
Maryland*

ANDREW G. BESHEAR
Attorney General of the
   Commonwealth of
   Kentucky


By: _/s/ Andrew G. Beshear_
ANDREW G. BESHEAR
Office of the Attorney General
700 Capitol Avenue
Capitol Building, Suite 118
Frankfort, KY 40601
(502) 696-5300
Andy.Beshear@ky.gov

*Attorney for Petitioner
Commonwealth of Kentucky*

MAURA HEALEY
Attorney General of the
   Commonwealth of
   Massachusetts


By: _/s/ Jared Rinehimer_
JARED RINEHIMER
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Jared.Rinehimer@state.ma.us


*Attorneys for Petitioner
Commonwealth of Massachusetts*

JAMES M. HOOD
Attorney General of the
  State of Mississippi

By:  /s/ Crystal Utley Secoy
CRYSTAL UTLEY SECOY
Special Assistant Attorney
General, Consumer Protection
Office of the Attorney General
P.O. Box 22947
Jackson, MS 39225
(601) 359-4212
CUtle@ago.state.ms.us

*Attorneys for Petitioner State of
Mississippi*

GURBIR S. GREWAL
Attorney General of the
  State of New Jersey

By:  /s/ Jeremy M. Feigenbaum
JEREMY M. FEIGENBAUM
Assistant Attorney General
Office of the Attorney General
25 Market Street, 8th Floor
Trenton, NJ 08625
(609) 292-4925
Jeremy.Feigenbaum@njoag.gov

*Attorneys for Petitioner State of
New Jersey*

LORI SWANSON
Attorney General of the
  State of Minnesota

By:  /s/ Joseph C. Meyer
JOSEPH C. MEYER
Assistant Attorney General
Office of the Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1433
Joseph.Meyer@ag.state.mn.us

*Attorneys for Petitioner State of
Minnesota*

HECTOR BALDERAS
Attorney General of the
  State of New Mexico

By:  /s/ Tania Maestas
TANIA MAESTAS
Deputy Attorney General
Office of the Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
TMaestas@nmag.gov

*Attorneys for Petitioner State of
New Mexico*

61

ELLEN F. ROSENBLUM
Attorney General of the
    State of Oregon

By: /s/ Andrew Shull
ANDREW SHULL
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301
(503) 934-4400
Andrew.Shull@doj.state.or.us

*Attorneys for Petitioner State of Oregon*

JOSHUA H. STEIN
Attorney General of the
    State of North Carolina

By: /s/ Kevin Anderson
KEVIN ANDERSON
Senior Deputy Attorney General
Department of Justice
114 West Edenton Street
Raleigh, NC 27603
(919) 716-6000
KAnder@ncdoj.gov

*Attorneys for Petitioner State of North Carolina*

JOSH SHAPIRO
Attorney General of the
    Commonwealth of
    Pennsylvania

By: /s/ Michael J. Fischer
MICHAEL J. FISCHER
Chief Deputy Attorney General
Office of the Attorney General
Strawberry Square, 16th Floor
Harrisburg, PA 17120
(215) 560-2171
MFischer@attorneygeneral.gov

*Attorneys for Petitioner Commonwealth of Pennsylvania*

PETER KILMARTIN
Attorney General of the
    State of Rhode Island

By: /s/ Michael W. Field
MICHAEL W. FIELD
Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
MField@riag.ri.gov

*Attorneys for Petitioner State of Rhode Island*

MARK R. HERRING
Attorney General of the
 Commonwealth of
 Virginia

By: _/s/ Samuel T. Towell_
SAMUEL T. TOWELL
Deputy Attorney General
Office of the Attorney General
202 N. North Street
Richmond, VA 23219
(804) 786-6731
STowell@oag.state.va.us

*Attorneys for Petitioner*
*Commonwealth of Virginia*

ROBERT W. FERGUSON
Attorney General of the
 State of Washington

By: _/s/ Tiffany Lee_
TIFFANY LEE
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6098
TiffanyC@atg.wa.gov

*Attorneys for Petitioner State of*
*Washington*

THOMAS J. DONOVAN, JR.
Attorney General of the
 State of Vermont

By: _/s/ Christopher J. Curtis_
CHRISTOPHER J. CURTIS
Chief, Public Protection Division
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5586
Christopher.Curtis@vermont.gov

*Attorneys for Petitioner State of*
*Vermont*

KARL A. RACINE
Attorney General of the
 District of Columbia

By: _/s/ Loren L. AliKhan_
LOREN L. ALIKHAN
Solicitor General
Office of the Attorney General
441 4th Street NW
(202) 72706287
Loren.AliKhan@dc.gov

*Attorneys for Petitioner*
*District of Columbia*

DENNIS J. HERRERA
City Attorney


By:  */s/ William K. Sanders*
WILLIAM K. SANDERS
Deputy City Attorney
Office of the City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
(415) 554-6771
William.Sanders@sfcityatty.org

*Attorneys for Intervenor City and*
*County of San Francisco*

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Megan Chu, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 9,966 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

 /s/ Megan Chu

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the accompanying Proof Brief for Government Petitioners by using the CM/ECF system on August 20, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:   August 20, 2018
         New York, NY

/s/ Ester Murdukhayeva