## 18-1051(L)

**Consolidated Cases: 18-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065, 18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105**

# United States Court of Appeals for the District of Columbia Circuit

MOZILLA CORPORATION, et al.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

## PROOF REPLY BRIEF FOR GOVERNMENT PETITIONERS

JAMES R. WILLIAMS
  *County Counsel*
  *County of Santa Clara*
Office of the County Counsel
70 West Hedding Street
San José, CA 95110
(408) 299-5906

BARBARA D. UNDERWOOD
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-6279

AROCLES AGUILAR
  *General Counsel*
  *California Public Utilities Commission*
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822

Dated: November 16, 2018

*(Complete counsel listing appears on signature pages.)*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES ..................................................iii

GLOSSARY OF TERMS AND ABBREVIATIONS ................................vii

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................1

ARGUMENT ........................................................................2

POINT I

THE *ORDER* IS ARBITRARY AND CAPRICIOUS ...........................2

    A.    The Commission Arbitrarily Relied on Market Forces to Deter and Correct Abusive Practices. ......................................2

    B.    The Commission Abandoned Its Statutory Obligation to Consider Public Safety ..............................................3

        1.    Post hoc rationalizations cannot substitute for consideration of public safety by the Commission. ...........3

        2.    The *Order's* discussion of market forces does not address risks to public safety............................................7

        3.    The *Order*'s unexamined impact on universal service further undermines public safety.........................10

    C.    The *Order* Impermissibly Disregarded Petitioners' Substantial Reliance on Open Internet Protections. .............11

POINT II

THE COMMISSION'S PREEMPTION ORDER IS INVALID ...........................12

A.   No Statute Authorizes Preemption. ....................... 12

B.   The Commission Has Failed to Properly Invoke
     Ancillary Authority. ................................................. 16

     1.   The Commission cannot claim ancillary authority to
          preempt when it has disavowed statutory authority
          to regulate BIAS providers' abusive practices. .............. 17

     2.   The Commission's stated grounds for ancillary
          authority to preempt are insufficient. ........................... 20

          a.   The "impossibility exception" is not a
               standalone grant of regulatory authority. ............... 20

          b.   The Commission cannot preempt on policy
               grounds. .................................................. 25

C.   Conflict Preemption Is Not a Source of Regulatory
     Authority. .......................................................... 26

CONCLUSION ........................................................ 27

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*American Library Ass'n v. FCC,*
   406 F.3d 689 (D.C. Cir. 2005) ........................................... 12, 17, 18, 24

*American Trading Transp. Co. v. United States,*
   791 F.2d 942 (D.C. Cir. 1986) .......................................................... 5, 6

*AT&T Corp. v. Core Commc'ns, Inc.,*
   806 F.3d 715 (3d Cir. 2015) ................................................................ 18

*Beno v. Shalala,*
   30 F.3d 1057 (9th Cir. 1994) ................................................................ 5

*Blatchford v. Native Vill. of Noatak,*
   501 U.S. 775 (1991) ............................................................................ 13

*California v. FCC,*
   39 F.3d 919 (9th Cir. 1994) ................................................................ 23

*California v. FCC,*
   905 F.2d 1217 (9th Cir. 1990) .......................................................... 23

*Cellco P'ship v. FCC,*
   700 F.3d 534 (D.C. Cir. 2012) .......................................................... 15

*Chamber of Commerce of the United States v. Whiting,*
   563 U.S. 582 (2011) ............................................................................ 14

*Charter Advanced Services LLC v. Lange,*
   903 F.3d 715 (8th Cir. 2018) .............................................................. 22

*City of Dallas v. FCC,*
   165 F.3d 341 (5th Cir. 1999) ...................................................... 14, 16

*City of New York v. FCC,*
   486 U.S. 57 (1988) ...................................................................... 25, 26

*Comcast Corp. v. FCC,*
   600 F.3d 642 (D.C. Cir. 2010) ...................... 17, 18, 19, 20, 24, 25, 26

**Cases**                                                               **Page(s)**

*Covad Commc'ns Co. v. FCC,*
    450 F.3d 528 (D.C. Cir. 2006) ............................................................. 14

*David Saxe Prods., LLC v. NLRB,*
    888 F.3d 1305 (D.C. Cir. 2018) ............................................................. 8

*EchoStar Satellite L.L.C. v. FCC,*
    704 F.3d 992 (D.C. Cir. 2013) ....................................................... 18, 25

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................. 12

*Hawaiian Tel. Co. v. FCC,*
    498 F.2d 771 (D.C. Cir. 1974) ............................................................. 2

*In re FCC 11-161,*
    753 F.3d 1015 (10th Cir. 2014) ......................................................... 10

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ............................................................. 12, 21, 26

*Minnesota Pub. Util. Comm'n v. FCC,*
    483 F.3d 570 (8th Cir. 2007) ............................................................. 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
    *Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................... 3

*National Ass'n of Regulatory Comm'rs v. FCC,*
    880 F.2d 422 (D.C. Cir. 1989) ..................................................... 21, 23

*National Ass'n of Regulatory Utility Comm'rs v. FCC,*
    533 F.2d 601 (D.C. Cir. 1976) ..................................................... 19, 20

*Nuvio Corp. v. FCC,*
    473 F.3d 302 (D.C. Cir. 2006) ............................................................. 3

*Public Citizen Health Research Group v. Auchter,*
    702 F.2d 1150 (D.C. Cir. 1983) ............................................................. 9

**Cases**                                                         **Page(s)**

*Public Serv. Comm'n of Maryland v. FCC*,
909 F.2d 1510 (D.C. Cir. 1990) ........................................................ 21

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*,
485 U.S. 495 (1988) ............................................................................ 13

*United States Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) .......................................................... 11

*Wyeth v. Levine*,
555 U.S. 555 (2009) ..................................................................... 26, 27

**Statutes**

*Federal*

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5
§ 6001(k), 123 Stat. 115, 516 (2009) .................................................. 15

Pub. L. No. 104-104, 110 Stat. 56, 143 (1996) ........................................ 16

47 U.S.C.
§ 151 .................................................................................................... 7
§ 230 .................................................................................................... 7
§ 253 .................................................................................................. 15

*State*

Cal. Pub. Util. Code § 451 .......................................................................... 7

**Administrative Materials**

*Facilitating the Deployment of Text-to-911*
29 FCC Rcd. 9846 (2014) ............................................................... 3, 5

**Miscellaneous Authorities**                                    **Page(s)**

FCC, *Voice over Internet Protocol*, Consumer Guides (Jan.
27, 2017), https://www.fcc.gov/cgb/consumerfacts/voip.pdf ............... 23

**Miscellaneous Authorities**                                   **Page(s)**

H.R. Conf. Rep. No. 104-458 (1996) .................................................... 14, 15

## GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
| *2015 Order* | *In re Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015), *aff'd sub nom. United States Telecom Association v. FCC*, 825 F.3d 674, *cert. denied*, – S.Ct. –, 2018 WL 5779065 (Mem.) |
| BIAS | Broadband Internet Access Service |
| Bowden Decl. | Declaration of Anthony Bowden [Brief for Government Petitioners, Addendum 1-12] |
| Cable Act of 1984 | Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2279 |
| *California III* | *California v. FCC*, 39 F.3d 919 (9th Cir. 1994) |
| Commission or FCC | Federal Communications Commission |
| CPUC | California Public Utilities Commission |
| Communications Act | Communications Act of 1934, as amended, 47 U.S.C. § 151 et seq. |
| Government Petitioners | States of New York, California, Connecticut, Delaware, Hawaiʻi, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, the District of Columbia, the County of Santa Clara, Santa Clara County Central Fire Protection District, and the California Public Utilities Commission |
| GP Br. | Brief for Government Petitioners |
| IA Br. | Brief for Intervenors Internet Association, Entertainment Software Association, Computer & Communications Industry Association, and Writers Guild of America, West, Inc. |

| | |
|---|---|
| IA Reply Br. | Reply Brief for Intervenors Internet Association, Entertainment Software Association, Computer & Communications Industry Association, and Writers Guild of America, West, Inc. |
| Intervenors | Intervenors US Telecom-The Broadband Association, CTIA-The Wireless Association, NCTA-The Internet & Television Association, American Cable Association, and Wireless Internet Service Providers Association |
| ISP Br. | Joint Brief for Intervenors US Telecom-The Broadband Association, CTIA-The Wireless Association, NCTA-The Internet & Television Association, American Cable Association, and Wireless Internet Service Providers Association |
| Lifeline | Federal and state programs that provide a monthly discount for low-income subscribers of certain communication services |
| *Louisiana PSC* | *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) |
| *Minnesota PUC* | *Minnesota Pub. Util. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007) |
| *NARUC II* | *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) |
| *NARUC III* | *National Ass'n of Regulatory Comm'rs v. FCC*, 880 F.2d 422 (D.C. Cir. 1989) |
| Non-Government Petitioners | Mozilla Corporation, Vimeo, Inc., Public Knowledge, Open Technology Institute, National Hispanic Media Coalition, NTCH, Inc., Benton Foundation, Free Press, Coalition for Internet Openness, Etsy, Inc., Ad Hoc Telecom Users Committee, Center for Democracy and Technology, and INCOMPAS |
| NGP Br. | Brief for Non-Government Petitioners |
| NYC Amicus Br. | Brief for Amici Curiae The City of New York and 27 Other Local Governments, Mayors, and Municipal Organizations in Support of Petitioners |

| Open Internet | The principle that broadband providers must treat all Internet traffic the same regardless of source |
|---|---|
| *Order* | Restoring Internet Freedom, *Declaratory Ruling, Report and Order, and Order*, 33 FCC Rcd. 311 (2018) |
| Respondents | Federal Communications Commission and the United States |
| Resp. Br. | Brief for Respondents Federal Communications Commission and the United States |
| Sandoval | Professor Catherine Sandoval, Santa Clara University School of Law |
| *Text-to-911 Order* | *Facilitating the Deployment of Text-to-911*, 29 FCC Rcd. 9846 (2014) |
| Transparency Rule | Disclosures mandated by the *Order* ¶¶ 215-231 |
| VoIP | Voice over Internet Protocol |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The *Order*'s departure from the Commission's long-standing commitment to the open Internet cannot be justified and must be reversed. Respondents and Intervenors erroneously dismiss the record evidence of potential harm to the public—from consumer protection to public safety to government services—as sufficiently addressed by market forces. Moreover, the post hoc argument that market forces may protect public safety was not presented in the *Order* and cannot cure the Commission's failure to fulfill its statutory duty to consider public safety.

Respondents and Intervenors further defend the *Order*'s sweeping preemption provisions as authorized by the Commission's subject-matter jurisdiction over broadband Internet, but such jurisdiction does not by itself authorize regulation, much less preemption. The Commission must instead identify affirmative statutory authority for preemption, which it has failed to do. The Commission may not rely on conflict preemption as a source of regulatory authority, and its views on the matter are premature and invalid.

# ARGUMENT

## POINT I

### THE *ORDER* IS ARBITRARY AND CAPRICIOUS

**A.    The Commission Arbitrarily Relied on Market Forces to Deter and Correct Abusive Practices.**

The *Order* arbitrarily disregards substantial evidence that broadband Internet access service (BIAS) providers have engaged and will engage in abusive practices that harm consumers and undermine public safety, unreasonably relying on a patchwork of unenforceable voluntary commitments, amorphous market pressures, and speculative ex post remedies. *See* GP Br. 17-21, 23-24. Market-based justifications for the Commission's abdication of its regulatory role are plainly inadequate. Indeed, Congress's decision to require "regulation by government agencies is based on the belief that competition cannot be trusted to do the job of regulation." *Hawaiian Tel. Co. v. FCC*, 498 F.2d 771, 777 (D.C. Cir. 1974). Neither Respondents nor Intervenors rebut the substantial likelihood of harm to consumers and the public established by the record or sufficiently explain how the *Order* addresses such harms. *See* Resp. Br. 63-77; ISP Br. 25-29.

**B.     The Commission Abandoned Its Statutory Obligation to Consider Public Safety.**

Respondents do not dispute—and Intervenors concede—that the Commission was "required to consider public safety by . . . its enabling act," *Nuvio Corp. v. FCC*, 473 F.3d 302, 307 (D.C. Cir. 2006), and that a failure to do so is fatal to the *Order. See* Resp. Br. 95-96; ISP Br. 36. As now-Chairman Ajit Pai stated, the Commission "has no higher purpose than promoting the safety of life and property through the use of communications." *Facilitating the Deployment of Text-to-911*, 29 FCC Rcd. 9846, 9944 (2014) (*Text-to-911 Order*) (dissenting). Neither Respondents nor Intervenors identify *any* consideration of public safety in the *Order. See* GP Br. 22-28. Instead, they resort to post hoc arguments that cannot withstand even superficial scrutiny and that the Commission itself has rejected in the past.

**1.     Post hoc rationalizations cannot substitute for consideration of public safety by the Commission.**

The *Order* can be upheld only "on the basis articulated by the [Commission] itself"—not on "appellate counsel's post hoc rationalizations." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Respondents and Intervenors cannot show that

the Commission considered Government Petitioners' public safety concerns. Tellingly, they disagree over how the Commission purportedly did so. Their post hoc justifications cannot cure the *Order*'s fatal defect.

Respondents concede that the *Order* failed to separately consider public safety. *See* Resp. Br. 95-96. Instead, they argue—without citing to the *Order*—that this omission is inconsequential because the Commission's discussion of market forces adequately addressed public safety. According to Respondents, there is nothing "distinct" about public safety. *Id.* That argument was not, however, "articulated by the [Commission]" in the *Order*: the Commission never considered public safety in its analysis, much less found it addressed by market incentives.[1] It was "incumbent upon [the agency] explicitly to acknowledge and address" public safety in the *Order* to "carry out with fidelity its

---

[1] *See Order* ¶¶ 86-108 [JA __-__] (public policy discussion with no reference to public safety), ¶ 109 [JA __] (concluding that "economic" factors support the *Order*), ¶¶ 239-245 [JA __-__] (eliminating open Internet protections without discussion of public safety), ¶¶ 246-252 [JA __-__] (finding general conduct standard not in the "public interest" without considering public safety), ¶¶ 263-266 [JA __-__] (disclaiming need for bright-line rules without considering public safety), ¶¶ 304-323 [JA __-__] (cost-benefit analysis without discussion of public safety).

statutory charge." *American Trading Transp. Co. v. United States*, 791 F.2d 942, 949 n.7 (D.C. Cir. 1986). Its failure to do so cannot now be cured by appellate counsel. *See also Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) ("[W]e cannot infer an agency's reasoning from mere silence.").

The Commission's approach to fulfilling this statutory mandate in past rulemaking is further evidence that Respondents have manufactured a rationale to save the *Order*. The Commission has rejected analyses that risk the "subordination of important public policy objectives to market forces" because "public safety interests are not driven solely by economic considerations." *See, e.g., Text-to-911 Order* ¶ 22.

While Respondents concede that the Commission failed to separately consider public safety (*see* Resp. Br. 95-96), Intervenors scour the *Order* for *any* consideration, settling on four provisions that do not even mention the phrase (*see* ISP Br. 36-37 (quoting *Order* ¶¶ 116, 196, 258 n. 943, 265 [JA __, __, __, __])). Intervenors first claim that the Commission found "'scant evidence' of threats to public safety." *Id.* at 37. The Commission did no such thing; Intervenors insert the words "public safety" into the *Order*'s discussion of "scant evidence that end users, under different legal frameworks, have been prevented by blocking or

throttling from accessing the content of their choosing." *Order* ¶ 265 [JA __]. Similarly, Intervenors misrepresent the *Order* as permitting States to "'continue to play their vital role' in advancing public safety" by referencing a portion of the *Order* discussing state regulation of consumer protection and unfair business practices. ISP Br. 37 (quoting *Order* ¶ 196 [JA __]).

Intervenors then cite (*id.*) to the *Order*'s dismissal, in a footnote, of the concern that "[f]oreign governments and their agents would . . . buy priority Internet access to slow American messages or create a priority blockade" (*Order* ¶ 258 n.943 [JA __]). This portion of the *Order* is irrelevant to Government Petitioners' public safety concerns. *See* GP Br. 22-28. Finally, Intervenors assert that the Commission considered public safety in a single sentence on "'remaining unaddressed harms.'" ISP Br. 37 (quoting *Order* ¶ 116 [JA __]). Nothing in this provision links it to public safety. Moreover, claiming the Commission considered public safety as an "unaddressed" harm recognizes the Commission's failure to meet its obligation to "explicitly acknowledge" the issue. *American Trading*, 791 F.2d at 949 n.7.

## 2. The *Order's* discussion of market forces does not address risks to public safety.

Respondents and Intervenors attempt to defend the *Order*'s failure to consider public safety by claiming that the Commission's discussion of market forces disposes of the significant record evidence of risks to public safety. Resp. Br. 93-94; ISP Br. 36-37. Even if the Commission had advanced this position, it is contrary to law: the Communications Act does not regard public safety as addressed or subsumed by market forces, but addresses these factors separately. *Compare* 47 U.S.C. § 151 (mandate to consider public safety) *with* 47 U.S.C. § 230(b) (policy to promote market competition).[2] This argument also cannot be reconciled with abundant record evidence of harms to public safety that are unaddressed—and in many cases *caused*—by market forces. *See* Santa Clara Comments 1-14 [JA __-__]; CPUC Comments 4-9 [JA __-__]; Sandoval Reply Comments 47-51 [JA __-__]. The Commission's failure to address such evidence is fatal to both Respondents' and Intervenors'

---

[2] Moreover, Respondents' argument ignores inherent differences between private and public entities. Public utilities, for example, are statutorily required to provide safe service. *See, e.g.*, Cal. Pub. Util. Code § 451.

position and to the *Order. See David Saxe Prods., LLC v. NLRB*, 888 F.3d 1305, 1311 (D.C. Cir. 2018).

Government Petitioners demonstrated with specific, detailed examples how revoking the *2015 Order* jeopardizes residents' access to safe and reliable electricity; prevents residents from receiving timely evacuation, shelter-in-place, and disease outbreak alerts; and interferes with urgent medical services, among other things. *See* GP Br. 24-27; *see also* NYC Amicus Br. 9-21. Ignoring these examples, Respondents and Intervenors baldly assert that BIAS providers' market incentives will lead them to prioritize public safety over profit. *See* Resp. Br. 94.

No evidence supports this assertion. To the contrary, while not "intentionally" harming public safety, BIAS providers have, following market incentives, prioritized profit at the expense of public safety. For example, Verizon intentionally throttled a fire department battling the then-largest wildfire in California history until it agreed to switch to a "new data plan at more than twice the cost."[3] Bowden Decl. ¶¶ 6, 9 [GP

---

[3] Respondents and Intervenors focus on whether the *2015 Order* would have applied to Verizon's throttling of first responders. Resp. Br. 94-95; ISP Br. 37. They misunderstand the simple lesson from Verizon's

Br., Addendum 2-4]. Respondents' position in this litigation that BIAS providers may address damaging practices after they actually harm public safety is no answer. *See, e.g.*, *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) ("Delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake."); Santa Clara Comments 2 [JA __] (throttling public safety services risks "irreversible damage"); NYC Amicus Br. 21 ("The police need applications to pinpoint the precise location from where gunshots were *just* fired"). Similarly, Respondents' post hoc claim (Resp. Br. 94) that the Transparency Rule will ameliorate harm to public safety is baseless: the rule does not enable the public to distinguish between intentional net neutrality violations and innocuous connectivity problems, much less ensure "consumer backlash" that could protect public safety. *See* GP Br. 20; IA Reply Br. 7-8. Accordingly, the *Order* must be rejected for failing to fulfill the Commission's statutory mandate to consider public safety.

---

throttling: the public cannot rely on "transparency and market forces" to protect public safety.

### 3. The *Order*'s unexamined impact on universal service further undermines public safety.

Respondents fail to respond meaningfully to Government Petitioners' concern that the *Order* bars inclusion of standalone broadband in Lifeline programs, depriving low-income residents of access to crucial government health and safety services provided via broadband.[4] *See* Resp. Br. 110-111. The Commission's insistence that it has broad discretion to defer considering the impact its decision will have on Lifeline programs fails to acknowledge that the *Order*'s classification of BIAS is a determinative issue that cannot be revisited in a later proceeding. *See* GP Br. 33-35; *see also In re FCC 11-161*, 753 F.3d 1015, 1049 (10th Cir. 2014) (holding that broadband-only providers "cannot be designated as 'eligible telecommunications carriers'"). Further, Respondents fail to reconcile the assertion that States can include standalone broadband in their universal service programs, with the Commission's insistence that the

---

[4] Nor do Respondents explain how States can enforce pole attachment safety regulations on BIAS providers (*see* Resp. Br. 96 n.28), as reverse-preemption under 47 U.S.C. § 224 applies to nondiscriminatory access by telecommunications carriers, not information services.

1996 Act "forbids any common-carriage regulation, whether federal or state, of information services." *See* Resp. Br. 111, 128.

## C.  The *Order* Impermissibly Disregarded Petitioners' Substantial Reliance on Open Internet Protections.

Respondents and Intervenors disregard investments made in reliance on the Commission's prior open Internet protections by rehashing the contention that Petitioners were required to demonstrate reliance on the *2015 Order*. Resp. Br. 92; ISP Br. 32. But it is well established that the Commission has maintained open Internet protections since at least 2005; the *2015 Order* reaffirmed that commitment and reinstated rules the Commission had previously imposed. *See United States Telecom Ass'n v. FCC*, 825 F.3d 674, 693-95 (D.C. Cir. 2016), *cert. denied*, – S.Ct. –, 2018 WL 5779065 (Mem.); GP Br. 30 n.18.

Intervenors additionally argue that Petitioners had an "obligation . . . to supply sufficient information about [reliance] costs to allow the [Commission] to consider them." ISP Br. 32 (quotation marks omitted). Petitioners did just that. The County of Santa Clara alone submitted sixteen pages of comments outlining its specific investments. *See* Santa Clara Comments 2-14 [JA __-__]; Santa Clara Reply Comments 4-8

[JA __-__]. The *Order*'s disregard of record evidence demonstrating Petitioners' "serious reliance interests" renders it arbitrary and capricious. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## POINT II

### THE COMMISSION'S PREEMPTION ORDER IS INVALID

"A federal agency may preempt state law only when and if it is acting within the scope of its congressionally delegated authority." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Commission can regulate—and thus preempt—only pursuant to direct statutory authority or ancillary authority. *See American Library Ass'n v. FCC*, 406 F.3d 689, 692 (D.C. Cir. 2005). Here, neither basis is present. Respondents' and Intervenors' reliance on conflict preemption is likewise meritless.

### A. No Statute Authorizes Preemption.

The *Order* does not identify a statute that expressly directs or permits the Commission to preempt state regulation of information services. Instead, Respondents and Intervenors argue that Congress's apparent decision to limit federal regulation of information services

implicitly precludes "*any* public-utility regulation, state or federal."[5] Resp. Br. 114 (emphasis in original); *see also id.* at 127-128; ISP Br. 42-43. The States' sovereign authority precludes any such inference. Because the States "entered the [Union] with their sovereignty intact," *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991), they do not require federal authority or approval to exercise their police powers to protect their residents' rights and interests. "[W]ithout a text that can . . . plausibly be interpreted as *prescribing* federal preemption, it is impossible to find that a free market was mandated by federal law." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988). Respondents and Intervenors identify no such text.

Respondents and Intervenors contend that section 153(51) of the Communications Act directly precludes state "common carrier" regulations on information services. Resp. Br. 127-128; ISP Br. 42-43 (citing 47 U.S.C. § 153(51)). However, the text of section 153(51) limits the Commission's

---

[5] The Commission purported to preempt far more than public-utility regulations, including any "state or local measures . . . that would impose more stringent requirements for any aspect of broadband service" addressed in the *Order*. *Order* ¶ 195 [JA __].

authority "under this chapter," *i.e.*, "for purposes of the Communications Act," H.R. Conf. Rep. No. 104-458, at 114 (1996), and neither the statute nor the relevant portions of the conference reports address state legislative or regulatory power. Congressional restrictions on federal power do not, by themselves, limit the States' authority.[6] *See City of Dallas v. FCC*, 165 F.3d 341, 347-48 (5th Cir. 1999) (eliminating federal franchising requirement does not preclude state and local governments from imposing that requirement); *see also Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 608-611 (2011).

In any event, the *Order*'s categorical attempt to preempt nearly every conceivable state law or regulation touching upon BIAS includes innumerable regulations unrelated to common carriage. *See Order* ¶¶ 194-196 [JA __-__]. Indeed, determining whether any given regulation

---

[6] Respondents also incorrectly describe Title II's forbearance provision "as providing 'preemption authority.'" Resp. Br. 115 n.35 (citing *Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006)). The forbearance provision is not applicable here because the Commission disavowed authority under Title II, and the provision's legislative history forecloses any interpretation that confers preemptive authority. *See* GP Br. 46-47 (citing S. Conf. Rep. No. 104-458, at 185 (1996)). This Court's decision in *Covad* is irrelevant because neither forbearance nor preemption were ultimately at issue in that case. *See* 450 F.3d at 551.

constitutes a common carriage requirement necessitates a case-by-case analysis absent in the *Order*. *See Cellco P'ship v. FCC*, 700 F.3d 534, 544-49 (D.C. Cir. 2012).

It is implausible that by adopting the 1996 Act in general, and section 153(51) specifically, Congress would silently block States from regulating BIAS—a service it has described as fundamental to, among other things, "consumer welfare, civic participation, public safety and homeland security, community development, health care delivery, energy independence and efficiency, education, worker training, private sector investment, entrepreneurial activitys, job creation and economic growth." *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2)(D), 123 Stat. 115, 516 (2009). If Congress had intended to preempt state regulation of BIAS (or any information service), it would have done so expressly, as it did when authorizing preemption of certain state regulations of telecommunications services. *See* 47 U.S.C. § 253(a); *see also* NYC Amicus Br. 29 (collecting examples of federal deregulatory statutes). Indeed, Congress carefully considered preemption with respect to numerous provisions of the 1996 Act. *See, e.g.*, H.R. Conf. Rep. No. 104-458, at 191, 197-98, 201, 210. Congress's

express prohibition of implied preemption in section 601(c)(1) of the 1996 Act bars Respondents' and Intervenors' assertion of preemption in the absence of an explicit statutory preemption directive.[7] *See id.* at 201; Pub. L. No. 104-104, 110 Stat. 56, 143 (1996) (codified at 42 U.S.C. § 152 note); *City of Dallas*, 165 F.3d at 348-49.

## B. The Commission Has Failed to Properly Invoke Ancillary Authority.

Because no statute directly authorizes preemption, the *Order*'s preemption provisions can be supported only by a proper exercise of the Commission's ancillary authority. The Commission must satisfy two conditions to regulate under ancillary authority. "First, the subject of the regulation must be covered by the Commission's general grant of

---

[7] Respondents contend that "section 601(c)(1) precludes any construction of the 1996 Act that would divest the FCC of its preexisting power to preempt state law under the federal policy of nonregulation for information services." Resp. Br. 128-129. This argument is illogical because the category of "information services" did not exist before 1996. In any event, the Commission did not have freestanding preemption authority over enhanced services (the predecessor to information services) prior to the 1996 Act, and instead had to justify specific preemption orders with ancillary authority. Moreover, section 601(c)(1) itself bars any interpretation of the 1996 Act as an implicit expansion of the Commission's regulatory authority.

jurisdiction under Title I of the Communications Act." *American Library*, 406 F.3d at 692. "Second, the subject of the regulation must be 'reasonably ancillary to the effective performance of the Commission's various responsibilities.'" *Id.* at 693. The Commission identifies no basis for ancillary authority.

### 1. The Commission cannot claim ancillary authority to preempt when it has disavowed statutory authority to regulate BIAS providers' abusive practices.

Neither Respondents nor Intervenors mention, much less grapple with, the standard for ancillary authority. They instead contend that preemption of state laws touching on BIAS is authorized because BIAS is either "predominantly" or "exclusively" an interstate service under the Commission's subject-matter jurisdiction. *See* Resp. Br. 112-114 (citing 47 U.S.C. § 152); ISP Br. 38-40. At most, BIAS's status as an interstate communications service satisfies the first part of the standard for ancillary authority—namely, establishing the Commission's subject-matter jurisdiction. *See Comcast Corp. v. FCC*, 600 F.3d 642, 648 (D.C. Cir. 2010). However, subject-matter jurisdiction over BIAS does not by itself confer authority for the Commission to impose any regulation

touching on BIAS, much less authority to preempt state laws.[8] *Cf. EchoStar Satellite L.L.C. v. FCC*, 704 F.3d 992, 999 (D.C. Cir. 2013).

Rather, to satisfy the second part of this Court's standard for ancillary authority, the Commission must further demonstrate that a specific regulation is "reasonably ancillary to the Commission's effective performance" of some independent statutorily delegated responsibility. *American Library*, 406 F.3d at 700; *Comcast*, 600 F.3d at 658; *see also* GP Br. 41-42. Here, the Commission did not connect preemption to any independent grant of statutory authority. To the contrary, the *Order*'s underlying premise is that the Commission *lacks* statutory authority to regulate certain abusive practices by BIAS providers. *Order* ¶¶ 268-292

---

[8] There is likewise no merit to the argument (Resp. Br. 112-116; ISP Br. 38-41) that States lack authority to regulate any aspect of any service within the Commission's subject-matter jurisdiction. A "jurisdictional determination reflects only a finding about the Commission's power to regulate . . . not a view that its jurisdiction is exclusive." *AT&T Corp. v. Core Commc'ns, Inc.*, 806 F.3d 715, 726 (3d Cir. 2015). Indeed, the *Order* contemplates fulsome state regulation of BIAS through consumer protection laws and other exercises of the States' police powers. *See, e.g., Order* ¶¶ 141-142 & n.517, 145, 196 & n.732 [JA __-__, __, __-__.] In any event, this case is not about the scope of the States' authority, but about the lawfulness of the Commission's action.

[JA __-__]; *see also* Resp. Br. 59-62. The Commission's disavowal of statutory authority to regulate such practices necessarily precludes it from asserting authority to preempt corollary state regulation.

Respondents erroneously argue that this Court's standard for ancillary authority is limited to the creation of "new regulatory obligations." *Id.* at 122-123. Every regulatory action taken pursuant to ancillary authority "must be independently justified as reasonably ancillary to the Commission's" statutory mandates. *Comcast*, 600 F.3d at 651. Indeed, *Comcast* expressly relied on and discussed numerous cases involving preemption when defining the limits of the Commission's ancillary authority. *See id.* at 650, 657-58. Accordingly, a preemption order must be invalidated where, as here, the Commission has not shown that preemption is ancillary to a specific delegation of statutory authority. *See National Ass'n of Regulatory Utility Comm'rs v. FCC* (*NARUC II*), 533 F.2d 601, 617 (D.C. Cir. 1976).[9]

---

[9] Respondents incorrectly distinguish *NARUC II*, which *Comcast* reaffirmed as standing for the proposition that ancillary authority is required to preempt (*Comcast*, 600 F.3d at 650-651, 654), by arguing that the decision was limited to intrastate services. Resp. Br. 121-122. The majority concluded that preemption was unauthorized because it was

### 2. The Commission's stated grounds for ancillary authority to preempt are insufficient.

Respondents purport to identify "two independent bases of authority" for preemption: (a) the judicially created impossibility exception to intrastate regulation, and (b) a "federal policy of nonregulation for information services." Resp. Br. 116 (citing *Order* ¶¶ 198-203 [JA __-__]). Neither rationale provides a sufficient link to the "express delegation[] of regulatory authority" required to support ancillary authority. *Comcast*, 600 F.3d at 655.

#### a. The "impossibility exception" is not a standalone grant of regulatory authority.

Respondents and Intervenors misconceive the "impossibility exception" as a free-floating grant of regulatory authority that allows the Commission to preempt any time interstate services are implicated by state regulation. Resp. Br. 116-123; ISP Br. 41. To the contrary, the impossibility exception is a narrow, judicially created doctrine that

---

not "reasonably ancillary" to the Commission's statutory responsibilities. *NARUC II*, 533 F.3d at 612-14, 621-622. Only one judge concluded that the Commission *also* lacked preemption authority because it was attempting to regulate intrastate services. *Contra id.* at 621-23 (Lumbard J., concurring).

enables the Commission to extend its proper authority over *interstate* practices to regulate *intrastate* practices that the agency otherwise would be prohibited from regulating under 47 U.S.C. § 152(b). Preemption under the impossibility exception requires the Commission to show that "state regulation would negate the exercise by the FCC of its own lawful authority." *Public Serv. Comm'n of Maryland v. FCC*, 909 F.2d 1510, 1515 (D.C. Cir. 1990) (quotation marks omitted). Thus, far from excusing the Commission from connecting preemption to an express source of statutory authority, the impossibility exception is premised on such a showing. *See Louisiana PSC*, 476 U.S. at 375 n.4; *National Ass'n of Regulatory Comm'rs v. FCC* (*NARUC III*), 880 F.2d 422, 429 (D.C. Cir. 1989).

Respondents ignore the prerequisite of lawful authority and instead cite cases in which the agency's exercise of authority was satisfied, uncontested, or presumed. *See* Resp. Br. 116-121 (citing *Minnesota Pub. Util. Comm'n v. FCC* (*Minnesota PUC*), 483 F.3d 570 (8th Cir. 2007); *California v. FCC* (*California III*), 39 F.3d 919 (9th Cir. 1994); *NARUC III*, 880 F.2d at 429)). These cases do not support Respondents' preemption argument.

*Minnesota PUC* involved an order preempting certain state regulations of VoIP services. 483 F.3d at 574. Critically, no party challenged the Commission's exercise of regulatory authority over VoIP, and the court therefore did not reach the issue. Instead, *Minnesota PUC* addressed whether it was "possible to separate the interstate and intrastate aspects of the service," *see* 483 F.3d at 578-79—an irrelevant inquiry here because the Commission failed the threshold requirement of identifying a lawful basis for its exercise of regulatory authority.[10] Moreover, unlike in this case, the Commission has not disavowed statutory authority to comprehensively regulate VoIP, but has imposed extensive requirements on the service including compliance with local number portability, 911-service obligations, and mandatory

---

[10] *Charter Advanced Services LLC v. Lange* likewise did not present the question of whether the Commission preempted state regulation of VoIP pursuant to lawful authority. *See* 903 F.3d 715 (8th Cir. 2018). Rather, the majority opinion in *Charter* erroneously concluded that states were barred from regulating information services based on a misreading of prior precedent. *Charter* is therefore inapplicable as well as unpersuasive.

contributions to universal service funds. *See* FCC, *Voice over Internet Protocol*, Consumer Guides (Jan. 27, 2017).[11]

*California III* likewise applied the impossibility exception to allow preemption of state laws that required companies providing telephone services and those providing enhanced services (e.g., database services) to remain structurally separated. 39 F.3d at 932. The Ninth Circuit did not address the Commission's preemption authority because it had decided the issue in a petition for review from a prior version of the order, holding that "[i]n the case of enhanced services, the specific responsibility to which the Commission's Title I authority is ancillary [is] to its Title II authority [] over common carrier services." *California v. FCC*, 905 F.2d 1217, 1240 n.35 (9th Cir. 1990); *see also id.* at 1230-39.

Finally, in *NARUC III*, this Court upheld an order preempting state regulation of inside telephone wiring. 880 F.2d at 425. As this Court has noted, the Commission in that case explained why preemption was ancillary to its regulation of interstate telephone service. *See Comcast*, 600 F.3d at 657. Absent that "link to express delegated

---

[11] https://www.fcc.gov/cgb/consumerfacts/voip.pdf.

authority," the Commission had no basis for preemption. *Id*. at 658. Here, by contrast, the Commission has failed to identify the "statutorily mandated responsibilit[y]" to which preemption is ancillary. *American Library*, 406 F.3d at 692.

Intervenors purport to identify two instances of the Commission's exercise of lawful authority over BIAS, but neither is sufficient for preemption. *See* ISP Br. 41-42. First, Intervenors state that the Commission exercised its authority "in adopting a transparency regime under [47 U.S.C.] § 257." *Id*. at 42. Even assuming the Transparency Rule was lawful (*but see* NGP Br. 50, 54-55; IA Br. 30-39), Intervenors fail to explain how preemption of all state laws touching upon BIAS is ancillary to the Commission's effective performance of its responsibilities under section 257. Second, Intervenors incorrectly state that the Commission "exercised lawful authority" in reclassifying BIAS as an information service (*but see* NGP Br. 22-47), and contend that "immunity from common-carrier regulation" is a necessary consequence of reclassification. ISP Br. 42. Intervenors' reliance on section 153(51)'s reference to common carrier regulations is misplaced. See *supra* at 13-16. In any event, reclassification, even if lawful, does not authorize the

Commission to regulate or preempt in the absence of direct or ancillary authority.

### b. The Commission cannot preempt on policy grounds.

Respondents likewise err in relying on a purported "federal policy of nonregulation" of information services as a basis for preemption. Resp. Br. 123-130; *see also* ISP Br. 42-43. Respondents appear to concede that the Commission may not "exercise ancillary authority on the basis of policy alone." *Comcast*, 600 F.3d at 658 (quoting *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 806-07 (D.C. Cir. 2002)); *EchoStar*, 704 F.3d at 999. Instead Respondents now contend that "Congress ratified" a federal policy of nonregulation in the 1996 Act and that such a policy "amounts to statutory authority." Resp. Br. 129.

Respondents' reliance on *City of New York v. FCC*, 486 U.S. 57 (1988), is misplaced because that case undermines their theory of statutory authority. *See* GP Br. 44-45. In *City of New York*, the Supreme Court upheld an order preempting state and local technical standards for cable services, finding that preemption was within "the proper bounds of the [Commission's] lawful authority" under section 624(e) of

the Cable Act of 1984, which authorized the agency to establish such standards nationally. 486 U.S. at 66-69. The Court discussed the Commission's prior regulatory scheme—which included preemption—only to the extent it was relevant to understanding the scope of regulatory authority under section 624. *See id. City of New York* thus stands for the uncontroversial proposition that regulatory and legislative history can illuminate "the nature and scope of the authority granted by Congress to the agency." *Louisiana PSC*, 476 U.S. at 374; *see also Comcast*, 600 F.3d at 654. However, regulatory history standing alone does not create preemptive authority; only Congress can do so.

## C. Conflict Preemption Is Not a Source of Regulatory Authority.

Respondents and Intervenors concede that conflict preemption arguments may be resolved only on a case-by-case basis in direct challenges to particular state laws or regulations. Resp. Br. 133; ISP Br. 43. Congress has not delegated to the Commission the authority to declare conflict preemption as a regulatory matter. *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009). In the absence of a statutory provision providing for express preemption—which does not exist here—an

agency's views on conflict preemption are not entitled to *Chevron* deference, let alone dispositive weight. *See id.* Courts, not federal agencies, decide whether a specific state law conflicts with the federal regime. *See id.* at 576-77. This Court should therefore reject Respondents' and Intervenors' attempts to use conflict preemption as a source of authority for the *Order*'s preemption provisions.

## CONCLUSION

The *Order* should be vacated and reversed.

Dated:      New York, New York
            November 16, 2018

Respectfully submitted,

AROCLES AGUILAR
General Counsel
HELEN M. MICKIEWICZ
Assistant General Counsel
LISA-MARIE G. CLARK
Staff Counsel

BARBARA D. UNDERWOOD
Attorney General of the
   State of New York
STEVEN C. WU
Deputy Solicitor General

By:  */s/ Kimberly J. Lippi*
KIMBERLY J. LIPPI
Staff Counsel
California Public Utilities
Commission
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822
Kimberly.Lippi@cpuc.ca.gov

By:  */s/ Ester Murdukhayeva*
ESTER MURDUKHAYEVA
Assistant Solicitor General
Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6279
Ester.Murdukhayeva@ag.ny.gov

*Attorneys for Petitioner California
Public Utilities Commission*

*Attorneys for Petitioner State of
New York*

(*Counsel listing continues on next page.*)

JAMES R. WILLIAMS
County Counsel
GRETA S. HANSEN
LAURA TRICE

By:  */s/ Danielle L. Goldstein*
DANIELLE L. GOLDSTEIN
Office of the County Counsel
70 W. Hedding Street
San José, CA 95110
(408) 299-5906
Danielle.Goldstein@cco.sccgov.org

JEFFREY T. PEARLMAN
Intellectual Property &
Technology Law Clinic
USC Gould School of Law
699 Exposition Boulevard
Los Angeles, CA 90089-0071
(213) 740-7613
jef@law.usc.edu

PHILLIP R. MALONE
Juelsgaard Intellectual Property
and Innovation Clinic
Mills Legal Clinic at
Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305
(650) 725-6369
jipic@law.stanford.edu

*Attorneys for Petitioners County of
Santa Clara and Santa Clara
County Central Fire Protection
District*

XAVIER BECERRA
Attorney General of the
   State of California

By: */s/ Sarah E. Kurtz*
SARAH E. KURTZ
Deputy Attorney General
California Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510-3473
Sarah.Kurtz@doj.ca.gov

*Attorneys for Petitioner State of
California*

GEORGE JEPSEN
Attorney General of the
   State of Connecticut

By: */s/ Jonathan J. Blake*
JONATHAN J. BLAKE
Assistant Attorney General
Office of the Attorney General
110 Sherman Street
Hartford, CT 06105
(860) 808-5400
Jonathan.Blake@ct.gov

*Attorneys for Petitioner State of
Connecticut*

MATTHEW P. DENN
Attorney General of the
  State of Delaware

By:  */s/ Christian D. Wright*
CHRISTIAN D. WRIGHT
Director, Consumer Protection
Office of the Attorney General
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
Christian.Wright@state.de.us

*Attorneys for Petitioner State of
Delaware*

RUSSELL A. SUZUKI
Attorney General of the
  State of Hawai'i

By:  */s/ Clyde J. Wadsworth*
CLYDE J. WADSWORTH
Solicitor General
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1180
Clyde.J.Wadsworth@hawaii.gov

*Attorneys for Petitioner State of
Hawai'i*

LISA MADIGAN
Attorney General of the
  State of Illinois

By:  */s/ David Franklin*
DAVID FRANKLIN
Solicitor General
Office of the Attorney General
100 West Randolph Street
12th Floor
Chicago, IL 60601
(312) 814-5028
DFranklin@atg.state.il.us

*Attorneys for Petitioner State of
Illinois*

THOMAS J. MILLER
Attorney General of the
  State of Iowa

By:  */s/ Benjamin E. Bellus*
BENJAMIN E. BELLUS
Assistant Attorney General
Office of the Attorney General
1305 East Walnut Street, 2nd Floor
Des Moines, IA 50319
(515) 281-5926
Benjamin.Bellus@ag.iowa.gov

*Attorneys for Petitioner State of
Iowa*

ANDREW G. BESHEAR
Attorney General of the
  Commonwealth of
  Kentucky

By:  /s/ Andrew G. Beshear
ANDREW G. BESHEAR
Office of the Attorney General
700 Capitol Avenue
Capitol Building, Suite 118
Frankfort, KY 40601
(502) 696-5300
Andy.Beshear@ky.gov

*Attorney for Petitioner
Commonwealth of Kentucky*

JANET T. MILLS
Attorney General of the
  State of Maine

By:  /s/ Brendan O'Neil
BRENDAN O'NEIL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8842
Brendan.ONeil@maine.gov

*Attorneys for Petitioner State of
Maine*

BRIAN E. FROSH
Attorney General of the
  State of Maryland

By:  /s/ Richard L. Trumka, Jr.
RICHARD L. TRUMKA, JR.
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6957
RTrumka@oag.state.md.us

*Attorneys for Petitioner State of
Maryland*

MAURA HEALEY
Attorney General of the
  Commonwealth of
  Massachusetts

By:  /s/ Jared Rinehimer
JARED RINEHIMER
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Jared.Rinehimer@state.ma.us

*Attorneys for Petitioner
Commonwealth of Massachusetts*

LORI SWANSON
Attorney General of the
   State of Minnesota

By: _/s/ Joseph C. Meyer_
JOSEPH C. MEYER
Assistant Attorney General
Office of the Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1433
Joseph.Meyer@ag.state.mn.us


*Attorneys for Petitioner State of Minnesota*

JAMES M. HOOD
Attorney General of the
   State of Mississippi

By: _/s/ Crystal Utley Secoy_
CRYSTAL UTLEY SECOY
Special Assistant Attorney
General, Consumer Protection
Office of the Attorney General
P.O. Box 22947
Jackson, MS 39225
(601) 359-4212
CUtle@ago.state.ms.us

*Attorneys for Petitioner State of Mississippi*

GURBIR S. GREWAL
Attorney General of the
   State of New Jersey

By: _/s/ Jeremy M. Feigenbaum_
JEREMY M. FEIGENBAUM
Assistant Attorney General
Office of the Attorney General
25 Market Street, 8th Floor
Trenton, NJ 08625
(609) 292-4925
Jeremy.Feigenbaum@njoag.gov


*Attorneys for Petitioner State of New Jersey*

HECTOR BALDERAS
Attorney General of the
   State of New Mexico

By: _/s/ Tania Maestas_
TANIA MAESTAS
Deputy Attorney General
Office of the Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
TMaestas@nmag.gov

*Attorneys for Petitioner State of New Mexico*

JOSHUA H. STEIN
Attorney General of the
   State of North Carolina


By:  */s/ Kevin Anderson*
KEVIN ANDERSON
Senior Deputy Attorney General
Department of Justice
114 West Edenton Street
Raleigh, NC 27603
(919) 716-6000
KAnder@ncdoj.gov

*Attorneys for Petitioner State of*
*North Carolina*


ELLEN F. ROSENBLUM
Attorney General of the
   State of Oregon


By:  */s/ Andrew Shull*
ANDREW SHULL
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301
(503) 934-4400
Andrew.Shull@doj.state.or.us

*Attorneys for Petitioner State of*
*Oregon*

JOSH SHAPIRO
Attorney General of the
   Commonwealth of
   Pennsylvania


By:  */s/ Michael J. Fischer*
MICHAEL J. FISCHER
Chief Deputy Attorney General
Office of the Attorney General
Strawberry Square, 16th Floor
Harrisburg, PA 17120
(215) 560-2171
MFischer@attorneygeneral.gov

*Attorneys for Petitioner*
*Commonwealth of Pennsylvania*


PETER KILMARTIN
Attorney General of the
   State of Rhode Island


By:  */s/ Michael W. Field*
MICHAEL W. FIELD
Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
MField@riag.ri.gov

*Attorneys for Petitioner State of*
*Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of the
   State of Vermont


By:  /s/ Christopher J. Curtis
CHRISTOPHER J. CURTIS
Chief, Public Protection Division
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5586
Christopher.Curtis@vermont.gov

*Attorneys for Petitioner State of Vermont*

MARK R. HERRING
Attorney General of the
   Commonwealth of
   Virginia


By:  /s/ Samuel T. Towell
SAMUEL T. TOWELL
Deputy Attorney General
Office of the Attorney General
202 N. North Street
Richmond, VA 23219
(804) 786-6731
STowell@oag.state.va.us

*Attorneys for Petitioner Commonwealth of Virginia*

ROBERT W. FERGUSON
Attorney General of the
   State of Washington


By:  /s/ Tiffany Lee
TIFFANY LEE
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6098
TiffanyC@atg.wa.gov

*Attorneys for Petitioner State of Washington*

KARL A. RACINE
Attorney General of the
   District of Columbia


By:  /s/ Loren L. AliKhan
LOREN L. ALIKHAN
Solicitor General
Office of the Attorney General
441 4th Street NW
(202) 727-6287
Loren.AliKhan@dc.gov

*Attorneys for Petitioner District of Columbia*

DENNIS J. HERRERA
City Attorney


By: __/s/ William K. Sanders__
WILLIAM K. SANDERS
Deputy City Attorney
Office of the City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
(415) 554-6771
William.Sanders@sfcityatty.org

*Attorneys for Intervenor City and
County of San Francisco*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Megan Chu, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,999 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

       /s/ Megan Chu

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the accompanying Proof Reply Brief for Government Petitioners by using the CM/ECF system on November 16, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:   November 16, 2018
             New York, NY


                                                    /s/ Ester Murdukhayeva

# Addendum

# TABLE OF CONTENTS

*Except for the following, all applicable statutes and regulations are contained in the Addendum to the Brief for Government Petitioners.*

PAGE

47 U.S.C. § 257.......................................................................... ADD1

American Recovery and Investment Act of 2009,
Pub. L. No. 111-5, § 6001(k), 123 Stat. 115, 515-16 (2009) ....................... ADD2

Cal. Pub. Util Code § 451 .......................................................... ADD4

i



any requirement of this section or any regulation thereunder. The Commission shall have exclusive jurisdiction with respect to any complaint under this section.

(June 19, 1934, ch. 652, title II, §255, as added Pub. L. 104–104, title I, §101(a), Feb. 8, 1996, 110 Stat. 75.)

REFERENCES IN TEXT

Section 12102 of title 42, referred to in subsec. (a)(1), was amended generally by Pub. L. 110–325, §4(a), Sept. 25, 2008, 122 Stat. 3555, and, as so amended, provisions formerly appearing in par. (2)(A) are now contained in par. (1)(A).

## § 256. Coordination for interconnectivity

### (a) Purpose

It is the purpose of this section—

(1) to promote nondiscriminatory accessibility by the broadest number of users and vendors of communications products and services to public telecommunications networks used to provide telecommunications service through—

(A) coordinated public telecommunications network planning and design by telecommunications carriers and other providers of telecommunications service; and

(B) public telecommunications network interconnectivity, and interconnectivity of devices with such networks used to provide telecommunications service; and

(2) to ensure the ability of users and information providers to seamlessly and transparently transmit and receive information between and across telecommunications networks.

### (b) Commission functions

In carrying out the purposes of this section, the Commission—

(1) shall establish procedures for Commission oversight of coordinated network planning by telecommunications carriers and other providers of telecommunications service for the effective and efficient interconnection of public telecommunications networks used to provide telecommunications service; and

(2) may participate, in a manner consistent with its authority and practice prior to February 8, 1996, in the development by appropriate industry standards-setting organizations of public telecommunications network interconnectivity standards that promote access to—

(A) public telecommunications networks used to provide telecommunications service;

(B) network capabilities and services by individuals with disabilities; and

(C) information services by subscribers of rural telephone companies.

### (c) Commission's authority

Nothing in this section shall be construed as expanding or limiting any authority that the Commission may have under law in effect before February 8, 1996.

### (d) "Public telecommunications network interconnectivity" defined

As used in this section, the term "public telecommunications network interconnectivity" means the ability of two or more public telecommunications networks used to provide telecommunications service to communicate and exchange information without degeneration, and to interact in concert with one another.

(June 19, 1934, ch. 652, title II, §256, as added Pub. L. 104–104, title I, §101(a), Feb. 8, 1996, 110 Stat. 76.)

## § 257. Market entry barriers proceeding

### (a) Elimination of barriers

Within 15 months after February 8, 1996, the Commission shall complete a proceeding for the purpose of identifying and eliminating, by regulations pursuant to its authority under this chapter (other than this section), market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services.

### (b) National policy

In carrying out subsection (a) of this section, the Commission shall seek to promote the policies and purposes of this chapter favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity.

### (c) Periodic review

Every 3 years following the completion of the proceeding required by subsection (a) of this section, the Commission shall review and report to Congress on—

(1) any regulations prescribed to eliminate barriers within its jurisdiction that are identified under subsection (a) of this section and that can be prescribed consistent with the public interest, convenience, and necessity; and

(2) the statutory barriers identified under subsection (a) of this section that the Commission recommends be eliminated, consistent with the public interest, convenience, and necessity.

(June 19, 1934, ch. 652, title II, §257, as added Pub. L. 104–104, title I, §101(a), Feb. 8, 1996, 110 Stat. 77.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (a) and (b), was in the original "this Act", meaning act June 19, 1934, ch. 652, 48 Stat. 1064, known as the Communications Act of 1934, which is classified principally to this chapter. For complete classification of this Act to the Code, see section 609 of this title and Tables.

## § 258. Illegal changes in subscriber carrier selections

### (a) Prohibition

No telecommunications carrier shall submit or execute a change in a subscriber's selection of a provider of telephone exchange service or telephone toll service except in accordance with such verification procedures as the Commission shall prescribe. Nothing in this section shall preclude any State commission from enforcing

(A) will, if approved, increase the affordability of, and subscribership to, service to the greatest population of users in the area;

(B) will, if approved, provide the greatest broadband speed possible to the greatest population of users in the area;

(C) will, if approved, enhance service for health care delivery, education, or children to the greatest population of users in the area; and

(D) will, if approved, not result in unjust enrichment as a result of support for non-recurring costs through another Federal program for service in the area; and

(3) consider whether the applicant is a socially and economically disadvantaged small business concern as defined under section 8(a) of the Small Business Act (15 U.S.C. 637).

(i) The Assistant Secretary—

(1) shall require any entity receiving a grant pursuant to this section to report quarterly, in a format specified by the Assistant Secretary, on such entity's use of the assistance and progress fulfilling the objectives for which such funds were granted, and the Assistant Secretary shall make these reports available to the public;

*Reports. Deadlines. Public information.*

(2) may establish additional reporting and information requirements for any recipient of any assistance made available pursuant to this section;

(3) shall establish appropriate mechanisms to ensure appropriate use and compliance with all terms of any use of funds made available pursuant to this section;

(4) may, in addition to other authority under applicable law, deobligate awards to grantees that demonstrate an insufficient level of performance, or wasteful or fraudulent spending, as defined in advance by the Assistant Secretary, and award these funds competitively to new or existing applicants consistent with this section; and

(5) shall create and maintain a fully searchable database, accessible on the Internet at no cost to the public, that contains at least a list of each entity that has applied for a grant under this section, a description of each application, the status of each such application, the name of each entity receiving funds made available pursuant to this section, the purpose for which such entity is receiving such funds, each quarterly report submitted by the entity pursuant to this section, and such other information sufficient to allow the public to understand and monitor grants awarded under the program.

*Database. Web site. Records.*

(j) Concurrent with the issuance of the Request for Proposal for grant applications pursuant to this section, the Assistant Secretary shall, in coordination with the Commission, publish the non-discrimination and network interconnection obligations that shall be contractual conditions of grants awarded under this section, including, at a minimum, adherence to the principles contained in the Commission's broadband policy statement (FCC 05-15, adopted August 5, 2005).

*Publication.*

(k)(1) Not later than 1 year after the date of enactment of this section, the Commission shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate, a report containing a national broadband plan.

*Deadline. Reports. Broadband plan.*

(2) The national broadband plan required by this section shall seek to ensure that all people of the United States have access to broadband capability and shall establish benchmarks for meeting that goal. The plan shall also include—

(A) an analysis of the most effective and efficient mechanisms for ensuring broadband access by all people of the United States;

(B) a detailed strategy for achieving affordability of such service and maximum utilization of broadband infrastructure and service by the public;

(C) an evaluation of the status of deployment of broadband service, including progress of projects supported by the grants made pursuant to this section; and

(D) a plan for use of broadband infrastructure and services in advancing consumer welfare, civic participation, public safety and homeland security, community development, health care delivery, energy independence and efficiency, education, worker training, private sector investment, entrepreneurial activity, job creation and economic growth, and other national purposes.

(3) In developing the plan, the Commission shall have access to data provided to other Government agencies under the Broadband Data Improvement Act (47 U.S.C. 1301 note).

*Broadband map.* (l) The Assistant Secretary shall develop and maintain a comprehensive nationwide inventory map of existing broadband service capability and availability in the United States that depicts the geographic extent to which broadband service capability is deployed and available from a commercial provider or public provider *Deadline.* throughout each State. Not later than 2 years after the date of *Web posting.* the enactment of this Act, the Assistant Secretary shall *Public information.* make the broadband inventory map developed and maintained pursuant to this section accessible by the public on a World Wide Web site of the National Telecommunications and Information Administration in a form that is interactive and searchable.

*Regulations.* (m) The Assistant Secretary shall have the authority to prescribe such rules as are necessary to carry out the purposes of this section.

# TITLE VII—LIMITS ON EXECUTIVE COMPENSATION

**SEC. 7000. TABLE OF CONTENTS.**

The table of contents of this title is as follows:

TITLE VII—LIMITS ON EXECUTIVE COMPENSATION

Sec. 7000. Table of contents.
Sec. 7001. Executive compensation and corporate governance.
Sec. 7002. Applicability with respect to loan modifications.

**SEC. 7001. EXECUTIVE COMPENSATION AND CORPORATE GOVERNANCE.**

Section 111 of the Emergency Economic Stabilization Act of 2008 (12 U.S.C. 5221) is amended to read as follows:

**ADD3**


STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

State of California

**PUBLIC UTILITIES CODE**

**Section 451**

---

451.  All charges demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful.

Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

All rules made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable.

(Amended by Stats. 1977, Ch. 700.)