18-1051(L)          FINAL VERSION

Consolidated Cases: 18-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065, 18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105

# United States Court of Appeals
# for the District of Columbia Circuit

MOZILLA CORPORATION, et al.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

## ADDENDUM TO BRIEF FOR GOVERNMENT PETITIONERS

JAMES R. WILLIAMS
  *County Counsel*
  *County of Santa Clara*
Office of the County Counsel
70 West Hedding Street
San José, CA 95110
(408) 299-5906

AROCLES AGUILAR
  *General Counsel*
  *California Public Utilities Commission*
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-5822

BARBARA D. UNDERWOOD
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-6279

*(Complete counsel listing appears on Brief for Government Petitioners.)*

# TABLE OF CONTENTS

PAGE

Declaration of Anthony Bowden, dated Aug. 17, 2018 .............................. ADD1

    Exhibit A  -  Email Exchange ............................................ ADD5

Declaration of Imre Kabai, dated Aug. 16, 2018 .................................... ADD13

28 U.S.C. § 2342 ............................................................... ADD16

42 U.S.C. § 5195c ............................................................... ADD17

47 U.S.C. § 151 ................................................................. ADD19

47 U.S.C. § 152 ................................................................. ADD20

47 U.S.C. § 153 ................................................................. ADD21

47 U.S.C. § 154 ................................................................. ADD22

47 U.S.C. § 160 ................................................................. ADD23

47 U.S.C. § 214 ................................................................. ADD24

47 U.S.C. § 224 ................................................................. ADD27

47 U.S.C. § 230 ................................................................. ADD30

47 U.S.C. § 253 ................................................................. ADD32

47 U.S.C. § 254 ................................................................. ADD33

47 U.S.C. § 332 ................................................................. ADD43

47 U.S.C. § 402 ................................................................. ADD47

47 U.S.C. § 414 ................................................................. ADD49

47 U.S.C. § 1302 [Telecommunications Act of 1996 § 706] ...................... ADD50

47 U.S.C. § 1304 ............................................................... ADD51

Telecommunications Act of 1996, Pub. L. No. 104-104

    § 601(c)(1) [47 U.S.C. § 152 note] ...................................... ADD54
    § 602 ................................................................... ADD55

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISCTICT OF COLUMBIA CIRCUIT

|  |  |
|---|---|
| MOZILLA CORPORATION, et al.,<br><br>                Petitioners,<br><br>    v.<br><br>FEDERAL COMMUNICATIONS<br>COMMISSION and UNITED STATES OF<br>AMERICA,<br><br>                Respondents. | Case No. 18-1051 (Lead)<br><br>Consolidated with Nos. 10-1052, 18-1053, 18-1054, 18-1055, 18-1056, 18-1061, 18-1062, 18-1064, 18-1065, 18-1066, 18-1067, 18-1068, 18-1088, 18-1089, 18-1105 |

## DECLARATION OF FIRE CHIEF ANTHONY BOWDEN

I, Anthony Bowden, declare:

1.      I make this declaration in support of the Brief of the County of Santa Clara ("County") in the matter referenced above.  I know the facts herein of my own personal knowledge and if called upon to do so, I could competently testify to them under oath.

2.      I was recently appointed the Fire Chief for the Santa Clara County Central Fire Protection District ("County Fire").  As Fire Chief, I also serve as Fire Marshal for Santa Clara County and as the California Office of Emergency Services (OES) Operational Area Fire and Rescue Coordinator. In these roles, I am responsible for the coordination of mutual aid resources in Santa Clara County. This includes the coordination of all fire resources to significant events, such as wildfires, throughout the State, when those resources are requested from Santa Clara County's operational area.  I have worked in fire protection for more than two decades, and in that time, I have held every rank at County Fire.

**ADD1**

3.      Established in 1947, County Fire provides fire services for Santa Clara County and the County's communities of Campbell, Cupertino, Los Altos, Los Altos Hills, Los Gatos, Monte Sereno, and Saratoga. The department also provides protection for the unincorporated areas adjacent to those cities. Wrapping in an approximately 20-mile arc around the southern end of Silicon Valley, County Fire has grown to include 15 fire stations, an administrative headquarters, a maintenance facility, and several other support facilities, and covers 128.3 square miles. The department employs almost three hundred fire prevention, suppression, investigation, administration, and maintenance personnel; daily emergency response consists of more than sixty employees. County Fire also contributes resources to all-hazard response outside Santa Clara County and around the state. For example, County Fire has deployed equipment and personnel in response to the ongoing Mendocino Complex Fire, the largest fire in California's history.

4.      County Fire relies upon Internet-based systems to provide crucial and time-sensitive public safety services. The Internet has become an essential tool in providing fire and emergency response, particularly for events like large fires which require the rapid deployment and organization of thousands of personnel and hundreds of fire engines, aircraft, and bulldozers. During these events, resources are marshaled from across the state and country—in some cases, even from other countries. In these situations, a key responsibility of emergency responders, and of County Fire in particular, is tracking those resources and ensuring they get to the right place as quickly and safely as possible. County Fire, like virtually all other emergency responders, relies heavily on the Internet to do both of these things.

5.      As I explain below, County Fire has experienced throttling by its ISP, Verizon. This throttling has had a significant impact on our ability to provide emergency services. Verizon imposed these limitations despite being informed that throttling was actively impeding County Fire's ability to provide crisis-response and essential emergency services.

6.      Only a few weeks ago, County Fire deployed OES Incident Support Unit 5262 ("OES 5262"), to the Mendocino Complex Fire, now the largest fire in state history. OES 5262

is deployed to large incidents as a command and control resource. Its primary function is to track, organize, and prioritize routing of resources from around the state and country to the sites where they are most needed. OES 5262 relies heavily on the use of specialized software and Google Sheets to do near-real-time resource tracking through the use of cloud computing over the Internet.

7.     Resources tracked across such a large event include personnel and equipment supplied from local governments across California; the State of California; federal agencies including the Department of Defense, the Bureau of Land Management, the U.S. Forest Service; and other countries. As of Monday, August 13, 2018, the response effort for the wildfires burning across California included 13,000 firefighters, multiple aircraft, dozens or hundreds of bulldozers, and hundreds of fire engines. The wildfires have resulted in over 726,000 acres burned and roughly 2,000 structures destroyed. With several months left in what is a "normal" fire season, we fully expect these numbers to rise.

8.     OES 5262 also coordinates all local government resources deployed to the Mendocino Complex Fire. That is, the unit facilitates resource check-in and routing for local government resources. In doing so, the unit typically exchanges 5-10 gigabytes of data per day via the Internet using a mobile router and wireless connection. Near-real-time information exchange is vital to proper function. In large and complex fires, resource allocation requires immediate information. Dated or stale information regarding the availability or need for resources can slow response times and render them far less effective. Resources could be deployed to the wrong fire, the wrong part of a fire, or fail to be deployed at all. Even small delays in response translate into devastating effects, including loss of property, and, in some cases, loss of life.

9.     In the midst of our response to the Mendocino Complex Fire, County Fire discovered the data connection for OES 5262 was being throttled by Verizon, and data rates had been reduced to 1/200, or less, than the previous speeds. These reduced speeds severely interfered with the OES 5262's ability to function effectively. My Information Technology staff

communicated directly with Verizon via email about the throttling, requesting it be immediately lifted for public safety purposes. That email exchange is attached here as Exhibit A. We explained the importance of OES 5262 and its role in providing for public and first-responder safety and requested immediate removal of the throttling. Verizon representatives confirmed the throttling, but, rather than restoring us to an essential data transfer speed, they indicated that County Fire would have to switch to a new data plan at more than twice the cost, and they would only remove throttling after we contacted the Department that handles billing and switched to the new data plan.

10.     In the interim, County Fire personnel in were forced to use other agencies' Internet Service Providers and their own personal devices to provide the necessary connectivity and data transfer capability required by OES 5262. While Verizon ultimately did lift the throttling, it was only after County Fire subscribed to a new, more expensive plan.

11.     In light of our experience, County Fire believes it is likely that Verizon will continue to use the exigent nature of public safety emergencies and catastrophic events to coerce public agencies into higher cost plans ultimately paying significantly more for mission critical service—even if that means risking harm to public safety during negotiations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _August 17, 2018_ at San José, California.

_Anthony Bowden_ (signature)

Anthony Bowden

# EXHIBIT A

## Re: [E] Verizon Account for OES 5262

**From :** Silas Buss <silas.buss@verizonwireless.com>          Mon, Jul 30, 2018 01:50 PM

**Subject :** Re: [E] Verizon Account for OES 5262          📎1 attachment

**To :** daniel farrelly <daniel.farrelly@sccfd.org>

Hi Dan,

Just left you a message. The below plans are what I would suggest - it's $99.99 for the first 20GB and $8/GB thereafter. To get the plan changed immediately, I would suggest calling in the plan change to our customer service team at 800-922-0204. Let me know if you have any questions - I'll be available by phone for at least the next hour or so.

| Public Sector Mobile Broadband Share Plans: Government Subscribers Only | | | |
|---|---|---|---|
| The calling plans below reflect the monthly access fee discount. No additional discounts apply. | | | |
| Public Sector Mobile Broadband | 5 Gigabytes | 10 Gigabytes | 20 Gigabytes |
| Monthly Access Fee | $39.99 (90239) | $59.99 (90240) | $99.99 (90241) |
| Shared Domestic Data Allowance | 5GB | 10GB | 20GB |
| Overage Per Gigabyte | | $8.00 Per Gigabyte | |

Note: This plan is available for domestic data only devices, on the Verizon Wireless network only. Data Sharing: At the end of each bill cycle, any unused data allowances for lines sharing on the same account will be applied to the overages of the other lines on the same account beginning with the line with the lowest overage need. Plan changes may not take effect until the billing cycle following the change request. Current NationalAccess and Mobile Broadband coverage details can be found at www.verizonwireless.com. New activations on these service plans require 4G LTE devices. Existing customers transitioning to one of these service plans are able to utilize existing 3G devices. The 5GB, 10GB, and 20GB Public Sector Mobile Broadband Plans are able to share with each other.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

**verizon**✓

On Mon, Jul 30, 2018 at 10:00 AM Daniel Farrelly <daniel.farrelly@sccfd.org> wrote:

Silas,

Please work with us. All we need is a plan that does not offer throttling or caps of any kind.

Dan

---

**From:** "Daniel Farrelly" <daniel.farrelly@sccfd.org>
**To:** "Silas Buss" <silas.buss@verizonwireless.com>
**Cc:** "tony bowden" <tony.bowden@sccfd.org>, "Justin Stockman" <justin.stockman@sccfd.org>, "Todd Garde" <todd.garde@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Sunday, July 29, 2018 9:38:28 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Silas,

Remove any data throttling on OES5262 effective immediately.

**ADD6**

**From:** "Justin Stockman" <justin.stockman@sccfd.org>
**To:** "Silas Buss" <silas.buss@verizonwireless.com>
**Cc:** "daniel farrelly" <daniel.farrelly@sccfd.org>, "tony bowden" <tony.bowden@sccfd.org>, "Todd Garde" <todd.garde@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Sunday, July 29, 2018 8:32:50 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Chief Bowden,

I just wanted to provide an update to those who were involved in this originally.  OES 5262 is deployed again, now to the Mendocino Complex (CA-MEU-008674), and is still experiencing the same throttling.  As I understood it from our previous exchange regarding this device, the billing cycle was set to end 7/23, which should have alleviated the throttling.  In a side by side comparison, a crew members personal phone using verizon was seeing speeds of 20Mbps/7Mbps.  The department verizon device is experiencing speeds of 0.2Mbps/0.6Mbps, meaning it has no meaningful functionality.

I've sent an email to Dan trying to identify a rapid solution for OES 5262.


Thank you,




Justin Stockman
Fire Captain
B Shift Relief
650-465-2485
Justin.Stockman@sccfd.org


**From:** "Silas Buss" <silas.buss@verizonwireless.com>
**To:** "daniel farrelly" <daniel.farrelly@sccfd.org>
**Cc:** "tony bowden" <tony.bowden@sccfd.org>, "steve prziborowski" <steve.prziborowski@sccfd.org>, "FRED SCHULENBURG" <fred.schulenburg@sccfd.org>, "tamera haas" <tamera.haas@sccfd.org>, "Justin Stockman" <justin.stockman@sccfd.org>, "Todd Garde" <todd.garde@sccfd.org>, "Dave Morrisey" <dave.morrisey@sccfd.org>, "Maggie Eddy" <maggie.eddy@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Monday, July 9, 2018 1:38:10 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Hi Dan,

**ADD7**

I'll give the short response below to some of your questions, but I would certainly suggest we follow-up with a call to discuss in greater detail. Here's my availability this week: **Tues: 1PM, Weds 3PM, Thurs 9AM-11:30AM**

In short, Verizon has always reserved the right to limit data throughput on unlimited plans. All unlimited data plans offered by Verizon have some sort of data throttling built-in, including the $39.99 plan. Verizon does offer plans with no data throughput limitations; these plans require that the customer pay by the GB for use beyond a certain set allotment. Attached is the list of public sector plans, see pgs. 10-18 for data plans. Also attached is the State of CA plans which offers the $37.99 unlimited data plan (pg. 1). We can talk about these plans to find the solution that best fits the needs of your department.

To my knowledge, there have not been any large scale changes to the price plans for the fleet as requested by SCC Fire. As I recall, there were some plan changes made on about 10 of the 400 or so mobile broadband lines from the $39.99 plan to the $37.99 - this was back in January or February. I'd just like to point out that Verizon will never change plans/service without advance customer consent and/or notice. If you'd like to know what those changes were, we can reach out to Asa Pierce, your account advisor, to see what was done at the time.

Service will not disconnect on the unlimited plans after 25GB of use. Depending on which plan is active, after 25GB of use, the data throughput is limited to 200Kbps or 600Kbps.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

**verizon**✓

On Fri, Jul 6, 2018 at 11:54 AM Daniel Farrelly <daniel.farrelly@sccfd.org> wrote:

Silas,

Can confirm that after using 25GB of data, our service drops to zero. This is unacceptable and needs to be fixed. Let me know when you are available.

Dan

---

**From:** "Daniel Farrelly" <daniel.farrelly@sccfd.org>
**To:** "Silas Buss" <silas.buss@verizonwireless.com>
**Cc:** "tony bowden" <tony.bowden@sccfd.org>, "steve prziborowski"
<steve.prziborowski@sccfd.org>, "FRED SCHULENBURG" <fred.schulenburg@sccfd.org>,
"tamera haas" <tamera.haas@sccfd.org>, "justin stockman" <justin.stockman@sccfd.org>,
"todd garde" <todd.garde@sccfd.org>, "dave morrisey" <dave.morrisey@sccfd.org>, "Maggie
Eddy" <maggie.eddy@sccfd.org>, "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Thursday, July 5, 2018 10:23:47 AM
**Subject:** Re: [E] Verizon Account for OES 5262

Silas,

I am back at County Fire full-time and would like to discuss the plans we have with Verizon.

As far as I know all our data plans were originally signed up for a $39.99 plan which offered no data caps or throttling...

However, when I look up the same device on the Verizon portal, there seems to be a 25GB limitation...

I am assuming this is what Justin ran into on OES 5262. Yes, there may be unlimited data, but after 25GB speeds throttle down.

My major concern is that there may have been changes to the data plans we use for public safety, and that these changes might start adversely affecting our fleet. As I mentioned earlier, none of our devices should have any sort of data caps or throttling. Also, speed is essential for the services we utilize. Moving OES 5262 to a $34.99 plan offering 600Kbps is not an adequate solution for devices that require 4G access to data.

With that said, please provide a list of all applicable public safety plans that provide 4G data without any caps or data throttling limitations. Our goal is to have all our devices on one plan that offers both unlimited use and unlimited bandwidth and no data throughput limitations.

If you would like talk direct, feel free to contact me at any time,

**Santa Clara County Fire Department**
—

Daniel Farrelly  -  Systems Analyst
o: 408.341.4468 | c: 408.966.6156
e: daniel.farrelly@sccfd.org

**From:** "Silas Buss" <silas.buss@verizonwireless.com>
**To:** "steve prziborowski" <steve.prziborowski@sccfd.org>
**Cc:** "Garrett Chan" <garrett.chan@verizonwireless.com>, "justin stockman" <justin.stockman@sccfd.org>, "todd garde" <todd.garde@sccfd.org>, "dave morrisey" <dave.morrisey@sccfd.org>, "tony bowden" <tony.bowden@sccfd.org>, "Maggie Eddy" <maggie.eddy@sccfd.org>, "daniel farrelly" <daniel.farrelly@sccfd.org>, "FRED SCHULENBURG" <fred.schulenburg@sccfd.org>, "tamera haas" <tamera.haas@sccfd.org>
**Sent:** Friday, June 29, 2018 2:17:56 PM
**Subject:** Re: [E] Verizon Account for OES 5262

Hello Steve,

As Garrett mentioned, we have a call set at 2:30 to discuss, I hope you'll join.

The short of it is, public safety customers have access to plans that do not have data throughput limitations. However, the current plan set for all of SCCFD's lines does have data throttling limitations. We will need to talk about making some plan changes to all lines or a selection of lines to address the data throttling limitation of the current plan.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

**verizon**✓

On Fri, Jun 29, 2018 at 1:31 PM Steve Prziborowski <steve.prziborowski@sccfd.org> wrote:

Hi Silas,

Justin Stockman made me aware of the Internet bandwidth challenges we are having for our apparatus (OES 5262).

Before I give you my approval to do the $2.00 a month upgrade, the bigger question is why our public safety data usage is getting throttled down? Our understanding from Eric Prosser, our former Information Technology Officer, was that he had received approval from Verizon that public safety should never be gated down because of our critical infrastructure need for these devices. Justin articulates that quite well below in his forwarded email.

The unit we are discussing is basically a fire engine (minus the water, hoses and ladders) but with tools and equipment that is used to support incident operations at major emergencies and/or disasters. It is currently assisting the Incident Command Team at the Pawnee Fire in Lake County, to ensure that all of the apparatus and personnel can effectively mitigate that major wildfire.

If I need to talk to a supervisor or account manager to not have to pay the extra $2 per month and instead, have our account be unlimited and protected from being gated down, please let me know who that person would be.

Thanks for any assistance you can offer us, I look forward to hearing back from you.

Steve

= = =

**Steve Prziborowski**
Deputy Chief / Training
Santa Clara County Fire Department
14700 Winchester Blvd.
Los Gatos, CA 95032-1818

- 408-341-4476 (office)
- 408-896-6890 (cellular)
**Email:** steve.prziborowski@sccfd.org
**Website:** www.sccfd.org

---

**From:** "Justin Stockman" <justin.stockman@sccfd.org>
**To:** "Steve Prziborowski" <steve.prziborowski@sccfd.org>
**Sent:** Friday, June 29, 2018 12:15:59 PM
**Subject:** Fwd: [E] Throttled Device

Chief,

We're having an issue with 5262. 5262 has a device that connects to the internet using a verizon sim card. Data usage on the device is supposed to be unlimited. The reason for this need is that 5262 performs an important public safety function by supporting CalOES region chiefs at large disasters. This device spends months where it sits unused and uses zero data. When it does get used it uses a tremendous

amount of data, on the order of 5-10 gigabytes/day. Verizon throttles normal consumer "unlimited devices" around 23 gigabytes. Throttling means that the device that can normally act like a modern broadband internet connection is slowed to the point of acting more like an AOL dial up modem from 1995. Verizon is currently throttling OES 5262 so severely that it's hampering operations for the assigned crew. This is not the first time we have had this issue. In December of 2017 while deployed to the Prado Mobilization Center supporting a series of large wildfires we had the same device with the same sim card also throttled. I was able to work through Eric Prosser at the time to have service to the device restored and Eric communicated that Verizon had properly re-categorized the device as truly "unlimited".

In the email below Verizon is stating that they can restore the device for an extra $2/month. I obviously lack the authority to make such an approval. If we could get Verizon that approval I would appreciate it.

Respectfully,

Justin Stockman
Fire Captain
B Shift Relief
650-465-2485
Justin.Stockman@sccfd.org

---

**From:** "Silas Buss" <silas.buss@verizonwireless.com>
**To:** "Justin Stockman" <justin.stockman@sccfd.org>
**Cc:** "Garrett Chan" <garrett.chan@verizonwireless.com>
**Sent:** Friday, June 29, 2018 11:35:46 AM
**Subject:** Re: [E] Throttled Device

Hi Justin,

To get the data speeds restored on this device, will you please reply that you approve moving the plan on line 408-438-4844 from the $37.99 (84356) plan to the $39.99 (84357) plan?

We'll talk about what's going on here in the call this afternoon.

**Silas Buss**
Major Accounts Manager - Govt.
201 Spear St. Suite 700 San Francisco, CA 94105
M 408.204.6611 | silas.buss@verizonwireless.com

# verizon✓

> ---------- Forwarded message ---------
> From: **Justin Stockman** <justin.stockman@sccfd.org>
> Date: Fri, Jun 29, 2018 at 9:05 AM
> Subject: [E] Throttled Device
> To: Garrett M Chan <garrett.chan@verizonwireless.com>
>
>
> Hi Garrett,

The device we're having an issue with is a Cradlepoint AER 2100. It is deployed on the Pawnee fire as part of an OES support unit that is providing essential operational coverage for mutual aid resources deployed on that fire. The challenge of this device is that it is normally off, and consumes little to no data on a monthly basis. When the unit gets deployed it used a decent amount of data for a few days to a few weeks. On the order of 5-10gb a day. The crew was getting around 50/10mbps and is current getting 30/130kbps.

Info I have for the device is:
MEID A000005A866927
IMEI 353547064027397
NAI 6692210322@vzims.com
ICCID 89148000002567273591
Mobiel Subscriber ID 4084384844
IMSI 311480257790168
PRI ID 9903437
Cell ID 7844630 (0x77b316)

Hopefully that's more info than you need. Sorry if i'm over supplying, i'm not familiar with a lot of this info.

Justin Stockman
Fire Captain
B Shift Relief
650-465-2485
Justin.Stockman@sccfd.org

--

Verizon

Garrett Chan
Manager Solutions Engineer
Silicon Valley - Northern California/Nevada

2870 Zanker Road, Suite 100
San Jose, CA 95134

O 925.872.0620 | M 925.872.0620
Garrett.Chan@verizonwireless.com

24 hrs DATA TECHNICAL ASSISTANCE
contact the BGCO 1-800-922-0204

Product Information:

IoT Private Network Overview

IoT Private Network White Paper

IoT Security Services | Verizon Enterprise Solutions

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISCTICT OF COLUMBIA CIRCUIT

MOZILLA CORPORATION, et al.,

Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES OF
AMERICA,

Respondents.

Case No. 18-1051 (Lead)

Consolidated with Nos. 10-1052, 18-
1053, 18-1054, 18-1055, 18-1056, 18-
1061, 18-1062, 18-1064, 18-1065, 18-
1066, 18-1067, 18-1068, 18-1088, 18-
1089, 18-1105

## DECLARATION OF IMRE KABAI

I, Imre Kabai, declare:

1.      I make this declaration in support of the Brief of the County of Santa Clara
("County") in the matter referenced above.  I know the facts herein of my own personal
knowledge and if called upon to do so, I could competently testify to them under oath.

2.      I have worked in information technology and architecture for more than twenty-
five years.  I am currently the Chief Technology Officer ("CTO") for the County.  Before I held
this position, I was the Chief Architect and Director of Platforms and Enterprise Architecture for
Granite Construction, a $2.5 billion construction company employing approximately 5,400
employees across the United States.  Before I held that position, I was the Chief Architect for the
Stanford Linear Accelerator Laboratory at Stanford University, and an Enterprise Architect for
the Stanford University Medical Center.  Before I held those positions, I was a Senior Enterprise
Architect and Senior Manager for Life Technologies.

3. I have a B.S. in Computational Mathematics and an MSc in Geophysics from Eötvös Loránd University, one of the top universities in Hungary.

4. Santa Clara County, home to Silicon Valley, has roughly 1.9 million residents. With a $250B GDP it is the world's 43rd largest economy. The County Administration serves the residents and businesses of Santa Clara by providing environmental, safety-net, infrastructure, law enforcement, justice, and healthcare services.

5. The County is heavily dependent upon internet-based technology systems for service delivery and has invested millions of dollars in these systems over the last decade

6. For example, the County's safety-net hospital, Valley Medical Center, has invested in excess of a hundred million dollars in a medical records system, EPIC, that exchanges medical records between the County and thousands of clinics, hospitals, and emergency departments. While the system is capable of reduced functionality in a disaster scenario in which it is completely cut off from those endpoints, a large portion of the value of the system comes from high-volume, speedy records exchange that is free from blocking, throttling, or discriminatory practices.

7. The County has also invested in providing key civic engagement systems via the internet. These services include publication of County law through a niche provider called Municode, and live-streaming of its governing board meetings through Accela, a niche provider of government civic engagement systems. To function properly, these systems require residents to be able to access them without blocking, throttling, or deprioritization that degrades their function.

8. Generally, the County's investments in web-based systems were made in reliance on the idea that they would continue to function as intended because the public would continue to have access to an internet free from discriminatory practices like blocking, throttling, or deprioritization. The County's information technology design principles do not include such scenarios.

9. In addition, because the County's functions are unique to government entities and,

like most government entities, its budget is constrained, the businesses that develop innovative technologies for the County are largely niche businesses that do not have significant resources. It is unlikely that governmental entities or the niche providers who host their services will have the resources to pay the ISPs of any possible user of the County's systems to avoid blocking, throttling, or deprioritization of their traffic. It is also unlikely that the County's users will pay more for the basic governmental access afforded by the County's systems. As a result, in a regime where traffic can be subjected to discriminatory practices by ISPs, it is quite likely that the kind of innovative systems developed by these providers will become much less effective and useful, and, ultimately, it is likely that development of these systems will slow dramatically, or the providers will be unable to continue developing them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __8-16-2018__ at San José, California.

_____

Imre Kabai

**28 U.S.C.**

United States Code, 2016 Edition
Title 28 - JUDICIARY AND JUDICIAL PROCEDURE
PART VI - PARTICULAR PROCEEDINGS
CHAPTER 158 - ORDERS OF FEDERAL AGENCIES; REVIEW
Sec. 2342 - Jurisdiction of court of appeals
From the U.S. Government Publishing Office, www.gpo.gov

## §2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) all rules, regulations, or final orders of—

(A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101–56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6) all final orders under section 812 of the Fair Housing Act; and

(7) all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

**42 U.S.C.**
United States Code, 2016 Edition
Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 68 - DISASTER RELIEF
SUBCHAPTER IV-B - EMERGENCY PREPAREDNESS
Sec. 5195c - Critical infrastructures protection
From the U.S. Government Publishing Office, www.gpo.gov

# §5195c. Critical infrastructures protection

**(a) Short title**

This section may be cited as the "Critical Infrastructures Protection Act of 2001".

**(b) Findings**

Congress makes the following findings:

(1) The information revolution has transformed the conduct of business and the operations of government as well as the infrastructure relied upon for the defense and national security of the United States.

(2) Private business, government, and the national security apparatus increasingly depend on an interdependent network of critical physical and information infrastructures, including telecommunications, energy, financial services, water, and transportation sectors.

(3) A continuous national effort is required to ensure the reliable provision of cyber and physical infrastructure services critical to maintaining the national defense, continuity of government, economic prosperity, and quality of life in the United States.

(4) This national effort requires extensive modeling and analytic capabilities for purposes of evaluating appropriate mechanisms to ensure the stability of these complex and interdependent systems, and to underpin policy recommendations, so as to achieve the continuous viability and adequate protection of the critical infrastructure of the Nation.

**(c) Policy of the United States**

It is the policy of the United States—

(1) that any physical or virtual disruption of the operation of the critical infrastructures of the United States be rare, brief, geographically limited in effect, manageable, and minimally detrimental to the economy, human and government services, and national security of the United States;

(2) that actions necessary to achieve the policy stated in paragraph (1) be carried out in a public-private partnership involving corporate and non-governmental organizations; and

(3) to have in place a comprehensive and effective program to ensure the continuity of essential Federal Government functions under all circumstances.

**(d) Establishment of national competence for critical infrastructure protection**

**(1) Support of critical infrastructure protection and continuity by National Infrastructure Simulation and Analysis Center**

There shall be established the National Infrastructure Simulation and Analysis Center (NISAC) to serve as a source of national competence to address critical infrastructure protection and continuity through support for activities related to counterterrorism, threat assessment, and risk mitigation.

**(2) Particular support**

The support provided under paragraph (1) shall include the following:

(A) Modeling, simulation, and analysis of the systems comprising critical infrastructures, including cyber infrastructure, telecommunications infrastructure, and physical infrastructure, in order to enhance understanding of the large-scale complexity of such systems and to facilitate

modification of such systems to mitigate the threats to such systems and to critical infrastructures generally.

(B) Acquisition from State and local governments and the private sector of data necessary to create and maintain models of such systems and of critical infrastructures generally.

(C) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide education and training to policymakers on matters relating to—

(i) the analysis conducted under that subparagraph;

(ii) the implications of unintended or unintentional disturbances to critical infrastructures; and

(iii) responses to incidents or crises involving critical infrastructures, including the continuity of government and private sector activities through and after such incidents or crises.

(D) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide recommendations to policymakers, and to departments and agencies of the Federal Government and private sector persons and entities upon request, regarding means of enhancing the stability of, and preserving, critical infrastructures.

**(3) Recipient of certain support**

Modeling, simulation, and analysis provided under this subsection shall be provided, in particular, to relevant Federal, State, and local entities responsible for critical infrastructure protection and policy.

**(e) Critical infrastructure defined**

In this section, the term "critical infrastructure" means systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters.

**(f) Authorization of appropriations**

There is hereby authorized for the Department of Defense for fiscal year 2002, $20,000,000 for the Defense Threat Reduction Agency for activities of the National Infrastructure Simulation and Analysis Center under this section in that fiscal year.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 151 - Purposes of chapter; Federal Communications Commission created
From the U.S. Government Publishing Office, www.gpo.gov

## §151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 152 - Application of chapter
From the U.S. Government Publishing Office, www.gpo.gov

## §152. Application of chapter

(a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone. The provisions of this chapter shall apply with respect to cable service, to all persons engaged within the United States in providing such service, and to the facilities of cable operators which relate to such service, as provided in subchapter V–A.

(b) Except as provided in sections 223 through 227 of this title, inclusive, and section 332 of this title, and subject to the provisions of section 301 of this title and subchapter V–A, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio, or by wire and radio, with facilities, located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) of this subsection would be applicable except for furnishing interstate mobile radio communication service or radio communication service to mobile stations on land vehicles in Canada or Mexico; except that sections 201 to 205 of this title shall, except as otherwise provided therein, apply to carriers described in clauses (2), (3), and (4) of this subsection.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 153 - Definitions
From the U.S. Government Publishing Office, www.gpo.gov

# §153. Definitions

For the purposes of this chapter, unless the context otherwise requires—

[*Sections 1-23 omitted*]

### (24) Information service

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

[*Sections 25-49 omitted*]

### (50) Telecommunications

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

### (51) Telecommunications carrier

The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

[*Section 52 omitted*]

### (53) Telecommunications service

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

[*Remaining sections omitted*]

**ADD21**

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 154 - Federal Communications Commission
From the U.S. Government Publishing Office, www.gpo.gov

## §154. Federal Communications Commission

[*Sections a-h omitted*]

### (i) Duties and powers

The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

[*Remaining sections omitted*]

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER I - GENERAL PROVISIONS
Sec. 160 - Competition in provision of telecommunications service
From the U.S. Government Publishing Office, www.gpo.gov

## §160. Competition in provision of telecommunications service

**(a) Regulatory flexibility**

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that—

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

**(b) Competitive effect to be weighed**

In making the determination under subsection (a)(3), the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

**(c) Petition for forbearance**

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a). The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

**(d) Limitation**

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

**(e) State enforcement after Commission forbearance**

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a).

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation
Sec. 214 - Extension of lines or discontinuance of service; certificate of public convenience and necessity
From the U.S. Government Publishing Office, www.gpo.gov

# §214. Extension of lines or discontinuance of service; certificate of public convenience and necessity

**(a) Exceptions; temporary or emergency service or discontinuance of service; changes in plant, operation or equipment**

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: *Provided*, That no such certificate shall be required under this section for the construction, acquisition, or operation of (1) a line within a single State unless such line constitutes part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any line acquired under section 221 of this title: *Provided further*, That the Commission may, upon appropriate request being made, authorize temporary or emergency service, or the supplementing of existing facilities, without regard to the provisions of this section. No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: *Provided, however*, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.

**(b) Notification of Secretary of Defense, Secretary of State, and State Governor**

Upon receipt of an application for any such certificate, the Commission shall cause notice thereof to be given to, and shall cause a copy of such application to be filed with, the Secretary of Defense, the Secretary of State (with respect to such applications involving service to foreign points), and the Governor of each State in which such line is proposed to be constructed, extended, acquired, or operated, or in which such discontinuance, reduction, or impairment of service is proposed, with the right to those notified to be heard; and the Commission may require such published notice as it shall determine.

**(c) Approval or disapproval; injunction**

The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and

not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, extension, acquisition, operation, or discontinuance, reduction, or impairment of service covered thereby. Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest.

**(d) Order of Commission; hearing; penalty**

The Commission may, after full opportunity for hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier, party to such proceeding, to provide itself with adequate facilities for the expeditious and efficient performance of its service as a common carrier and to extend its line or to establish a public office; but no such authorization or order shall be made unless the Commission finds, as to such provision of facilities, as to such establishment of public offices, or as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier which refuses or neglects to comply with any order of the Commission made in pursuance of this subsection shall forfeit to the United States $1,200 for each day during which such refusal or neglect continues.

**(e) Provision of universal service**

**(1) Eligible telecommunications carriers**

A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received—

(A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and

(B) advertise the availability of such services and the charges therefor using media of general distribution.

**(2) Designation of eligible telecommunications carriers**

A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

**(3) Designation of eligible telecommunications carriers for unserved areas**

If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

### (4) Relinquishment of universal service

A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

### (5) "Service area" defined

The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

### (6) Common carriers not subject to State commission jurisdiction

In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation
Sec. 224 - Pole attachments
From the U.S. Government Publishing Office, www.gpo.gov

# §224. Pole attachments

### (a) Definitions

As used in this section:

(1) The term "utility" means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State.

(2) The term "Federal Government" means the Government of the United States or any agency or instrumentality thereof.

(3) The term "State" means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

(4) The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

(5) For purposes of this section, the term "telecommunications carrier" (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title.

### (b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of this title.

(2) The Commission shall prescribe by rule regulations to carry out the provisions of this section.

### (c) State regulatory authority over rates, terms, and conditions; preemption; certification; circumstances constituting State regulation

(1) Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and rights-of-way as provided in subsection (f), for pole attachments in any case where such matters are regulated by a State.

(2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the Commission that—

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

(3) For purposes of this subsection, a State shall not be considered to regulate the rates, terms, and

conditions for pole attachments—

    (A) unless the State has issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments; and

    (B) with respect to any individual matter, unless the State takes final action on a complaint regarding such matter—

      (i) within 180 days after the complaint is filed with the State, or

      (ii) within the applicable period prescribed for such final action in such rules and regulations of the State, if the prescribed period does not extend beyond 360 days after the filing of such complaint.

**(d) Determination of just and reasonable rates; "usable space" defined**

    (1) For purposes of subsection (b) of this section, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

    (2) As used in this subsection, the term "usable space" means the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment.

    (3) This subsection shall apply to the rate for any pole attachment used by a cable television system solely to provide cable service. Until the effective date of the regulations required under subsection (e), this subsection shall also apply to the rate for any pole attachment used by a cable system or any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) to provide any telecommunications service.

**(e) Regulations governing charges; apportionment of costs of providing space**

    (1) The Commission shall, no later than 2 years after February 8, 1996, prescribe regulations in accordance with this subsection to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges. Such regulations shall ensure that a utility charges just, reasonable, and nondiscriminatory rates for pole attachments.

    (2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

    (3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

    (4) The regulations required under paragraph (1) shall become effective 5 years after February 8, 1996. Any increase in the rates for pole attachments that result from the adoption of the regulations required by this subsection shall be phased in equal annual increments over a period of 5 years beginning on the effective date of such regulations.

**(f) Nondiscriminatory access**

    (1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.

    (2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory [1] basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

**(g) Imputation to costs of pole attachment rate**

    A utility that engages in the provision of telecommunications services or cable services shall impute to its costs of providing such services (and charge any affiliate, subsidiary, or associate company engaged in the provision of such services) an equal amount to the pole attachment rate for which such company would be liable under this section.

**(h) Modification or alteration of pole, duct, conduit, or right-of-way**

Whenever the owner of a pole, duct, conduit, or right-of-way intends to modify or alter such pole, duct, conduit, or right-of-way, the owner shall provide written notification of such action to any entity that has obtained an attachment to such conduit or right-of-way so that such entity may have a reasonable opportunity to add to or modify its existing attachment. Any entity that adds to or modifies its existing attachment after receiving such notification shall bear a proportionate share of the costs incurred by the owner in making such pole, duct, conduit, or right-of-way accessible.

**(i) Costs of rearranging or replacing attachment**

An entity that obtains an attachment to a pole, conduit, or right-of-way shall not be required to bear any of the costs of rearranging or replacing its attachment, if such rearrangement or replacement is required as a result of an additional attachment or the modification of an existing attachment sought by any other entity (including the owner of such pole, duct, conduit, or right-of-way).

[1] *So in original. Probably should be "nondiscriminatory".*

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part I - Common Carrier Regulation
Sec. 230 - Protection for private blocking and screening of offensive material
From the U.S. Government Publishing Office, www.gpo.gov

# §230. Protection for private blocking and screening of offensive material

## (a) Findings

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

## (b) Policy

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

## (c) Protection for "Good Samaritan" blocking and screening of offensive material

### (1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

### (2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others

the technical means to restrict access to material described in paragraph (1).[1]

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:
(A) filter, screen, allow, or disallow content;
(B) pick, choose, analyze, or digest content; or
(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

**ADD31**

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part II - Development of Competitive Markets
Sec. 253 - Removal of barriers to entry
From the U.S. Government Publishing Office, www.gpo.gov

# §253. Removal of barriers to entry

**(a) In general**

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

**(b) State regulatory authority**

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

**(c) State and local government authority**

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

**(d) Preemption**

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

**(e) Commercial mobile service providers**

Nothing in this section shall affect the application of section 332(c)(3) of this title to commercial mobile service providers.

**(f) Rural markets**

It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) of this title for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply—

(1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) of this title that effectively prevents a competitor from meeting the requirements of section 214(e)(1) of this title; and

(2) to a provider of commercial mobile services.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER II - COMMON CARRIERS
Part II - Development of Competitive Markets
Sec. 254 - Universal service
From the U.S. Government Publishing Office, www.gpo.gov

# §254. Universal service

## (a) Procedures to review universal service requirements

### (1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

### (2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

## (b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

### (1) Quality and rates

Quality services should be available at just, reasonable, and affordable rates.

### (2) Access to advanced services

Access to advanced telecommunications and information services should be provided in all regions of the Nation.

### (3) Access in rural and high cost areas

Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

### (4) Equitable and nondiscriminatory contributions

All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

### (5) Specific and predictable support mechanisms

There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

### (6) Access to advanced telecommunications services for schools, health care, and libraries

Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

### (7) Additional principles

Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

## (c) Definition

### (1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

### (2) Alterations and modifications

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

### (3) Special services

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

## (d) Telecommunications carrier contribution

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

## (e) Universal service support

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

## (f) State authority

A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a

manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

**(g) Interexchange and interstate services**

Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

**(h) Telecommunications services for certain providers**

**(1) In general**

**(A) Health care providers for rural areas**

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

**(B) Educational providers and libraries**

All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3), provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall—

(i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

(ii) notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

**(2) Advanced services**

The Commission shall establish competitively neutral rules—

(A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

(B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

**(3) Terms and conditions**

Telecommunications services and network capacity provided to a public institutional telecommunications user under this subsection may not be sold, resold, or otherwise transferred by such user in consideration for money or any other thing of value.

**(4) Eligibility of users**

No entity listed in this subsection shall be entitled to preferential rates or treatment as required by this subsection, if such entity operates as a for-profit business, is a school described in paragraph (7)(A) with an endowment of more than $50,000,000, or is a library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act [20 U.S.C. 9121 et seq.].

**(5) Requirements for certain schools with computers having Internet access**

**(A) Internet safety**

**(i) In general**

Except as provided in clause (ii), an elementary or secondary school having computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(I) submits to the Commission the certifications described in subparagraphs (B) and (C);

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the school under subsection (l); and

(III) ensures the use of such computers in accordance with the certifications.

**(ii) Applicability**

The prohibition in clause (i) shall not apply with respect to a school that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

**(iii) Public notice; hearing**

An elementary or secondary school described in clause (i), or the school board, local educational agency, or other authority with responsibility for administration of the school, shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy. In the case of an elementary or secondary school other than an elementary school or a secondary school as defined in section 7801 of title 20, the notice and hearing required by this clause may be limited to those members of the public with a relationship to the school.

**(B) Certification with respect to minors**

A certification under this subparagraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(i) is enforcing a policy of Internet safety for minors that includes monitoring the online activities of minors and the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene;

(II) child pornography; or

(III) harmful to minors;

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors; and

(iii) as part of its Internet safety policy is educating minors about appropriate online behavior, including interacting with other individuals on social networking websites and in chat rooms and cyberbullying awareness and response.

**(C) Certification with respect to adults**

A certification under this paragraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene; or
(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

**(D) Disabling during adult use**

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

**(E) Timing of implementation**

**(i) In general**

Subject to clause (ii) in the case of any school covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made—

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

**(ii) Process**

**(I) Schools with Internet safety policy and technology protection measures in place**

A school covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

**(II) Schools without Internet safety policy and technology protection measures in place**

A school covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)—

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any school that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such school comes into compliance with this paragraph.

**(III) Waivers**

Any school subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year program may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding

requirements prevent the making of the certification otherwise required by such subclause. A school, school board, local educational agency, or other authority with responsibility for administration of the school shall notify the Commission of the applicability of such subclause to the school. Such notice shall certify that the school in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the school is applying for funds under this subsection.

**(F) Noncompliance**

**(i) Failure to submit certification**

Any school that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

**(ii) Failure to comply with certification**

Any school that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse any funds and discounts received under this subsection for the period covered by such certification.

**(iii) Remedy of noncompliance**

**(I) Failure to submit**

A school that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the school shall be eligible for services at discount rates under this subsection.

**(II) Failure to comply**

A school that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the school shall be eligible for services at discount rates under this subsection.

**(6) Requirements for certain libraries with computers having Internet access**

**(A) Internet safety**

**(i) In general**

Except as provided in clause (ii), a library having one or more computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the library—

(I) submits to the Commission the certifications described in subparagraphs (B) and (C); and

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the library under subsection (l); and

(III) ensures the use of such computers in accordance with the certifications.

**(ii) Applicability**

The prohibition in clause (i) shall not apply with respect to a library that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

**(iii) Public notice; hearing**

A library described in clause (i) shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

**(B) Certification with respect to minors**

A certification under this subparagraph is a certification that the library—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene;

(II) child pornography; or

(III) harmful to minors; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors.

**(C) Certification with respect to adults**

A certification under this paragraph is a certification that the library—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

**(D) Disabling during adult use**

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

**(E) Timing of implementation**

**(i) In general**

Subject to clause (ii) in the case of any library covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made—

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

**(ii) Process**

**(I) Libraries with Internet safety policy and technology protection measures in place**

A library covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

**(II) Libraries without Internet safety policy and technology protection measures in place**

A library covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)—

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it

is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any library that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such library comes into compliance with this paragraph.

**(III) Waivers**

Any library subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A library, library board, or other authority with responsibility for administration of the library shall notify the Commission of the applicability of such subclause to the library. Such notice shall certify that the library in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the library is applying for funds under this subsection.

**(F) Noncompliance**

**(i) Failure to submit certification**

Any library that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

**(ii) Failure to comply with certification**

Any library that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse all funds and discounts received under this subsection for the period covered by such certification.

**(iii) Remedy of noncompliance**

**(I) Failure to submit**

A library that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the library shall be eligible for services at discount rates under this subsection.

**(II) Failure to comply**

A library that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the library shall be eligible for services at discount rates under this subsection.

**(7) Definitions**

For purposes of this subsection:

**(A) Elementary and secondary schools**

The term "elementary and secondary schools" means elementary schools and secondary schools, as defined in section 7801 of title 20.

**(B) Health care provider**

The term "health care provider" means—

(i) post-secondary educational institutions offering health care instruction, teaching hospitals, and medical schools;

(ii) community health centers or health centers providing health care to migrants;

(iii) local health departments or agencies;

(iv) community mental health centers;

(v) not-for-profit hospitals;

(vi) rural health clinics;

(vii) skilled nursing facilities (as defined in section 395i–3(a) of title 42); and

(viii) consortia of health care providers consisting of one or more entities described in clauses (i) through (vii).

**(C) Public institutional telecommunications user**

The term "public institutional telecommunications user" means an elementary or secondary school, a library, or a health care provider as those terms are defined in this paragraph.

**(D) Minor**

The term "minor" means any individual who has not attained the age of 17 years.

**(E) Obscene**

The term "obscene" has the meaning given such term in section 1460 of title 18.

**(F) Child pornography**

The term "child pornography" has the meaning given such term in section 2256 of title 18.

**(G) Harmful to minors**

The term "harmful to minors" means any picture, image, graphic image file, or other visual depiction that—

(i) taken as a whole and with respect to minors, appeals to a prurient interest in nudity, sex, or excretion;

(ii) depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals; and

(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value as to minors.

**(H) Sexual act; sexual contact**

The terms "sexual act" and "sexual contact" have the meanings given such terms in section 2246 of title 18.

**(I) Technology protection measure**

The term "technology protection measure" means a specific technology that blocks or filters Internet access to the material covered by a certification under paragraph (5) or (6) to which such certification relates.

**(i) Consumer protection**

The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

**(j) Lifeline assistance**

Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

**(k) Subsidy of competitive services prohibited**

A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

**(l) Internet safety policy requirement for schools and libraries**

**(1) In general**

In carrying out its responsibilities under subsection (h), each school or library to which subsection (h) applies shall—

(A) adopt and implement an Internet safety policy that addresses—

(i) access by minors to inappropriate matter on the Internet and World Wide Web;

(ii) the safety and security of minors when using electronic mail, chat rooms, and other forms of direct electronic communications;

(iii) unauthorized access, including so-called "hacking", and other unlawful activities by minors online;

(iv) unauthorized disclosure, use, and dissemination of personal identification information regarding minors; and

(v) measures designed to restrict minors' access to materials harmful to minors; and

(B) provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

**(2) Local determination of content**

A determination regarding what matter is inappropriate for minors shall be made by the school board, local educational agency, library, or other authority responsible for making the determination. No agency or instrumentality of the United States Government may—

(A) establish criteria for making such determination;

(B) review the determination made by the certifying school, school board, local educational agency, library, or other authority; or

(C) consider the criteria employed by the certifying school, school board, local educational agency, library, or other authority in the administration of subsection (h)(1)(B).

**(3) Availability for review**

Each Internet safety policy adopted under this subsection shall be made available to the Commission, upon request of the Commission, by the school, school board, local educational agency, library, or other authority responsible for adopting such Internet safety policy for purposes of the review of such Internet safety policy by the Commission.

**(4) Effective date**

This subsection shall apply with respect to schools and libraries on or after the date that is 120 days after December 21, 2000.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER III - SPECIAL PROVISIONS RELATING TO RADIO
Part I - General Provisions
Sec. 332 - Mobile services
From the U.S. Government Publishing Office, www.gpo.gov

# §332. Mobile services

[*Sections a-b omitted*]

## (c) Regulatory treatment of mobile services

### (1) Common carrier treatment of commercial mobile services

(A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that—

(i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

(ii) enforcement of such provision is not necessary for the protection of consumers; and

(iii) specifying such provision is consistent with the public interest.

(B) Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter.

(C) As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

(D) The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to the licensing of personal communications services, including making any determinations required by subparagraph (C).

**(2) Non-common carrier treatment of private mobile services**

A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

**(3) State preemption**

(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

(ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.

The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

(B) If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

### (4) Regulatory treatment of communications satellite corporation

Nothing in this subsection shall be construed to alter or affect the regulatory treatment required by title IV of the Communications Satellite Act of 1962 [47 U.S.C. 741 et seq.] of the corporation authorized by title III of such Act [47 U.S.C. 731 et seq.].

### (5) Space segment capacity

Nothing in this section shall prohibit the Commission from continuing to determine whether the provision of space segment capacity by satellite systems to providers of commercial mobile services shall be treated as common carriage.

### (6) Foreign ownership

The Commission, upon a petition for waiver filed within 6 months after August 10, 1993, may waive the application of section 310(b) of this title to any foreign ownership that lawfully existed before May 24, 1993, of any provider of a private land mobile service that will be treated as a common carrier as a result of the enactment of the Omnibus Budget Reconciliation Act of 1993, but only upon the following conditions:

(A) The extent of foreign ownership interest shall not be increased above the extent which existed on May 24, 1993.

(B) Such waiver shall not permit the subsequent transfer of ownership to any other person in violation of section 310(b) of this title.

### (7) Preservation of local zoning authority

#### (A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

#### (B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or

**ADD45**

instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

### (C) Definitions

For purposes of this paragraph—

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

## (8) Mobile services access

A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services. If the Commission determines that subscribers to such services are denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

[*Section d omitted*]

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER IV - PROCEDURAL AND ADMINISTRATIVE PROVISIONS
Sec. 402 - Judicial review of Commission's orders and decisions
From the U.S. Government Publishing Office, www.gpo.gov

# §402. Judicial review of Commission's orders and decisions

### (a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.

### (b) Right to appeal

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

(2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

(3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

(4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

(5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

(8) By any radio operator whose license has been suspended by the Commission.

(9) By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

(10) By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

### (c) Filing notice of appeal; contents; jurisdiction; temporary orders

Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of. Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission. Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper. Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless

otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

**(d) Notice to interested parties; filing of record**

Upon the filing of any such notice of appeal the appellant shall, not later than five days after the filing of such notice, notify each person shown by the records of the Commission to be interested in said appeal of the filing and pendency of the same. The Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28.

**(e) Intervention**

Within thirty days after the filing of any such appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission. Any person who would be aggrieved or whose interest would be adversely affected by a reversal or modification of the order of the Commission complained of shall be considered an interested party.

**(f) Records and briefs**

The record and briefs upon which any such appeal shall be heard and determined by the court shall contain such information and material, and shall be prepared within such time and in such manner as the court may by rule prescribe.

**(g) Time of hearing; procedure**

The court shall hear and determine the appeal upon the record before it in the manner prescribed by section 706 of title 5.

**(h) Remand**

In the event that the court shall render a decision and enter an order reversing the order of the Commission, it shall remand the case to the Commission to carry out the judgment of the court and it shall be the duty of the Commission, in the absence of the proceedings to review such judgment, to forthwith give effect thereto, and unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record upon which said appeal was heard and determined.

**(i) Judgment for costs**

The court may, in its discretion, enter judgment for costs in favor of or against an appellant, or other interested parties intervening in said appeal, but not against the Commission, depending upon the nature of the issues involved upon said appeal and the outcome thereof.

**(j) Finality of decision; review by Supreme Court**

The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 1254 of title 28, by the appellant, by the Commission, or by any interested party intervening in the appeal, or by certification by the court pursuant to the provisions of that section.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 5 - WIRE OR RADIO COMMUNICATION
SUBCHAPTER IV - PROCEDURAL AND ADMINISTRATIVE PROVISIONS
Sec. 414 - Exclusiveness of chapter
From the U.S. Government Publishing Office, www.gpo.gov

## §414. Exclusiveness of chapter

Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

**ADD49**

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 12 - BROADBAND
Sec. 1302 - Advanced telecommunications incentives
From the U.S. Government Publishing Office, www.gpo.gov

# §1302. Advanced telecommunications incentives

**(a) In general**

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

**(b) Inquiry**

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

**(c) Demographic information for unserved areas**

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) [1] and to the extent that data from the Census Bureau is available, determine, for each such unserved area—
    (1) the population;
    (2) the population density; and
    (3) the average per capita income.

**(d) Definitions**

For purposes of this subsection: [2]

**(1) Advanced telecommunications capability**

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

**(2) Elementary and secondary schools**

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of title 20.

**47 U.S.C.**
United States Code, 2016 Edition
Title 47 - TELECOMMUNICATIONS
CHAPTER 12 - BROADBAND
Sec. 1304 - Encouraging State initiatives to improve broadband
From the U.S. Government Publishing Office, www.gpo.gov

# §1304. Encouraging State initiatives to improve broadband

## (a) Purposes

The purposes of any grant under subsection (b) are—

(1) to ensure that all citizens and businesses in a State have access to affordable and reliable broadband service;

(2) to achieve improved technology literacy, increased computer ownership, and broadband use among such citizens and businesses;

(3) to establish and empower local grassroots technology teams in each State to plan for improved technology use across multiple community sectors; and

(4) to establish and sustain an environment ripe for broadband services and information technology investment.

## (b) Establishment of State broadband data and development grant program

### (1) In general

The Secretary of Commerce shall award grants, taking into account the results of the peer review process under subsection (d), to eligible entities for the development and implementation of statewide initiatives to identify and track the availability and adoption of broadband services within each State.

### (2) Competitive basis

Any grant under subsection (b) shall be awarded on a competitive basis.

## (c) Eligibility

To be eligible to receive a grant under subsection (b), an eligible entity shall—

(1) submit an application to the Secretary of Commerce, at such time, in such manner, and containing such information as the Secretary may require;

(2) contribute matching non-Federal funds in an amount equal to not less than 20 percent of the total amount of the grant; and

(3) agree to comply with confidentiality requirements in subsection (h)(2) of this section.

## (d) Peer review; nondisclosure

### (1) In general

The Secretary shall by regulation require appropriate technical and scientific peer review of applications made for grants under this section.

### (2) Review procedures

The regulations required under paragraph (1) shall require that any technical and scientific peer review group—

(A) be provided a written description of the grant to be reviewed;

(B) provide the results of any review by such group to the Secretary of Commerce; and

(C) certify that such group will enter into voluntary nondisclosure agreements as necessary to prevent the unauthorized disclosure of confidential and proprietary information provided by broadband service providers in connection with projects funded by any such grant.

## (e) Use of funds

A grant awarded to an eligible entity under subsection (b) shall be used—

(1) to provide a baseline assessment of broadband service deployment in each State;

(2) to identify and track—

    (A) areas in each State that have low levels of broadband service deployment;

    (B) the rate at which residential and business users adopt broadband service and other related information technology services; and

    (C) possible suppliers of such services;

(3) to identify barriers to the adoption by individuals and businesses of broadband service and related information technology services, including whether or not—

    (A) the demand for such services is absent; and

    (B) the supply for such services is capable of meeting the demand for such services;

(4) to identify the speeds of broadband connections made available to individuals and businesses within the State, and, at a minimum, to rely on the data rate benchmarks for broadband service utilized by the Commission to reflect different speed tiers, to promote greater consistency of data among the States;

(5) to create and facilitate in each county or designated region in a State a local technology planning team—

    (A) with members representing a cross section of the community, including representatives of business, telecommunications labor organizations, K–12 education, health care, libraries, higher education, community-based organizations, local government, tourism, parks and recreation, and agriculture; and

    (B) which shall—

        (i) benchmark technology use across relevant community sectors;

        (ii) set goals for improved technology use within each sector; and

        (iii) develop a tactical business plan for achieving its goals, with specific recommendations for online application development and demand creation;

(6) to work collaboratively with broadband service providers and information technology companies to encourage deployment and use, especially in unserved areas and areas in which broadband penetration is significantly below the national average, through the use of local demand aggregation, mapping analysis, and the creation of market intelligence to improve the business case for providers to deploy;

(7) to establish programs to improve computer ownership and Internet access for unserved areas and areas in which broadband penetration is significantly below the national average;

(8) to collect and analyze detailed market data concerning the use and demand for broadband service and related information technology services;

(9) to facilitate information exchange regarding the use and demand for broadband services between public and private sectors; and

(10) to create within each State a geographic inventory map of broadband service, including the data rate benchmarks for broadband service utilized by the Commission to reflect different speed tiers, which shall—

    (A) identify gaps in such service through a method of geographic information system mapping of service availability based on the geographic boundaries of where service is available or unavailable among residential or business customers; and

    (B) provide a baseline assessment of statewide broadband deployment in terms of households with high-speed availability.

**(f) Participation limit**

For each State, an eligible entity may not receive a new grant under this section to fund the activities described in subsection (d) within such State if such organization obtained prior grant awards under this section to fund the same activities in that State in each of the previous 4 consecutive years.

**(g) Reporting; broadband inventory map**

The Secretary of Commerce shall—

(1) require each recipient of a grant under subsection (b) to submit a report on the use of the funds provided by the grant; and

(2) create a web page on the Department of Commerce website that aggregates relevant information made available to the public by grant recipients, including, where appropriate, hypertext links to any geographic inventory maps created by grant recipients under subsection (e) (10).

## (h) Access to aggregate data

### (1) In general

Subject to paragraph (2), the Commission shall provide eligible entities access, in electronic form, to aggregate data collected by the Commission based on the Form 477 submissions of broadband service providers.

### (2) Limitation

Notwithstanding any provision of Federal or State law to the contrary, an eligible entity shall treat any matter that is a trade secret, commercial or financial information, or privileged or confidential, as a record not subject to public disclosure except as otherwise mutually agreed to by the broadband service provider and the eligible entity. This paragraph applies only to information submitted by the Commission or a broadband provider to carry out the provisions of this chapter and shall not otherwise limit or affect the rules governing public disclosure of information collected by any Federal or State entity under any other Federal or State law or regulation.

## (i) Definitions

In this section:

### (1) Commission

The term "Commission" means the Federal Communications Commission.

### (2) Eligible entity

The term "eligible entity" means—

(A) an entity that is either—

(i) an agency or instrumentality of a State, or a municipality or other subdivision (or agency or instrumentality of a municipality or other subdivision) of a State;

(ii) a nonprofit organization that is described in section 501(c)(3) of title 26 and that is exempt from taxation under section 501(a) of such title; or

(iii) an independent agency or commission in which an office of a State is a member on behalf of the State; and

(B) is the single eligible entity in the State that has been designated by the State to receive a grant under this section.

## (j) No regulatory authority

Nothing in this section shall be construed as giving any public or private entity established or affected by this chapter any regulatory jurisdiction or oversight authority over providers of broadband services or information technology.

# TITLE VI—EFFECT ON OTHER LAWS

47 USC 152 note.

**SEC. 601. APPLICABILITY OF CONSENT DECREES AND OTHER LAW.**

(a) APPLICABILITY OF AMENDMENTS TO FUTURE CONDUCT.—

(1) AT&T CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the AT&T Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

(2) GTE CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the GTE Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

(3) McCAW CONSENT DECREE.—Any conduct or activity that was, before the date of enactment of this Act, subject to any restriction or obligation imposed by the McCaw Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act and subsection (d) of this section and shall not be subject to the restrictions and the obligations imposed by such Consent Decree.

(b) ANTITRUST LAWS.—

(1) SAVINGS CLAUSE.—Except as provided in paragraphs (2) and (3), nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.

(2) REPEAL.—Subsection (a) of section 221 (47 U.S.C. 221(a)) is repealed.

(3) CLAYTON ACT.—Section 7 of the Clayton Act (15 U.S.C. 18) is amended in the last paragraph by striking "Federal Communications Commission,".

(c) FEDERAL, STATE, AND LOCAL LAW.—

(1) NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

(2) STATE TAX SAVINGS PROVISION.—Notwithstanding paragraph (1), nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or supersession of, any State or local law pertaining to taxation, except as provided

in sections 622 and 653(c) of the Communications Act of 1934 and section 602 of this Act.

(d) COMMERCIAL MOBILE SERVICE JOINT MARKETING.—Notwithstanding section 22.903 of the Commission's regulations (47 C.F.R. 22.903) or any other Commission regulation, a Bell operating company or any other company may, except as provided in sections 271(e)(1) and 272 of the Communications Act of 1934 as amended by this Act as they relate to wireline service, jointly market and sell commercial mobile services in conjunction with telephone exchange service, exchange access, intraLATA telecommunications service, interLATA telecommunications service, and information services.

(e) DEFINITIONS.—As used in this section:

(1) AT&T CONSENT DECREE.—The term "AT&T Consent Decree" means the order entered August 24, 1982, in the antitrust action styled United States v. Western Electric, Civil Action No. 82–0192, in the United States District Court for the District of Columbia, and includes any judgment or order with respect to such action entered on or after August 24, 1982.

(2) GTE CONSENT DECREE.—The term "GTE Consent Decree" means the order entered December 21, 1984, as restated January 11, 1985, in the action styled United States v. GTE Corp., Civil Action No. 83–1298, in the United States District Court for the District of Columbia, and any judgment or order with respect to such action entered on or after December 21, 1984.

(3) MCCAW CONSENT DECREE.—The term "McCaw Consent Decree" means the proposed consent decree filed on July 15, 1994, in the antitrust action styled United States v. AT&T Corp. and McCaw Cellular Communications, Inc., Civil Action No. 94–01555, in the United States District Court for the District of Columbia. Such term includes any stipulation that the parties will abide by the terms of such proposed consent decree until it is entered and any order entering such proposed consent decree.

(4) ANTITRUST LAWS.—The term "antitrust laws" has the meaning given it in subsection (a) of the first section of the Clayton Act (15 U.S.C. 12(a)), except that such term includes the Act of June 19, 1936 (49 Stat. 1526; 15 U.S.C. 13 et seq.), commonly known as the Robinson-Patman Act, and section 5 of the Federal Trade Commission Act (15 U.S.C. 45) to the extent that such section 5 applies to unfair methods of competition.

**SEC. 602. PREEMPTION OF LOCAL TAXATION WITH RESPECT TO DIRECT-TO-HOME SERVICES.**

(a) PREEMPTION.—A provider of direct-to-home satellite service shall be exempt from the collection or remittance, or both, of any tax or fee imposed by any local taxing jurisdiction on direct-to-home satellite service.

(b) DEFINITIONS.—For the purposes of this section—

(1) DIRECT-TO-HOME SATELLITE SERVICE.—The term "direct-to-home satellite service" means only programming transmitted or broadcast by satellite directly to the subscribers' premises without the use of ground receiving or distribution equipment,

except at the subscribers' premises or in the uplink process to the satellite.

(2) PROVIDER OF DIRECT-TO-HOME SATELLITE SERVICE.—For purposes of this section, a "provider of direct-to-home satellite service" means a person who transmits, broadcasts, sells, or distributes direct-to-home satellite service.

(3) LOCAL TAXING JURISDICTION.—The term "local taxing jurisdiction" means any municipality, city, county, township, parish, transportation district, or assessment jurisdiction, or any other local jurisdiction in the territorial jurisdiction of the United States with the authority to impose a tax or fee, but does not include a State.

(4) STATE.—The term "State" means any of the several States, the District of Columbia, or any territory or possession of the United States.

(5) TAX OR FEE.—The terms "tax" and "fee" mean any local sales tax, local use tax, local intangible tax, local income tax, business license tax, utility tax, privilege tax, gross receipts tax, excise tax, franchise fees, local telecommunications tax, or any other tax, license, or fee that is imposed for the privilege of doing business, regulating, or raising revenue for a local taxing jurisdiction.

(c) PRESERVATION OF STATE AUTHORITY.—This section shall not be construed to prevent taxation of a provider of direct-to-home satellite service by a State or to prevent a local taxing jurisdiction from receiving revenue derived from a tax or fee imposed and collected by a State.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the accompanying Addendum to Brief for Government Petitioners by using the CM/ECF system on November 27, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:   November 27, 2018
         New York, NY


 /s/ Ester Murdukhayeva