# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 18-1051 (and consolidated cases)

MOZILLA CORPORATION, *et al.*,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

## JOINT BRIEF FOR PETITIONERS MOZILLA CORPORATION, VIMEO, INC., PUBLIC KNOWLEDGE, OPEN TECHNOLOGY INSTITUTE, NATIONAL HISPANIC MEDIA COALITION, NTCH, INC., BENTON FOUNDATION, FREE PRESS, COALITION FOR INTERNET OPENNESS, ETSY, INC., AD HOC TELECOM USERS COMMITTEE, CENTER FOR DEMOCRACY AND TECHNOLOGY, AND INCOMPAS

Pantelis Michalopoulos
Cynthia Taub
Travis West
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C. 20036
*Counsel for Petitioners Coalition for Internet Openness and Etsy, Inc.*

Markham C. Erickson
Georgios Leris
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C. 20036
(202) 429-3000
merickson@steptoe.com
*Counsel for Petitioners Mozilla Corporation and INCOMPAS*

Michael A. Cheah
General Counsel
**VIMEO, INC.**
555 West 18th Street
New York, NY 10011
*Counsel for Petitioner Vimeo, Inc.*

Kevin Kendrick Russell
**GOLDSTEIN & RUSSELL, PC**
7475 Wisconsin Avenue,
Suite 850, Bethesda, MD 20814
*Counsel for Petitioners New America's Open Technology Institute, Free Press, and Public Knowledge*

November 27, 2018 *(additional counsel listed on inside cover)*

Colleen Boothby
Sara Crifasi
**LEVINE, BLASZAK, BLOCK AND BOOTHBY LLP**
2001 L Street NW, Suite 900
Washington, D.C. 20036
*Counsel for Petitioner Ad Hoc Telecom Users Committee*

James N. Horwood
Tillman L. Lay
Jeffrey M. Bayne
Katherine J. O'Konski
**SPIEGEL & MCDIARMID LLP**
1875 Eye Street NW, Suite 700
Washington, D.C. 20006
*Counsel for Petitioner National Hispanic Media Coalition*

Andrew Jay Schwartzman
600 New Jersey Avenue NW
Washington, D.C. 20001
*Counsel for Petitioner Benton Foundation*

Harold Jay Feld
John Bergmayer
Ryan Clough
**PUBLIC KNOWLEDGE**
1818 N Street, NW, Suite 410
Washington, D.C. 20036
(202) 861-0020
*Counsel for Petitioner Public Knowledge*

Brian M. Willen
Jack Mellyn
**WILSON SONSINI GOODRICH & ROSATI PROFESSIONAL CORPORATION**
1201 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
*Counsel for Petitioner Center for Democracy & Technology*

Donald J. Evans
**FLETCHER, HEALD & HILDRETH, PLC**
1300 N. 17th Street
Suite 1100
Arlington, VA 22209
*Counsel for Petitioner NTCH, Inc.*

Sarah J. Morris
**OPEN TECHNOLOGY INSTITUTE | NEW AMERICA**
1899 L Street, NW, Suite 400
Washington, D.C. 20036
(202) 986-2700
*Counsel for Petitioner New America's Open Technology Institute*

Matthew F. Wood
**FREE PRESS**
1025 Connecticut Avenue, NW, Suite 1110
Washington, D.C. 20036
(202) 265-1490
*Counsel for Petitioner Free Press*

Lisa A. Hayes
**CENTER FOR DEMOCRACY & TECHNOLOGY**
1401 K Street NW, Suite 200
Washington, D.C.  20005
*Counsel for Petitioner Center for Democracy & Technology*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Mozilla Corporation,

Vimeo, Inc., Public Knowledge, Open Technology Institute, National Hispanic

Media Coalition, NTCH, Inc., Benton Foundation, Free Press, Coalition for

Internet Openness, Etsy, Inc., Ad Hoc Telecom Users Committee, Center for

Democracy and Technology, and INCOMPAS certify as follows:

## A.    Parties and Amici

Tens of millions of companies, organizations, and individuals participated in

some manner in the rulemaking proceeding (WC Docket No. 17-108) before the

Federal Communications Commission ("FCC").  The FCC did not include in its

order under review here a listing of the participants before the agency.  Below is a

reasonably complete, but not comprehensive, list of major companies and

organizations that filed comments or reply comments during the rulemaking

according to the FCC's Electronic Comment Filing System:

> 18MillionRising.org (Voices Coalition)
> AARP
> Access Now
> Ad Hoc Telecom Users Committee
> ADT Corporation
> ADTRAN, Inc.
> Advanced Communications Law & Policy Institute at New York Law
>     School
> Akamai Technologies, Inc.
> Alamo Broadband
> Alarm Industry Communications Committee
> Alaska Communications

ALEC
Amazon
American Association of Community Colleges
American Association of Law Libraries et al.
American Association of State Colleges and Universities et al.
American Cable Association
American Civil Liberties Union
American Consumer Institute
American Library Association
American Sustainable Business Council
Americans for Tax Reform and Digital Liberty
Apple Inc.
AppNexus
Asian Americans Advancing Justice | AAJC
Association of Research Libraries
AT&T Services, Inc.
Benton Foundation
Black Women's Roundtable
California Public Utilities Commission
CALinnovates
Cause of Action
CCIA
Center for Democracy & Technology
Center for Individual Freedom
Center for Media Justice et al. (Voices Coalition)
CenturyLink
Charter Communications, Inc.
Cisco Systems, Inc.
Citizens Against Government Waste
City of Boston, Massachusetts
City of Portland, Oregon
City of San Francisco, California
Coalition for Internet Openness
Cogent Communications Group, Inc.
Color of Change (Voices Coalition)
Comcast Corporation
Common Cause
Communications Workers of America
Commonwealth of Massachusetts
Competitive Enterprise Institute

CompTIA
Community Technology Advisory Board
Consumers Union
County of Santa Clara, California
Cox Communications, Inc.
CREDO Mobile
CTIA – The Wireless Association
Daily Kos
Data Foundry
Digital Policy Institute
Directors Guild of America
District of Columbia
Electronic Frontier Foundation
Electronic Gaming Foundation
Engine
Entertainment Software Association
Electronic Privacy Information Center
Ericsson
Etsy, Inc.
European Digital Rights
Farsight Security
Fiber Broadband Association
FreedomWorks
Free Press
Free State Foundation
Friends of Community Media
Frontier Communications
FTC Staff
Future of Music Coalition
Golden Frog
Greenlining Institute
Hispanic Technology and Telecommunications Partnership
Home Telephone Company
INCOMPAS
Independent Film & Television Alliance
Information Technology Industry Council
Inmarsat
Institute for Local Self-Reliance
Interisle Consulting Group LLC
Internet Association

Internet Freedom Coalition
Internet Innovation Alliance (IIA)
ITIF
ITTA – The Voice of Midsize Communications Companies
Level 3 Communications, LLC
Judicial Watch
Massillon Cable Comments
Media Alliance (Voices Coalition)
MediaFreedom.org
Meetup, Inc.
Microsoft Corporation
M-Lab
Mobile Future
Mobilitie, LLC
Motion Picture Association of America
Mozilla Corporation
NAACP
National Association of Realtors
National Association of Regulatory Utility Commissioners
National Association of State Utility Consumer Advocates
National Cable & Telecommunications Association
National Exchange Carrier Association
National Grange
National Hispanic Media Coalition
National Newspaper Publishers Association
National Venture Capital Association
Netflix, Inc.
New America Foundation (Open Technology Institute)
New Media Rights
Nokia
Nominum
NTCA – The Rural Broadband Association
NTCH, Inc.
Oracle Corp
Presente.Org (Voices Coalition)
Public Knowledge
QUALCOMM Incorporated
R Street
Sandvine Incorporated
Software and Information Industry Alliance

Sprint Corporation
State of California
State of Connecticut
State of Hawaii
State of Illinois
State of Iowa
State of Maine
State of Maryland
State of Mississippi
State of New York
State of Oregon
State of Rhode Island
State of Vermont
State of Washington
Techdirt
Tech Knowledge
Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI), et al.
Telecommunications Industry Association
T-Mobile USA, Inc.
TracFone Wireless
Twilio
Twitter
United Church of Christ (Voices Coalition)
United States Telecom Association
Verizon
Vimeo, Inc.
Voices for Internet Freedom Coalition
Volo
Wikimedia Foundation
Wireless Internet Service Providers Association
Writers Guild of America, West, Inc.
WTA – Advocates for Rural Broadband
Y Combinator

Petitioners in these consolidated cases are Mozilla Corporation (No. 18-1051), Vimeo, Inc. (No. 18-1052), Public Knowledge (No. 18-1053), Open Technology Institute (No. 18-1054), State of New York, et al.  (No. 18-1055),

National Hispanic Media Coalition (No. 18-1056), NTCH, Inc. (No. 18-1061),

Benton Foundation (No. 18-1062), Free Press (No. 18-1064), Coalition for Internet

Openness (No. 18-1065), Etsy, Inc. (No. 18-1066), Ad Hoc Telecom Users

Committee (No. 18-1067), Center for Democracy and Technology (No. 18-1068),

County of Santa Clara and the Santa Clara County Central Fire Protection District

(No. 18-1088), California Public Utilities Commission (No. 18-1089), and

INCOMPAS (No. 18-1105).

Respondents in these consolidated cases are the FCC and the United States
of America.

The following entities have intervened in support of Petitioner Mozilla *et al*.:
City and County of San Francisco, National Association of Regulatory Utility

Commissioners, Internet Association, Computer & Communications Industry

Association, National Association of State Utility Consumer Advocates, Writers

Guild of America, West, Inc., and Entertainment Software Association. The

following entities have moved to intervene in support of Respondents in these

consolidated cases: NCTA - The Internet & Television Association, CTIA - The

Wireless Association, USTelecom – The Broadband Association, American Cable

Association, Leonid Goldstein, and Wireless Internet Service Providers

Association. The following entity has intervened in support of neither side:

Digital Justice Foundation.

### B.    Ruling under Review

The ruling under review is the FCC's Restoring Internet Freedom, *Declaratory Ruling, Report and Order, and Order*, 33 FCC Rcd. 311 (2018) (the "*Order*").

### C.    Related Cases

This is the third time an FCC action promulgating (or, as here, abolishing) rules to protect the open Internet has come before this Court.  The FCC promulgated open Internet rules on December 21, 2010.  *See* Preserving the Open Internet, *Report and Order*, 25 FCC Rcd. 17905 (2010).  That action was partly affirmed and partly vacated and remanded in *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014).  The FCC then promulgated open Internet rules on February 26, 2015. *See* Protecting and Promoting the Open Internet, *Report and Order on Remand, Declaratory Ruling, and Order*, 30 FCC Rcd. 5601 (2015).  These rules were affirmed in their entirety in *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).  This Court then denied a petition for rehearing that decision *en banc*.  *See United States Telecom Ass'n v. FCC*, 855 F.3d 381 (D.C. Cir. 2017). The *Order* below, among other things, would abolish the 2015 open Internet rules.

The *Order* has not previously been the subject of a petition for review by this Court or any other court.  All petitions for review of the *Order* have been consolidated in this Court.

In addition, the following cases involving related issues are pending before the Supreme Court of the United States (on a petition for a writ of certiorari from the *United States Telecom Ass'n v. FCC* decision):

*Daniel Berninger v. FCC*, S.Ct. No. 17-498
*AT&T Inc. v. FCC*, S.Ct. No. 17-499
*American Cable Ass'n v. FCC*, S.Ct. No. 17-500
*CTIA-The Wireless Ass'n v. FCC*, S.Ct. No. 17-501
*NCTA-The Internet & TV Ass'n v. FCC*, S.Ct. No. 17-502
*TechFreedom v. FCC*, S.Ct. No. 17-503
*United States Telecom Ass'n v. FCC*, S.Ct. No. 17-504

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. R. 26.1, Petitioners submit the following corporate disclosure statements:

**Ad Hoc Telecom Users Committee:** The Ad Hoc Telecom Users Committee is an unincorporated, non-profit organization representing the interests of business end users of communications services. Ad Hoc is a "trade association" as defined by the D.C. Circuit Rule 26.1(b).

**Benton Foundation:** Benton Foundation is a non-profit corporation with no parent companies, subsidiaries or affiliates, and none of them have issued shares to the public.

**Center for Democracy and Technology:** Center for Democracy & Technology is a 501(c)(3) non-profit corporation. As a non-profit corporation, CDT does not issue stock. It has no parent companies, subsidiaries, or affiliates.

**Coalition for Internet Openness:** The Coalition for Internet Openness is a non-profit corporation that has not issued shares or debt securities to the public. The Coalition does not have any parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

**Etsy, Inc.:** Etsy, Inc. is a for-profit corporation organized under the laws of the State of Delaware with its principal place of business in Brooklyn, New York.

Etsy, Inc. is a publicly-traded company that has no parent company and no publicly-held corporation owns 10% or more of its stock.

**Free Press:** Free Press is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**INCOMPAS:** COMPTEL d/b/a INCOMPAS is a not-for-profit corporation and has not issued shares or debt securities to the public. INCOMPAS does not have any parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

**Mozilla Corporation:** Mozilla Corporation is a subsidiary of the Mozilla Foundation, a non-profit corporation that has not issued shares or debt securities to the public. The Mozilla Foundation does not have any parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

**National Hispanic Media Coalition:** The National Hispanic Media Coalition is a non-partisan, non-profit, media advocacy and civil rights organization. NHMC is a non-profit corporation that does not issue stock. It has no parent companies, subsidiaries, or affiliates.

**NTCH, Inc.:** NTCH, Inc. is a Delaware corporation. No publicly held company owns 10% or more of its stock. A company called Ally Finance Corporation owns 92.77% of its equity in the form of non-voting stock.

**Open Technology Institute:**  The Open Technology Institute is a program within the New America Foundation, d/b/a New America.  New America is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Public Knowledge:** Public Knowledge is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Vimeo, Inc.:** Vimeo, a Delaware corporation, is a subsidiary of IAC/InterActiveCorp ("IAC"), a Delaware corporation.  Other than IAC, no publicly held company owns more than 10% of Vimeo's stock.  IAC is a publicly held company with no parent company; no publicly held company owns more than 10% of IAC's stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

    A.    Parties and Amici ......................................................................... i

    B.    Ruling under Review ................................................................ vii

    C.    Related Cases ........................................................................... vii

CORPORATE DISCLOSURE STATEMENTS .................................... ix

TABLE OF CONTENTS .................................................................... xii

TABLE OF AUTHORITIES ...............................................................xv

GLOSSARY .................................................................................... xxii

STATEMENT OF JURISDICTION ......................................................1

STATEMENT OF THE ISSUES ..........................................................1

STATUTES AND REGULATIONS ......................................................1

STATEMENT OF THE CASE ..............................................................1

    A.    Factual and Regulatory Background. .........................................1

    B.    The *Order* on Review. ..........................................................12

SUMMARY OF ARGUMENT ...........................................................14

STANDING .......................................................................................20

STANDARD OF REVIEW ................................................................21

ARGUMENT .....................................................................................22

I.    THE FCC'S PRIMARY RATIONALE FOR RECLASSIFYING BIAS AS AN INFORMATION SERVICE IS UNAMBIGUOUSLY CONTRARY TO THE LAW. ......................................................................................22

    A.    The FCC's New Interpretation Finds no Support in *Brand X*. ..........23

    B.    The FCC's Interpretation Contravenes the Statutory Text. ................26

        1.    "Information Service" definition. .........................................26

        2.    "Telecommunications" definition. ........................................29

    C.    The *Order* Refuses to Interpret the Definition of "Telecommunications." ..........................................................32

D.      The FCC's Principal Theory Does Not Withstand
*Chevron* Step Two Scrutiny. .............................................................33

II.     THE FCC'S CONCLUSION THAT BIAS INEXTRICABLY
INTERTWINES TELECOMMUNICATIONS WITH INFORMATION
SERVICES IS UNREASONABLE. ............................................................34

III.    RELIANCE ON DNS AND CACHING FAILS *CHEVRON* STEP TWO. .41

A.      DNS and Caching Fall within the Telecommunications
Management Exception. .....................................................................43

B.      DNS and Caching Do Not Render BIAS an Information Service. .....46

IV.    THE FCC ERRONEOUSLY DISAVOWED OTHER SOURCES OF
AUTHORITY. ...........................................................................................48

V.     THE FCC *ORDER* IS ARBITRARY, CAPRICIOUS AND CONTRARY
TO LAW. ...................................................................................................51

A.      The *Order* Unreasonably Concludes that Other Statutes and the
Transparency Rule Adequately Protect Internet Openness.................52

1.     Delegation to other agencies. ...................................................52

2.     Reliance on antitrust and consumer protection laws. ..............53

3.     Reliance on disclosure. ............................................................55

B.      The FCC Abrogated Its Duty to Promote Competition. ....................56

1.     The FCC arbitrarily accepted the lack of competition.............57

2.     The FCC did not even consider its prior findings that ISPs
have the incentive and ability to harm edge providers. ...........62

C.      The FCC Erroneously Excluded Consumer Complaints. ...................64

D.      The FCC Did Not Address Data Roaming Rates. ...............................66

E.      The FCC Erroneously Found that the 2015 Rules Caused ISPs to
Reduce Investment and Ignored Edge Providers'
Investment-Backed Reliance on the Rules. ........................................68

VI.    THE FCC'S COST-BENEFIT ANALYSIS IS FLAWED. ..........................72

VII.   THE FCC'S MOBILE CLASSIFICATION DECISION IS UNLAWFUL. 74

A.    Mobile Broadband Is an Interconnected Service even under the FCC's Restrictive Conception of the "Public Switched Network." ...............................................75

B.    The FCC's Interpretation of "The Public Switched Network" Is Unreasonable. ...............................................79

C.    Mobile BIAS Is at Least the Functional Equivalent of a Commercial Mobile Service. ...............................................80

VIII.  CONCLUSION ...............................................82

CIRCUIT RULE 32(a)(2) ATTESTATION

CERTIFICATE OF COMPLIANCE

DECLARATIONS OF STANDING ADDENDUM

STATUTES AND REGULATIONS ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aerolineas Argentinas v. United States*,
    77 F.3d 1564 (D.C. Cir. 1996)...........................................................55

*American Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008)..........................................................63

*American Equity Inv. Life Ins.Co. v. SEC*,
    613 F.3d 166 (D.C. Cir. 2010)..........................................................71

*American Trucking Ass'n, Inc. v. EPA*,
    175 F.3d 1027 (D.C. Cir. 1999)........................................................65

*AT&T Wireless Servs., Inc. v. FCC*,
    270 F.3d 959 (D.C. Cir. 2001)....................................................56, 61

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................53

*Business Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011)........................................................73

*Butte County v. Hogen*,
    613 F.3d 190 (D.C. Cir. 2010)..........................................................63

*Chamber of Commerce v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005)..........................................................48

\*    *Chevron v. Natural Res. Def. Council*,
    467 U.S. 837 (1984).........................................................................25

*Children's Hosp. & Research Ctr. of Oakland, Inc. v. NLRB*,
    793 F.3d 56 (D.C. Cir. 2015)............................................................33

Authorities principally relied upon are designated by an asterisk (*).

*Comcast Corp. v. FCC,*
   600 F.3d 642 (D.C. Cir. 2010).........................................................10

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 US 208 (2009).........................................................................73

*In re FCC 11-161,*
   753 F.3d 1015 (10th Cir. 2014) ....................................................50

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .................................................................59, 61

*Home Box Office, Inc. v. FCC,*
   567 F.2d 9 (D.C. Cir. 1977)...........................................................71

*Local 1976, United Bhd. of Carpenters and Joiners v. NLRB,*
   357 U.S. 93 (1958)........................................................................52

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)......................................................................21

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
   486 U.S. 825 (1988)......................................................................27

*Maritel, Inc. v. Collins,*
   422 F. Supp. 2d 188 (D.D.C. 2006)..............................................64

*Motion Picture Ass'n of America, Inc. v. FCC,*
   309 F.3d 796 (D.C. Cir. 2002).......................................................32

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Ins. Co.,*
   463 U.S. 29 (1983)..................................................................34, 63

*New York Shipping Ass'n, Inc. v. Federal Mar. Comm'n,*
   854 F.2d 1338 (D.C. Cir. 1988).....................................................52

*NARUC v. FCC,*
   851 F.3d 1324 (D.C. Cir. 2017).....................................................24

\* *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005)........................................... 7, 8, 21, 23, 27, 35
   ........................................................... 37, 38, 41, 43, 44, 47

*National Lime Ass'n v. EPA*,
   627 F.2d 416 (D.C. Cir. 1980)..........................................................67

*Natural Res. Def. Council v. EPA*,
   755 F.3d 1010 (D.C. Cir. 2014)........................................................49

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier*
   *Safety Admin.*,
   494 F.3d 188 (D.C. Cir. 2007)..........................................................71

*Portland Cement Ass'n v. Ruckelshaus*,
   486 F.2d 375 (D.C. Cir. 1973)..........................................................65

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002)..........................................................21

*Susquehanna Int'l Grp., LLP v. SEC*,
   866 F.3d 442 (D.C. Cir. 2017)..........................................................62

*United Savs. Ass'n v. Timbers of Inwood Forest Assocs.*,
   484 U.S. 365 (1988)........................................................................32

\* *United States Telecom Ass'n v. FCC*,
   825 F.3d 674 (D.C. Cir. 2016).............................2, 3, 4, 7, 9, 13,
   .................................................................... 16, 23, 24, 26, 33, 38,
   ........................................................................ 43, 44, 46, 47, 49,
   ........................................................... 51, 74, 76, 77, 78, 79, 80

*United States Telecom Ass'n v. FCC*,
   855 F.3d 381 (D.C. Cir. 2017)..........................................................33

*United States v. American Tel. & Tel. Co.*,
   1989 WL 119060 (D.D.C. Sept. 11, 1989)........................................44

*United States v. Calamaro*,
   354 U.S. 351 (1957)........................................................................27

*United States v. Western Elec. Co., Inc.*,
   673 F. Supp. 525 (D.D.C. 1987)......................................................45

*Utility Air Regulatory Grp. v. EPA*,
   134 S. Ct. 2427 (2014)....................................................................30

\*   *Verizon v. FCC*,
    740 F.3d 623 (D.C. Cir. 2014).....................................................2, 4, 10, 11, 21,
    ............................................................................ 48, 50, 51, 58, 59, 62

AGENCY PROCEEDINGS

Amendment of Section 64.702 of the Commission's Rules and
    Regulations (Computer II), *Tentative Decision and Further Notice*
    *of Inquiry and Rulemaking*, 72 F.C.C.2d 358 (1979) (*Tentative*
    *Decision*), 77 F.C.C.2d 384 (1980) (*Final Decision*), *aff'd sub*
    *nom. Computer and Commc'n Indus. Ass'n v. FCC*, 693 F.2d 198
    (D.C. Cir. 1982), *cert. denied*, 461 U.S. 938 (1983) .......................................3, 4

Applications for Consent to the Transfer of Control of Licenses and
    Section 214 Authorizations from MediaOne Group, Inc.,
    Transferor, to AT&T Corp. Transferee, *Memorandum Opinion and*
    *Order*, 15 FCC Rcd. 9816 (2000)....................................................................... 6

Appropriate Framework for Broadband Access to the Internet over
    Wireline Facilities*, Policy Statement*, 20 FCC Rcd. 14986 (2005)................... 10

Appropriate Framework for Broadband Access to the Internet over
    Wireline Facilities, *Report and Order and Notice of Proposed*
    *Rulemaking*, 20 FCC Rcd. 14853 (2005).......................................................... 36

Deployment of Wireless Services Offering Advanced
    Telecommunications Capability, *Memorandum Opinion and*
    *Order, and Notice of Proposed Rulemaking*, 13 FCC Rcd. 24012
    (1998)................................................................................................................ 50

Inquiry Concerning Deployment of Advanced Telecommunications
    Capability to All Americans in a Reasonable and Timely Fashion,
    *2018 Broadband Deployment Report*,
    33 FCC Rcd. 1660 (2018)......................................................................... 57, 60

Inquiry Concerning High-Speed Access to the Internet Over Cable
    and Other Facilities, *Declaratory Ruling and Notice of Proposed*
    *Rulemaking*, 17 FCC Rcd. 4798 (2002)............................................................. 7

NTCH, Inc. v. Cellco P'ship d/b/a Verizon Wireless, *Order*, 31 FCC
    Rcd. 7165 (EB 2016) ......................................................................................66

Preserving the Open Internet, *Report and Order*, 25 FCC Rcd. 17905
(2010) ........................................................................................61

Protecting and Promoting the Open Internet, *Notice of Proposed
Rulemaking*, 29 FCC Rcd. 5561 (2014)...........................................70

\* Protecting and Promoting the Open Internet, *Report and Order On
Remand, Declaratory Ruling, and Order*, 30 FCC Rcd. 5601
(2015) ........................................................1, 4, 9, 11, 12,
................................................................ 24, 43, 46, 55, 58, 59,
...............................................................................62, 61, 67, 77

Reexamination of Roaming Obligations of Commercial Mobile Radio
Service Providers and Other Providers of Mobile Data Services,
*Second Report and Order*, 26 FCC Rcd. 5411 (2011) .......................66

\* Restoring Internet Freedom, *Declaratory Ruling, Report and Order,
and Order*, 33 FCC Rcd. 311 (2018) ................................ 12, 13, 14, 22, 23, 24,
................................................................ 26, 28, 29, 32, 33, 34, 35,
................................................................ 36, 39, 40, 41, 43, 44,
................................................................ 45, 46, 48, 49, 50, 51,
................................................................ 53, 54, 55, 57, 58, 59,
................................................................ 60, 61, 63, 64, 65, 67,
................................................................ 68, 69, 70, 72, 73, 74,
................................................................ 75, 76, 77, 78, 79, 80, 81

\* Restoring Internet Freedom, *Notice of Proposed Rulemaking*, 32 FCC
Rcd. 4434 (2017) .............................................. 12, 13, 51, 55, 64, 72

**STATUTES**

5 U.S.C. § 706....................................................................................21

15 U.S.C. §§ 1-2...........................................................................53, 54

28 U.S.C. § 2342.................................................................................1

28 U.S.C. § 2344.................................................................................1

47 U.S.C. § 151.................................................................................52

47 U.S.C. § 153(20) ..........................................................................42

\* 47 U.S.C. § 153(24) ......................................................5, 16, 30, 43, 45

\* 47 U.S.C. § 153(50) ........................................................................5, 29

47 U.S.C. § 153(51) ..................................................................4, 5, 34, 78

\* 47 U.S.C. § 153(53) ...............................................................................5

47 U.S.C. § 160 ......................................................................................11

47 U.S.C. § 201 ......................................................................................31

\* 47 U.S.C. § 257 ........................................................................14, 50, 55

\* 47 U.S.C. § 332 .....................................................................5, 6, 78, 79, 80

47 U.S.C. § 402 ........................................................................................1

\* 47 U.S.C. § 1302 ..............................................................................48, 52

RAY BAUM'S Act of 2018, Pub L. 115-141, 132 Stat. 1089 (2018) ....................55

## Regulations

47 C.F.R § 20.3 ................................................................................74, 77

## Legislative Materials

H.R. Rep. No. 103-111 (1993)................................................................77

## Other Materials

*AOL Commercial* – Homework, YouTube, https://www.youtube.com/
watch?v=_SVXqvrFtOM.......................................................................4

Circular A-4, https://www.whitehouse.gov/sites/whitehouse.gov/
files/omb/circulars/A4/a-4.pdf ...........................................................72

Complaint, *United States v. Charter Commc'n, et al.*,
Case No. 1-16-cv-00759 (D.D.C. Apr. 25, 2016) ............................................62

Edmund L. Andrews, *Threat to Cellular Phone Services*, N.Y. Times
(Feb. 13, 1991),
https://www.nytimes.com/1991/02/13/business/threat-to-cellular-
phone-services.html .............................................................................77

*Excite (Dec. 19, 2000)*, Internet Archive,
   https://web.archive.org/web/20001219063100/http:/excite.com/. ......................6

*Fixed Broadband Deployment Data from FCC Form 477*, FCC (Dec.
   13, 2017), https://www.fcc.gov/general/broadband-deployment-
   data-fcc-form-477 ..............................................................................................58

Josh Blackman, *Gridlock*, 130 Harv. L. Rev. 241, 261 (2016) ..............................33

Reply Brief of Gov., *National Cable & Telecomms. Ass'n v. Brand X
   Internet Servs.*, 545 U.S. 967 (2005) (Nos. 04-277 and 04-281) .....................27

Robert W. Crandall, *The FCC's Net Neutrality Decision and Stock
   Prices*, 50 Rev. Indus. Org. 555, 571 (Feb 2017)..............................................70

# GLOSSARY

| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
|---|---|
| *1998 Wireless Order* | Deployment of Wireless Services Offering Advanced Telecommunications Capability, *Memorandum Opinion and Order, and Notice of Proposed Rulemaking*, 13 FCC Rcd. 24012 (1998) |
| *2005 Wireline Order* | Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, *Report and Order and Notice of Proposed Rulemaking*, 20 FCC Rcd. 14853 (2005) |
| *2010 Order* | Preserving the Open Internet, *Report and Order*, 25 FCC Rcd. 17905 (2010), *aff'd in part and vacated in part*, *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) |
| *2014 NPRM* | Protecting and Promoting the Open Internet, *Notice of Proposed Rulemaking*, 29 FCC Rcd. 5561 (2014) |
| *2015 Order* | Protecting and Promoting the Open Internet, *Report and Order On Remand, Declaratory Ruling, and Order*, 30 FCC Rcd. 5601 (2015), *aff'd sub nom. United States Telecom Association v. FCC*, 825 F.3d 674 |
| *2018 Broadband Deployment Report* | Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion, *2018 Broadband Deployment Report*, 33 FCC Rcd. 1660 (2018) |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 701-706 |
| *AT&T/MediaOne Order* | Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from MediaOne Group, Inc., Transferor, to AT&T Corp. Transferee, *Memorandum Opinion and Order*, 15 FCC Rcd. 9816 (2000) |
| BIAS | Broadband Internet Access Service |
| *Cable Modem Order* | Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, *Declaratory Ruling and Notice of Proposed Rulemaking*, 17 FCC Rcd. 4798 (2002) |

| Caching | Caching is the storage of "content that can be accumulated by the ISP through . . . retrieval of information from websites . . . ." *Order* ¶ 42 |
|---|---|
| CBA | Cost-Benefit Analysis |
| Communications Act or Act | Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.* |
| *Computer II* | Amendment of Section 64.702 of the Commission's Rules and Regulations (Computer II), *Tentative Decision and Further Notice of Inquiry and Rulemaking*, 72 F.C.C.2d 358 (1979) (*Tentative Decision*), 77 F.C.C.2d 384 (1980) (*Final Decision*), *aff'd sub nom. Computer and Commc'n Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982), *cert. denied*, 461 U.S. 938 (1983) |
| DNS | Domain Name System, a function that "matches the Web site address the end user types into his browser . . . with the IP address of the Web page's host server," *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) |
| DSL | Digital Subscriber Line; an early broadband technology utilizing copper telephone lines to transmit data, which is limited by the physical constraints of the material resulting in a decrease in data rate as distance from the telephone company hub increases. |
| Edge Provider | Third-party companies providing ISPs' users content, applications, and services over the Internet |
| FCC or Commission | Federal Communications Commission |
| FOIA | Freedom of Information Act |
| FTCA | Federal Trade Commission Act |
| *Internet Policy Statement* | Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, *Policy Statement*, 20 FCC Rcd. 14986 (2005) |
| IP | Internet Protocol |
| ISP | Internet Service Provider |

| | |
|---|---|
| MFJ | Modified Final Judgment |
| NANP | North American Numbering Plan |
| *NPRM* | Restoring Internet Freedom, *Notice of Proposed Rulemaking*, 32 FCC Rcd. 4434 (2017) (JA000001-000087) |
| *NTCH v. Cellco* | NTCH, Inc. v. Cellco P'ship d/b/a Verizon Wireless, *Order*, 31 FCC Rcd. 7165 (EB 2016) |
| *Order* | Restoring Internet Freedom, *Declaratory Ruling, Report and Order, and Order*, 33 FCC Rcd. 311 (2018) (JA003358-003896) |
| Pai Dissent | Dissenting Statement of Commissioner Ajit Pai to *2015 Order* (JA004217-004280) |
| *Second Roaming Order* | Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services, *Second Report and Order*, 26 FCC Rcd. 5411 (2011) |
| Section 706 | Section 706 of the 1996 Act, Pub. L. 104-104, §706, 110 Stat. 153, codified at 47 U.S.C. § 1302 |
| Sherman Act | 15 U.S.C. §§ 1-2 |
| VoIP | Voice over Internet Protocol |

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C.

§ 2342(1).  The *Order*, released on January 4, 2018, was published in the Federal

Register on February 22, 2018 (83 Fed. Reg. 7852).  Petitions were timely filed.

*See* 28 U.S.C. § 2344.

## STATEMENT OF THE ISSUES

Whether:  the *Order*'s reclassification of broadband Internet access service

as an "information service," and mobile broadband Internet access service as a

"private mobile service," misinterprets or violates the law; and the FCC's failure to

consider the evidence, abandonment of the open Internet rules, and denial of

motions to introduce additional evidence, violates the APA or is otherwise contrary

to law.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reproduced in the Statutes and

Regulations Addendum.

## STATEMENT OF THE CASE

### A.    Factual and Regulatory Background.

The *2015 Order* was the culmination of a decade of proceedings designed to

enact reasonable limits on the ability of BIAS providers to interfere with their

customers' free and open access to the Internet.  *2015 Order* ¶¶ 7-8.  This Court

has upheld the *2015 Order*'s premises that BIAS providers have the incentive and

capability to interfere with users' Internet access, and have done so. *See Verizon v. FCC*, 740 F.3d 623, 646-49 (D.C. Cir. 2014). It has confirmed the FCC's finding that the prospect of such interference was a barrier to development of broadband deployment and Internet innovation. *Id.* And it has upheld the FCC's determination that in light of massive changes in markets and technologies over the past two decades, fixed and mobile BIAS satisfied the statutory criteria for mandatory common carriage treatment, subject to forbearance from major rules (including rate regulation). *See United States Telecom Ass'n v. FCC*, 825 F.3d 674, 697-98 (D.C. Cir. 2016).

Yet, in the aftermath of the 2016 presidential election, the FCC did an abrupt about-face, comprehensively embracing the BIAS providers' objections this Court rejected in *USTA* and *Verizon*, revoking the telecommunications service designation of fixed and mobile BIAS, repealing all the rules governing BIAS provider conduct, and disavowing every source of authority for such rules. Petitioners, a diverse coalition of Internet companies, broadband providers, Internet consumers, and public interest groups, bring this petition to challenge the FCC's wholesale abdication of its statutory responsibilities.

*How the Internet Works*. The basic unit of Internet communication is the "packet," which is much like an envelope containing a letter. *See Verizon*, 740 F.3d at 629. Data packets contain information generated by a user and directed for

delivery to a recipient the user selects. The packet includes routing information, akin to the address on an envelope. An email or video created on a user's computer is divided into multiple packets, given routing information, and transmitted through the Internet to a destination, where the packets are reassembled without change in the information's form or content. *Id*.

BIAS providers operate a "pipe" (fiber, wireless, etc.) between customers and an Internet point of presence, thereby connecting subscribers to every destination on the Internet. To facilitate this service, providers generally run DNS servers that translate the address of an email server or web server address into the numerical IP address used for Internet routing (*e.g.*, "Google.com" is "216.58.208.36"). *See USTA*, 825 F.3d at 699. Providers may also save copies of frequently accessed web pages on their servers, a process called "caching," which reduces BIAS providers' costs by limiting the number of times they must transmit content from locations on the Internet. *Id*.

*Initial Regulatory Framework*. Early data transmission was regulated under the FCC's *Computer Inquiries*. *See USTA*, 825 F.3d at 690-91. In its 1980 *Computer II Order*, the FCC declared that Title II of the Act applied to carriers' provision of "basic" service, defined as "a pure transmission capability" that included "analog or digital transmission of voice, data, video, etc., information." *Computer II* ¶¶ 93, 96. The fact that computers might be involved—for example,

to apply "bandwidth compression techniques" and other methods that facilitate economical, reliable movement of information—did "not alter the nature of the basic service." *Id.* ¶ 95.  The FCC called such computer operations "adjunct-to-basic." *See USTA*, 825 F.3d at 691.  "[E]nhanced services," by contrast, were defined as "any offering over the telecommunications network which is more than a basic transmission service," *Computer II* ¶¶ 97, 104, including voicemail, time-share services on a mainframe computer, and email.  *Id.* ¶ 97 & n.34.

*Early History of Internet Access.*  Consumers initially reached the Internet through dial-up modems connecting to ISPs such as America Online over basic telephone lines provided by the phone company and regulated as common carriage. *Verizon*, 740 F.3d at 629.  Many early ISPs offered their customers a portal that provided proprietary email, chatrooms, news and other content.  While consumers could reach the relatively few other Internet sites, that function was secondary for most (Google did not launch until 1998).  *See generally 2015 Order* ¶ 343.[1]

*Telecommunications Act of 1996.*  The Telecommunications Act of 1996 declared "a telecommunications carrier *shall be* treated as a common carrier . . . to the extent it is engaged in providing telecommunications services . . . ."  47 U.S.C.

---

[1] *See also AOL Commercial – Homework*, YouTube, https://www.youtube.com/watch?v=_SVXqvrFtOM ("On America Online, I get Compton's Encyclopedia, Barron's Book Notes, *even the entire Internet.*") (emphasis added).

§ 153(51) (emphasis added).  A "telecommunications carrier" is defined by the Act

as a "provider of telecommunications services," which is "an offering of

telecommunications for a fee directly to the public. . . ."  *Id.* §§ 153(51), (53).

"Telecommunications," in turn, is defined as "the transmission, between or among

points specified by the user, of information of the user's choosing, without change

in the form or content of the information as sent and received."  *Id*. § 153(50).

Telecommunications services allow users to reach "information services,"

defined as an "offering of a capability for generating, acquiring, storing,

transforming, processing, retrieving, utilizing, or making available information via

telecommunications . . . ."  *Id*. § 153(24).  The "telecommunications management

exception" to that definition excludes "any use of any such capability for the

management, control, or operation of a telecommunications system or the

management of a telecommunications service."  *Id*.

The 1996 Act left in place earlier provisions regarding mobile services.

Those provisions directed that every "commercial mobile service" must be treated

as common carriage.  *Id.* § 332(c)(1)(A).  A "commercial mobile service" is

defined as one "interconnected with the public switched network (as such terms are

defined by regulation by the Commission) . . . ."  *Id.* § 332(d)(1)-(2).  Any mobile

service that "is not a commercial mobile service" or its "functional equivalent" is

classified as a "private mobile service," *id.* § 332(d)(3), which "shall not . . . be treated as a common carrier." *Id.* § 332(c)(2).

*Early broadband Internet access.* In the years after the 1996 Act, the cable and, later, telephone companies began to provide Internet users with forms of "broadband" Internet access, an "always on," dramatically faster service. These early BIAS providers created their own information services and portals, such as Excite@Home and Roadrunner,[2] largely following AOL's "walled garden" model. Under that model, consumers had access to a number of information services within the garden; while they could access the broader Internet, too, that function remained supplemental[3]:

---

[2] *See AT&T/MediaOne Order* ¶ 107 ("AT&T and MediaOne each provide to households passed by their cable systems Internet services that combine (a) broadband transport through their cable systems and (b) Internet access and proprietary content through their affiliated ISPs.").

[3] *Excite (Dec. 19, 2000)*, Internet Archive, https://web.archive.org/web/20001219063100/http:/excite.com/ (last visited Aug. 15, 2018).



Unlike dial-up ISPS, BIAS providers offered consumers both a transmission line and information services. BIAS morphed into two forms: cable modem service was provided by the cable companies, DSL by the telephone companies.

*Brand X (2005)*. The FCC had classified DSL as a telecommunications service in 1998. *USTA*, 825 F.3d at 691-92. But four years later it declared that cable modem service was an information service. *Cable Modem Order* ¶ 41.

A divided Supreme Court upheld the *Cable Modem Order*. *National Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 993-97 (2005). The Court recognized that cable modem service included a telecommunications component. *Id*. at 988. But this function was bundled with various other services, like ISP-provided email, user newsgroups, file transfer service, DNS, and caching.

*Id*. at 987.  The Court held that, given the record at the time, the FCC reasonably

decided that "the transmission component of cable modem service is sufficiently

integrated with the finished service to make it reasonable to describe the two as a

single, integrated offering" of an information service.  *Id*. at 990; *see also id*. at

992, 997, 1000, 1003.  The Court also made clear that these classifications were

not "carved in stone," but that the FCC was compelled to "consider varying

interpretations and the wisdom of its policy on a continuing basis," including "in

response to changed factual circumstances."  *Id*. at 981 (citation omitted).

*The changing views of the BIAS industry*.  The BIAS providers, which now

urge the FCC to abolish the telecommunications service classification of BIAS, did

not always and uniformly hold that view.  At least two "baby Bell" companies,

members of intervenor USTA, previously argued that "the transport portion of

cable modem service is a telecommunications service under the 1996 Act,"[4] and

that "the [1996] Act automatically regulates cable operators offering broadband

access as common carriers."[5]  Similarly for mobile service, while pressing the FCC

to interpret "commercial mobile service" narrowly below, AT&T's predecessor

_____

[4] Qwest Communications International Inc. Comments, GN Docket No. 00-185, at
2-3 (Dec. 1, 2000).

[5] Verizon Communications Comments, GN Docket No. 00-185, at 21 (Dec. 1,
2000).

previously advocated the view that wireless broadband is a "commercial mobile service,"[6] the reverse of its current position.

*Threats to Internet openness*. The turn of this century witnessed a massive expansion in Internet edge services, such as online music, video, and telephony. *See 2015 Order* ¶¶ 347-49. BIAS providers abandoned the portal and proprietary information services model and focused on broadband Internet access. The path to the walled garden became the road to the Internet. New services were created outside the wall by third-party innovators (such as Amazon, Apple, Dropbox, Facebook, Netflix, and millions of small business websites).

These new edge providers became a driving force for what the FCC dubbed a "virtuous circle" of innovation. *See USTA*, 825 F.3d at 694. Users' open access to edge-provider services and web content drove demand for broadband access, which in turn led to increased investment in the network, which drove further innovation at the edge.

Many of these edge providers introduced technologies and services that BIAS providers viewed as threats to their legacy businesses. Online video was viewed as a potential competitor to cable television. VoIP providers competed

---

[6] Cingular Wireless LLC Comments, GN Docket No. 04-163, at 14-15 (June 3, 2004).

against traditional telephony. Yet these edge providers necessarily relied on BIAS

providers to reach their customers. Thus BIAS providers now had not only the

ability, but also the incentive to hamper perceived threats. *See Verizon*, 740 F.3d

at 645-46, 648. And they had a similar incentive and ability to interfere with

communications critical of them or otherwise deemed undesirable. *See* Free Press

Comments, WC Docket No. 17-108, at 15 & n.20 (JA000745) (July 17, 2017)

(describing incident in which Verizon claimed the right to block content it deemed

"controversial or unsavory").

 *Light-touch open Internet rules*. Recognizing this reality, the FCC in 2005

unanimously adopted an Internet Policy Statement, promising to take action should

BIAS providers interfere with consumers' "access [to] the lawful Internet content

of their choice." *Internet Policy Statement* ¶ 4 (2005).

 *Comcast v. FCC*. Two years later, the FCC invoked its Title I ancillary

authority to stop Comcast's interference with users' ability to use BitTorrent, a

protocol for sharing large files. But this Court found that the FCC's claimed

authority was inadequate. *Comcast Corp. v. FCC*, 600 F.3d 642, 644 (D.C. Cir.

2010).

 *Verizon v. FCC*. In 2010, the FCC adopted rules that would ban blocking

and discrimination against lawful content. This Court upheld the FCC's position

that Section 706, which requires the FCC to remove barriers to broadband

infrastructure investment, "vest[ed] [the FCC] with affirmative authority to enact measures encouraging" infrastructure deployment. *Verizon*, 740 F.3d at 628. It also upheld the FCC's determinations that BIAS providers had the incentive and means to interfere with Internet content, as proven by a record of such attempts. *Id*. at 645-49. But the Court vacated the rules because they were tantamount to common carriage regulation of providers whom the FCC had not classified as common carriers. *Id.* at 655-59.

*USTA v. FCC*. The FCC instituted new proceedings. In the *2015 Order*, the FCC found that changes in technology, broadband use, consumer perceptions, and Internet services since *Brand X* required reclassifying BIAS as a telecommunications service and mobile BIAS as a commercial mobile service. *2015 Order* ¶¶ 88, 330.

The FCC prohibited BIAS providers from blocking or throttling users' access to Internet content and services, barred paid prioritization, and forbade conduct that unreasonably interfered with subscribers' or edge providers' ability to transmit lawful content. *Id.* ¶¶ 112, 119, 125, 136. But the FCC exercised its authority under 47 U.S.C. § 160(a) to forbear from "27 provisions of Title II," and "expressly eschew[ed] the future use of prescriptive, industry-wide rate regulation." *Order* ¶ 5.

In *USTA*, this Court upheld the *2015 Order* in all respects.

## B. The *Order* on Review.

After the 2016 presidential election, a newly configured FCC issued a notice of proposed rulemaking, proposing to repeal the *2015 Order*. *See NPRM* ¶ 5 (JA000002). In response to FOIA requests by NHMC, the FCC later acknowledged possession of approximately 47,000 informal consumer complaints submitted under the open Internet rules, but turned over only some of them before the comment period expired. On January 4, 2018, the FCC released the so-called "Restoring Internet Freedom" *Order*. The *Order* not only reversed the prior telecommunications service classification of fixed and mobile broadband, it also disclaimed any responsibility for enforcing the bipartisan goal of Internet openness.

The principal ground for reclassification was the FCC's view that, even if BIAS did nothing more than provide a telecommunications path to third-party edge providers offering information services, that path in itself qualified as an "information service." *Order* ¶¶ 30-32 (JA003369-003370). As a backup, the FCC claimed that DNS and caching are information services that make BIAS an information service in its totality. *Id.* ¶ 33 (JA003372).

The FCC separately decided that mobile BIAS "is not a commercial mobile service" under "the best reading of the Act." *Id.* ¶ 74 (JA003402). It

acknowledged this Court's contrary conclusion in *USTA*, *see* 825 F.3d at 721-23, but decided that conclusion was wrong. *See Order* ¶ 79 (JA003405).

In the FCC's view, Title II classification imposed "considerable social cost, in terms of foregone investment and innovation" with "no discernable incremental benefit relative to Title I classification." *Id*. ¶ 87 (JA003410). Yet the FCC did not identify any providers interested in engaging in the conduct the *2015 Order* prohibited. *Id*. ¶ 142 (JA003342). It hypothesized that, if competition failed to prevent harmful behavior, "pre-existing legal remedies, particularly antitrust and consumer protection laws, [would] sufficiently address such harms." *Id*. ¶ 87 (JA003417).

The FCC did not engage in the robust cost-benefit analysis the *NPRM* had promised, contenting itself with a "qualitative," "direction[al]" determination. *Id*. ¶ 304 (JA003538); *NPRM* ¶ 107 (JA000036). The FCC also denied NHMC's motion to include and consider informal consumer complaints under the previous rules, which NHMC had asked be included in the record. *Order* ¶¶ 339-43 (JA003548-003550). The FCC likewise denied INCOMPAS's motion to allow access to sealed records of recent merger proceedings involving major BIAS broadband providers. *Id*. ¶ 324 (JA003543).

Reversing course from the position the *Verizon* Court affirmed, the FCC construed Section 706 as merely "hortatory," *id*. ¶ 267 (JA003517-003518), and

therefore not an alternative source of authority.  The FCC thus preserved only a set of pared-back disclosure requirements, *id*. ¶¶ 218-23 (JA003846-003849), founded on its supposed authority under Section 257 of the Act.  *Id.* ¶ 232 (JA002492-002493).

*The current state of broadband markets*.  The record before the FCC below shows that roughly half of U.S. homes have either only one high-speed Internet option or none.  *Id.* ¶ 125 (JA003430).  The record also confirms what everyone who has tried to change Internet access providers knows:  it is tough even where there *is* a choice of providers.  *See* INCOMPAS Comments, WC Docket No. 17-108, at 33 (JA001061) (July 17, 2017) ("INCOMPAS Comments").  The fact that many of us depend on our BIAS provider for video, telephone *and* Internet does not help, as switching providers affects a large portion of our 21st century existence.

## SUMMARY OF ARGUMENT

For a period of ten years, bookmarked by four decisions of this Court, four generations of the FCC—two Republican-, two Democrat-controlled—made rules to protect the open Internet from interference by BIAS providers.  For ten years, much of the BIAS industry—the cable television, phone, and cellphone companies that control Internet access—fought the FCC at every turn.  The FCC's efforts culminated in 2015 with open Internet rules.  These rules barred blocking,

throttling, pay-to-play practices, and other methods of interference with the use of the Internet by end users and Internet companies trying to reach them, and established a framework for protecting users' other rights. In 2016, this Court upheld the rules in their entirety. In 2017, a new FCC undid them, again in their entirety, on a record that had changed little, if at all. The *Order*'s relentless deregulatory urge swept aside everything in its path, including the law, the facts, reasoned decisionmaking, and the decisions of this Court.

To undo the rules, the FCC reclassified the service itself, BIAS, concluding it is an information service, not a telecommunications service, based primarily on a rationale it had never before used. All prior decisions of the FCC, this Court, and the Supreme Court alike acknowledged that BIAS includes both a telecommunications component and add-on information services that had erstwhile been provided by the BIAS providers themselves. This mix was then analyzed to determine if telecommunications was being "offered" (as required by the "telecommunications service" definition), or whether the telecommunications part was instead inextricably intertwined with the BIAS providers' information services.

Now that these add-on information services have indisputably atrophied, there was little mix to speak of. Thus, the 2017 FCC instead turned to the third-party content and information services that are the destinations of Internet access

customers—in other words, the Internet itself.  In the FCC's new view, if a road (BIAS) leads to a destination (edge providers and end users) and was designed to reach it, the road itself becomes the destination; if the US Postal Service delivers a parcel to my home, the delivery service becomes the product in the parcel.  On the FCC's theory, BIAS becomes an information service, not because it is bundled with information services as part of a unified "offer" itself, but because it connects to services and content provided by Hulu, Skype, Snapchat and millions of others.

This Court summarily rejected that interpretation when the petitioners raised it in *USTA*, since a conduit is a conduit, and was considered one by Congress: "under the statute's definition of 'information service,' such services are provided 'via telecommunications.'"  825 F.3d at 702 (quoting 47 U.S.C. § 153(24)). Retelling the argument does not improve it.  The *Order*'s reading violates the statutory definitions on their face and should be struck down under *Chevron* Step One.

The law defines "telecommunications" as the transmission of information between points specified by the user without change in the information's form or content.  There is no exception for transmissions that are intended to allow access to an information service.  Indeed, the *Order*'s newly imagined exception to the telecommunications service definition is close to the very definition of telecommunications service:  BIAS providers simply transmit information between

users.  None of Comcast, AT&T or Verizon adds scenes to the movies we watch online or embellishes our friends' notes on a social media "wall."  BIAS is a transmission conduit; its nature is unchanged by the fact that it intentionally allows reaching others' information services.

In fact, the FCC avowedly refused to interpret the "telecommunications" and "telecommunications service" definitions altogether—one more mistake, as the agency may not choose which of the two categories applies by examining only one of them.  Even if Congress had not spoken directly to the issue, the FCC's interpretation would be unreasonable:  a road laid by a construction company to reach a cluster of hotels built by third-party entrepreneurs cannot reasonably escape classification as a road by being labeled a hotel instead.  The FCC's contrary position collapses the distinction between telecommunications and information services.

The *Order* falls back on DNS and caching, two ministerial functions offered by BIAS providers (and by third parties), which were barely discussed afterthoughts of no decisional significance in *Brand X*.  Suddenly, these adjunct functions loom as information services important enough to make BIAS an information service itself.  Never mind that the record shows BIAS consumers buy transmission without caring, or knowing, about these functions and who provides them.  No matter that the Supreme Court has found consumer perception is the

lodestar for classifying BIAS. The attempt to elevate DNS and caching into the main event is equivalent to claiming that consumers view their dogs as an inseparable accessory to their dogs' leashes.

Adding disregard for the public interest to statutory misinterpretation, the FCC undid the 2015 protections even as it acknowledged that the open Internet needs protecting. It disavowed Section 706, which requires it to remove barriers to broadband deployment, as an alternative source of authority for such rules, even though this Court had previously upheld the FCC's interpretation that Section 706 gives it some authority. It instead read the "shall" in Section 706 as a mere exhortation. The agency found that its hands are tied, apparently because it did not really want to use them.

Instead, the FCC punted to other agencies and laws without determining if these laws would actually achieve the open Internet protection the FCC acknowledged was necessary. It cited the FTCA, but was only willing to say that the statute would prohibit deceptive behavior, meaning that BIAS providers throttling and telling the truth about it will be fine. It cited the DOJ's and FTC's antitrust enforcement authority even as it questioned BIAS providers' market power. It invoked general laws, even though it had previously decried the Internet protections it undid as being too general. As a result, for the first time since the

beginning of the commercial Internet, a start-up cannot be certain that it can launch a new Internet-based service without interference from BIAS providers.

One after another, the FCC reversed virtually all of the *2015 Order*'s hundred-plus factual findings, proclaiming wrong what had been found to be right in 2015 and upheld as right in 2016. The abrupt about-face was not adequately reasoned. The new FCC acted based on a lopsided discussion of the supposed cons of open Internet rules, of which it found a myriad, and their pros, of which it found none.

The FCC wrongly found that the abolition of the rules was necessary to encourage investment by BIAS providers, even though many BIAS company executives had assured the world that the rules would not deter investment. The agency dismissed the fact that the BIAS providers' stock prices had not fallen when the open Internet rules were established, on the flippant speculation that the market may have seen the rules coming already.

While preoccupied with safeguarding the investment incentives of the BIAS gatekeepers, the FCC showed no regard for Internet investment. In its view, while the fortunes of BIAS providers had suffered intolerably from the open Internet rules, those of edge providers would suffer negligibly from these rules' absence.

The FCC's "do-nothing" preference exhibited itself glaringly in its attitude toward competition. The very statistics on which the agency relied show that

about half of Americans have either one or zero wireline BIAS option and about 45% have only two.  But the agency charged with promoting competitive markets found it was not worth considering rules that would mitigate the impacts of this dismal lack of competition.  For households that can choose between providers, the agency ignored the difficulties of switching from one to another, documented in the record and familiar to all of us who have ever wanted or tried to do it.  The agency also unreasonably denied two motions to introduce relevant evidence:  the record in BIAS provider merger proceedings, which is directly probative of their power and past interference with the Internet; and the thousands of consumer complaints (and related materials) filed under the 2015 rules—an essential part of the record for a proceeding considering abolition of these rules.

## STANDING

The *Order* directly injures Petitioners in ways obvious from the record. Many Petitioners—Mozilla, Vimeo, NTCH, and Etsy—are online companies; the *Order* allows BIAS providers to interfere with their services.  Some Petitioners— Coalition for Internet Openness, Ad Hoc Telecom Users Committee, and INCOMPAS—are associations of businesses whose members depend on BIAS and will suffer from the same injuries.  Other Petitioners—Public Knowledge, Open Technology Institute, National Hispanic Media Coalition, Benton Foundation, Free Press, and Center for Democracy and Technology—are public interest

organizations; the *Order* injures them because it allows BIAS providers to interfere with Petitioners' own use of the Internet and their dissemination of, and access to, content online. Both their members and Ad Hoc's include end users who are injured because the *Order* allows interference with their creation of, and access to, content.

Petitioners meet the requirements for standing. All Petitioners participated in the proceeding below. They will suffer an injury-in-fact that is caused by the *Order* and would be redressed by its *vacatur*. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Petitioners are the "object of [the *Order*]," which means there is "little question that the action or inaction has caused [the Petitioners] injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62. Petitioners' standing is thus "self-evident" and "no evidence outside the administrative record is necessary . . . ." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). Out of an abundance of caution, Petitioners submit declarations by certain Petitioners in the Declarations of Standing Addendum.

## STANDARD OF REVIEW

The FCC's interpretation of the Communications Act is reviewed under *Chevron*'s two-step framework. *Brand X*, 545 U.S. at 981. The Court also evaluates "whether the Commission's actions were 'arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law.'"  *Verizon*, 740 F.3d at 635

(quoting 5 U.S.C. § 706(2)(A)).

## ARGUMENT

## I.  THE FCC'S PRIMARY RATIONALE FOR RECLASSIFYING BIAS AS AN INFORMATION SERVICE IS UNAMBIGUOUSLY CONTRARY TO THE LAW.

Despite the long history of FCC decisions on broadband access, no FCC

decision had attempted this *Order*'s primary ground for reclassifying BIAS.  The

FCC could have followed its own precedent and that of *Brand X*.  To do this, it

would have to analyze the mix between telecommunications and the few add-on

information services provided by BIAS providers, determine whether the two are

functionally integrated or not, or if any add-on services qualified for the

telecommunications management exception, and decide whether BIAS involves

the "offering" of telecommunications.  The FCC did not do that.  Its primary

rationale is a different idea altogether:  that the bare transmission is a conduit

connecting users to third-party information services, and therefore constitutes an

information service *itself*.  *Order* ¶ 30 (JA003369-003370).  According to the

FCC, the pipe becomes the message, at least in cases where the pipe's

"fundamental purpose" is to convey the message; with no telecommunications in

the mix, there is no mix to analyze after all, and it is not necessary to determine if

there is an "offering" of telecommunications to the public.  *Id.* ¶ 31 (JA003370-003371).

To appreciate how much of a stretch this reading is, imagine a road laid by a construction company.  The road leads to two seaside hotels, the Mozilla and the Etsy, which provide sleeping, business conferencing, and beach recreation services.  The builder argues that the road should be classified as a hotel and therefore exempted from any and all rules of the road.  It leads to the hotels, the builder continues, and was built to lead to them.  Never mind, continues the builder, that the road itself does not provide guests with any lodging, business conferencing, or beach recreation services.  That is the essence of what the FCC argues.

The FCC's argument goes far beyond interpretation; it is a direct contradiction of the law.  Its argument also finds no support in *Brand X* and has already been rejected in *USTA* as contrary to the text of the statute.  *USTA*, 825 F.3d at 702.  The FCC misinterprets the definition of "information services" and ignores those of "telecommunications" and "telecommunications service"—two terms that it would scrub out of the law books.

A.     **The FCC's New Interpretation Finds No Support in *Brand X*.**

The FCC correctly does not claim that its new interpretation was approved by *Brand X*, *see Order* ¶¶ 30-32 (JA003369-003372):  it was not.

The Communications Act differentiates between telecommunications services, which are subject to common carrier requirements, and information services. The definitions are simple. The statute distinguishes services that generate or process information—like web sites, search engines, and email—from the telecommunications conduits that deliver the information. Both this Court and the FCC have consistently found that the definitions of information service and telecommunications service are "mutually exclusive." *See NARUC v. FCC*, 851 F.3d 1324, 1325 (D.C. Cir. 2017); *Order* ¶ 62 (JA003369-003372); *2015 Order* ¶ 385. The same service cannot be classified as both.

In *Brand X*, the Supreme Court found ambiguity in the word "offering" as used in the definition of "telecommunications service," and therefore held that the agency's interpretation of that term was entitled to deference. *See Brand X*, 545 U.S. at 988; *USTA*, 825 F.3d at 701-02. In *Brand X*, the FCC had concluded that, while "telecommunications was one necessary component" of BIAS, the question of whether telecommunications is "offered" involved more than that. The FCC had found there was no "offering" of telecommunications because telecommunications or "data transport" was "inextricably intertwined" with the information service capabilities like ISP-provided email, forming a "single, integrated" offering from the consumer's point of view. *See Brand X*, 545 U.S. at 978-79, 988, 990. The Supreme Court upheld that interpretation as within the

scope of the FCC's authority—"though perhaps just barely." *Id*. at 1003 (Breyer, J., concurring). The question to which Congress had not directly spoken, then, was this: when a service includes both telecommunications and information service capabilities, and when the two are inextricably intertwined, is telecommunications being "offered"?

That question was at the heart of *Brand X* because, as mentioned above, early BIAS providers had created their own portals and bolted their own add-on information services onto their transmission path. Now that this business model is largely extinct, it is perhaps not surprising that the agency has changed the subject. It now resorts to a claim that, if meritorious, would have rendered much of the analysis in *Brand X* beside the point.

The question on which the FCC now dwells is entirely different: is a transmission that otherwise meets the definition of "telecommunications" properly classified as "information service" based on its "capability" of facilitating interaction with third-party providers of information services? This question has nothing to do with consumer perception—the subject of *Brand X*'s inquiry.

Congress has spoken with precision to it, and the FCC's interpretation fails *Chevron* Step One.[7]

**B.    The FCC's Interpretation Contravenes the Statutory Text.**

1.    *"Information Service" definition.*

The Act defines "information service" as the "offering of a capability for" eight types of information-processing functions.  The FCC jumps from "capability" to "potential ability," and from there to the notion that every service that is a conduit for someone else's information service is itself an information service if only it was "designed and intended" with the "fundamental purpose" to act as such a conduit.  *Order* ¶ 30 (JA003369-003370).

This Court has already rejected the FCC's broad reading.  In *USTA*, the petitioners had likewise argued that BIAS's bare transmission qualified as an "information service" because it provided access to third-party information services.  In the Court's words, this argument "ignores that under the statute's definition of 'information service,' such services are provided 'via telecommunications.'"  *USTA*, 825 F.3d at 702 (citation omitted).  The *Order*

---

[7] *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984) ("First, always, is the question whether Congress has directly spoken *to the precise question at issue*.") (emphasis added).  The ambiguity of the term "offering" as used in the definition of telecommunications service does not mean that the terms of the "information service" definition interpreted by the FCC are ambiguous.

makes the same mistake.  The Court went on: "[t]his, then, brings us back to the basic question: do broadband providers make a standalone offering of telecommunications?"  *Id.*  Like USTA's rejected argument, the *Order*'s primary ground for reclassification ignores this question.[8]

The inclusion of "via telecommunications" in the definition reflects the fact that information services rely on the transmission path of a telecommunications service.  It is inconceivable that Congress would have self-destructively included the phrase in the definition of "information service" to make its other two definitions, those of "telecommunications" and "telecommunications service," irrelevant.  *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

In addition to glossing over "via telecommunications," the FCC also introduces new, non-existent words into the "information service" definition.  There is no element of "purpose," "intent," or "design" in that definition.  *See United States v. Calamaro,* 354 U.S. 351, 358-59 (1957) (agency may not make an

---

[8] The FCC had raised a similar argument in *Brand X*, Reply Brief of Gov. at 5, *Brand X*, 545 U.S. 967 (2005) (Nos. 04-277, 04-281), but the Supreme Court did not adopt, or even mention, it.

"addition to the statute of something which is not there").  The FCC invents that element to create a limiting principle where otherwise none would exist; the agency interprets "capability" so broadly that it needs to narrow it with the requirement of intent.  But the effort fails.

The record is clear: every transmission of communications today involves a computer, and to say it was "designed" to do so adds nothing, making even more pernicious the implication that the *Order* attaches to such design.  OTI Comments, WC Docket No. 17-108, at 92 (JA001690) (July 17, 2017) ("OTI Comments").

Take the plain old phone calls that have been part of our lives since long before the Internet's inception.  Our telephones have long offered access to either automated information or a person who can generate or otherwise act upon information.  And the capability of telephone lines to reach this wealth of information-processing is surely not by accident but by design.  *Presto*—the telephone service has become an information service, too, under the FCC's reading.  The FCC believes otherwise, *Order* ¶ 56 (JA003393-003394), but the only basis in the record for its view is one statement from Verizon's reply comments:  "'[BIAS] is designed with advanced features, protocols, and security measures so that it can integrate directly into electronic computer systems . . . .'" *Id.* (JA003393) (citation omitted).  That tells us nothing about the equation's other side—how modern telephone networks are designed.  The record suggests that

modern telephones are designed with "advanced features" and the fundamental purpose of accessing information processing, too.  OTI Comments at 65-66 (JA001663-001664).

Faced with the lack of record evidence, the FCC resorts to "past distinctions" and concludes that "the fundamental nature of traditional telephone service" is to provide "basic transmission."  *Order* ¶ 56 (JA003393).  But this conclusion is not based on the FCC's own fact finding, but on "pre-1996 Act MFJ precedent."  *Id.* (JA003393).

### 2.  *"Telecommunications" definition.*

The "telecommunications" definition is treated no better.  Congress decided that telecommunications is the transmission of information between or among points specified by the user without change in form or content.  47 U.S.C. § 153(50).[9]

Still, the FCC now thinks otherwise:  it has introduced an exception to the definition of "telecommunications," concluding that not all transmissions that have the characteristics prescribed in the definition fit the bill.  Thus, under the *Order*,

---

[9] The FCC effectively concedes that such transmission is the primary purpose of BIAS at the outset, when it defines BIAS as "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints . . . ."  *Order* ¶ 21 (JA003365-003366) (footnote omitted).

transmission of information of the user's choosing between points specified by the user is not telecommunications if it is used to access third-party information services. *Order* ¶ 30 (JA003369-003370).

The problem is that the telecommunications definition does not exclude transmissions undertaken with the purpose of reaching third-party information services. Congress knew how to qualify these definitions with exceptions when that was its intent: the definition of an "information service" is subject to an exception for information-processing used in the management, control, or operation of a telecommunications system or service. 47 U.S.C. § 153(24). Congress did not do so here. *Utility Air Regulatory Grp. v. EPA,* 134 S. Ct. 2427, 2446 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

The *Order*'s implications are absurd. Say a Comcast subscriber asks Sony Vue to stream a film to her house. The subscriber expects Comcast to transmit that film from Sony Vue to her house, without adding or subtracting scenes or actors. Under the plain meaning of the definition, that transmission is "telecommunications." But according to the FCC, it is not, because it is "designed" or "intended" to achieve the "fundamental purpose" of acquiring and retrieving information from an "online streaming" application. And when an AT&T customer asks Snapchat for her social media timeline, she expects AT&T to

transmit her interactions with friends to her phone. AT&T does not include new friends or change her friends' messages—and could not even if it wanted, as the information is encrypted. That transmission, too, is telecommunications under the plain meaning of the law. Yet under the *Order*, it is not, because it is meant to be used in "generating and making available" information obtained from *other* points specified by the user.

The *Order*'s new "exception" devours almost the entire statutory definition. If a pipe is the message because it transmits the message and was designed to do so, then there is no pipe—and there is nearly nothing for Title II of the Communications Act to cover. If calls on plain old phones are information services since they are designed to access information processing, then anything goes, and nothing is left in Title II.

Petitioners need not take the FCC's rationale to the extreme—it is already extreme. By the *Order*, the FCC is signing the death sentence of Title II, unlawfully rewriting the Act and ignoring the statutory provisions that give the FCC its most fundamental responsibilities. 47 U.S.C. § 201(a).

In addition to excluding services from Title II, this broadening of "information service" could import into Title I services and activities that the Act was never intended to reach. Would a computer processing chip, designed with the purpose of enabling a smartphone to connect to the Internet through wireless

transmissions, likewise be an information service?  The FCC's interpretation

would lead to a vast expansion in the agency's authority without congressional

authorization.  *See Motion Picture Ass'n of America, Inc. v. FCC*, 309 F.3d 796,

801 (D.C. Cir. 2002).

### C.    The *Order* Refuses to Interpret the Definition of "Telecommunications."

The *Order* does so much violence to the definition of "telecommunications"

that it is unsurprising the FCC decided to look the other way:  "[b]ecause we find it

more reasonable to conclude that at least some telecommunications is being used

as an input into [BIAS]—thereby satisfying the 'via telecommunications'

criteria—we need not further address the scope of the 'telecommunications'

definition in order to justify our classification of [BIAS] as an information

service."  *Order* ¶ 52 (JA003388-003390).  The FCC's apparent motivation here is

convenience, not the asserted lack of need:  addressing the "telecommunications"

definition would reveal the contradiction between the statute and the FCC's

position.

The blinders with which the FCC has willingly narrowed its gaze would be

improper even in the best of cases:  "Statutory construction . . . is a holistic

endeavor."  *United Savs. Ass'n v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365,

371 (1988).

But the agency's error is more severe here than in the usual case of an agency's exclusive focus on one provision, because "telecommunications" is not part of the backdrop; it's in the foreground. The FCC may not meaningfully choose between two mutually exclusive definitions by looking only at one. *Children's Hosp. & Research Ctr. of Oakland, Inc. v. NLRB*, 793 F.3d 56, 59 (D.C. Cir. 2015) ("When an agency fails to wrestle with the relevant statutory provisions, we cannot do its work for it.").

Finally, the FCC cannot plausibly invoke the major questions doctrine as an excuse for its otherwise untenable interpretation. *See Order* ¶ 161 (JA003454-003455). This Court has already held that it does not apply here. *USTA*, 825 F.3d at 704. It is not a one-way street even when it does. A rule on a major question is a major rule whether it says "you shall not" or "you may." Therefore, if it applied, the doctrine would mean that the *Order* itself is not entitled to *Chevron* deference. *See United States Telecom Ass'n v. FCC*, 855 F.3d 381, 402-03 (D.C. Cir. 2017) (Brown, J., dissenting from denial of rehearing); Josh Blackman, *Gridlock*, 130 Harv. L. Rev. 241, 261 (2016).

### D. The FCC's Principal Theory Does Not Withstand *Chevron* Step Two Scrutiny.

Even if the third-party information services at the end of BIAS's journey were enough to make BIAS an information service under *Chevron* Step One, the FCC's position would be unreasonable.

Even then, BIAS would still meet the statutory definition of telecommunications—transmission of information without change from one point to another.  And this is not a case where the same service can be classified as both, or an instance in which the agency has discretion to classify it as one or the other. The statute employs the language of command—"shall."  If it is a telecommunications service, it must be regulated as one.  47 U.S.C. § 153(51) ("A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services . . . .").  It is either fish or fowl, the FCC (including in the *Order*) has said, and so has this Court.  *See supra* p.24.

In any event, the FCC never considered whether the statute permits classifying a service that meets the definition of a "telecommunications service" as, instead, an information service not subject to Title II.  That failure to consider an "important aspect of the problem" violated the APA.  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Ins. Co*., 463 U.S. 29, 43 (1983).

## II. THE FCC'S CONCLUSION THAT BIAS INEXTRICABLY INTERTWINES TELECOMMUNICATIONS WITH INFORMATION SERVICES IS UNREASONABLE.

The FCC's secondary rationale is no more than its primary one in disguise. The FCC is grudgingly brought to consider the possibility that BIAS includes a telecommunications part:  "even if the information service could be said to involve

the provision of telecommunications as a component of the service," the agency says, that component is "inextricably intertwined" with an information service component. *Order* ¶ 53 (JA003390). The existence of the telecommunications component is not only something that "could be said"; it has been said by the Supreme Court, this Court, and the prior FCCs alike. And the agency's interest in it is lackluster. Indeed, the *Order* seems to dismiss that component *a priori*. Thus, this FCC argues that the existence of a telecommunications component is no surprise, since information services are defined as offered "via telecommunications" after all: "[b]y definition, *all* information services accomplish their functions 'via telecommunications . . . .'" *Id.* ¶ 52 (JA003388-003390).

This type of reasoning is no different than the FCC's first idea—the pipe is the message if it leads to the message and was intended to. This is not a genuine application of the fact-specific consumer perception test, but yet another attempt to read that definition out of the statute. When something is true "by definition," its truth does not depend on the circumstances. If the transmission component of BIAS can always be classified as an information service due to the "via telecommunications" part of the information service definition, the *Brand X* court would never have asked "whether the transmission component of cable modem

service is sufficiently integrated with the finished [cable modem] service to make it reasonable to describe the two as a single, integrated offering." 545 U.S. at 990.

In the same vein, the *Order* states that an offering like BIAS "'always and necessarily' includes integrated transmission and information service capabilities . . . ." *Order* ¶ 55 (JA003392 ) (citation omitted). The quote comes from the *2005 Wireline Order*, but the *Order* takes it a crucial step further: in 2005, the FCC had said the service "always and necessarily *combines*" the two components. *2005 Wireline Order* ¶ 9. The FCC now says the two are "always and necessarily" "*integrated*." Certitude precludes fact-finding. *Brand X* rightly considered how users of that service may perceive what's on offer. Perceptions change. But if the telecommunications component is always integrated, and thus made to disappear by the FCC, such changes in perception will never matter.

It is thus not surprising that, while the FCC purportedly makes an inquiry into actual consumer perception, the effort is flawed. The FCC asks the wrong question, puts the wrong type of consumer perception under its lens, and creates a new test that is always guaranteed to confirm its statutory interpretation.

The FCC relies upon evidence that consumers "highly value the capabilities their BIAS providers offer to acquire information from websites," and "view" the attributes of BIAS "as a means of enabling these capabilities to interact with information online, not as ends in and of themselves." *Order* ¶ 46 & n.161

(JA003382). Of course they do. But this does not show they view BIAS as an information service; on the contrary, it shows they view it as offering them pure transmission *to* information services. The *Brand X* FCC had classified BIAS as an information service because many consumers then had a very different thought—they viewed BIAS as more *of* an end in itself, due to the early BIAS providers' bundling together of transmission with their own information offerings.

The FCC's variant of the consumer perception test does not confirm the FCC's statutory interpretation; it *assumes* it. The FCC assumes that a service intended as a conduit to information-processing functions is itself an information service. Then the FCC observes that consumers value the service as a conduit to those functions. *Ergo*, the consumer perceives the service as an information service, too. The conclusion is no better than the assumption.

The real test is whether consumers—not this FCC—view the two components provided by the BIAS provider itself as intertwined. And the only possible answer allowed by the record is that they have not been perceived as intertwined for quite a few years. The early 2000s, the period examined by the FCC in *Brand X*, were the time of portals like Excite@Home and Roadrunner, as well as ISP-provided email and curated news. In concluding that consumers perceived the transmission and information service components of BIAS as inextricably intertwined, it was to these manifold information services provided by

the ISPs that the FCC and the Supreme Court looked: the service enabled users to browse the World Wide Web (through their ISP portals), but also to use a whole host of ISP-provided information services. *Brand X*, 545 U.S. at 987. These add-on services have not existed for quite some time. In *USTA*, this Court upheld the FCC's determination that things have changed: "broadband consumers not only focus on the offering of transmission but often avoid using the broadband providers' add-on services altogether, choosing instead 'to use their high-speed Internet connections to take advantage of competing services offered by third parties.'" *USTA*, 825 F.3d at 698.

Moreover, the *USTA* court independently found that edge provider content dominates the broadband user's experience: "[t]hat consumers focus on transmission to the exclusion of add-on applications is hardly controversial . . . . [G]iven the tremendous impact third-party internet content has had on our society, it would be hard to deny its dominance in the broadband experience. . . . The same assuredly cannot be said for broadband providers' own add-on applications." *Id.* at 698. The necessary premise of *USTA*'s finding is that, when the transmission component is the consumer's "focus" and the "dominant" partner in the mix, the functional integration test is no longer met. This premise is not new—the *Brand X* Court had expressed it when it found there is no "functional[] integrat[ion]" when

the telecommunications is "only trivially dependent" on the information service component. *Brand X*, 545 U.S. at 998.

Our road-and-hotels example helps here as well. Suppose that the builder, finding no traction for its argument that all roads designed to lead to hotels are themselves hotels, returns to a different argument: the road is a hotel not because it leads to one, but because the builder has also built rest stops, where drivers can find coffee shops, gas stations, and motels, along the road's way. Is the mix of road and rest stops so integrated as to make the road a "hotel"? The argument may be less extreme, but it is equally unreasonable, if the rest stops bundled with the road have mostly closed, and the drivers now perceive the road simply as a means of getting to the hotels.

The FCC does not, and cannot, deny that the information services provided by ISPs have atrophied. While the FCC vaguely mentions "certain other information processing capabilities" of BIAS, *see, e.g.*, *Order* ¶ 33 (JA003372), it finds them not "determinative" as to BIAS's classification.[10] They *should* have been determinative to make a difference. The FCC points to no evidence to show

_____

[10] In a footnote, the FCC lists a variety of potential additional information processing features, including email, but does not even attempt to argue that such features are functionally integrated components of BIAS for today's end users. *See Order* ¶ 33 n.99 (JA003372).

that consumers now perceive BIAS as an information service rather than a road providing access to third-party information. Instead, the FCC relies on its "historical understanding," *Order* ¶ 47 (JA003383-003384), dating back to 2005 and earlier, a reliance that ignores the possibility of consumer perception changing in a dynamic market. For the rest, the FCC confines itself to disputing the relevance of the fact that BIAS providers largely market BIAS on the basis of transmission speed. *Id.* ¶ 48 (JA003384-003385).

And the FCC makes one more fatal mistake: while purporting to consider the "ordinary customer's perception," *id.* ¶ 46 (JA003382), it shifts from the customers' perspective to that of BIAS providers, who, in the FCC's view, "are in the best position to understand the inputs used in [BIAS] . . . ." *Id.* ¶ 52 (JA003388). Thus, according to the FCC, "even assuming that any individual consumer could perceive an ISP's offer of [BIAS] as akin to a bare transmission service, the information processing capabilities that are actually offered as an integral part of the service make [BIAS] an information service . . . ." *Id.* ¶ 49 (JA003385) (citing BIAS providers' comments for support) (footnote omitted). This customer-is-wrong approach casts aside consumer perception as irrelevant—an improper departure from the customer focus of *Brand X* and FCC precedent. And even when the FCC purports to consider the consumer's perspective, it does

so through the self-serving filter of the providers. *See id.* ¶ 46 (JA003382) ("As Cox explains . . . .").

Millions of consumers filed comments. Many of them told the FCC that they perceive BIAS as a bare transmission path. *See, e.g.*, NHMC Comments, WC Docket No. 17-108, at Appendix B (JA002102-002115) (July 17, 2017); *see also* Ad Hoc Comments, WC Docket No. 17-108, at 6 (JA000098) (July 17, 2017) ("In today's world, customers obtain internet access service on an entirely separate basis from web hosting, web browsers, applications, 'newsgroup' services, customer premise equipment (which now includes highly sophisticated hardware and software), email servers, etc."). But the FCC closed its ears, and chose instead to hear only from the BIAS providers.

## III. RELIANCE ON DNS AND CACHING FAILS *CHEVRON* STEP TWO.

This leaves DNS and caching. The *Order* claims that they are "integrated information processing capabilities offered as part of [BIAS]," *Order* ¶ 33 (JA003372), rather than functions falling within the telecommunications management exception, *id*. ¶¶ 36, 42 (JA003375-003376, JA003379-003380). And, the *Order* assumes, an integrated offer combining a telecommunications service overwhelmingly devoted to data transmission with this limited bundle of alleged information services is permissibly classified as an information service. That position is unreasonable.

While the FCC tries to wrap itself in the cloak of *Brand X*, its argument is very different. In *Brand X*, the Court was focused on the BIAS providers' add-on information services, such as ISP-provided email, file transfer services and Usenet newsgroups. *See Brand X*, 545 U.S. at 987. It was the mix of these services with the transmission component that drove the decision; the Court had no occasion to consider the proper classification of a service combining telecommunications with nothing more than DNS and caching.

In addition to addressing a materially different mix of services, *Brand X* expressly declined to decide whether DNS fell within the telecommunications management exception. *See id*. at 1000 n.3. Specifically, the majority explained that, in calling DNS a telecommunications management function, the dissent presupposed that cable modem service otherwise qualified as a telecommunications service that DNS could manage. *See id*. at 1013 n.6 (management exception applies to a capability used for "the management of a telecommunications service") (quoting 47 U.S.C. § 153(20)). But the majority had already decided that cable modem service could reasonably be viewed as *not* providing a telecommunications service because, even setting aside DNS and caching, it functionally integrated telecommunications with a wide range of other information services, like email, etc. *See id*. at 986-88, 997-98. Accordingly, the majority took "no view" on whether DNS would fall within the

telecommunications management exception if associated with a service that was otherwise a telecommunications service and there were no other ISP information services bundled with it. *Id.* at 1000 n.3. This case presents that unresolved question.

### A. DNS and Caching Fall within the Telecommunications Management Exception.

This Court has already agreed that DNS and caching fall within the terms of the telecommunications management exception. *See USTA*, 825 F.3d at 705. They assist in the "management, control, [and] operation of a telecommunication system," 47 U.S.C. § 153(24), by facilitating the efficient delivery of data to and from destinations of their subscribers' choosing. Caching, in turn, is simply a method for that provider to reduce its costs and more cheaply deliver on its promise of quick delivery of user-requested content from third parties.

DNS and caching also meet the definition of an adjunct-to-basic service, the precursor to the telecommunications management exception, because both are secondary—literally "adjunct"—to the basic telecommunications service consumers are buying. *See USTA*, 825 F.3d at 705 (adjunct-to-basic services "facilitate use of the network without altering the fundamental character of the telecommunications service"); *2015 Order* ¶ 367 (they are "incidental" to basic service); *id.* (examples include speed dialing, call forwarding, and computer-provided directory assistance). When we pay Comcast or Verizon $90 per month,

the fundamental service we buy is transmission to the Internet.  Many of us do not know that BIAS-supplied DNS and caching exist, and they are not the "fundamental" service anyone buys.  OTI Comments at 31 (JA001629).

The *Order* denies the relevance of the adjunct-to-basic precedent, claiming that the "telecommunications management exception . . . was drawn most directly from the MFJ," *Order* ¶ 35 n.112 (JA003374); *see also id*. ¶ 36 & nn.114, 116 (JA003375), which supposedly applies a different test—whether the service is "directed at internal operations" or is instead a "servic[e] for customers or end users." *Id*. ¶ 36 (JA003375).  The FCC declares that DNS and caching are the latter because they are "useful to the consumer."  *Id*. ¶ 42 (JA003380).

But this Court and the Supreme Court have held that the telecommunications management exception "[t]rack[s] the Commission's approach to adjunct-to-basic services," *USTA*, 825 F.3d at 691, and is derived from the *Computer II* framework. *Brand X*, 545 U.S. at 976-77.

Nor, in any event, did the MFJ court apply a different standard.  The only support the *Order* cites is one sentence in a two-page unpublished order, which simply paraphrases *the Government's* position, in a case where the details of the test didn't matter.  *Order* ¶ 36 & n.117 (JA003375) (quoting *United States v. American Tel. & Tel. Co*., 1989 WL 119060, *1 (D.D.C. Sept. 11, 1989)).  In a more relevant passage, the court noted that it had "allowed the regional companies

to provide *directory assistance* to their own customers pursuant to that exception," 1989 WL 119060, at *1 n.7 (emphasis added), confirming that even under MFJ precedents, a service like DNS was not considered an information service.

The FCC claims that another MFJ decision held that an "address translation" function "rendered gateways an information service." *Order* ¶ 35 (JA003374) (citing *United States v. Western Elec. Co., Inc.*, 673 F. Supp. 525, 593 & n.307 (D.D.C. 1987)). Not so. While the court considered the *overall* gateway service (which also contained protocol conversion and computerized billing) to be an information service, it never said address translation somehow had an independent status as an information service or that it was the key to the overall classification. *See Western Elec.*, 673 F. Supp. at 592-93 & n.307; *see also* Public Knowledge Reply Comments, WC Docket No. 17-108, at 32-35 (JA002852-002855) (Aug. 30, 2017).

The statute asks whether a function is used "for the management, control, or operation of a telecommunications system," 47 U.S.C. § 153(24), not whether the function also benefits consumers. In any event, DNS and caching are "services for customers" only in the sense that every telecommunications management function is. They make the transmission service more efficient in ways that are generally invisible to users; they are useful only insofar as they help users reach the

information services provided by others, without altering the fundamental character of the transmission service.

The *Order* also fails to acknowledge or address the fact that its new test is incompatible with the longstanding classifications of speed dialing, call forwarding, and computer-provided directory assistance, each of which is classified as falling within the telecommunications management exception, *see USTA*, 825 F.3d at 691; *2015 Order* ¶ 367, even though each can be seen as providing "services for customers or end users." *Order* ¶ 36 (JA003375).

## B. DNS and Caching Do Not Render BIAS an Information Service.

The inquiry into the scope of the management exception does not end the matter. Even if DNS and caching are information services, they matter only if they are inextricably intertwined with the transmission component, and only if their inclusion reasonably renders the overall service an "information service." The FCC makes short shrift of these questions, confining itself to the conclusory statements that DNS is "an indispensable functionality," *id.* ¶ 34 (JA003372), and caching is "functionally integrated." *Id.* ¶ 41 (JA003379). But these statements are contradicted by the *Order* itself. The FCC acknowledges that DNS and caching are not "indispensable"—a user can easily configure her computer to use a third-party DNS server and content can be delivered even without caching (which is increasingly required because caching cannot be used when users employ

encryption).  *Id*. ¶¶ 34, 42 & n.147 (JA003372, JA003379-003380); Public

Knowledge Comments, WC Docket No. 17-108, 12-14 (JA002182-002184) (July

19, 2017) ("Public Knowledge Comments").

Moreover, crucially, the FCC's conclusion disregards the fact that, under the

"inextricably intertwined" test, the relative importance of the two components is

itself important.  As the Court stated in *USTA*, "consumers *focus* on transmission to

the exclusion of add-on applications"; "[they] rely on the service primarily to

access third-party content"; and "it would be hard to deny its *dominance* in the

broadband experience."  825 F.3d at 698 (emphasis added).  If forced to give a

single designation to an offer that combines pets and leashes, one couldn't

reasonably call it "leash sales" and avoid subjecting the business to "pet sale"

regulations.

And, even if the "focus" on, and "dominance" of, one component over the

other were not part of the functional integration inquiry, a finding of functional

integration does not automatically lead to an information service classification.  In

*Brand X*, the Court left open whether it would "be unreasonable" to classify

telephone service as an information service due to bundling with voicemail.  *See*

545 U.S. at 997.  The FCC could not have reasonably concluded that a drop of

DNS and caching in a sea of transmission transformed the service into something

that could properly be called an information service.

## IV. THE FCC ERRONEOUSLY DISAVOWED OTHER SOURCES OF AUTHORITY.

Section 706 of the 1996 Telecommunications Act states that the FCC "shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment." 47 U.S.C. § 1302(a). If an agency recognizes that a serious problem exists but finds that one of the two statutory provisions used in the past does not empower it to solve the problem in its entirety, what does it do? In this case, close to nothing. The agency acknowledged that the consequences of blocking and throttling are serious and that something should be done to avert them, *Order* ¶ 265 (JA003515-003516), but then rushed to give up on any and all tools, by demoting Section 706 from a command to an exhortation. *Id.* ¶ 267 (JA003517-003518).

This is wrong for two reasons. First, the FCC did not adequately consider a reasonable alternative raised by a party. *See Chamber of Commerce v. SEC*, 412 F.3d 133, 145 (D.C. Cir. 2005). The idea of Section 706 as an alternative source of authority for at least some open Internet rules was raised by a number of parties.

*See, e.g.*, INCOMPAS Comments at 64 (JA001092). Importantly, even some

BIAS providers agreed.[11] And the FCC did not need to take these parties' word: it

only had to look to this Court: "we start and end our analysis with section 706 . . .

which . . . furnishes the Commission with the requisite affirmative authority . . . ."

*Verizon*, 740 F.3d at 635. *USTA* "fully adopt[ed]" the Court's "findings and

analysis in *Verizon* concerning the existence and permissible scope of the

Commission's section 706 authority . . . ." 825 F.3d at 243.

And so, if the agency had imposed open Internet rules under Section 706, the

rules could not have been identical to those in the *2015 Order*, but the authority

given by Section 706 would be unimpeachable. This Court had recognized that

Congress endowed the FCC with a tool for adoption of open Internet rules, and the

FCC declined to use it. We agree that this protection is a worthwhile goal, the

agency effectively said, but no thank you.

Second, the FCC misinterpreted the statute. It acknowledged that "shall"

"generally" conveys a command. *Order* ¶ 270 (JA003518-003519); *Natural Res.*

*Def. Council v. EPA*, 755 F.3d 1010, 1019 (D.C. Cir. 2014) ("The word 'shall'

makes the directive . . . mandatory.") (citation omitted). But it concluded that

---

[11] *See* AT&T Comments, WC Docket No. 17-108, at 101-06 (JA000217-000222)
(July 17, 2017); Cogent Comments, WC Docket No. 17-108, at 22-24 (JA00400-
00402) (July 17, 2017).

"shall" does not do so here based on illogical reasoning: "the Commission has other authority under the Communications Act that it can exercise consistent with the direction in section 706(a) and (b) of the 1996 Act . . . ." *Order* ¶ 270 (JA003519).

An order is still an order if its recipient already has the power to do what is ordered. Let us assume that Congress told the FCC: I am now commanding you to do what you previously had the power to do. This is not just exhortation, but mandate. Nor is it circumscribed by an exception that says: you may avoid obeying my command if I have not given you power to act already. Such an exception is the FCC's invention. As another Circuit has held with respect to Section 706(b), if that section did not act as a grant of independent authority, it would be difficult to understand what it was meant to do. *In re FCC 11-161*, 753 F.3d 1015, 1053-54 (10th Cir. 2014). The FCC's interpretation is particularly unreasonable in light of its conclusion that no other source of authority to protect the open Internet actually exists.

The other ground cited by the FCC is the supposed benefit of returning to the FCC's original interpretation of Section 706. *Order* ¶ 270 (JA003518-003519). But the FCC does not acknowledge that interpretation was based on an entirely different rationale: an earlier FCC had expressed concern that, if Section 706 were interpreted as a grant of authority, it would allow the agency to forbear from

enforcing statutory provisions even though that was not allowed by the specific forbearance provision. *1998 Wireless Order* ¶ 73. The FCC does not rely on that rationale here for good reason; this Court has found it makes "little sense." *Verizon*, 740 F.3d at 637. The FCC's reading is also inconsistent with its reading of Section 257, which expressly confines the FCC to "regulations pursuant to its authority under this chapter (*other than this section*) . . . ." 47 U.S.C. § 257(a) (emphasis added). The FCC finds this explicit language, absent from Section 706, no bar to treating Section 257 as an independent source of authority for the transparency rules.

## V.    THE FCC *ORDER* IS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW.

For a decade, the FCC had found that broadband providers have the incentive and capability to interfere with their customers' access to the Internet. *See USTA*, 825 F.3d at 694-95. This Court has repeatedly upheld those findings. *See id*.; *Verizon*, 740 F.3d at 645-49. The FCC nonetheless now disavows any responsibility for guarding against those harms, repealing every open Internet conduct rule, eliminating the classification that made those rules possible, and disclaiming other potential sources of authority. Its justifications do not withstand APA scrutiny.

**A.    The *Order* Unreasonably Concludes that Other Statutes and the Transparency Rule Adequately Protect Internet Openness.**

Agencies often abolish a rule when the problem the rule was intended to solve has gone away.  This is the unusual case where the agency recognizes the continuing existence of the problem targeted by the rule, and announces it will stop doing anything to address it.  The *Order* acknowledges that "[t]he potential consequences of blocking or throttling lawful content on the Internet ecosystem are well-documented," *Order* ¶ 265 (JA003515), and agrees with "the need for a no-blocking rule on principle." *NPRM* ¶ 80 (JA000028).  But it decides that other rules, "particularly antitrust and consumer protection laws, sufficiently address such harms." *Order* ¶ 87 (JA003410).  That conclusion is arbitrary and capricious.

1.    *Delegation to other agencies.*

To start, Section 706 directs that "[t]he *Commission* . . . shall encourage the deployment" of broadband.  47 U.S.C. § 1302(a) (emphasis added).  Section 1 of the Communications Act likewise directs the FCC to make rapid and efficient communications services available to all.  *See id.* § 151.  The FCC may not delegate to DOJ and the FTC responsibility for addressing fundamental questions of national telecommunications policy when Congress expressly assigned that job to the FCC.  *See, e.g.*, *Local 1976, United Bhd. of Carpenters and Joiners v. NLRB*, 357 U.S. 93, 111 (1958) (an agency may not "abandon an independent inquiry into the requirements of its own statute and mechanically accept standards

elaborated by another agency under a different statute for wholly different purposes"); *New York Shipping Ass'n, Inc. v. Federal Mar. Comm'n*, 854 F.2d 1338, 1368 (D.C. Cir. 1988).

<h3 style="text-align:center">2.     *Reliance on antitrust and consumer protection laws.*</h3>

Nor can the FCC satisfy its duty by simply declaring that the only practices that need to be proscribed to promote broadband deployment just happen to be those practices made illegal by other laws enacted for different purposes. Blind faith is not reasoned analysis. At a minimum, the FCC must: (1) determine what conduct it believes must be prohibited to fulfill the Act's objectives; and (2) ensure that the substitute statutes actually prohibit it. This *Order* does neither.

First, one searches in vain for a straight answer to whether the FCC believes that all blocking or throttling should be prohibited by law and, if not, when blocking and throttling can be tolerated without unduly interfering with broadband deployment. *See, e.g.*, *Order* ¶ 265 (JA003515-003516). And while the *Order* suggests that *some* amount of paid prioritization may be acceptable, in *some* circumstances, the *Order* never identifies with clarity what those are. *See id*. ¶¶ 253-62 (JA003504-003514).

Second, the FCC never asks whether the undesirable conduct would be reached by the hodge-podge of antitrust and consumer laws it contemplates. On the antitrust side, the *Order* does not examine the extent to which consumer harm

is limited only to those practices prohibited by the Sherman Act.  It does not

consider that BIAS providers could engage in tacit coordination—such as uniform

adoption of throttling policies—potentially escaping a finding of collusion under

Section 1 of the Sherman Act.  *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 553-54 (2007).  In fact, the FCC acknowledges that antitrust law is not

designed to protect users from discrimination on the basis of their political

expression.  *Order* ¶ 153 (JA003349-003350).  It never determines whether (or

when) blocking, throttling, or paid prioritization would fail the "rule of reason"

under antitrust law or be held "unfair" under the FTCA.  *See, e.g.*, *Order* ¶ 261-62

(JA003512-003514); *id.* ¶ 255 n.924 (JA003506).

And on the consumer protection side, the *Order* suggests that the FTCA

would ban throttling by providers who promise not to do it in their public

disclosures.  *Id.* ¶ 142 (JA003442-003443).  But this would do nothing for

consumers whose BIAS providers make no such promises or else candidly disclose

conduct that threatens Internet openness; such disclosures are costless for providers

facing little competition.  The FCC also fails to consider the implications of its

actions on other areas of consumer protection and communications policy, such as

privacy, universal service, and access by the disabled.

If the reality is that blocking and throttling will almost always be lawful

under these statutes, so long as the BIAS provider does not lie about its behavior,

the FCC must own up to that fact and square it with the FCC's Section 706 obligations.

Finally, the *Order* fails to reconcile its objections to the alleged vagueness of the general conduct standard with the necessarily generic nature of the antitrust and consumer laws it says are appropriate replacements. *See Order* ¶ 247 (JA003500) (claiming vagueness in general conduct standard causes harmful regulatory uncertainty).

### 3. *Reliance on disclosure.*

The FCC's reliance on its pared-down disclosure requirements is likewise unreasonable. Disclosure does little for consumers with no practical alternatives. In addition, as the non-governmental intervenors explain in greater detail, the disclosure rules themselves are unlawful.

First, Section 257(c) was repealed before the *Order* became effective. *See* RAY BAUM'S Act of 2018, Pub. L. 115-141, § 402(f), 132 Stat. 1089 (2018). "When a statute has been repealed, the regulations based on that statute automatically lose their vitality." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1575 (D.C. Cir. 1996).

Even if the rule were still effective, the FCC failed to give adequate notice of the statutory authority upon which it ultimately relied in imposing the transparency

rule, Section 257 of the Communications Act.  *See NPRM* ¶ 103 & n.227

(JA000034) (citing *2015 Order* ¶¶ 124-35, 137); *Order* ¶ 232 (JA003492-003493).

Finally*,* Section 257 provides no authority for any rule because it gives the

FCC the authority to "identify[] and eliminat[e]" market entry barriers "by

regulations pursuant to its authority under this chapter (*other than this section*)."

47 U.S.C. §§ 257(a),(c) (emphasis added).

Without the transparency rule, the *Order* as a whole cannot stand because

the disclosure requirements are a cornerstone of the FCC's justification for

repealing all the other rules.  *See Order* ¶¶ 208, 239-45, 253, 261-64, 283, 297

(JA003482, JA003497-003499, JA003504, JA003512-003513, JA003527,

JA003535).

## B.    The FCC Abrogated Its Duty to Promote Competition.

The FCC plowed forward with abolishing the rules despite the *Order*'s

finding that wireline BIAS competition is non-existent in roughly half the country,

evidence that consumers cannot easily switch BIAS providers even where there are

two competitors, and the FCC's recent determination that fixed and mobile BIAS

are not substitutable products.  The FCC did so by shrugging off its own data.

That action is arbitrary and abrogates the FCC's authority to promote competition.

*See AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001)

("Conclusory explanations . . . where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review.").

> 1.     *The FCC arbitrarily accepted the lack of competition.*

In 2015, Chairman (then-Commissioner) Pai dissented from the *2015 Order*'s conclusion that many rules of Title II were not necessary and their application could be forborne.  He reasoned:  "[w]hat I cannot find—and what our precedent does not countenance—is any instance where the FCC eliminated economic regulations without first performing any market analysis or finding competition sufficient to constrain anticompetitive pricing and behavior."  Pai Dissent at 5978 (JA004274).  Yet the FCC's *Order* suffers from the very infirmity Chairman Pai claimed was fatal to the *2015 Order*'s forbearance decision.

The facts are not in dispute.  Here is the relevant chart from the *Order*.

**Percent of U.S. population in developed census blocks in which residential broadband wireline ISPs reported deployment (as of December 31, 2016)[12]**

| Speed of at least: | Number of providers | | | |
|---|---|---|---|---|
| | 3+ | 2 | 1 | 0 |
| 3 Mbps down and 0.768 Mbps up | 12.1% | 67.2% | 16.2% | 4.4% |
| 10 Mbps down and 1 Mbps up | 9.0% | 58.5% | 26.3% | 6.2% |
| 25 Mbps down and 3 Mbps up | 5.9% | 45.2% | 39.6% | 9.2% |

---

[12] *Order* ¶ 125 (JA003530).

This chart shows that, for residential high-speed wireline BIAS,[13] almost 10% of the population in developed census blocks does not have any high-speed access option and that almost 40% has only one choice.  This adds up to almost half of Americans.  Another 45% have only two high-speed wireline options.  This leaves a paltry 6% of the population with three or more high-speed options.

How can the FCC conclude that competition is "widespread" in the face of these facts?  By resorting to three arguments.  First, the FCC claims that fixed satellite and fixed terrestrial wireless Internet access providers place "some competitive constraints" on BIAS providers.  *Order* ¶ 125 (JA003430).  But it immediately takes back most of that claim, admitting that there are questions as to whether satellite and fixed wireless are indeed competitors to BIAS and "mak[ing] no finding as to whether lower speed fixed Internet access services are in the same market as higher speed fixed Internet access services."  *Id.* ¶ 124 n.454 (JA003429).  In other words, the *Order* disavows its own claim of competitive constraints from one paragraph to the next.  And it must, as even the source data on

_____

[13] The FCC defines BIAS as at least 25 Mbps up/3 Mbps down.  *See 2018 Broadband Deployment Report* ¶ 15.

which the FCC relied to compile its chart warn that the number of providers shown "does not purport to measure competition."[14]

Second, the FCC finds that, in those places where at least two BIAS providers exist, they will place competitive constraints on each other. *Id.* ¶ 126 (JA003430-003431). But the FCC dismisses previous FCC determinations supported by this Court that market power is reinforced by high switching costs, including early termination fees, the inconvenience of ordering, installing, and set-up, the difficulty in returning equipment, and the risk of temporarily losing service. *Verizon*, 740 F.3d at 646-47. The FCC has moreover consistently found that churn from one BIAS provider to another is low. *2015 Order* ¶ 81. This cannot be due to the high quality of the service: BIAS providers consistently rank among the worst companies in America in terms of customer satisfaction. Public Knowledge Comments at 109-10 (JA002279-002280). It can only be due to either the lack of competition or the inconvenience of switching. The FCC so found in 2015. *2015 Order* ¶ 81.

The FCC is content to let the contradiction stand unresolved: "[our] prior findings on churn in the broadband marketplace do not dissuade us from

---

[14] *See Fixed Broadband Deployment Data from FCC Form 477*, FCC (Dec. 13, 2017), https://www.fcc.gov/general/broadband-deployment-data-fcc-form-477.

concluding that wireline broadband ISPs often face competitive pressures." *Order* ¶ 128 (JA003432). "Because we said so" does not constitute reasoned decision making. *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 537 (2009) (Kennedy, J., concurring) ("An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past . . . .").

Third, the FCC claims that, where a BIAS provider faces competition broadly, it will not act badly in uncompetitive areas because doing so is operationally expensive. This is wishful speculation, especially since one supposed cost is reputational harm. Again, the reputation of BIAS providers has no room to sink lower.

The FCC moreover reversed without explanation its prior finding that "once a consumer chooses a broadband provider the provider has a monopoly on access to the subscriber," *Order* ¶ 135 (JA003437) (quoting *2015 Order* ¶ 80), a finding that has been upheld by *Verizon*. 740 F.3d at 646-47.

The FCC also argues that mobile BIAS provided by the cellphone companies is an adequate substitute for wireline BIAS at the subscriber's home. *Order* ¶ 130 (JA003434-003435). That would come as a surprise to anyone trying to discern the expressions on the two-inch long version of Tom Cruise's face. It would also surprise anyone told by her tablet that her cellphone service does not support a data stream, or reading the bill at the end of the month if the streaming

were done on high-priced but limited bandwidth mobile plans. That viewer's surprise would be consistent with the FCC's own finding earlier this year: "we disagree . . . that mobile services are currently full substitutes for fixed service," as "there are salient differences between the two technologies." *2018 Broadband Deployment Report* ¶ 18. The FCC has failed to explain its diametrically opposite findings.

In addition, the FCC does not dispute that about 65% of U.S. consumers can be reached through three broadband providers (and usually have access to only one of them). *See* David S. Evans White Paper, attached to INCOMPAS Reply Comments, WC Docket No. 17-108, at 10 (JA002639) (Aug. 30, 2017) ("Evans White Paper"). While the FCC asserts that this "do[es] not seem like a likely source [of] . . . market power," it acknowledges in the same sentence the "possible exception of edge providers [such as video] whose services require . . . high-speed fixed networks . . . ." *Order* ¶ 133 (JA003436-003437). This is the proverbial exception that swallows the rule: streaming video traffic is 70% of all global IP traffic. Public Knowledge Comments at 12 (JA002182). More than 40 new over-the-top video providers have launched since the *2015 Order*. Free Press Comments at 171 (JA000901).

The FCC claims that only very large ISPs could exercise "substantial market power in negotiations with Google or Netflix." *Order* ¶ 136 (JA003438). This is

precisely the problem:  the three ISPs controlling access to almost 65% of broadband subscribers *are* very large.  Evans White Paper at 10 (JA002639).  And what about the myriad other small edge providers that have zero clout?

The FCC's bald assertions that BIAS providers lack market power would not satisfy the requirement of reasoned decisionmaking.  *AT&T Wireless*, 270 F.3d at 968.  Given the landscape of unexplained contrary past findings and internal contradictions within the *Order*, the FCC has not come close to meeting its duty. *Fox*, 556 U.S. at 515.

> 2.    *The FCC did not even consider its prior findings that ISPs have the incentive and ability to harm edge providers.*

"An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Fox*, 556 U.S. at 537 (Kennedy, J., concurring).  The FCC has repeatedly found that BIAS providers have the ability and incentive to harm edge providers and consumers.  In the *2010 Order*, the FCC found they "potentially face at least three types of incentives to reduce the current openness of the Internet."  *2010 Order* ¶ 21.  The *Verizon* court agreed: "nothing in the record gives us any reason to doubt the Commission's determination . . . ." *Verizon*, 740 F.3d at 645.  In the *2015 Order*, the FCC likewise found that "broadband providers have both the incentive and the ability to act as gatekeepers . . . ." *2015 Order* ¶ 20.

The FCC and DOJ have reached similar conclusions in their investigation of three BIAS provider mergers. As the DOJ found: "a TWC board presentation from February 2014 illustrated the threat posed by such emerging online competitors as a meteor speeding towards earth." Complaint, *United States v. Charter Commc'n, et al.*, Case No. 1-16-cv-00759, 11-12 ¶ 27 (D.D.C. Apr. 25, 2016); *see also* INCOMPAS Reply Comments, WC Docket No. 17-108, at Exhibit A (JA002625-002628) (Aug. 30, 2017) ("INCOMPAS Reply Comments").

The FCC ignored these conclusions and instead credited the BIAS providers' self-serving statements that they no longer want to harm anyone. This was wrong. *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446-47 (D.C. Cir. 2017) (holding that the SEC had abdicated its responsibility when it "took [the regulated party's] word for it" instead of critically reviewing the regulated party's analysis or performing its own).

The FCC's failure to consider the evidence from prior merger reviews' conclusions is arbitrary on its own. *See* INCOMPAS Motion, WC Docket 17-108, at 2 (July 17, 2017) (JA001127). While the material did not include "information from the entire industry"—the FCC's criticism, *Order* ¶ 329 (JA003544)—it did touch on the practices of three major BIAS providers serving nearly 65% of broadband subscribers. That information might have well established that rules

were necessary in light of the conduct of these providers. The FCC refused to find out.

**C.    The FCC Erroneously Excluded Consumer Complaints.**

The FCC also denied NHMC's motions to introduce direct evidence of customer complaints about BIAS provider practices under the 2015 rules, skewing the record in favor of its preferred outcome and subverting the rulemaking process.

Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its actions." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. Materials upon which an agency relies "must be made available during the rulemaking in order to afford interested persons meaningful notice and opportunity to comment." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 238 (D.C. Cir. 2008). Likewise, an agency cannot close its eyes to evidence in its possession on which it chooses not to rely. *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (citing *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43).

The FCC has sole possession of materials regarding informal consumer complaints filed under the category of open Internet/Net Neutrality, information critical to the questions posed in the *NPRM* about Title II classification's impacts on consumers and ISPs' conduct. *See, e.g.*, *NPRM* ¶¶ 50-51, 80, 90, 93, 97-98 (JA000019, JA000028, JA000030, JA000031, JA000033). Although the *Order*'s analysis, *Order* ¶ 87 (JA003410-003411), is premised, in part, on the lack of

evidence of harms, the FCC never included the informal complaint materials in the record or provided all of them in response to FOIA requests.[15] And because the FOIA production did not conclude before the reply comment deadline (and indeed, still has not concluded), participants were denied adequate time to review and comment on this incomplete set of materials.

The *Order* offered two explanations for the exclusion. First, the FCC "d[id] not rely on these informal complaints as the basis for [its] decisions." *Order* ¶ 342 (JA003550). That is the point—consideration of these informal complaints may have affected its decision. *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) ("Nor may the agency exclude information on the grounds that it did not 'rely' on the excluded information in its final decision.") (citation omitted).

Second, "[a]fter routinely reviewing the consumer complaints over the past two years" and the record in this proceeding, the FCC concluded that the "overwhelming majority" of these complaint materials do not implicate the open Internet rules and that it is "exceedingly unlikely" that they identify harms not already in the record. *Order* ¶ 342 (JA003549-003550). But the FCC cannot make

---

[15] *See* Application for Review of NHMC, WC Docket No. 17-108, 4-6 (JA002960-002962) (Nov. 14, 2017) (noting that the FCC did not produce, among other things, attachments included with informal consumer complaints, all carrier responses, consumer rebuttals to carrier responses, ombudsperson emails since January 2017, and attachments to ombudsperson emails).

that finding without enabling the public (or this Court) to test its accuracy. In fact, a preliminary review of those materials in the record revealed evidence adverse to the FCC's conclusion that broadband is not perceived as a "telecommunications service."[16] The exclusion of relevant information in an agency's sole possession is fundamentally inconsistent with notice and comment rulemaking, and on this ground alone, the *Order* must be vacated and remanded. *See Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data . . . known only to the agency."), *superseded on other grounds by statute as recognized in American Trucking Ass'n, Inc. v. EPA*, 175 F.3d 1027 (D.C. Cir. 1999)).

### D.    The FCC Did Not Address Data Roaming Rates.[17]

The classification of mobile broadband as an information service and a private commercial service also has implications for the data roaming rates exacted by BIAS providers. NTCH raised this issue with the FCC below as a real problem

---

[16] For example, Dr. Reza Rajabiun conducted a Natural Language Processing analysis and identified examples that "fundamentally challenge[] the presumptions underlying the [FCC's] proposal . . . . " *See* Ex Parte Letter from Carmen Scurato, NHMC, to Marlene Dortch, FCC, WC Docket No. 17-108, at 2 (JA003006) (Nov. 20, 2017).

[17] This section expresses the views of only one Petitioner, NTCH.

for which preserving Title II treatment was the solution. *See* NTCH Joint

Comments, WC Docket No. 17-108, at 9-11 (JA001588-001590) (July 17, 2017)

("NTCH Joint Comments"). The FCC did not consider the issue at all.

The FCC declared data roaming in 2011 to be an information service but it

required the rates to be "commercially reasonable" under its Title III authority over

radio licensees. *Second Roaming Order* ¶¶ 1-2. This standard has turned out to be

toothless since the FCC has determined any rate generally accepted by carriers to

be commercially reasonable no matter how high and no matter how much the rates

exceed costs. *See NTCH v. Cellco* ¶¶ 15-17.

The result was unreasonably high data roaming rates, which have posed a

serious threat to consumers and crippled the ability of small wireless carriers to

compete against the national carriers. Many carriers, including NTCH, have

complained to the FCC that their rates are so unsustainably high as to seriously

impair their ability to do business.

In the *2015 Order*, the FCC changed course, determining that data roaming

is actually a telecommunications service, but forbearing from applying any Title II

obligations to this service pending a further inquiry. *See 2015 Order* ¶ 525.

Instead of that inquiry, the FCC reversed course again in the *Order*, declaring all

broadband internet access services, including data roaming, to be information

services. *Order* ¶¶ 26-29 (JA003367-003368). In doing so, the FCC ignored the

abundant information which it has gathered in the course of complaint proceedings that data roaming prices exceed by a huge margin the cost of providing that service. NTCH Joint Comments at 9-11 (JA001588-001590). NTCH explained in its comments below that Title II treatment of mobile broadband is necessary. The FCC did not afford the question so much as a paragraph of discussion. In disregarding NTCH's comments, the FCC has failed to consider this serious impact on a large segment of the industry in violation of its duties. *See National Lime Ass'n v. EPA*, 627 F.2d 416, 453 (D.C. Cir. 1980).

The FCC's reclassification has abandoned consumers and small competitive carriers alike to a jungle where, in critical sub-markets like data roaming, there is neither effective competition nor any effective regulatory oversight. Even worse, as wireless carriers move toward all-IP based networks, the reclassification may allow an argument, wrong-headed though it may be, that mobile voice is also an information service exempt from any protection against unreasonableness and discrimination. *See Order* ¶ 81 n.302 (JA003406).

**E. The FCC Erroneously Found that the 2015 Rules Caused ISPs to Reduce Investment and Ignored Edge Providers' Investment-Backed Reliance on the Rules.**

In finding that the 2015 rules hurt BIAS providers and did not help edge providers, the FCC put facts on a Procrustean bed, stretching some to make them fit, and dismissing the vast majority.

Although the FCC acknowledged that it lacks the data to analyze the "magnitudes of many of the effects" of the *2015 Order*, *Order* ¶ 304 (JA003538), it found that "Title II classification likely has resulted, and will result, in considerable social cost, in terms of foregone investment and innovation." *Id.* ¶ 87 (JA003410). Had the FCC relied on aggregate investment totals as actually reported by companies to investors, it would have found an aggregate investment increase of 5.3 percent for publicly traded broadband providers during the nearly two years when the 2015 rules were in effect. Free Press Comments at 130 (JA000860). Instead, the FCC looked to studies that made adjustments to those reported figures to find investment declines. All of the FCC's favored studies suffered from serious methodological defects. For example, the FCC acknowledged that the Singer study, upon which it placed primary emphasis, "do[es] not control for some factors that influence investment, such as the 'lumpiness' of capital investment and technological change." *Order* ¶ 91 n.339 (JA003412). It then ignored Free Press's showing that this "lumpiness"— especially for AT&T, which had undergone a dramatic increase in spending to complete its 4G LTE network—was the principal cause of the individual firm decline Singer purported to identify. Free Press Comments at 135 (JA000865).[18]

_____

[18] Nor did the FCC consider the connection between the level of necessary

Individual BIAS providers' results, which are more accurate than easily-skewed aggregate numbers, showed that two-thirds of publicly traded broadband providers *increased* their investments in this period, some by as much as 25 or even 50 percent. *Id*. at 130-31 (JA000860-000861).

The words of BIAS providers themselves, ignored by the FCC, offered much more probative evidence on the effect of the *2015 Order* on investment decisions. Asked if "net neutrality or Title II rules" were "an impediment" to AT&T's plans, its CEO answered "No": "[e]verything that we are planning on doing fits within those rules." *Id.* at 151-52 & n.308 (JA000881-000882). And here is Charter's CEO: "Title II . . . hasn't hurt us . . . ." INCOMPAS Reply Comments at 12 (JA002606).

Other facts that did not fit the FCC's theory suffered the same fate— summary dismissal. Why did the BIAS providers' stock prices not fall with the *2015 Order*, adopted in February 2015? A study cited by the FCC found that these stocks had risen by 17% more than the S&P 500 in the year through mid-2015. Robert W. Crandall, *The FCC's Net Neutrality Decision and Stock Prices*, 50 Rev. Indus. Org. 555, 571 (Feb 2017). The FCC's laconic explanation: this "may reflect the forward-looking, predictive capabilities of market players." *Order* ¶ 93

investment and the massive improvements in speed and capacity since 2005.

n.346 (JA003413). What was the prediction in question? That the markets had seen the reclassification coming? That would have taken a crystal ball, since reclassification was not the preferred course announced by the FCC in the *2014 NPRM*. *2014 NPRM* ¶ 148. Or was it that the market predicted a future FCC would undo the rules, a prediction for which there was no basis in 2015? The FCC does not answer these questions, nor consider that the investment community did not see BIAS providers' businesses as any less attractive.

The FCC's overly tolerant standards for finding harm to BIAS interests stand in contrast to its treatment of edge providers' reliance claims. The *Order* devotes a single paragraph to the topic, claiming that assertions "regarding absolute levels of edge investment do not meaningfully attempt to attribute particular portions of that investment to any reliance on the [*2015*] *Order*." *Order* ¶ 159 (JA003454). That's not the opening sentence; it's the entire discussion. The FCC's standard was double.

The FCC's statement also mischaracterizes the nature of edge providers' reliance interests. The billions of dollars in edge investment over the past decade relied not simply on a particular classification decision, but on the FCC's unwavering commitment—beginning at least with the *Internet Policy Statement*—to use what powers it has to ensure that consumers would have free access to all

lawful internet content. *See* Letter from Eric Null, OTI, to Marlene Dortch, FCC, WC Docket No. 17-108, at 2-6 (JA003348-003352) (Dec. 7, 2017).

## VI.   THE FCC'S COST-BENEFIT ANALYSIS IS FLAWED.

The *NPRM* proposed a CBA that the *Order* ultimately abandoned *sub silentio* for a study whose methodology is a mystery and whose scope was inadequate. The result is a non-quantitative mishmash incapable of being reviewed for accuracy, which (unsurprisingly) affirms the FCC's desired policy outcome.

When an agency chooses to conduct a CBA, it opens itself to review of that analysis. *American Equity Inv. Life Ins.Co. v. SEC*, 613 F.3d 166, 177 (D.C. Cir. 2010) (although an agency was not required to perform a CBA, it must defend the analysis because the agency chose to conduct it). Further, an agency must provide sufficient detail of its proposed methodology for comment. *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 55 (D.C. Cir. 1977); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007).

In the *NPRM*, the FCC stated that it would conduct a CBA pursuant to the Office of Management and Budget's Circular A-4 ("Circular"). *NPRM* ¶ 107 (JA000036). The Circular requires agencies to provide "a systematic framework for identifying and evaluating the likely outcomes of alternative regulatory

choices," focusing on the benefits and costs that accrue to the public in a *quantifiable* manner against an identified baseline.[19]

But the FCC abandoned the Circular's roadmap, not even mentioning it in the *Order*, and concluded that it lacked sufficient data for a quantitative analysis. *Order* ¶ 304 (JA003538). The FCC instead found it only had enough data for a *qualitative* analysis that *directionally* supports the *Order*. *Id.* ¶ 308 (JA003539).

Moreover, in finding that the benefits of prohibiting blocking and throttling practices are "approximately zero" while also finding that "the costs of these bans are likely small," *id.* ¶ 322-23 (JA003542-003543), the FCC failed to take into account the costs of eliminating *ex ante* open Internet rules to innovation and democratic discourse. INCOMPAS Comments at 69 (JA001097) ("*Ex post* enforcement would hamstring nascent industries . . . ."). The FCC's analysis improperly discounted the reliance interests that edge providers have placed on *ex ante* rules for the past thirteen years, *see supra* Section V.E, and failed to address the cost to consumers of decreased innovation and other consumer harms. *See* INCOMPAS Comments at 70 (JA001098); *Disclosure, Deception, and Deep-Packet Inspection*, attached to Catherine Sandoval Reply Comments, WC Docket

---

[19] *See* Circular A-4, Section D, https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.

No. 17-108, at 674 (JA002429) (Aug. 31, 2017) (citing a finding that Comcast had blocked users' ability to share copies of the King James Bible).

There might be reason to forgo such important benefits if the countervailing costs were too high. As Justice Breyer has observed, "it would make no sense to require [power] plants to 'spend billions to save one more fish or plankton.'" *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 232-33 (2009) (Breyer, J., concurring). Yet here, the FCC concedes the reverse—that the no-blocking and no-throttling rules cost ISPs almost nothing. *Order* ¶ 322 (JA003542). Against the near-zero cost to ISPs, the removal of *ex ante* rules threatens the entire fauna of the Internet's oceans.

Finally, the FCC erroneously overstated the costs of Title II classification by relying selectively on studies whose defects it ignored, as discussed above. *See Business Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011) (faulting agency for acknowledging contrary studies but discounting them based on factors such as concerns about methodology or scope).

## VII.  THE FCC'S MOBILE CLASSIFICATION DECISION IS UNLAWFUL.

The FCC's decision to reclassify mobile BIAS as a "private" mobile service (akin to a private taxi radio dispatch service or a private intra-company push-to-talk network) from a "commercial" service (which applies to mobile voice services) is unreasonable.

74

## A. Mobile Broadband Is an Interconnected Service even under the FCC's Restrictive Conception of the "Public Switched Network."

The *Order* declares that mobile BIAS is not a commercial mobile service because it does not offer "interconnected service." *Order* ¶ 74 (JA003402). The regulations define "interconnected service" as one that "gives subscribers the capability to communicate to or receive communications from all other users on the public switched network." 47 C.F.R § 20.3. The "public switched network" is defined as "any common carrier switched network . . . that uses the North American Numbering Plan . . . ." *Id*.

The FCC did not dispute that mobile broadband subscribers can communicate with all NANP users, as this Court observed in *USTA*. *Order* ¶¶ 81-82 (JA003406-003407); *USTA*, 825 F.3d at 720. It nonetheless concludes that mobile BIAS does not provide interconnected service because effectuating the communication requires using a VoIP application, such as Google Voice or FaceTime. *See Order* ¶ 80 (JA003405). "When viewed as a distinct service," the FCC decided, mobile BIAS "itself does not enable users to reach NANP telephone numbers and therefore cannot be considered an interconnected service." *Id*. ¶ 81 (JA003406). That gerrymandered conception of what constitutes an interconnected service is unsupportable.

To start, even mobile voice—the archetypal commercial mobile service—would not be an interconnected service under this reasoning. Moreover, the vast

majority of mobile voice subscribers (77% of Americans as of November 2016) use smartphones.  OTI Comments at 90 (JA001688).  To complete a voice call to NANP users, the subscriber generally uses third-party software (most often pre-installed as part of the smartphone's Android or Apple operating system).  Under the *Order*'s reasoning, then, when viewed as "distinct from the service capabilities offered by applications (whether installed by a user or hardware manufacturer) that may ride on top of it," mobile voice "does not enable users to reach NANP telephone numbers," any more than mobile BIAS does.  *Order* ¶ 81 (JA003406).

The same is true even for users of older cell phones without BIAS:  the bare service is useless unless paired with a phone (frequently provided by a third party) that is programmed (either through software or hard-wired circuity) to perform the functions necessary to communicate over the service.  The FCC does not even attempt to reconcile its new interpretation of "interconnected service" with its longstanding classification of mobile voice.  That, by itself, is grounds for reversal.

Indeed, as this Court observed in *USTA*, "[a]ny distinction between calls made with a device's 'native' dialing capacity and those made through VoIP thus has become 'increasingly inapt.'"  825 F.3d at 720 (citations omitted).  Like native dialing applications, VoIP is now deeply integrated into smartphone operating systems, with well-known applications coming preinstalled on most phones, and other applications widely available for download.  *Order* ¶ 81 (JA003406); *USTA*,

825 F.3d at 720. For most users, the only operational difference between communicating with all other users, including all NANP endpoints, through a mobile voice call versus VoIP is which icon they press.

The FCC's ignore-the-software rationale does not justify the disparate treatment. The "distinction between (i) mobile broadband alone enabling a connection, and (ii) mobile broadband enabling a connection through use of an adjunct application such as VoIP" is "elusive." *USTA*, 825 F.3d at 721. It has only become more elusive with time.

What is more, many voice calls today are routed by the BIAS provider itself through a BIAS connection such as Voice-over-LTE or Wi-Fi hotspots. OTI Comments at 92 (JA001690). The FCC swats aside this point in a footnote on the ground that "the two are distinct services." *Order* ¶ 81 n.302 (JA003406). But such calls use BIAS to reach every NANP number on the public switched telephone network without anyone's intervention, and so the agency's claimed distinction between mobile BIAS itself and VoIP is not implicated.

In the end, nothing in the statute's text or purposes supports distinguishing between providers simply because they provide the same functionality through different technologies. To the contrary, the statutory definition of "interconnected service" asks whether the service "gives subscribers the *capability* to communicate . . . [with] all other users on the public switched network," 47 C.F.R. § 20.3(a)

(emphasis added); *how* that interconnection is accomplished is irrelevant.

Congress's objectives were (1) to distinguish between services that offer

"ubiquitous access," like mobile voice, and those, like taxi dispatch systems, that

offer "users access to a discrete and limited set of endpoints"; and (2) "to 'creat[e]

regulatory symmetry among similar mobile services.'" *USTA*, 825 F.3d at 715-16

(quoting *2015 Order* ¶¶ 391, 398-99, 404). Those purposes are well illustrated by

the circumstances that prompted the legislation. Congress enacted Section 332 in

response to operators using private taxi dispatch licenses to provide cellphone

service to the public. H.R. Rep. No. 103-111 at 259-60 (1993).[20] Congress heard

the pleas for symmetry coming from incumbent cellphone companies, and acted to

make services previously treated as private into commercial services, not the other

way around. *Id.* at 259 . Mobile BIAS is nothing like the private mobile services

Congress had in mind in 1993. OTI Comments at 95-96 (JA001693-001694).

Finally, accepting the FCC's strained interpretation of "interconnected

service" would unnecessarily give rise to a statutory contradiction. *See USTA*, 825

F.3d at 725. As discussed, mobile BIAS unambiguously constitutes a

"telecommunications service," and is therefore subject to mandatory classification

---

[20] *See* Edmund L. Andrews, *Threat to Cellular Phone Services*, N.Y. Times (Feb. 13, 1991), https://www.nytimes.com/1991/02/13/business/threat-to-cellular-phone-services.html (detailing incumbents' appeal to Congress).

as common carriage by Section 153(51).  The FCC's designation of mobile BIAS as a "private mobile service," on the other hand, triggers Section 332(c)(2)'s *prohibition* against common carriage regulation.  The FCC recognizes that it would be unreasonable to construe the statute to create such a contradiction, if it can be avoided.  *Order* ¶ 82 (JA003406-003407).  Accordingly, if the Court were to disagree with the FCC's classification of BIAS as an information service, that would be a powerful factor in favor of concluding that mobile BIAS is a commercial mobile service.  This would require remand, at least to allow the FCC to reconsider its mobile decision in light of the potential statutory conflict.

**B.   The FCC's Interpretation of "The Public Switched Network" Is Unreasonable.**

As for the FCC's interpretation of "public switched network" as limited to telephones, it is hard to improve on this Court's rebuttal.  The *Order* concludes that Congress intended Section 332(d)(2) to freeze in place the understanding of the "public switched network" that prevailed in 1993, when the statute was enacted, years before the advent of mobile broadband.  *Order* ¶ 75 (JA003402).  In *USTA*, this Court rejected the same argument as "counter-textual," "wooden," and "counterintuitive":

> If Congress meant for the phrase "public switched network" to carry the more restrictive meaning attributed to it by mobile petitioners, Congress could (and presumably would) have used the more limited—and more precise—term "public switched telephone network." Indeed, Congress used that precise formulation in another, later-enacted statute. Here, though, Congress elected to use the more general term "public switched network," which by its plain language can reach beyond telephone networks alone.

825 F.3d at 717-18 (citation omitted). Thus, the Court concluded, "the more general phrase 'public switched network,' by its terms, reaches any network that is both 'public' and 'switched,'" two requirements the Internet indisputably meets. *Id*. at 718.

The FCC nonetheless insists that by referring to the public switched network (singular), Congress contemplated "a single, integrated network," not "multiple networks that need not be connected to the public telephone network." *Order* ¶ 76 (JA003402-003403). That puts far too much weight on the word "the." And in any event, the NANP system itself could just as easily be described as two "distinct and separate networks," *id*. ¶ 76 n.284 (JA003403)—the wireline and mobile voice systems.

### C. Mobile BIAS Is at Least the Functional Equivalent of a Commercial Mobile Service.

Mobile BIAS is at minimum the functional equivalent of a commercial mobile service because it provides *all* the functionality of mobile voice, allowing subscribers to call anyone a mobile voice subscriber could. The FCC nonetheless

found the two are not functional equivalents under 47 U.S.C. § 332(d)(3) because mobile broadband also offers *additional* functions. *Order* ¶ 85 (JA003408-003409). But the statutory question is whether mobile broadband replicates the functions of commercial mobile services like mobile voice, not whether mobile voice replicates all the functions of mobile broadband. And the essential *function* of commercial mobile service is providing ubiquitous interconnection and communication among the members of the general public. *See supra* VII.A. This core function is now being performed by smartphones toggling effortlessly between voice and BIAS, sometimes in the middle of a single call. *See id*; *see also USTA*, 825 F.3d 724. Insisting that these different modes of performing the same function are not functionally equivalent blinks reality.

Finally, the *Order* is arbitrary even on its own terms because it is premised on the unsubstantiated assumption that consumers are choosing between distinct mobile voice and mobile BIAS contracts that are not "closely substitutable." *See Order* ¶ 85 (JA JA003408-003409). The record, however, demonstrated that "[t]oday each of the four national carriers exclusively sell smartphone plans that bundle voice, texting and internet access as applications—not as separately priced or optional 'commercial' (voice and/or text) and 'private' (Internet access) services." OTI Comments at 97-98 & nn.276-78 (JA001695-001696). *Compare*

*id. with Order* ¶ 85 n.318 (JA003409) (relying on voice-only plans offered by

Cricket and Republic Wireless).

## VIII.  CONCLUSION

The Court should vacate the *Order*.

Dated:  November 27, 2018                          Respectfully submitted,

<table>
<tr><td></td><td>/s/ <em>Markham C. Erickson</em></td></tr>
<tr><td>Pantelis Michalopoulos<br>Cynthia Taub<br>Travis West<br><strong>STEPTOE & JOHNSON LLP</strong><br>1330 Connecticut Avenue NW<br>Washington, D.C.  20036<br>(202) 429-3000<br><em>Counsel for Petitioners Coalition for Internet Openness and Etsy, Inc.</em></td><td>Markham C. Erickson<br>Georgios Leris<br><strong>STEPTOE & JOHNSON LLP</strong><br>1330 Connecticut Avenue NW<br>Washington, D.C.  20036<br>merickson@steptoe.com<br>(202) 429-3000<br><em>Counsel for Petitioners Mozilla Corporation and INCOMPAS</em></td></tr>
<tr><td>Michael A. Cheah<br>General Counsel<br><strong>VIMEO, INC.</strong><br>555 West 18th Street<br>New York, NY  10011<br>(212) 314-7457<br><em>Counsel for Petitioner Vimeo, Inc.</em></td><td>Kevin Kendrick Russell<br><strong>GOLDSTEIN & RUSSELL, PC</strong><br>7475 Wisconsin Avenue<br>Suite 850<br>Bethesda, MD  20814<br>(202) 362-0636<br><em>Counsel for Petitioners New America's Open Technology Institute, Free Press, and Public Knowledge</em></td></tr>
</table>

Colleen Boothby
Sara Crifasi
**LEVINE, BLASZAK, BLOCK AND
BOOTHBY LLP**
2001 L Street NW, Suite 900
Washington, D.C.  20036
(202) 857-2550
*Counsel for Petitioner Ad Hoc Telecom
Users Committee*

James N. Horwood
Tillman L. Lay
Jeffrey M. Bayne
Katherine J. O'Konski
**SPIEGEL & MCDIARMID LLP**
1875 Eye Street NW, Suite 700
Washington, D.C.  20006
(202) 879-4000
*Counsel for Petitioner National Hispanic
Media Coalition*

Andrew Jay Schwartzman
600 New Jersey Avenue NW
Washington, D.C.  20001
*Counsel for Petitioner Benton
Foundation*

Harold Jay Feld
John Bergmayer
Ryan Clough
**PUBLIC KNOWLEDGE**
1818 N Street, NW, Suite 410
Washington, D.C.  20036
(202) 861-0020
*Counsel for Petitioner Public
Knowledge*

Brian M. Willen
Jack Mellyn
**WILSON SONSINI GOODRICH &
ROSATI
PROFESSIONAL CORPORATION**
1201 Avenue of the Americas,
40th Floor
New York, NY 10019-6022
(212) 999-5800
*Counsel for Petitioner Center for
Democracy & Technology*

Donald J. Evans
**FLETCHER, HEALD & HILDRETH, PLC**
1300 N. 17th Street
Suite 1100
Arlington, VA  22209
(703) 812-0430
*Counsel for Petitioner NTCH, Inc.*

Sarah J. Morris
**OPEN TECHNOLOGY INSTITUTE | NEW
AMERICA**
1899 L Street, NW, Suite 400
Washington, D.C.  20036
(202) 986-2700
*Counsel for Petitioner New America's
Open Technology Institute*

Matthew F. Wood
**FREE PRESS**
1025 Connecticut Avenue, NW,
Suite 1110
Washington, D.C.  20036
(202) 265-1490
*Counsel for Petitioner Free Press*

Lisa A. Hayes
**CENTER FOR DEMOCRACY &
TECHNOLOGY**
1401 K Street NW, Suite 200
Washington, D.C.  20005
*Counsel for Petitioner Center for
Democracy & Technology*

## CIRCUIT RULE 32(a)(2) ATTESTATION

In accordance with D.C. Circuit Rule 32(a)(2), I, Markham C. Erickson, hereby attest that all other parties on whose behalf this joint brief is submitted concur in the brief's content.


/s/ *Markham C. Erickson*
Markham C. Erickson

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(5)-(7)

Pursuant to Fed. R. App. P. 32(a)(7)(B)(i) and D.C. Cir. R. 32(e), as modified by the Court's July 30, 2018 briefing order granting Non-Government Petitioners 18,000 words, the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman. Exclusive of the portions exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1), this brief contains 17,971 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief (Microsoft Word 2010).

/s/ *Markham C. Erickson*
Markham C. Erickson

November 27, 2018

# DECLARATIONS OF STANDING ADDENDUM

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MOZILLA CORPORATION, *et al.*

    Petitioners

    v.

FEDERAL COMMUNICATIONS
COMMISSION,

and

UNITED STATES OF
AMERICA,

    Respondents

Case No. 18-1051 and
consolidated cases

---

## DECLARATION OF MATTHEW F. WOOD

I, Matthew F. Wood, declare as follows:

1.      I am Policy Director for Free Press, a nonprofit advocacy

organization.  Among other things, Free Press has long advocated to protect open

access to the Internet, free from interference by internet service providers.

2.      Free Press participated in the rulemaking process culminating in the

Order on review in this litigation, as it has in every major rulemaking relating to

net neutrality before the Federal Communications Commission.

3.      The Order withdrew broadband internet access service's classification

as telecommunications service and eliminated rules that prohibited broadband

providers from blocking or throttling subscribers' access to lawful internet site and services. It also withdrew a ban on paid prioritization and a general conduct rule prohibiting providers from unreasonably interfering with subscribers' access to lawful internet content and services.

4.	Free Press is among the class of broadband subscribers previously protected by the withdrawn rules and now exposed to the harmful conduct the new Order permits.

5.	Free Press relies on access to the open internet – free from blocking, throttling, reduced transmission speeds resulting from paid prioritization, and other conduct barred by the prior general conduct standard – in its critical day-to-day operations.

6.	Free Press uses the internet to communicate among its staff, with other like-minded groups and activists, and with the public at large, through email, messaging, websites, and social media. Staff at Free Press also use these services to telework from home and other remote locations.

7.	Free Press also uses online video conferencing and other internet tools to broadcast events over the internet to the public.

8.	Free Press operates a website that is essential to its advocacy mission and communicating with the public. Among other things, Free Press publishes on its website analysis and advocacy pieces, including in relation to the proceedings in

this case. Some of that information and advocacy is critical of broadband internet access services companies and the government.

9. Free Press uses the internet to petition the government for redress of grievances, including by using emails to coordinate grassroots lobbying and by utilizing the Commission's online system for submitting comments in rulemakings such as this one.

10. Free Press also uses its website, emails, and other internet services for fundraising.

11. Free Press accesses the internet for the activities described above through both fixed and mobile broadband.

12. As substantiated in the record of these proceedings, Free Press has a reasonable fear that absent the protections eliminated by the Order, its ability to use the internet in the ways just described will be seriously impaired. Broadband providers have the means and incentive to block, throttle, or otherwise unreasonably interfere with Free Press's ability to communicate positions that conflict with the providers' interests.

13. As substantiated in the record of these proceedings, providers also have the means and incentive (and some have, at times, expressed interest in) relegating to slower service those who are unable or unwilling to pay for faster service through paid prioritization schemes. Free Press relies on high-speed

service, especially for its video conferences and video streaming activities. As a non-profit, Free Press also cannot afford to pay for prioritized service without impairing its other advocacy activities.

I, Matthew F. Wood, hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Matthew F. Wood

Executed this 17th day of August, 2018

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

MOZILLA CORPORATION, *et al.*

    Petitioners

    v.

FEDERAL COMMUNICATIONS
COMMISSION,

and

UNITED STATES OF
AMERICA,

    Respondents

Case No. 18-1051 and
consolidated cases

## DECLARATION OF SARAH J. MORRIS

I, Sarah J. Morris, declare as follows:

1.    My name is Sarah J. Morris. I am the director of Open Internet Policy for the Open Technology Institute (OTI), a program within the New America Foundation, a nonprofit policy organization working in the public interest. Among other things, OTI has long advocated to protect open access to the Internet, free from interference by internet service providers.

2.    OTI participated in the rulemaking process culminating in the Order on review in this litigation, as it has in every major rulemaking relating to net neutrality before the Federal Communications Commission.

3.     The Order withdrew broadband internet access service's classification as common carriage and eliminated rules that prohibited broadband providers from blocking or throttling subscribers' access to lawful internet site and services.  It also withdrew a ban on paid prioritization and a general conduct rule prohibiting providers from unreasonably interfering with subscribers' access to lawful internet content and services.

4.     OTI is among the class of broadband subscribers previously protected by the withdrawn rules and now exposed to the harmful conduct the new Order permits.

5.     OTI relies on access to the open internet – free from blocking, throttling, reduced transmission speeds resulting from paid prioritization, and other conduct barred by the prior general conduct standard – in its critical day-to-day operations.

6.     OTI uses the internet to communicate among its staff, with other like-minded groups and activists, and with the public at large, through email, messaging, websites, and social media.  Staff at OTI also use these services to telework from home and other remote locations.

7.     OTI also uses online video conferencing and other internet tools to broadcast events over the internet to the public.

8.     OTI operates a website that is essential to its policy mission and communicating with the public. Among other things, OTI publishes on its website analysis and advocacy pieces, including in relation to the proceedings in this case. Some of that information and advocacy is critical of broadband internet access services companies and the government.

9.     OTI uses the internet to petition the government for redress of grievances, including by using the Commission's online system for submitting comments in rulemakings such as this one.

10.    OTI also uses its website, emails, and other internet services for fundraising.

11.    OTI accesses the internet for the activities described above through both fixed and mobile broadband.

12.    As substantiated in the record of these proceedings, OTI has a reasonable fear that absent the protections eliminated by the Order, its ability to use the internet in the ways just described will be seriously impaired. Broadband providers have the means and incentive to block, throttle, or otherwise unreasonably interfere with OTI's ability to communicate positions that conflict with the providers' interests.

13.    As substantiated in the record of these proceedings, providers also have the means and incentive (and some have, at times, expressed interest in)

relegating to slower service those who are unable or unwilling to pay for faster service through paid prioritization schemes. OTI relies on high-speed service, especially for its video conferences and video streaming activities. As a non-profit, OTI also cannot afford to pay for prioritized service without impairing its other mission-critical activities.

I, Sarah J. Morris, hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Sarah J. Morris

Executed this 17th day of August, 2018

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

MOZILLA CORPORATION, *et al.*

    Petitioners

    v.

FEDERAL COMMUNICATIONS
COMMISSION,

and

UNITED STATES OF
AMERICA,

    Respondents

Case No. 18-1051 and
consolidated cases

## DECLARATION OF JOHN BERGMAYER

I, John Bergmayer, declare as follows:

1.    My name is John Bergmayer.  I am Senior Counsel for the Public Knowledge, a nonprofit advocacy organization.  Among other things, Public Knowledge has long advocated to protect open access to the Internet, free from interference by internet service providers.

2.    Public Knowledge participated in the rulemaking process culminating in the Order on review in this litigation, as it has in every major rulemaking relating to net neutrality before the Federal Communications Commission.

3.     The Order withdrew broadband internet access service's classification as common carriage and eliminated rules that prohibited broadband providers from blocking or throttling subscribers' access to lawful internet site and services.  It also withdrew a ban on paid prioritization and a general conduct rule prohibiting providers from unreasonably interfering with subscribers' access to lawful internet content and services.

4.     Public Knowledge is among the class of broadband subscribers previously protected by the withdrawn rules and now exposed to the harmful conduct the new Order permits.

5.     Public Knowledge relies on access to the open internet – free from blocking, throttling, reduced transmission speeds resulting from paid prioritization, and other conduct barred by the prior general conduct standard – in its critical day-to-day operations.

6.     Public Knowledge uses the internet to communicate among its staff, with other like-minded groups and activists, and with the public at large, through email, messaging, websites, and social media.  Staff at Public Knowledge also use these services to telework from home and other remote locations.

7.     Public Knowledge also uses online video conferencing and other internet tools to broadcast events over the internet to the public.

8.      Public Knowledge operates a website that is essential to its advocacy mission and communicating with the public.  Among other things, Public Knowledge publishes on its website analysis and advocacy pieces, including in relation to the proceedings in this case.  Some of that information and advocacy is critical of broadband internet access services companies and the government.

9.      Public Knowledge uses the internet to petition the government for redress of grievances, including by using emails to coordinate grass-roots lobbying and by utilizing the Commission's online system for submitting comments in rulemakings such as this one.

10.     Public Knowledge also uses its website, emails, and other internet services for fundraising.

11.     Public Knowledge accesses the internet for the activities described above through both fixed and mobile broadband.

12.     As substantiated in the record of these proceedings, Public Knowledge has a reasonable fear that absent the protections eliminated by the Order, its ability to use the internet in the ways just described will be seriously impaired. Broadband providers have the means and incentive to block, throttle, or otherwise unreasonably interfere with Public Knowledge's ability to communicate positions that conflict with the providers' interests.

13.     As substantiated in the record of these proceedings, providers also have the means and incentive (and some have, at times, expressed interest in) relegating to slower service those who are unable or unwilling to pay for faster service through paid prioritization schemes.  Public Knowledge relies on high-speed service, especially for its video conferences and video streaming activities. As a non-profit, Public Knowledge also cannot afford to pay for prioritized service without impairing its other advocacy activities.

I, John Bergmayer, hereby declare under penalty of perjury that the foregoing is true and correct.


_____
John Bergmayer

Executed this 16th day of August, 2018

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 18-1051 (and consolidated cases)

MOZILLA CORPORATION, *et al.*,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the Federal Communications Commission

## DECLARATION OF BRIAN J. WESOLOWSKI

I, Brian J. Wesolowski, hereby declare as follows:

1. I am the Director of Communications and Chief of Staff of Petitioner Center for Democracy and Technology ("CDT"). CDT is a non-profit organization, the mission of which is to strengthen individual rights and freedoms by defining, promoting, and influencing technology policy and the architecture of the Internet that impacts our daily lives.

2. On behalf of itself and other Internet users, CDT participated directly in the proceeding below. Among other activities, during the course of that proceeding CDT submitted multiple comments to the FCC expressing its strong concern over the proposed Restoring Internet Freedom Order (the "Order") and urging the FCC to uphold the Open Internet Order of 2015.

3. CDT itself is directly affected by the Order under review. In addition to its corporate mission, in which public access to the Internet figures centrally, CDT is itself a consumer of broadband Internet access services ("BIAS"), which are essential to its communicative, political, and educational activities. Universal and neutral BIAS is a crucial tool for CDT to disseminate its own content and to communicate with the public and with government officials. Because the

1

Restoring Internet Freedom Order repealed the rules prohibiting blocking and throttling, BIAS providers could harm CDT's access to the Internet or Internet users' ability to reach CDT's web content. Additionally, CDT's policy positions often run counter to those of BIAS providers, increasing their incentives to interfere with access to CDT's content. CDT believes that it is therefore directly aggrieved by the challenged Order, and that this harm will be redressed by the Order's termination or repeal.

I declare under penalty of perjury that the foregoing is true and correct. Executed August 20, 2018 at Center for Democracy & Technology, 1401 K Street, NW, Suite 200, Washington D.C.

/s/ Brian J. Wesolowski

# STATUTES AND REGULATIONS ADDENDUM

# STATUTORY AND REGULATORY ADDENDUM

## Table of Contents

<u>United States Code</u>

5 U.S.C. § 706 ...................................................................................1

15 U.S.C. §§ 1-2 ................................................................................2

28 U.S.C. § 2342 ...............................................................................3

28 U.S.C. § 2344 ...............................................................................4

47 U.S.C. § 151 .................................................................................5

47 U.S.C. § 153 (excerpts) ................................................................6

47 U.S.C. § 160 .................................................................................8

47 U.S.C. § 201 ...............................................................................10

47 U.S.C. § 257 ...............................................................................11

47 U.S.C. § 332 ...............................................................................12

47 U.S.C. § 402 ...............................................................................19

47 U.S.C. § 1302 .............................................................................23

RAY BAUM'S Act of 2018, Pub. L. 115-141, 132 Stat. 1089 (2018)
(excerpt) ....................................................................................25

<u>Code of Federal Regulations</u>

47 C.F.R. § 20.3 ..............................................................................26

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

    (1)  compel agency action unlawfully withheld or unreasonably delayed; and

    (2)  hold unlawful and set aside agency action, findings, and conclusions found to be--

        (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        (B) contrary to constitutional right, power, privilege, or immunity;

        (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D) without observance of procedure required by law;

        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 15 U.S.C. § 1

**Trusts, etc., in restraint of trade illegal; penalty**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## 15 U.S.C. § 2

**Monopolizing trade a felony; penalty**

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## § 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

(1)  all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

(2)  all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3)  all rules, regulations, or final orders of--

(A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

(B) the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

(4)  all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

(5)  all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

(6)  all final orders under section 812 of the Fair Housing Act; and

(7)  all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

## § 2344. Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of--

    (1)  the nature of the proceedings as to which review is sought;

    (2)  the facts on which venue is based;

    (3)  the grounds on which relief is sought; and

    (4)  the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

## § 151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

## 47 U.S.C.A. § 153

### § 153. Definitions

For the purposes of this chapter, unless the context otherwise requires--

(1)  Advanced communications services

The term "advanced communications services" means--

(A) interconnected VoIP service;

(B) non-interconnected VoIP service;

(C) electronic messaging service; and

(D) interoperable video conferencing service.

(20)  Exchange access

The term "exchange access" means the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services.

(24)  Information service

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

(50)  Telecommunications

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

(51)     Telecommunications carrier

The term "telecommunications carrier" means any provider of
telecommunications services, except that such term does not include
aggregators of telecommunications services (as defined in section 226 of
this title). A telecommunications carrier shall be treated as a common
carrier under this chapter only to the extent that it is engaged in
providing telecommunications services, except that the Commission
shall determine whether the provision of fixed and mobile satellite
service shall be treated as common carriage.

(53)     Telecommunications service

The term "telecommunications service" means the offering of
telecommunications for a fee directly to the public, or to such classes of
users as to be effectively available directly to the public, regardless of
the facilities used.

## § 160. Competition in provision of telecommunications service

(a) **Regulatory flexibility**

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that--

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

(b) **Competitive effect to be weighed**

In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

(c) **Petition for forbearance**

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for

failure to meet the requirements for forbearance under subsection (a) of this section within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a) of this section. The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

(d) **Limitation**

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

(e) **State enforcement after commission forbearance**

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a) of this section.

# 47 U.S.C.A. § 201

## § 201. Service and charges

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

## § 257. Market entry barriers proceeding

### (a) **Elimination of barriers**

Within 15 months after February 8, 1996, the Commission shall complete a proceeding for the purpose of identifying and eliminating, by regulations pursuant to its authority under this chapter (other than this section), market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services.

### (b) **National policy**

In carrying out subsection (a) of this section, the Commission shall seek to promote the policies and purposes of this chapter favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity.

### (c) **Repealed**

Pub.L. 115-141, Div. P, Title IV, § 402(f), Mar. 23, 2018, 132 Stat. 1089

**§ 332. Mobile services**

(a) **Factors which Commission must consider**

In taking actions to manage the spectrum to be made available for use by the private mobile services, the Commission shall consider, consistent with section 151 of this title, whether such actions will--

(1) promote the safety of life and property;

(2) improve the efficiency of spectrum use and reduce the regulatory burden upon spectrum users, based upon sound engineering principles, user operational requirements, and marketplace demands;

(3) encourage competition and provide services to the largest feasible number of users; or

(4) increase interservice sharing opportunities between private mobile services and other services.

(b) **Advisory coordinating committees**

(1) The Commission, in coordinating the assignment of frequencies to stations in the private mobile services and in the fixed services (as defined by the Commission by rule), shall have authority to utilize assistance furnished by advisory coordinating committees consisting of individuals who are not officers or employees of the Federal Government.

(2) The authority of the Commission established in this subsection shall not be subject to or affected by the provisions of part III of Title 5 or section 1342 of Title 31.

(3) Any person who provides assistance to the Commission under this subsection shall not be considered, by reason of having provided such assistance, a Federal employee.

(4) Any advisory coordinating committee which furnishes assistance to the Commission under this subsection shall not be subject to the provisions of the Federal Advisory Committee Act.

(c) **Regulatory treatment of mobile services**

    (1) Common carrier treatment of commercial mobile services

        (A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II of this chapter as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that--

            (i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

            (ii) enforcement of such provision is not necessary for the protection of consumers; and

            (iii) specifying such provision is consistent with the public interest.

        (B) Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter.

        (C) As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

(D) The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to the licensing of personal communications services, including making any determinations required by subparagraph (C).

(2) Non-common carrier treatment of private mobile services

A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

(3) State preemption

(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that--

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

(ii)  such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

(B) If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates.  If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory. After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

(4)  Regulatory treatment of communications satellite corporation

Nothing in this subsection shall be construed to alter or affect the regulatory treatment required by title IV of the Communications Satellite Act of 1962 [47 U.S.C.A. § 741 et seq.] of the corporation authorized by title III of such Act [47 U.S.C.A. § 731 et seq.].

(5)  Space segment capacity

Nothing in this section shall prohibit the Commission from continuing to determine whether the provision of space segment capacity by satellite systems to providers of commercial mobile services shall be treated as common carriage.

(6)  Foreign ownership

The Commission, upon a petition for waiver filed within 6 months after August 10, 1993, may waive the application of section 310(b) of this title to any foreign ownership that lawfully existed before May 24, 1993, of any provider of a private land mobile service that will be treated as a common carrier as a result of the enactment of the Omnibus Budget Reconciliation Act of 1993, but only upon the following conditions:

   (A)  The extent of foreign ownership interest shall not be increased above the extent which existed on May 24, 1993.

   (B)  Such waiver shall not permit the subsequent transfer of ownership to any other person in violation of section 310(b) of this title.

(7)  Preservation of local zoning authority

   (A)  General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

   (B)  Limitations

      (i)  The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

   (I) shall not unreasonably discriminate among providers of functionally equivalent services; and

   (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

  (ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

  (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

  (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

  (v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

 (C) Definitions

For purposes of this paragraph--

  (i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii)  the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii)  the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

(8)  Mobile services access

A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services. If the Commission determines that subscribers to such services are denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

**§ 402. Judicial review of Commission's orders and decisions**

(a) **Procedure**

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

(b) **Right to appeal**

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

(2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

(3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

(4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

(5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

(8)  By any radio operator whose license has been suspended by the Commission.

(9)  By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

(10)  By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

(c)  **Filing notice of appeal; contents; jurisdiction; temporary orders**

Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of. Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission. Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper. Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

(d)  **Notice to interested parties; filing of record**

Upon the filing of any such notice of appeal the appellant shall, not later than five days after the filing of such notice, notify each person shown by the records of the Commission to be interested in said appeal of the filing and pendency of the same. The Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28.

(e) **Intervention**

Within thirty days after the filing of any such appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission. Any person who would be aggrieved or whose interest would be adversely affected by a reversal or modification of the order of the Commission complained of shall be considered an interested party.

(f) **Records and briefs**

The record and briefs upon which any such appeal shall be heard and determined by the court shall contain such information and material, and shall be prepared within such time and in such manner as the court may by rule prescribe.

(g) **Time of hearing; procedure**

The court shall hear and determine the appeal upon the record before it in the manner prescribed by section 706 of Title 5.

(h) **Remand**

In the event that the court shall render a decision and enter an order reversing the order of the Commission, it shall remand the case to the Commission to carry out the judgment of the court and it shall be the duty of the Commission, in the absence of the proceedings to review such judgment, to forthwith give effect thereto, and unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record upon which said appeal was heard and determined.

(i) **Judgment for costs**

The court may, in its discretion, enter judgment for costs in favor of or against an appellant, or other interested parties intervening in said appeal, but not against the Commission, depending upon the nature of the issues involved upon said appeal and the outcome thereof.

(j)  **Finality of decision; review by Supreme Court**

The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 1254 of Title 28, by the appellant, by the Commission, or by any interested party intervening in the appeal, or by certification by the court pursuant to the provisions of that section.

## § 1302. Advanced telecommunications incentives

(a) **In general**

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) **Inquiry**

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) **Demographic information for unserved areas**

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) and to the extent that data from the Census Bureau is available, determine, for each such unserved area--

(1) the population;

(2) the population density; and

(3) the average per capita income.

(d) **<u>Definitions</u>**

For purposes of this subsection:

(1)  Advanced telecommunications capability

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2)  Elementary and secondary schools

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of Title 20.

**§ 402(f)**

§ 402(f) - **TRIENNIAL REPORT IDENTIFYING AND ELIMINATING MARKET ENTRY BARRIERS FOR ENTREPRENEURS AND OTHER SMALL BUSINESSES.**—Section 257 of the Communications Act of 1934 (47 U.S.C. 257) is amended by striking subsection (c).

# 47 C.F.R. § 20.3 Definitions

*Appropriate local emergency authority.* An emergency answering point that has not been officially designated as a Public Safety Answering Point (PSAP), but has the capability of receiving 911 calls and either dispatching emergency services personnel or, if necessary, relaying the call to another emergency service provider. An appropriate local emergency authority may include, but is not limited, to an existing local law enforcement authority, such as the police, county sheriff, local emergency medical services provider, or fire department.

*Automatic Number Identification* (ANI). A system that identifies the billing account for a call. For 911 systems, the ANI identifies the calling party and may be used as a call back number.

*Automatic Roaming.* With automatic roaming, under a pre-existing contractual agreement between a subscriber's home carrier and a host carrier, a roaming subscriber is able to originate or terminate a call in the host carrier's service area without taking any special actions.

*Commercial mobile data service.*

**(1)** Any mobile data service that is not interconnected with the public switched network and is:

**(i)** Provided for profit; and

**(ii)** Available to the public or to such classes of eligible users as to be effectively available to the public.

**(2)** Commercial mobile data service includes services provided by Mobile Satellite Services and Ancillary Terrestrial Component providers to the extent the services provided meet this definition.

*Commercial mobile radio service.* A mobile service that is:

**(a)**

**(1)** provided for profit, *i.e.*, with the intent of receiving compensation or monetary gain;

**(2)** An interconnected service; and

**(3)** Available to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or

**(b)** The functional equivalent of such a mobile service described in paragraph (a) of this definition.

**(c)** A variety of factors may be evaluated to make a determination whether the mobile service in question is the functional equivalent of a commercial mobile radio service, including: Consumer demand for the service to determine whether the service is closely substitutable for a commercial mobile radio service; whether changes in price for the service under examination, or for the comparable commercial mobile radio service, would prompt customers to change from one service to the other; and market research information identifying the targeted market for the service under review.

**(d)** Unlicensed radio frequency devices under part 15 of this chapter are excluded from this definition of Commercial mobile radio service.

*Consumer Signal Booster.* A bi-directional signal booster that is marketed and sold for use without modification.

*Designated PSAP.* The Public Safety Answering Point (PSAP) designated by the local or state entity that has the authority and responsibility to designate the PSAP to receive wireless 911 calls.

*Fixed Consumer Signal Booster.* A Consumer Signal Booster designed to be operated in a fixed location in a building.

*Handset-based location technology.* A method of providing the location of wireless 911 callers that requires the use of special location-determining hardware and/or software in a portable or mobile phone. Handset-based location technology may also employ additional location-determining hardware and/or software in the CMRS network and/or another fixed infrastructure.

*Host Carrier.* For automatic roaming, the host carrier is a facilities-based CMRS carrier on whose system another carrier's subscriber roams. A facilities-based CMRS carrier may, on behalf of its subscribers, request automatic roaming service from a host carrier.

*Incumbent Wide Area SMR Licensees.* Licensees who have obtained extended implementation authorizations in the 800 MHz or 900 MHz service, either by waiver or under Section 90.629 of these rules, and who offer real-time, two-way voice service that is interconnected with the public switched network.

*Industrial Signal Booster:* All signal boosters other than Consumer Signal Boosters.

*Interconnection or Interconnected.* Direct or indirect connection through automatic or manual means (by wire, microwave, or other technologies such as store and forward) to permit the transmission or reception of messages or signals to or from points in the public switched network.

*Interconnected Service.* A service:

**(a)** That is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers the capability to communicate to or receive communication from all other users on the public switched network; or

**(b)** For which a request for such interconnection is pending pursuant to section 332(c)(1)(B) of the Communications Act, 47 U.S.C. 332(c)(1)(B). A mobile service offersinterconnected service even if the service allows subscribers to access the public switched network only during specified hours of the day, or if the service provides general access to points on the public switched network but also restricts access in certain limited ways. Interconnected service does not include any interface between a licensee's facilities and the public switched network exclusively for a licensee's internal control purposes.

*Location-capable handsets.* Portable or mobile phones that contain special location-determining hardware and/or software, which is used by a licensee to locate 911 calls.

*Manual Roaming.* With manual roaming, a subscriber must establish a relationship with the host carrier on whose system he or she wants to roam in order to make a call. Typically, the roaming subscriber accomplishes this in the course of attempting to originate a call by giving a valid credit card number to the carrier providing the roaming service.

*Mobile Consumer Signal Booster.* A Consumer Signal Booster designed to operate in a moving vehicle where both uplink and downlink transmitting antennas are at least 20 cm from the user or any other person.

*Mobile Service.* A radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes:

**(a)** Both one-way and two-way radio communications services;

**(b)** A mobile service which provides a regularly interacting group of base, mobile, portable, and associated control and relay stations (whether licensed on an individual, cooperative, or multiple basis) for private one-way or two-way land mobile radio communications by eligible users over designated areas of operation; and

**(c)** Any service for which a license is required in a personal communications service under part 24 of this chapter.

*Network-based Location Technology.* A method of providing the location of wireless 911 callers that employs hardware and/or software in the CMRS network and/or another fixed infrastructure, and does not require the use of special location-determining hardware and/or software in the caller's portable or mobile phone.

*Non-individual.* A non-individual is a partnership and each partner is eighteen years of age or older; a corporation; an association; a state, territorial, or local government unit; or a legal entity.

*Private Mobile Radio Service.* A mobile service that meets neither the paragraph (a) nor paragraph (b) definitions of commercial mobile radio service set forth in this section. A mobile service that does not meet the paragraph (a) definition of commercial mobile radio service in this section is presumed to be a private mobile radio service. Private mobile radio service includes the following:

**(a)** Not-for-profit land mobile radio and paging services that serve the licensee's internal communications needs as defined in part 90 of this chapter. Shared-use, cost-sharing, or cooperative arrangements, multiple licensed systems that use third party managers or users combining resources to meet compatible needs for specialized internal communications facilities in compliance with the safeguards of § 90.179 of this chapter are presumptively private mobile radio services;

**(b)** Mobile radio service offered to restricted classes of eligible users. This includes entities eligible in the Public Safety Radio Pool and Radiolocation service.

**(c)** 220-222 MHz land mobile service and Automatic Vehicle Monitoring systems ( part 90 of this chapter) that do not offer interconnected service or that are not-for-profit; and

**(d)** Personal Radio Services under part 95 of this chapter (General Mobile Services, Radio Control Radio Services, and Citizens Band Radio Services); Maritime Service Stations (excluding Public Coast stations) ( part 80 of this chapter); and Aviation Service Stations ( part 87 of this chapter).

*Provider-Specific Consumer Signal Boosters.* Provider-Specific Consumer Signal Boosters may only operate on the frequencies and in the market areas of the specified licensee(s). Provider-Specific Consumer Signal Boosters may only be certificated and operated with the consent of the licensee(s) whose frequencies are being amplified by the device.

*Pseudo Automatic Number Identification* (Pseudo-ANI). A number, consisting of the same number of digits as ANI, that is not a North American Numbering Plan telephone directory number and may be used in place of an ANI to convey special meaning. The special meaning assigned to the pseudo-ANI is determined

by agreements, as necessary, between the system originating the call, intermediate systems handling and routing the call, and the destination system.

*Public Safety Answering Point.* A point that has been designated to receive 911 calls and route them to emergency service personnel.

*Public Switched Network.* Any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that uses the North American Numbering Plan in connection with the provision of switched services.

*Signal booster.* A device that automatically receives, amplifies, and retransmits on a bi- or unidirectional basis, the signals received from base, fixed, mobile, or portable stations, with no change in frequency or authorized bandwidth.

*Signal booster operator.* The signal booster operator is the person or persons with control over the functioning of the signal booster, or the person or persons with the ability to deactivate it in the event of technical malfunctioning or harmful interference to a primary radio service.

*Statewide default answering point.* An emergency answering point designated by the State to receive 911 calls for either the entire State or those portions of the State not otherwise served by a local PSAP.

*Wideband Consumer Signal Boosters.* Wideband Consumer Signal Boosters may operate on the frequencies and in the market areas of multiple licensees.

**CERTIFICATE OF SERVICE**

I, Markham C. Erickson, hereby certify that on November 27, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Markham C. Erickson*
Markham C. Erickson
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C. 20036
merickson@steptoe.com
(202) 429-3000