# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 18-1051 (and consolidated cases)

MOZILLA CORPORATION, *et al.*,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the
Federal Communications Commission

**JOINT REPLY BRIEF FOR PETITIONERS MOZILLA CORPORATION, VIMEO, INC., PUBLIC KNOWLEDGE, OPEN TECHNOLOGY INSTITUTE, NATIONAL HISPANIC MEDIA COALITION, NTCH, INC., BENTON FOUNDATION, FREE PRESS, COALITION FOR INTERNET OPENNESS, ETSY, INC., AD HOC TELECOM USERS COMMITTEE, CENTER FOR DEMOCRACY AND TECHNOLOGY, AND INCOMPAS**

Pantelis Michalopoulos
Cynthia Taub
Travis West
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C. 20036
*Counsel for Petitioners Coalition for Internet Openness and Etsy, Inc.*

Markham C. Erickson
Georgios Leris
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C. 20036
(202) 429-3000
merickson@steptoe.com
*Counsel for Petitioners Mozilla Corporation and INCOMPAS*

Michael A. Cheah
General Counsel
**VIMEO, INC.**
555 West 18th Street
New York, NY 10011
*Counsel for Petitioner Vimeo, Inc.*

Kevin Kendrick Russell
**GOLDSTEIN & RUSSELL, PC**
7475 Wisconsin Avenue,
Suite 850, Bethesda, MD 20814
*Counsel for Petitioners New America's Open Technology Institute, Free Press, and Public Knowledge*

November 27, 2018 *(additional counsel listed on inside cover)*

Colleen Boothby
Sara Crifasi
**LEVINE, BLASZAK, BLOCK AND BOOTHBY LLP**
2001 L Street NW, Suite 900
Washington, D.C. 20036
*Counsel for Petitioner Ad Hoc Telecom Users Committee*

James N. Horwood
Tillman L. Lay
Jeffrey M. Bayne
Katherine J. O'Konski
**SPIEGEL & MCDIARMID LLP**
1875 Eye Street NW, Suite 700
Washington, D.C. 20006
*Counsel for Petitioner National Hispanic Media Coalition*

Andrew Jay Schwartzman
600 New Jersey Avenue NW
Washington, D.C. 20001
*Counsel for Petitioner Benton Foundation*

Harold Jay Feld
John Bergmayer
Ryan Clough
**PUBLIC KNOWLEDGE**
1818 N Street, NW, Suite 410
Washington, D.C. 20036
(202) 861-0020
*Counsel for Petitioner Public Knowledge*

Brian M. Willen
Jack Mellyn
**WILSON SONSINI GOODRICH & ROSATI PROFESSIONAL CORPORATION**
1201 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
*Counsel for Petitioner Center for Democracy & Technology*

Donald J. Evans
**FLETCHER, HEALD & HILDRETH, PLC**
1300 N. 17th Street
Suite 1100
Arlington, VA 22209
*Counsel for Petitioner NTCH, Inc.*

Sarah J. Morris
**OPEN TECHNOLOGY INSTITUTE | NEW AMERICA**
1899 L Street, NW, Suite 400
Washington, D.C. 20036
(202) 986-2700
*Counsel for Petitioner New America's Open Technology Institute*

Matthew F. Wood
**FREE PRESS**
1025 Connecticut Avenue, NW, Suite 1110
Washington, D.C. 20036
(202) 265-1490
*Counsel for Petitioner Free Press*

Lisa A. Hayes
**CENTER FOR DEMOCRACY &
TECHNOLOGY**
1401 K Street NW, Suite 200
Washington, D.C.  20005
*Counsel for Petitioner Center for
Democracy & Technology*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

GLOSSARY ............................................................................... vi

SUMMARY OF ARGUMENT ........................................................1

ARGUMENT ................................................................................6

I.     THE FCC LARGELY LEAVES THE *ORDER*'S PRIMARY
RATIONALE UNDEFENDED. ..............................................6

     A.     The FCC Ignores *USTA*'s Rejection of Its Rationale. .....................7

     B.     The FCC Mischaracterizes *Brand X*. ...................................8

     C.     The FCC Continues to Introduce Words into the Statute. ...........9

     D.     None of the Information Service Activities Can Convert the
Path to Such Activities into an Information Service Itself. ...........12

     E.     The FCC Applies the Wrong Functional Integration Test,
Misstating What Needs to be Integrated with What. ....................13

     F.     The FCC's Classification Is Not Entitled to Deference under
*Chevron* Step 2. ........................................................15

II.    THE FCC CANNOT REASONABLY CLASSIFY BIAS AS AN
INFORMATION SERVICE BASED ON DNS OR CACHING. ............18

     A.     The FCC's Interpretation of the Telecommunications
Management Exception Is Wrong. ........................................18

          1.     The new test conflicts with the statute. ...............................19

          2.     The FCC's justification for its new test is arbitrary. ..........20

          3.     The FCC's interpretation is irreconcilable with its
classification of other services. ........................................21

          4.     The FCC's reliance on analogies to gateway services is
unfounded. ..............................................................22

     B.     DNS and Caching Do Not Render BIAS an Information
Service. ....................................................................23

III.  THE FCC DOES NOT JUSTIFY ITS DISAVOWAL OF OTHER SOURCES OF AUTHORITY. .................................................26

IV.  THE *ORDER* IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW. ..........................................................................27

   A.  The FCC's Reliance on Other Statutes and the Transparency Rule Is Arbitrary. ..............................................27

   B.  The FCC's Defense of Pay-to-Play Is Arbitrary. ...........29

   C.  The FCC Abrogated Its Duty to Promote Competition. ...............30

   D.  The FCC Erroneously Excluded Consumer Complaints. .............31

   E.  The FCC Did Not Adequately Explain Its Decision to Deny INCOMPAS's Motion. .........................................33

   F.  Excessive Data Roaming Rates Are a Significant Problem Known to the FCC. ..................................................34

V.  THE FCC'S DEFENSE OF ITS COST-BENEFIT ANALYSIS IS FLAWED. ..............................................................................35

VI.  THE FCC'S MOBILE BIAS CLASSIFICATION IS UNLAWFUL. ....36

   A.  The Interpretation of "Interconnected Service" Is Arbitrary. ......36

   B.  The Interpretation of "Public Switched Network" Is Unreasonable. ....................................................38

   C.  The Interpretation of "Functional Equivalent" Is Unreasonable. ....................................................39

VII. CONCLUSION ..........................................................................40

CIRCUIT RULE 32(a)(2) ATTESTATION

CERTIFICATE OF COMPLIANCE

STATUTES AND REGULATIONS ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Radio Relay League, Inc. v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008) ..................................................................31

*Catholic Social Services v. Shalala*,
  12 F.3d 1123 (D.C. Cir. 1994) ..................................................................29

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003) ..................................................................35

*Comcast Corp. v. FCC*,
  579 F.3d 1 (D.C. Cir. 2009) ......................................................................31

*Fed. Power Comm'n v. Texaco Inc.*,
  417 U.S. 380 (1974) ....................................................................................9

*Ledbetter v. Goodyear*,
  550 U.S. 518 (2007) ..................................................................................20

\* *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ............................................. 1, 7, 8, 16, 17, 20, 23

*Pearson v. Shalala*,
  164 F.3d 650 (D.C. Cir. 1999) ..................................................................10

*Portland Cement Ass'n v. Ruckelshaus*,
  486 F.2d 375 (D.C. Cir. 1973) ..................................................................32

*Shell Oil Co. v. EPA*,
  950 F.2d 741 (D.C. Cir. 1991) ..................................................................36

*Time Warner Entertainment Co., L.P. v. FCC*,
  240 F.3d 1126 (D.C. Cir. 2001) ................................................................31

*United States v. AT&T Co.*,
  552 F. Supp. 131 (D.D.C. 1982) ...............................................................22

Authorities principally relied upon are designated by an asterisk (*).

*United States v. Calamaro*,
    354 U.S. 351 (1957)........................................................10

*United States v. Western Elec. Co., Inc.*,
    673 F. Supp. 525 (D.D.C. 1987)....................................22

*United States v. Western Elec. Co., Inc.*,
    1989 WL 119060 (D.D.C. 1989).............................19, 20

\* *United States Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016).........................1, 3, 7, 18,
    .........................................................24, 25, 26, 38, 39

*Williams v. Lew*,
    819 F.3d 466 (D.C. Cir. 2016)......................................18

**Agency Proceedings**

Amendment of Section 64.702 of the Commission's Rules and
    Regulations (Computer II), *Tentative Decision and Further Notice
    of Inquiry and Rulemaking*, 72 F.C.C.2d 358 (1979).......................20

Applications of Charter Communications, Inc., Time Warner Cable
    Inc., and Advance/Newhouse Partnership for Consent to Assign or
    Transfer Control of Licenses and Authorizations, *Memorandum
    Opinion and Order*, 31 FCC Rcd. 6327 (2016)..................33

Appropriate Regulatory Treatment for Broadband Access to the
    Internet over Wireless Networks, *Declaratory Ruling*,
    22 FCC Rcd. 5901 (2007).................................................36

Implementation of the Non-Accounting Safeguards of Section 271
    and 272 of the Communications Act of 1934, as Amended, *First
    Report and Order and Further Notice of Proposed Rulemaking*,
    11 FCC Rcd. 21905 (1996).............................................20

Petitions for Waiver of Rules Filed by Pacific Bell, et al., *Waiver of
    Rules*, 100 F.C.C.2d 1057 (1985) ................................12

Reexamination of Roaming Obligations of Commercial Mobile Radio
    Service Providers and Other Providers of Mobile Data Services,
    *Declaratory Ruling*, 29 FCC Rcd. 15483 (WTB 2014) ....................34

\*   Restoring Internet Freedom, *Declaratory Ruling, Report and Order, and Order*, 33 FCC Rcd. 311 (2018)..............................................1, 2, 5, 6, 9, 10, ............................................................................... 13, 14, 15, 18, 19, 20, ............................................................................... 21, 22, 23, 24, 25, 26, ............................................................................... 27, 28, 30, 31, 33, 34, 36, 37

\*   Restoring Internet Freedom, *Notice of Proposed Rulemaking*, 32 FCC Rcd. 4434 (2017).....................................................................31, 32, 35

## Statutes

47 U.S.C. § 153(24) ..................................................................................19

47 U.S.C. § 153(50) ....................................................................................9

47 U.S.C. § 154(j) ....................................................................................31

47 U.S.C. § 332(d)(2) ..............................................................................38

\*   47 U.S.C. § 1302 ..............................................................................4, 26, 27

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ..................30

## Regulations

47 C.F.R. § 20.3 ......................................................................................38

# GLOSSARY

| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 |
|---|---|
| *2015 Order* | Protecting and Promoting the Open Internet, *Report and Order On Remand, Declaratory Ruling, and Order*, 30 FCC Rcd. 5601 (2015), *aff'd sub nom. United States Telecom Association v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 701-706 |
| BIAS | Broadband Internet Access Service |
| Caching | Caching is the storage of "content that can be accumulated by the ISP through . . . retrieval of information from websites . . . ." *Order* ¶ 42 |
| CBA | Cost-Benefit Analysis |
| *Charter/TWC Order* | Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations, *Memorandum Opinion and Order*, 31 FCC Rcd. 6327 (2016) |
| Communications Act or Act | Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.* |
| *Computer II* | Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), *Tentative Decision and Further Notice of Inquiry and Rulemaking*, 72 F.C.C.2d 358 (1979) (*Tentative Decision*), 77 F.C.C.2d 384 (1980) (*Final Decision*), *aff'd sub nom. Computer and Commc'n Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982), *cert. denied sub nom. La. Pub. Serv. Comm'n v. FCC*, 461 U.S. 938 (1983) |
| *Data Roaming Order* | Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services, *Declaratory Ruling*, 29 FCC Rcd. 15483 (WTB 2014) |

| | |
|---|---|
| DNS | Domain Name System, a function that "matches the Web site address the end user types into his browser . . . with the IP address of the Web page's host server," *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 999 (2005) |
| Edge Provider | Third-party companies providing ISPs' users content, applications, and services over the Internet |
| FCC or Commission | Federal Communications Commission |
| IP | Internet Protocol |
| ISP | Internet Service Provider |
| ISP Br. | Joint Brief of Intervenors USTelecom et al. in Support of Respondents |
| Jordan/Peha Br. | Brief of Amici Scott Jordan and Jon Peha in Support of Petitioners |
| MFJ | Modification of Final Judgment |
| *Non-Accounting Safeguards Order* | Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as Amended, *First Report and Order and Further Notice of Proposed Rulemaking*, 11 FCC Rcd. 21905 (1996), *rev'd in part by* Implementation of the Telecommunications Act of 1996, *Second Report and Order and Further Notice of Proposed Rulemaking*, 13 FCC Rcd. 8061 (1998) |
| *NPRM* | Restoring Internet Freedom, *Notice of Proposed Rulemaking*, 32 FCC Rcd. 4434 (2017) (JA00001-000074) |
| *Order* | Restoring Internet Freedom, *Declaratory Ruling, Report and Order, and Order*, 33 FCC Rcd. 311 (2018) (JA003358-003896) |
| Section 706 | Section 706 of the 1996 Act, Pub. L. 104-104, § 706, 110 Stat. 56, 153, codified at 47 U.S.C. § 1302 |
| VoIP | Voice over Internet Protocol |

| | |
|---|---|
| *Wireless Broadband Internet Access Order* | Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks, *Declaratory Ruling*, 22 FCC Rcd. 5901 (2007) |

## SUMMARY OF ARGUMENT

Before the *Order*, the classification of BIAS under the statute, as construed by the Supreme Court, depended on the mix of its telecommunications and information components—whether the consumer perceived a standalone offering of the telecommunications component or rather an inextricably intertwined amalgam of the two. The *Order* jettisoned this standard and relied for its classification of BIAS on something else altogether. The FCC held for the first time that BIAS is an information service, not because of its own integrated information service component, but rather because its transmission component standing alone takes people to information services provided by others and was designed to do so. On brief, Petitioners showed that this rationale contravened the statute's plain meaning, the Supreme Court's decision in *Brand X*, *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005), and this Court's decision in *USTA*, *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*, --- S.Ct. ----, 2018 WL 5779073 (Mem).

The FCC's response ignores Petitioners' most fundamental arguments. The FCC does not explain why thirteen years of jurisprudence, including *Brand X* and *USTA*, would be wasted on articulating the proper standard for classifying BIAS if the answer was always there, simple and unalterable: in the FCC's latest telling,

BIAS must be classified as an information service, as it has always led to third-party information services and will always do so.

The FCC has no answer for this Court's rejection of the FCC's rationale when it was offered in *USTA*. Instead, the FCC's brief cites language from *Brand X* that does not even speak to the FCC's current rationale, and that was not relied upon by the *Order* for it. The FCC likewise does not deny that, under its interpretation of "information service," some transmissions no longer qualify as "telecommunications" even if they fit the statutory definition of that term.

The FCC's brief also falls silent on the *Order*'s untenable conclusion that BIAS is an information service because its "fundamental purpose," "inten[t]," or "design[]" was to reach third-party information services, a newly invented element of the "information service" definition conspicuously absent from the actual statutory text. *Order* ¶ 30 (JA003369-003370). Rather, the brief replaces that supposed limitation with another equally unsupported one: it argues that BIAS is an information service unless its access to information services is *occasional*.

The FCC's brief also distinguishes for the first time among the activities listed in the statutory definition of information service, arguing that some of these activities may convert the trip to them into an information service even if others may not. But there is no basis for this distinction. Whatever the type of

information service activity third parties provide, transmission of information to or from it does not acquire information service status under the statutory definitions.

And the FCC's brief continues the *Order*'s silence on the one relevant question under *Brand X*: does the consumer view BIAS's components as functionally integrated with each other? Like the *Order*, the agency asks instead whether BIAS is functionally integrated with *other people's* services.

None of the FCC's arguments, new or old, nor its evasive silences, can save the *Order*'s classification decision. The FCC's unpersuasive dismissal of all analogies notwithstanding, the FCC's classification does not only confuse the road with the destination, but it would convert a food transport service such as Uber Eats into a restaurant, no matter that it does not sell any food.

The FCC's secondary argument is that DNS and caching are information services sufficient to pull the telecommunications component of BIAS into their orbit and transform the whole into an information service. As the FCC found in 2015 and this Court affirmed in 2016, these functions fall within the telecommunications management exception to the "information service" definition. *See USTA*, 825 F.3d at 705-06. The FCC now says the exact opposite conclusion is also reasonable, stretching the concept of reasonableness beyond breaking. The FCC points to no relevant factual developments to justify that change. Instead, its disagreement with the *2015 Order* is purely legal; it rejects the FCC's prior

interpretation of the telecommunications management exception founded on the "adjunct-to-basic" standard in favor of a new construction allegedly based on the MFJ precedent, and then distorts that precedent too.

Even if DNS and caching qualified as information services, their auxiliary nature, which no one disputes, is insufficient to give them main billing and classify the entire BIAS as an information service. Under the functional integration test, the dominant BIAS telecommunications component cannot be viewed as integrated with, and swallowed by, these activities. Relative importance matters. The words "focus" and "dominance" are not Petitioners' insertion: they came from *USTA*. The Court's reasoning makes sense—a few drops of fresh water do not turn an ocean into a lake.

In rejecting Section 706 as an alternative source of authority for net neutrality protections, the FCC says nothing in defense of its reading of Section 706's language of command ("shall") as a mere exhortation. The FCC's brief creates a strawman by arguing that Section 706 could not "provide the agency with a basis for retaining the conduct rules," FCC Br. 60, without assessing whether Section 706 provided a basis for some rules, albeit not "the" rules.

The FCC's factual findings, the opposite on an unchanged record of those reached in 2015, are unreasonable. Among other things, the FCC does not explain why the general antitrust and consumer protection laws, designed to solve other

problems, would coincidentally achieve the same objectives as specific net neutrality rules. In extolling the superiority of antitrust law, the FCC's brief exacerbates the *Order*'s fatal contradiction: the FCC argues that the same attribute—case-by-case analysis—allows "innovative arrangements" in the case of antitrust but deters "service-related innovation" in the case of the *2015 Order*'s abolished general conduct rule.

The agency's exclusion of consumer complaints made under the 2015 rules because of their supposed irrelevance was arbitrary and capricious. Many of the materials produced were relevant. For the materials not produced, the FCC's say-so is inadequate absent the APA's check of the opportunity for public comment.

As for the record of four BIAS provider proceedings, which the FCC refused to incorporate below, the agency's main objection—the information's dated vintage—is untenable. Three of these proceedings date from 2015-16, and later developments only accentuate concerns about BIAS providers' incentive and ability to discriminate against edge providers.

The FCC's brief offers a new reason why VoIP applications are supposedly not enough to make mobile BIAS "interconnected," and hence a commercial service: it says cellphones come "out of the box" capable of making calls, then claims VoIP is necessarily a "separate service or application." But the out-of-the-box qualification is not in the *Order*—in fact, the *Order* dismisses VoIP

applications "even if" they are "pre-installed." *Order* ¶ 80 n.298 (JA003405).

And the record disproves the FCC brief's factual premise, showing that VoIP

applications are now "pre-installed"—ready to work out of the box as part of most

modern cellphones.

## ARGUMENT

## I. THE FCC LARGELY LEAVES THE *ORDER*'S PRIMARY RATIONALE UNDEFENDED.

BIAS provides access to the Internet. Sometimes BIAS providers also offer

information services as part of their Internet access subscriptions. When they offer

both, the Supreme Court and this Court have held that BIAS involves both

"telecommunications"—the transmission of information without change between

points specified by the users—and information service—the offering of a

capability for one of eight information processing functions. Since

telecommunications service is the "offering" of telecommunications, the Supreme

Court and this Court have held that the proper classification of BIAS depends on

whether the consumer perceives a standalone offering of the telecommunications

component, or rather a functionally integrated and inextricably intertwined mix of

two components. The *Order* wrongly discarded that standard by looking beyond

the components of BIAS, to the services to which BIAS provides access, for help

in making BIAS an information service.

## A. The FCC Ignores *USTA*'s Rejection of Its Rationale.

The FCC's argument that the road to a third-party information service becomes itself the information service was rejected in *USTA*, a fact the FCC's brief never confronts. The FCC contents itself with citing *USTA*'s statement that "classification of broadband as an information service was permissible." 825 F.3d at 704. Permissible, yes, but not on the basis of the specific rationale this Court rejected. In *USTA*, petitioners argued that BIAS qualified as an information service because it provides access to third-party information services. Not so, said the Court: this argument "ignores that under the statute's definition of 'information service,' such services are provided 'via telecommunications.'" *Id.* at 702 (citation omitted). The Court went on: "[t]his, then, brings us back to the basic question: do broadband providers make a standalone offering of telecommunications?" *Id.*

The FCC's brief in this case does not even attempt to distinguish the *Order*'s rationale from the argument that the Court rejected in *USTA* or explain why the Court's rejection of that interpretation was wrong. Nor could it. Moreover, because the Court rejected the argument as unambiguously foreclosed by the text of the statute, *Chevron* provides no basis for upholding the FCC's contrary interpretation now. *See Brand X*, 545 U.S. at 982-83.

**B.      The FCC Mischaracterizes *Brand X*.**

The FCC implies that, although this Court rejected USTA's argument, the Supreme Court embraced it in *Brand X*.  *USTA* was not wrongly decided, for the Supreme Court did no such thing.  Indeed, the FCC's approach here makes nonsense of *Brand X*.  If all it took for BIAS to be classified as an information service is access to third-party websites, *Brand X*'s functional integration inquiry would be unnecessary.

The FCC's brief twice quotes[1] a snippet of language from *Brand X*:  "[w]hen an end user accesses a third-party's Web site, . . . he is equally using the information service provided by the [broadband provider] that offers him Internet access as when he accesses [the provider's] own Web site, its e-mail service, or his personal Web page."  545 U.S. at 998-99.  The language is irrelevant to the FCC's primary rationale because it has nothing to do with third-party services.  In keeping with the rest of *Brand X*, the phrase "information service provided by the [broadband provider]" relates to *the ISP's own services*—here, DNS and caching. The immediately following passage makes that clear, discussing DNS and caching only.  *Id.* at 999-1000.  The passage thus provides support only for the FCC's 2002 finding that, at the time, DNS and caching were viewed as functionally integrated

_____

[1] FCC Br. 3, 34.

and inextricably intertwined with BIAS.[2]  It is no surprise, then, that the *Order* cites it only in connection with that totally different point.  *Order* ¶ 10 (JA003362).

The FCC's post-hoc attempt to find support for its primary rationale in *Brand X* is therefore as unavailing as it is impermissibly late.  *See Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 397 (1974).

### C.    The FCC Continues to Introduce Words into the Statute.

The statute defines telecommunications as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  47 U.S.C. § 153(50).  Petitioners' brief explained that, on the FCC's interpretation, any "telecommunications" becomes an information service instead.  The FCC's brief defends neither the consequences of the FCC's interpretation of "information service" for the definition of "telecommunications" nor its refusal to interpret "telecommunications" in the first place.  This leaves unexplained the agency's acrobatic leap between deciding that BIAS no longer includes a "telecommunications" component that needs to be analyzed and also deciding that the statutory definition of "telecommunications" need not be construed.

_____

[2] As explained, *infra*, the Court did not consider whether DNS and caching fall within the telecommunications management exception to the information service definition.

The *Order* had attempted to narrow the all-encompassing scope of its "information service" interpretation by claiming that a transmission becomes an information service only if reaching third-party information services is its "fundamental purpose," "inten[t]," or "design[]." *Order* ¶ 30 (JA003369-003370). Petitioners pointed out that the statute provides no exception for transmissions that fit the definition of "telecommunications" but are undertaken with the "purpose" of accessing third-party information services. Petitioners also noted that this supposed limitation is not one at all, as every modern transmission technology reaches third-party information services, and none appears to do so accidentally.

The FCC's brief says nothing in defense of the "purpose" standard. Instead, the FCC pivots to a different formulation to argue that its classification of BIAS need not swallow all possible telecommunications: transmissions that lead to third-party information services only on "occasion" are still telecommunications. FCC Br. 34. This argument suffers from the same problem—there is no exception for "occasional" access to information services in the statute. *See United States v. Calamaro*, 354 U.S. 351, 358-59 (1957) (agency may not make an "addition to the statute of something which is not there"). Nor does the *Order* explain what constitutes "occasional access." Agencies cannot utilize a "we-know-it-when-we-see-it" approach. *See Pearson v. Shalala*, 164 F.3d 650, 660-61 (D.C. Cir. 1999).

Here, then, are the dizzying interpretations of the "telecommunications" definition that emerge from the FCC's brief. A transmission from one point to another at the user's request without change in the content is telecommunications; provided that, if that transmission has the potential ability to be used to engage in the acquisition, retrieval, or use of information, it becomes an information service; except it becomes telecommunications once again if it is used to do so only occasionally.

This is what happens when one takes leave of the statutory language. The FCC has become entangled in its own criteria because they have no mooring in the statute. Nor can the FCC successfully rely on the statute's ambiguity to demand deference for its untethered interpretation. The FCC *assumes* the statute is ambiguous. FCC Br. 28. But the only ambiguity found by *Brand X* lay in what constitutes an "offering" of telecommunications services, *not* in whether a transmission that fits the characteristics of "telecommunications" is in fact telecommunications.

In the end, neither the supposed need to find "purpose" behind the transmission nor the "occasional access" safety valve, equally absent from the statute, saves the FCC's theory from its lack of a limiting principle (or of any grounding in the statute itself). What keeps plain old telephone calls, the most emblematic telecommunications service, from the same fate as BIAS? As

explained in Petitioners' brief, the telephone, too, is designed to access third-party information services. Mozilla Br. 28. In its effort to show that "telecommunications" still means something, the FCC's brief suggests that the telephone network is static, involving "point-to-point transmission over a single dedicated path," and the Internet is dynamic, relying on packet switching. FCC Br. 35. This is yet another newly minted distinction, equally absent from the law. Moreover, as the FCC is well aware, most telephone communications are packet-switched, and have been for decades. *See, e.g.*, Petitions for Waiver of Rules Filed by Pacific Bell, et al., *Waiver of Rules*, 100 F.C.C.2d 1057, 1057 ¶ 1 (1985). And, as explained in the record below, 800-number telephone services can be dynamically "mapped to any one of a number of call centers around the country," just as "an IP address can sometimes be mapped to more than one server . . . ." Reclassification Comments of Jon Peha, WT Docket No. 17-108, at 8 (JA001230) (July 17, 2017).

### D. None of the Information Service Activities Can Convert the Path to It into an Information Service Itself.

For the first time, on brief, the FCC argues that BIAS is an information service by virtue of accessing some (not all) of the eight information service types listed in the statute. Petitioners' brief mentioned two of these activities, generating and processing information, pointing out they are distinct from the conduits that deliver the information. Mozilla Br. 23-24. In response, the FCC seems to

concede that these types of information service are distinct from the conduits, but argue that other types are not: "A service that offers a capability to generate and process information is an information service, but a service, *like broadband*, that offers a capability *to acquire, retrieve, and utilize* information is also an information service." FCC Br. 33-34 (emphases added). Of course, there is nothing in the *Order* that distinguishes among these eight activities or that explains why some confer information service status on BIAS while others may not. Rather, according to the *Order*, each operates in the same manner: BIAS becomes an information service because it "*necessarily* has the capacity or potential ability to be used to engage in" *any* of the activities listed in the information service definition. *Order* ¶ 30 (JA003369) (emphasis added). The *Order*'s treatment of each is uniform, and uniformly erroneous.

### E. The FCC Applies the Wrong Functional Integration Test, Misstating What Needs to be Integrated with What.

*Brand X* embraced a functional integration test that asked: when a service includes both "telecommunications" and "information service" components, are the two functionally integrated from the consumer's point of view? The *Order* changes this to a vastly different question, and one unauthorized by *Brand X*—not whether consumers view the service's components as integrated, but whether they view the service as integrated with their intended destination. The FCC thus asks and answers whether consumers "value the capabilities their ISPs offer to acquire

information from websites, utilize information on the Internet, retrieve such information, and otherwise process such information." *Order* ¶ 46 (JA003382).

As Petitioners pointed out, the FCC repeats its primary argument and substitutes it for the functional integration test. No consumer views a transmission pipe as an end in and of itself. No one makes a phone call for the call's own sake. But if the status of BIAS as an information service could be so easily answered, the *Brand X* question of functional integration would be redundant.

The FCC's brief does not answer this point, except to distort Petitioners' argument by suggesting a concession that Petitioners never made. According to the FCC, Petitioners concede that "'[o]f course' consumers perceive the integrated product that broadband providers offer as Internet access." FCC Br. 46. Petitioners did say "of course," but in reference to the statement that "consumers . . . 'view' the attributes of BIAS 'as a means of enabling these capabilities to interact with information online, not as ends in and of themselves.'" Mozilla Br. 36 (quoting *Order* ¶ 46 (JA003382)). Even the supposed concession that the FCC invents remains unavailing because it begs the question: whether the product's components are perceived as integrated, not how a product assumed to be integrated is perceived.

The FCC's brief, like the *Order*, also discards consumer perception as irrelevant: "[w]holly apart from consumer perceptions, the FCC found that

broadband providers in fact 'offer a single, inextricably intertwined information service.'" FCC Br. 46 (quoting *Order* ¶ 49 (JA003385)). The apparent reason for the half-acknowledged and fully unreasoned departure is sour grapes: consumers no longer view the telecommunications component as inextricably intertwined with any add-on services offered by BIAS providers. This means that the test approved by *Brand X* can no longer be applied in the service of classifying BIAS as an information service.

The ISP Intervenors, perhaps unwittingly, get it right when they state that the question evaluated in *Brand X* was "whether consumers are offered *one* integrated service or *two* (or more) separate services." ISP Br. 10. The FCC answers the question irrationally by concluding that consumers are offered one integrated service by Comcast and Mozilla or by AT&T and Etsy or by any ISP and any of the millions of edge providers.

## F. The FCC's Classification Is Not Entitled to Deference under *Chevron* Step 2.

Even if it were not precluded by the plain meaning of the statutory text, the agency's road-becomes-the-destination classification would not withstand *Chevron* Step 2 inquiry. While the FCC's brief brims with the word "reasonable" and its cognates, *see, e.g.*, FCC Br. 34, what the agency did was far from reasonable. All that telecommunications does is take information to places. To question whether, based on the facts prevailing at the time of *Brand X*, BIAS involves a standalone

offering of telecommunications is one thing.  But to take the position that BIAS has no telecommunications component, and there is no mix to analyze, because it leads to places where third-party information services are provided, negates the nature of telecommunications.

The road-becomes-the-hotel analogy is useful in illuminating the unreasonableness of the FCC's rationale.  It makes no sense to say the road provides no transportation by calling it a hotel just because it leads to hotels, and thus exempt it from rules of the road intended to protect the drivers.

The FCC has no answer on this point except to declare war on metaphor, citing a bit of dialogue between the majority and the dissent in *Brand X*.  But the statement that "policy in this technical and complex area [is] to be set by the Commission, not by warring analogies," *Brand X*, 545 U.S. at 992, cannot be read as a precedential ban on analogies that accurately illuminate an issue.

The ISP Intervenors go further than the FCC, but they misstep.  They say that, under the *Order*, broadband is not merely a road to hotels, but "offers capabilities that allow the user to find the best hotel, store her belongings there, retrieve them at any time, and even become her own hotel[.]"  ISP Br. 10.  But, as the record shows, virtually all of these functions are provided by third parties, *not* the BIAS providers.  The traveler has at her disposal third-party services with crowd-sourced reviews such as Yelp to help her choose the hotel, and cloud

services such as Dropbox to store and retrieve her belongings.  As will be seen, DNS is no different than the system of road signs, caching no different than a shortcut bringing the "destination" closer.  Neither suffices to turn the road into the destination.

The analogies invoked by Justice Scalia's *Brand X* dissent are still instructive as well.  By classifying BIAS as an information service because it provides access to third-party websites, the FCC takes the pizza completely out of the pizza-and-delivery analogy and the puppy out of the leashed puppies combination.  *Brand X*, 545 U.S. at 1007-08 (Scalia, J., dissenting).  When a pizzeria also offers delivery, it may be reasonable to ask if consumers view the home delivery as integrated with the offering of pizza.  Reasonable people can disagree, and the Supreme Court Justices did.  But what the *Order* introduces is more analogous to a service like Uber Eats:  the service provider does not own restaurants but merely delivers food made by others, and yet it is still said to not only be integrated with, but in fact the same thing as, the third-party-produced food.  And similarly, the question answered by the FCC now is no longer whether the offering of dogs and leashes is functionally integrated.  It is closer to whether a hardware store selling dog leashes can reasonably be perceived as a pet shop.  The answer the Commission gives would be an unreasonable construction under *Chevron* Step 2 even if it were not barred by the law's plain meaning.

## II.    THE FCC CANNOT REASONABLY CLASSIFY BIAS AS AN INFORMATION SERVICE BASED ON DNS OR CACHING.

The FCC's sole backup argument is that the inclusion of DNS and caching services with the transmission function renders BIAS as a whole an information service.  FCC Br. 36-43.[3]  That argument fails.

### A.    The FCC's Interpretation of the Telecommunications Management Exception Is Wrong.

The FCC's backup theory works only if DNS and caching fall outside the telecommunications management exception.  And despite its initial reliance on *Brand X*, FCC Br. 37, the FCC ultimately acknowledges that *Brand X* "had no occasion to consider whether DNS fell within the telecommunications management exception . . . ." *Id*. 38 n.6.[4]

The FCC's brief does not contest that DNS and caching meet the adjunct-to-basic test applied in the *2015 Order*, as upheld by this Court.  *See USTA*, 825 F.3d at 705.  Instead, the FCC defends the *Order*'s creation of a "revised interpretation" of the exception, FCC Br. 41, under which a service must be "'directed at internal operations, not at services for customers or end users,'" *id*. 39 (quoting *United*

---

[3] The FCC refers, in passing, to other "'functionally integrated information processing components,'" FCC Br. 36 (quoting *Order* ¶ 33 (JA003372)), but its failure to develop that argument forfeits the claim.  *See Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016).

[4] The FCC does not dispute that *Brand X* likewise failed to consider whether caching fell within the exception.  *See* FCC Br. 38 n.6.

*States v. Western Elec. Co., Inc.*, 1989 WL 119060, at *1 (D.D.C. 1989)). DNS and caching fail this new test, the FCC says, because "DNS is used principally to help [end users] navigate the Internet" and caching "enables and enhances consumers' access to and use of information online." FCC Br. 38-39 (some internal punctuation and citations omitted). But it is these new FCC arguments that fail.

1.    *The new test conflicts with the statute.*

The FCC admits that caching is used to more efficiently manage the delivery of user-requested data. *See Order* ¶¶ 41-42 (JA003379-003380); *see also* Jordan/Peha Br. 19-21. That, by any definition, is a function being used "for the management, control, or operation of a telecommunications system . . . ." 47 U.S.C. § 153(24). To reach its preferred result, the FCC is forced to read into the statute an exception for such functions if they *also* benefit the consumer. FCC Br. 38-39 ("[C]aching does not *merely* 'manage' [a broadband provider's] network, it enables and enhances consumers' access to and use of information online.") (quoting *Order* ¶ 42 (JA003379)) (emphasis added).

That is an amendment to the text, not an interpretation of it. Nearly every capability used to improve management, control, or operation of a network also "'enables and enhances consumers' access to and use of'" the system. FCC Br. 38-39 (quoting *Order* ¶ 42 (JA003379)). For example, the FCC admits that

19

"configuration management" falls within the exception, *Order* ¶ 36 n.126 (JA003376), but surely a properly configured system enables and enhances access to it and thereby benefits consumers.

> 2. *The FCC's justification for its new test is arbitrary.*

The FCC's justification for its new interpretation also fails the APA's test of reasoned decisionmaking. Contrary to the FCC's claim, MFJ precedent is neither more authoritative than the adjunct-to-basic standard nor different from it. FCC Br. 39, 41; *Order* ¶ 35 & n.112 (JA003374-003375).

Although the 1996 Act may have drawn some language from the MFJ, the Supreme Court has explained that the rules "originated" in the *Computer II* regime. *Brand X*, 545 U.S. at 976-77. Indeed, the FCC has confirmed that "'adjunct-to-basic' services are also covered by the 'telecommunications management exception' to the statutory definition of information services . . . ." *Non-Accounting Safeguards Order* ¶ 107.

The FCC ignores Petitioners' point that the only support for the agency's supposed alternative test is an off-hand sentence in a single, two-page, unpublished MFJ order in which the precise articulation of the test did not matter. *See Western Elec. Co., Inc.*, 1989 WL 119060, at *1.[5] No one in that case was advocating for a

---

[5] The FCC's interpretation of judicial decisions commands no deference. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 642 n.11 (2007),

departure from the established adjunct-to-basic framework, and the FCC points to no intent of that court to do so.

3.  *The FCC's interpretation is irreconcilable with its classification of other services.*

The new interpretation is also arbitrary because it would exclude services like speed dialing and directory assistance, which the FCC reaffirms are properly classified under the telecommunications management exception. *See* Mozilla Br. 45; FCC Br. 41. Even if speed dialing is "'narrowly focused on facilitating bare transmission,'" FCC Br. 41 (quoting *Order* ¶ 38 & n.135 (JA003377)), as the FCC claims, it does not qualify as a telecommunications management function under the FCC's new interpretation unless it solely helps the provider "'manage' its network" rather than benefiting end users. FCC Br. 38 (quoting *Order* ¶ 36 (JA003375)). And if DNS and caching do not meet that newly minted "internal-operations-only" test, then surely speed dialing fails it too—it does nothing other than save the user effort.

The response also begs the question. The FCC offers DNS and caching as an alternative ground to uphold the *Order* if the Court rejects the *Order*'s principal argument that BIAS's bare transmission component is, in itself, an information service. But if the Court rejects that argument, it will be considering DNS and

*superseded by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5.

caching on the understanding that DNS and caching are "'facilitating bare transmission,'" just like speed dialing.  FCC Br. 41 (quoting *Order* ¶ 38 & n.135 (JA003377)).

       4.     *The FCC's reliance on analogies to gateway services is unfounded.*

The FCC says that DNS is most comparable to the address translation function in early gateway services and that the MFJ court found that address translation rendered gateways information services.  FCC Br. 39.  That is untrue. In the cited passage, the court concluded "an appropriate amendment to the decree" was required because address translation ran afoul of *another* provision of the decree that "prohibits interexchange routing," never mentioning the provisions on information services.  *United States v. Western Elec. Co, Inc.*, 673 F. Supp. 525, 593 n.308 (D.D.C. 1987), *rev'd in part*, *United States v. Western Elec. Co., Inc.*, 900 F.2d 283 (D.C. Cir. 1990).[6]  Moreover, nothing in the opinion remotely supports the FCC's claim that it was the inclusion of address translation that rendered gateways an information service (as opposed to their integration of protocol conversion, billing management, and a database of third-party information services).  *Id.* at 592.  And *Western Electric* never considered whether the MFJ

_____

[6] The court also mentioned a provision governing "information access," *Western Elec.*, 673 F. Supp. at 593 n.308, which is distinct from an "information service," *see United States v. AT&T Co.*, 552 F. Supp. 131, 227, 229 (D.D.C. 1982).

version of the telecommunications management exception would apply if address translation were supporting something that was otherwise a pure telecommunications service.

Nor is gateway data hosting analogous to caching. The defining characteristic of caching is its use of complex algorithms for "'storing third party content'" to make the transmission more efficient. FCC Br. 37 (quoting *Order* ¶ 42 (JA003380)). In contrast, gateway providers hosted data because third parties paid them to, without regard to whether doing so improved transmission efficiency. *See* Jordan/Peha Br. 21-22.

## B.     DNS and Caching Do Not Render BIAS an Information Service.

Even if DNS and caching were not telecommunications management functions, the FCC could not reasonably conclude that their inclusion in BIAS creates an integrated information service.

First, under *Brand X*, DNS and caching must be functionally integrated with transmission *in the consumer's eye*. *See* 545 U.S. at 990-91. The *Order* never asks that question. Instead, it occasionally asserts that DNS and caching are "functionally integrated," without explanation or any reference to consumer perception. *See Order* ¶¶ 33, 34, 41 (JA003372-003374, 003379). And when it *does* consider consumer perception, the *Order* ignores DNS and caching. *See Order* ¶ 46 & n.160 (JA003382).

The FCC's brief offers a new suggestion: that transmission is functionally integrated with DNS because a "subscriber would keenly feel the absence of those functions," and with caching because, without it, BIAS "'would be a significantly inferior experience for the consumer' . . . ." FCC Br. 42-43 (quoting *Order* ¶ 42 (JA003380)). But, even if the *Order* had attempted this reformulation, finding that consumers would keenly miss a service is not enough to satisfy the functional integration test. One could equally say, for example, that search engines and web browsers are "essential" to navigating the Internet. But that does not mean that an ISP would automatically offer an integrated information service by offering its customers its own alternative to Google or a bundled web browser. The ready availability of alternatives shows that the services are not functionally integrated. *See USTA*, 825 F.3d at 698. If providers did not offer a default DNS server, users would simply make a one-time change to their settings to select another. *See* Jordan/Peha Br. 17-18.

Second, the BIAS transmission component cannot be said to be integrated with, and subsumed by, DNS and caching services given the overwhelming dominance in the consumer's eye of the transmission's third-party destinations rather than any ISP-provided information services accompanying the transmission. *See* Mozilla Br. 46-47. The FCC says Petitioners have wrongly focused on "dominance" and "focus." But the words, which the FCC's brief attributes to

Petitioners, FCC Br. 43, come from a more authoritative source—this Court's decision in *USTA*. *See* 825 F.3d at 698. In this Court's words, "consumers focus on transmission to the exclusion of add-on applications . . . ." *Id.* The pertinence of the two components' relative importance makes sense. The question, after all, is whether there is a standalone offering of the telecommunications component; the additional two ancillary functions cannot be credibly viewed as affecting the perception of such an offering.

Third, the FCC's brief, like the *Order*, never analyzes whether BIAS could properly be called an integrated information service if the only basis for that description was integration of DNS and caching with a bare telecommunications service. Instead, as noted, the FCC's integration analysis relies on the FCC's principal theory—the road becomes the destination. *See* FCC Br. 44; *Order* ¶¶ 46-47 (JA003382-003384).

Finally, the FCC offers no response to Petitioners' commonsense observation that a few drops of fresh water do not turn an ocean into a lake. Congress could not have intended inclusion of two minor auxiliary information services to transform the classification of what is otherwise overwhelmingly telecommunications. Mozilla Br. 46-47.[7]

---

[7] As for the FCC's newly "[m]ost significant[]" argument that Sections 230 and 231 "firmly support" its determination that BIAS is an information service, FCC

## III. THE FCC DOES NOT JUSTIFY ITS DISAVOWAL OF OTHER SOURCES OF AUTHORITY.

The FCC's brief does not even try to defend the *Order*'s reading of Section 706's language of command ("shall") as merely exhortation. But then, having found that BIAS is an information service, why did the FCC give up and decide that no rules could be maintained under any alternative source of authority? On brief, the FCC and the Intervenors supporting it give two answers.

First, they claim there was no problem to be solved, and hence no need to look for other authority. They reason that BIAS providers will be deterred by the risk of a "'fierce consumer backlash'" if they block or throttle users, and that many ISPs have "publicly committed" not to do it. ISP Br. 28-29 (quoting *Order* ¶ 264 (JA003514)). But as the *Order* recognizes, blocking and throttling are harmful, and their "potential consequences . . . on the Internet ecosystem are well-documented . . . ." *Order* ¶ 265 (JA003515). What then is the harm of exploring alternative sources of authority for a rule averting such detrimental consequences?[8]

---

Br. 32-33, the *Order* had it right: the argument is not "dispositive." *Order* ¶ 61 n.235 (JA003397). It is moreover, once again, precluded by *USTA*, which found Section 230 too "oblique and indirect . . . ." 825 F.3d at 703 (citations omitted).

[8] Notwithstanding the supposed fear of a backlash, such practices have occurred repeatedly. *See* Comments of Open Technology Institute, WC Docket No. 17-108, at 11-14 (JA001609-001612) (July 17, 2017) ("OTI Comments").

The FCC's second response answers an argument Petitioners did not make. Section 706, the agency protests, could "not provide the agency with a basis for retaining *the* conduct rules." FCC Br. 60 (emphasis added). But the question is *why* the FCC took an all-or-nothing approach and failed to consider a reasonable alternative source of authority to maintain at least some net neutrality protections. The FCC responds by repeating that all-or-nothing approach, not explaining it.

## IV. THE *ORDER* IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW.

### A. The FCC's Reliance on Other Statutes and the Transparency Rule Is Arbitrary.

Petitioners have explained why the FCC acted arbitrarily when it acknowledged the real harms addressed by the *2015 Order*, yet washed its hands of any responsibility for preventing them, delegating that duty to other agencies and relying on a transparency rule that is itself unlawful. Mozilla Br. 51-55. Intervenors supporting Petitioners show in detail why the FCC's responses are inadequate. Petitioners emphasize a few points here.

First, the FCC's brief all but admits that the *Order* did not determine the extent to which federal antitrust or consumer protection laws would, *in fact*, prohibit such conduct. *See, e.g.*, FCC Br. 66 (claiming only that most "'examples of net neutrality violations discussed in the *Title II Order* could have been *investigated*'"—not remedied—"'as antitrust violations'") (quoting *Order* ¶ 145

(JA003445)) (emphasis added). Instead, the FCC says that it "need not spell out here what the *precise* outcome would be in *every* hypothetical case involving *every* conceivable set of facts." FCC Br. 67 n.14 (emphases added). That is a palpable evasion of Petitioners' point: the FCC does not adequately explain why other statutes, developed to address other problems, just happen to do the job Congress assigned to the FCC. The failure is all the more serious because the FCC is entitled to no deference for its interpretation of laws that it is not entrusted to implement.

Second, rather than defending a fatal contradiction in the *Order*'s reasoning, the FCC's brief highlights it. In extolling the supposed superiority of antitrust law, the FCC argues that "'case-by-case analysis, coupled with the rule of reason, allows for innovative arrangements to be evaluated based on their real-world effects, rather than a regulator's *ex ante* predictions.'" FCC Br. 67 (quoting *Order* ¶ 150 (JA003447)). Yet a few pages later, the FCC seeks to justify abolition of the general conduct rule on account of the same attribute. The FCC laments that, under the general conduct rule, "a provider could [not] know in advance what practices violate the rule." FCC Br. 75. But it does not explain why case-by-case analysis deters "'service-related innovation'" in one case, *id*. (quoting *Order* ¶ 249 (JA003501)), yet "'allows for innovative arrangements'" in the other, FCC Br. 67 (quoting *Order* ¶ 150 (JA003447)).

Third, the FCC does not deny that, if its transparency rule is unauthorized, the entire *Order* must fail, given its pervasive reliance on disclosure as a substitute for regulation. *See* FCC Br. 96-102. Instead, it argues that Petitioners lack standing to challenge the rule. *Id*. 96-97. But it is undisputed that *all* Petitioners are harmed by the withdrawal of protections. The agency uses the disclosure rule to justify that harmful withdrawal, which is enough. *See, e.g.*, *Catholic Social Service v. Shalala*, 12 F.3d 1123, 1125 (D.C. Cir. 1994) (petitioners had standing to argue that entire order was void by virtue of invalidity of provision that did not apply to them).[9]

## B. The FCC's Defense of Pay-to-Play Is Arbitrary.

The FCC hypothesizes that, without a ban on paid prioritization, BIAS providers would not need to "recover all costs solely through subscriber fees" and would be more able to target these costs at edge providers. FCC Br. 70. But the record does not contain any instance when BIAS providers lowered subscriber prices by doing so, even for the interim period between the *Verizon* decision and the *2015 Order* when no net neutrality rules were in effect. The likely reason is lack of competition: BIAS providers have no need to cut their prices.

---

[9] Intervenors supporting Petitioners show that the FCC's interpretation of Section 257 as a source of adequate authority for the transparency rule is an unreasonably tortured invention of counsel.

## C. The FCC Abrogated Its Duty to Promote Competition.

The FCC's brief confirms the extent to which the FCC has abrogated its duty to promote competition[10] by essentially asserting a "monopolies-may-be-good-after-all" defense. In support of its failure to consider terminating monopolies, the FCC argues that, even if they exist, they may be efficient: "And even when the [terminating monopoly] theory applies, it does not address 'the extent to which the resulting prices are economically inefficient . . . .'" FCC Br. 91 (quoting *Order* ¶ 137 (JA003438)).

The FCC's brief continues to espouse the *Order*'s glass-half-full position that a little competition for a slower service in parts of the country should be good enough, when it states that "more than two-thirds of all Americans hav[e] a choice of providers at lower broadband speeds and nearly half of all Americans hav[e] a choice of providers at higher speeds." FCC Br. 86-87. Never mind that lower speed services do not qualify as BIAS. *See* Mozilla Br. 57 n.13.

To embellish this picture of lack of choice, the FCC cites intermodal competition, disregarding the *Order*'s recognition that fixed terrestrial wireless and satellite providers are unlikely to provide real competition to BIAS. *Order* ¶ 125 (JA003430). The FCC repeats its view that duopolies are competitive enough, a

---

[10] Congress has directed the FCC to "promote competition and reduce regulation." Preamble, Telecommunications Act of 1996, P.L. 104-104, 110 Stat. 56, 56 (1996).

view that, even if it were correct, would produce little comfort for the half of the country not endowed with even a duopoly's mixed "blessing."

And the FCC's brief repeats with even greater conviction the *Order*'s claim that, since the largest BIAS provider, Comcast, only has a 25% market share, all is well, as edge providers can be viable in the long term by offering service "'to three quarters of broadband subscribers.'" FCC Br. 90 (quoting *Order* ¶¶ 132-33 (JA003436)). The FCC's talismanic reliance on market shares to draw conclusions about the viability of content providers has been twice struck down by this Court. *See Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009); *Time Warner Entertainment Co., L.P. v. FCC*, 240 F.3d 1126, 1136 (D.C. Cir. 2001).

### D. The FCC Erroneously Excluded Consumer Complaints.

The FCC's discretion in conducting its proceedings, 47 U.S.C. § 154(j), does not allow it to withhold from the record relevant material in its exclusive possession. *See American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 238-39 (D.C. Cir. 2008). The FCC made the open Internet consumer complaints relevant when the *NPRM* requested information about the impact of Title II classification on consumers and ISPs' conduct. *See, e.g.*, *NPRM* ¶¶ 50-51, 80, 90, 93, 97-98 (JA000019,000028,000030,000031,000033). Yet it neither included these materials in the record for public inspection nor produced them to NHMC except in part and late.

The FCC's argument that the complaint materials are irrelevant or raise already identified issues is not based on the record. The partial materials the FCC produced contained relevant information.[11] The FCC cannot fault Petitioners for not identifying additional relevant materials when the FCC never produced, among other things, many carrier responses and ombudsperson emails—materials likely relevant to the *NPRM*'s queries.[12] Nor is there evidence the FCC analyzed this material itself.

The exclusion of the material is fundamentally inconsistent with notice and comment rulemaking, as are the FCC's untested assertions about the relevance of that material. *See Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973), *superseded on other grounds by statute as recognized in American Trucking Ass'ns v. EPA*, 175 F.3d 1027 (D.C. Cir. 1999).

---

[11] *See* Joint Reply of NHMC et al., WC Docket No. 17-108, at 2-3 (JA002951-002952) (Oct. 5, 2017) (discussing, among other examples, a complaint regarding potential transparency violations of the *2015 Order*); Expert Report of Dr. Reza Rajabium, attached to Ex Parte Letter from Carmen Scurato, NHMC, to Marlene Dortch, FCC, WC Docket No. 17-108, at 2 (JA003006) (Nov. 20, 2017) (discussing the expert analysis of Dr. Reza Rajabiun, finding "information that is directly relevant" to the *NPRM* and that "fundamentally challenges the [FCC's] presumptions").

[12] *See* Application for Review of NHMC, WC Docket No. 17-108, 4-6 (JA002960-002962) (Nov. 17, 2017).

### E. The FCC Did Not Adequately Explain Its Decision to Deny INCOMPAS's Motion.

In defense of its refusal to add to the record material from merger investigations involving BIAS providers that serve 65% of the nation's subscribers, the FCC does not dispute that material's substantive relevance. It goes to, among other things, a BIAS provider's "incentive to harm [online video services] that could serve as substitutes for some or all of its video products." *Charter/TWC Order* ¶ 42. Rather, the FCC questions the material's relevance on account of its vintage, calling it outdated. FCC Br. 106.

Three of the four proceedings are in fact recent, dating from 2015 and 2016. The concerns they raised have become more, not less, pronounced: the broadband markets are even more concentrated now than they were in the past, with Charter having acquired Time Warner and 72% of residential BIAS subscribers now being served by four ISPs.[13] At the same time, with the explosion of online video, BIAS providers' incentives to foreclose online video distributors in order to protect their own video distribution affiliates are only greater.

As for the assurances given BIAS providers in the relevant protective orders that the material would not be used outside these proceedings, the *Order* itself unwittingly reveals the question was moot. INCOMPAS's request would be

---

[13] *See* David S. Evans White Paper, attached to Reply Comments of INCOMPAS, WC Docket No. 17-108, at 10 (JA002639) (Aug. 30, 2017).

implemented by asking the parties to resubmit the information into the docket of this proceeding under a new protective order. *Order* ¶ 326 (JA003544). That also dispenses with the FCC's unusual claim about needing software to read the materials. *Order* ¶ 330 n.1140 (JA003545). Even if accurate, this would not be necessary, as the information would be resubmitted by the parties to whom it belonged. In any event, the cost and difficulty of "gathering" material that does not appear scattered is speculative and unclear.

### F. Excessive Data Roaming Rates Are a Significant Problem Known to the FCC.[14]

The FCC brushes off its failure to address the persistence of unreasonably high and discriminatory data roaming rates by indicating that NTCH pointed only to its own complaint against Verizon to substantiate the issue. FCC Br. 109. While NTCH's complaint did make a comprehensive showing, NTCH also referred the FCC to the record in another docket where virtually the entire cellular carrier industry—apart from Verizon and AT&T—complained about these rates. *See* Joint Comments of NTCH and Flat Wireless, LLC, WC Docket No. 17-108, at 9 (JA001588) (July 17, 2017) ("NTCH Joint Comments"). The FCC at that time imposed a requirement that such rates be "commercially reasonable," *Data Roaming Order* ¶ 1, a loose standard that has proven woefully ineffective. Given

---

[14] This section expresses the views of only one Petitioner, NTCH.

the ample evidence of a problem, the FCC was required to address it. *City of Waukesha v. EPA*, 320 F.3d 228, 257-58 (D.C. Cir. 2003).

The FCC's broad interpretation of "information service" means that the most basic form of communications protected by Title II of the Act—ordinary phone calls—may fall into a regulatory void free from the constraints of reasonableness and non-discrimination. But even aside from that slippery slope, this is a particularly acute risk here since VoIP is increasingly becoming the standard protocol for not only roaming calls but *all* cellular voice communications. NTCH Joint Comments at 16 (JA001595).

## V.   THE FCC'S DEFENSE OF ITS COST-BENEFIT ANALYSIS IS FLAWED.

The FCC defends its choice to conduct a qualitative analysis both by stating that it left open the possibility that it would diverge from Circular A-4 and, incongruously, by claiming that its analysis did not diverge from Circular A-4 after all. FCC Br. 78-79. Both of these arguments are misguided.

The possibility of divergence from Circular A-4 mentioned in the *NPRM* cannot reasonably be read as auguring a qualitative analysis. Every relevant paragraph of the *NPRM* is focused on quantifying the costs and benefits; the word "qualitative" does not even appear. *NPRM* ¶¶ 105-15 (JA000035-000037). The FCC appears to think that commenters should have received notice from the lack of quantitative data in the record. But where the *NPRM* is silent, comments are no

substitute. *See Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991). The

*silence* of the comments—their failure to include quantitative information—is even

less of a cure for the silence of the *NPRM*.

Finally, the FCC's brief acknowledges, but shrugs off, the fact that the

prohibition on blocking and throttling would have virtually no downside for the

simple reason that many ISPs have "publicly committed" to not block or throttle

content anyway. *See Order* ¶ 322 (JA003542) ("[T]he costs of these [rules] are

likely small."). Under any CBA, these rules would be a no-brainer, as the

prophylactic benefit of averting behavior the FCC views as detrimental is not

offset by any significant cost.[15]

## VI. THE FCC'S MOBILE BIAS CLASSIFICATION IS UNLAWFUL.

The FCC's attempted defense of the *Order*'s reclassification of mobile BIAS

fails as well.

### A. The Interpretation of "Interconnected Service" Is Arbitrary.

The *Order* held that mobile BIAS does not offer interconnected service

because it does not, "'in and of itself . . . provide the capability to communicate

with all users of the public switched network' . . . ." *Order* ¶ 79 (JA003405)

(quoting *Wireless Broadband Internet Access Order* ¶ 45). But under the FCC's

---

[15] The FCC also fails to rebut the argument that it ignored its action's costs on
innovation and democratic discourse. Mozilla Br. 72-73.

test, even mobile voice (indeed, even plain old telephone service) is not an interconnected service because successful communication always requires using the service *with* a device that has appropriate functionality or software, commonly provided by third parties. Mozilla Br. 75; *see also* Jordan/Peha Br. 27-28.

The FCC's brief responds by revising the *Order*'s test, arguing that a service provides interconnected service so long as it allows a user to reach North American Numbering Plan ("NANP") destinations *when paired* with a device capable of making such calls "out of the box." FCC Br. 55.

But the "out-of-the-box" qualification is nowhere in the *Order*. In fact, the *Order* expressly disavows it. *See Order* ¶ 81 (JA003406) (insisting that statute turns exclusively on providers' "core service [which] is distinct from the service capabilities offered by applications (whether installed by a user or a hardware manufacturer) . . . ."); *id.* ¶ 80 n.298 (JA003405) (disavowing the role of applications "even if [they] are pre-installed in the mobile device offered by the provider . . . .").

The factual premise of the argument—that phones provide the capability of mobile voice calling, but not VoIP, "out of the box"—is not in the *Order* either. *See Order* ¶¶ 80-81 (JA003405-003406). And the record disproves it, showing that VoIP applications now come pre-installed on all iPhones (Facetime) and the vast majority of Android phones (Google Voice and/or Google Hangout). OTI

Comments, at 90, 91-92 (JA001688, JA001689-001690); *see also USTA*, 825 F.3d at 720.

There is also no basis for an "out-of-the-box" qualification in the statutory text, which draws no distinctions between a mobile service's capabilities when combined with the functions available on a device "out of the box" as opposed to those added. *See* 47 U.S.C. § 332(d)(2).

Successful communication between mobile voice users and NANP endpoints has always required users on both ends to connect compatible devices running compatible software, often provided by third parties. *See* Jordan/Peha Br. 28-29. Mobile BIAS is interconnected in *that* sense no less than mobile voice.

ISP Intervenors claim that VoIP does not enable interconnected services because the VoIP calls must travel through an intermediary, the landline telephone user's local exchange carrier. ISP Br. 20-21. The FCC makes no such argument, for good reason. As ISP Intervenors surely know, the same is true of long-distance and mobile voice calls, which are similarly handed to a local exchange carrier to complete the call. *See* 47 C.F.R. § 20.3 ("Interconnected" means "[d]irect *or indirect* connection . . . .") (emphasis added).

## B. The Interpretation of "Public Switched Network" Is Unreasonable.

The FCC repeats the arguments this Court rejected in *USTA*, claiming that, although it failed to say so, Congress really meant the "public switched *telephone*

network" and that it intended to freeze that understanding in place regardless of any changes in the characteristics of modern telecommunications. FCC Br. 51-52; *see USTA*, 825 F.3d at 717-18. To be sure, the arguments made by the *USTA* petitioners were reviewed under a different standard, but the Court's reasons for rejecting them as "counter-textual" and contrary to the "plain language" of the statute equally lead to the conclusion that the FCC's interpretation is unreasonable under *Chevron*. 825 F.3d at 717-18; *see also* OTI Comments at 79-83 (JA001677-001681).

### C. The Interpretation of "Functional Equivalent" Is Unreasonable.

The FCC denies that mobile BIAS is the functional equivalent of mobile voice, reasoning that mobile BIAS provides greater functionality and, therefore, commands a higher price than a plan limited to mobile voice (if such a plan can be found). FCC Br. 56-57. But the statutory question is whether the *functions* of mobile BIAS can substitute for the *functions* of mobile voice. The FCC does not dispute that they can. That is sufficient. The point of the functional equivalent test is to prevent providers from offering all the functionality of a commercial mobile service while avoiding the common carriage classification. Mozilla Br. 77; OTI Comments at 95-98 (JA001693-001696). That is precisely the evasion the *Order* permits.

## VII. CONCLUSION

The Court should vacate the *Order*.

Dated:  November 27, 2018

Respectfully submitted,

/s/ *Markham C. Erickson*

Pantelis Michalopoulos
Cynthia Taub
Travis West
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C.  20036
(202) 429-3000
*Counsel for Petitioners Coalition for*
*Internet Openness and Etsy, Inc.*

Markham C. Erickson
Georgios Leris
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C.  20036
merickson@steptoe.com
(202) 429-3000
*Counsel for Petitioners Mozilla*
*Corporation and INCOMPAS*

Michael A. Cheah
General Counsel
**VIMEO, INC.**
555 West 18th Street
New York, NY  10011
(212) 314-7457
*Counsel for Petitioner Vimeo, Inc.*

Kevin Kendrick Russell
**GOLDSTEIN & RUSSELL, PC**
7475 Wisconsin Avenue
Suite 850
Bethesda, MD  20814
(202) 362-0636
*Counsel for Petitioners New*
*America's Open*
*Technology Institute, Free Press, and*
*Public Knowledge*

Colleen Boothby
Sara Crifasi
**LEVINE, BLASZAK, BLOCK AND**
**BOOTHBY LLP**
2001 L Street NW, Suite 900
Washington, D.C.  20036
(202) 857-2550
*Counsel for Petitioner Ad Hoc Telecom*
*Users Committee*

Brian M. Willen
Jack Mellyn
**WILSON SONSINI GOODRICH &**
**ROSATI**
**PROFESSIONAL CORPORATION**
1201 Avenue of the Americas,
40th Floor
New York, NY 10019-6022
(212) 999-5800
*Counsel for Petitioner Center for*
*Democracy & Technology*

James N. Horwood
Tillman L. Lay
Jeffrey M. Bayne
Katherine J. O'Konski
**SPIEGEL & MCDIARMID LLP**
1875 Eye Street NW, Suite 700
Washington, D.C. 20006
(202) 879-4000
*Counsel for Petitioner National Hispanic
Media Coalition*

Andrew Jay Schwartzman
600 New Jersey Avenue NW
Washington, D.C. 20001
*Counsel for Petitioner Benton
Foundation*

Harold Jay Feld
John Bergmayer
Ryan Clough
**PUBLIC KNOWLEDGE**
1818 N Street, NW, Suite 410
Washington, D.C. 20036
(202) 861-0020
*Counsel for Petitioner Public
Knowledge*

Lisa A. Hayes
**CENTER FOR DEMOCRACY &
TECHNOLOGY**
1401 K Street NW, Suite 200
Washington, D.C. 20005
*Counsel for Petitioner Center for
Democracy & Technology*

Donald J. Evans
**FLETCHER, HEALD & HILDRETH, PLC**
1300 N. 17th Street
Suite 1100
Arlington, VA 22209
(703) 812-0430
*Counsel for Petitioner NTCH, Inc.*

Sarah J. Morris
**OPEN TECHNOLOGY INSTITUTE | NEW
AMERICA**
1899 L Street, NW, Suite 400
Washington, D.C. 20036
(202) 986-2700
*Counsel for Petitioner New America's
Open Technology Institute*

Matthew F. Wood
**FREE PRESS**
1025 Connecticut Avenue, NW,
Suite 1110
Washington, D.C. 20036
(202) 265-1490
*Counsel for Petitioner Free Press*

## CIRCUIT RULE 32(a)(2) ATTESTATION

In accordance with D.C. Circuit Rule 32(a)(2), I, Markham C. Erickson, hereby attest that all other parties on whose behalf this joint brief is submitted concur in the brief's content.

/s/ *Markham C. Erickson*
Markham C. Erickson

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(5)-(7)**

Pursuant to Fed. R. App. P. 32(a)(7)(B)(i) and D.C. Cir. R. 32(e), as modified by the Court's July 30, 2018 briefing order granting Non-Government Petitioners 9,000 words, the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman. Exclusive of the portions exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1), this brief contains 8,958 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief (Microsoft Word 2010).

/s/ *Markham C. Erickson*
Markham C. Erickson

November 27, 2018

# STATUTES AND REGULATIONS ADDENDUM

**STATUTES AND REGULATIONS ADDENDUM \***

**TABLE OF CONTENTS**

47 U.S.C. § 154(j) ..................................................................................1

Telecommunications Act of 1996 (excerpt) ............................................2

\* Except for statutes contained in the addendum hereto, the text of statutes discussed herein are contained in the addendum attached to the Joint Brief for Petitioners Mozilla Corporation, et al.

**(j) Conduct of proceedings; hearings**

The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. No commissioner shall participate in any hearing or proceeding in which he has a pecuniary interest. Any party may appear before the Commission and be heard in person or by attorney. Every vote and official act of the Commission shall be entered of record, and its proceedings shall be public upon the request of any party interested.

The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense.

PUBLIC LAW 104–104—FEB. 8, 1996

TELECOMMUNICATIONS ACT OF 1996

An Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.

**CERTIFICATE OF SERVICE**

I, Markham C. Erickson, hereby certify that on November 27, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Markham C. Erickson*
Markham C. Erickson
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C.  20036
merickson@steptoe.com
(202) 429-3000